# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SANJAY OM TEWARI,          )

         )

         )    Docket No. 23-36

        Plaintiff-Appellant,    )

         )

       v.         )

         )

LORI S. SATTLER, individually and in their capacity)

as a Justice of the First Department of the   )

Supreme Court of the State of New York,   )

         )

        Defendant - Appellee    )

## Plaintiff- Appellant Brief

## OPENING

Is a Judge who accepts private campaign contributions from opposing counsel no longer privileged with judicial immunity in cases in which the Judge then suspends the United States Constitution and strips defendants of their basic rights to life, liberty and property?

## ISSUE

The United States Constitution provides strong and clear protections to the people from overreach of the government. Here, as is so many cases in the past, local governments sometimes overstep their authorities and strip citizens of their basic rights while trying to hide under the tutelage of "Judicial Immunity."

As a Pro Se Appellant who has been forced into bankruptcy by Judge Lori Sattler's numerous onerous and unconstitutional orders I have done my best to research case law and commentary regarding this matter.

In almost every instance in which judicial immunity was invoked there were two very clear thoughts which had been consistent throughout all of the cases and decisions:

1. Judicial Immunity exists in an effort to maintain judicial independence.

2. Judicial Immunity exists because the decisions and court proceedings by a corrupt Judge are then appealable based upon the court record.

In my case, neither of these two burdens were met. Judge Lori Sattler should not be permitted to hide her violations of due process with a Judicial Immunity defense.

1. On numerous occasions in the recent past, Judge Lori Sattler has accepted Campaign contributions for her position as Judge by opposing counsel Brett Ward (Exhibit A). Judge Lori Sattler never revealed this potential conflict to the defendant nor to his attorneys at any time during any proceeding. In fact, from the first moment of the case, Brett Ward controlled the entire proceedings to the chagrin of my attorneys who were repeatedly shocked that Brett Ward seemed to wield an incredible amount of power and influence over Judge Sattler. If the innocent defendant had known that Brett Ward, the plaintiff's attorney, had made financial contributions to help Judge Sattler win her position, the defendant would have immediately objected to this apparent conflict of interest which to the laymen may suggest a *quid pro quo*. Given

the fact that Judge Lori Sattler barred the defendant from ever being present at any of the first seven hearings and barred the creation and maintenance of any court record of proceedings, the personal relationship between Judge Sattler and plaintiff's counsel Brett Ward ought to be understood as being circumspect.

2. The oft-repeated argument for judicial immunity clearly states that the potentially corrupt Judge's proceedings must be on record in order to avail the defendant his/her right to an appeal. Judge Carter, unfortunately did not address these glaring omissions by Judge Sattler on the many occasions during which Judge Sattler denied the defendant his basic rights to have a record. Since Judge Sattler never ever permitted the creation of a single court record for any of the hearings the defendant was banned form attending, Judge Sattler's many orders and lack of basic adherence to due process prohibit Judge Sattler from claiming judicial immunity.

## FACTS

On August 04, 2021, I, Sanjay Om Tewari M.D., was stripped of my property, my life, my children, my workspace with an *ex-parte* order while I was in the Country of Denmark. There were no police interventions, no police reports, there were no charges. An emergency temporary order needs to be reviewed and an evidentiary hearing must occur. (Exhibit D)

August 12, 2021: I, Sanjay Om Tewari M.D., was not permitted to attend the evidentiary hearing. A record of the hearing was never made. An evidentiary hearing

never took place. My access to my property, possessions and life remained confiscated.

August 31, 2021: I was again banned from being present at my hearing. An evidentiary hearing was never granted nor commissioned. I remained estranged from my property, possessions and life. Judge Sattler did not permit a record of the hearing to be made.

September 09, 2021: I was banned from being present at my hearing. At this time I had ample exculpatory evidence on my person which included a NYPD-Special Victims Unit Detective report which clearly found no evidence to keep me ostracized from my life, possessions and property. Judge Sattler refused to acknowledge the existence of the report from the Special Victims Unit Detective who was one of the first investigators at the scene and interrogated all of the individuals involved. The bias was clear. The deliberate absence of creation of any court record persisted.

September 22, 2021: I was banned from being present at my hearing. At this time I had brought multiple sworn affidavits from adult eyewitnesses and others who were willing to affirm my absolute innocence. My witnesses and affidavits were never addressed nor acknowledged. I continued to be estranged from life, property and possessions. Judge Sattler again did not permit the creation of any record of this hearing.

October 06, 2021: I was banned from being present at my hearing. Judge Sattler issued orders. A record of the hearing was never made. I remained estranged from life, property and my possessions.

October 20, 2021: I was banned from being present at my hearing. A basic evidentiary hearing still had never occurred nor had any of my witnesses, notarized statements, travel records ever been addressed. Judge Sattler did not permit a record of the hearing to be made.

October 26, 2021: I was banned from attending the hearing. No record was permitted to be created.

Until today, September 05, 2023, I remained completely estranged from my life, property and possessions due to Judge Lori Sattler's unconstitutional orders and blatant violations of basic due process afforded to all defendants. By repeatedly suspending the United States Constitution, Judge Sattler acted outside of Judicial authority.

## ARGUMENT

Judge Carter, in his decision, relied entirely upon the "Judicial Immunity" clause to protect Judge Sattler from her blatant violations of the Untied States Constitution. Unfortunately, Judge Carter never addressed the two basic tenets of judicial immunity as I have stated above. What is to stop a descendant of a slave owner who files a case in civil court that the descendant of slaves is to be returned to his owner pending trial?

By never granting an evidentiary hearing and never making any record, Judge Lori Sattler, a recipient of campaign contributions from plaintiff's attorneys can make any decision, be influenced by any contributor, suspend the United Sates Constitution and then attempt to hide behind the shield of Judicial Immunity. From all of the cases I found, the shield of Judicial Immunity is designed only to protect judicial independence. The judiciary is not independent once the judiciary accepts private monies from plaintiffs attorneys and then the judiciary purposely bans the defendant from attending hearings and refuses the creation of any transcripts or records of the hearings, thereby making any decisions unappealable.

The last six years of my life have been dedicated to the very high risk care of autistic children and adults in extremely stressful environments where special needs children and adults are finally able to receive necessary medical and dental care which was completely ignored in the past. During the past two years I have done my best to learn the United States Constitution yet at every step have been not permitted to defend myself nor my innocent children in the local courts. My last avenue for defense is you. Judicial Immunity is not absolute when the Judiciary does not meet the two basic tenets upon which Judicial Immunity can be claimed. In the history of our nation, the federal courts have been the final arbiters in many cases in which corruption and tyranny of local officials were exposed. I am asking for the Court of Appeals for the Second Circuit to reinstate my right to demonstrate that Judge Lori Sattler was not independent when she suspended the United States Constitution and violated my basic constitutional rights over and over again by not permitting the defendant to be

present, not having an evidentiary hearing and not permitting the creation of any records while Judge Sattler issued unfounded order after order further alienating me from life, liberty and property without any adherence to basic due process.

## SUMMARY

As strange and bad as the decision was to return Dred Scott to slavery, there was a clear adherence to basic principles of maintaining court records which are basic to the rights of any defendant who has been stripped of life, liberty and property. Although Judge Carter's decision was legally sound, his reasoning does not apply to this case which is unique due to Judge Sattler's clear bias and multiple flagrant violations of the United States Constitution and New York State law in which any temporary emergency order must be reviewed within twenty four hours and the defendant has a right to an evidentiary hearing.( Exhibit D: Section 240 paragraph 6).

President Obama commissioned the special report on the New York State Justice system (Exhibit E) The report found glaring instances of clear bias and due process violations. In the New York State criminal court system, the innocence project has been able to free dozens of innocent incarcerated individuals who toiled away in prisons without ever having committed any crimes. It is clear that such bias and repudiations of the United Stated Constitution also exists in the civil courts which have even more unregulated authority to strip an innocent person of their life, liberty and property without any due process and then hide their tracks by never creating a record.

Secret hearings, secret decisions, the absence of court records are contrary to the fundamental principles of our founding fathers who espoused an open justice system which would diminish the ability of the judiciary to be corrupted.

## REMEDY

The remedy I seek is to find Judge Lori Sattler willfully and deliberately suspended the United States Constitution on numerous occasions by stripping me of my right to my property and possessions by never granting me even a basic evidentiary hearing which is required by both state law and the Judicial Immunity doctrine. Judge Sattler acted outside of her capacity and permitted undue influence by campaign contributors who curried her favor in this case.

There have been unintended negative consequences to various laws and decisions throughout the history of the United States which were initially written with sound intent. Time and time again, the federal government has been able to make efforts to remedy the negative results of these errors. Judicial Immunity in the presence of an independent judiciary is a sound policy. In cases where Justices abuse the policy by not being independent and then not even adhering to the basic principles of maintaining court records, the policy of Judicial Immunity should no longer apply.

I apologize if my appeal was not written in strict legal format. Due to my bankruptcy, I am unable to afford any attorneys so I needed to perform all the research myself. Exhibits F and G are reasonable arguments that I found which may apply to my case. Exhibit H is an index of caselaw regarding such matters. It is my hope that by reading the facts of this case, you will be able to concur that Judge Settler did indeed violate my basic constitutional rights and was not at all independent when Judge Sattler decided to strip me of my rights, property, and privileges without ever granting

me a single evidentiary hearing nor permitting the creation of any court records in the

seven hearings which were held in secrecy.


Respectfully submitted *Pro Se*


Dated September 05, 2023

Sanjay Om Tewari M.D.
15 Straight Brook Lane
North Creek, NY 12853
sjtewari@gmail.com
347-328-4600
518-251-8025

Sanjay Om Tewari

# Exhibit List

Exhibit A: Attorney Brett Ward contributions to Judge Sattler

Exhibit B: Appearance Details and Dates

Exhibit C: Carter ruling

Exhibit D: New York State Law 240

Exhibit E: New York State special advisor report

Exhibit F: Robert Craig Waters

Exhibit G: Jay Schweikert

Exhibit H: Index of caselaw

# EXHIBIT A



NEW YORK STATE

Services    News    Government

**Board of Elections**    Home    Campaign Disclosure ▾    Ballot Access ▾    County Board Roster    Elected Officials    Help ▾    Contact us    Release Notes



Search ^

marks required fields

Contributor Name

brett ward

[Search] [Clear]

**Filter Search Results**

Contributor Type

All ▾ [Go]

Amount Min $    Amount Max $

[Go]

Report Year

- Select - ▾ [Go]

Date From    Date To

MM/DD/YYYY    MM/DD/YYYY [Go]

Zip From    Zip To

00000-0000    00000-0000 [Go]

Home » Search Contributions by Contributor

# Search Contributions by Contributor

Note: If searching for contribution data for the current election cycle, enter the day after the most recent General Election day for that particular office in the Date From field when filtering search results. Leave the Date To field blank to include data through the most recent submitted disclosure report, as required). Dates of General Elections can be viewed in the applicable year's Filing Calendar.

Total Contributions: $500.00    [CSV Co...]

Show 10 entries    Search:

| Expand | Contribution Date | Amount | Contributor Name | Detail Original Name | Contributor Address | Transaction Type | Contributor Type | Transfer Type | Recipient | Disclosure Report | Committee Type | Filer type | Filer County | Filer Municipality |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 11/19/2014 | $26.02 | Brett Doward | | 3 Circle Street Rochester NY 14607 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Laborers' Local #91 Political Action Fund - ID# 21824 | 2014 State/Local 27-Day Post-General | Political Action Committee | State | | |
| | 12/17/2014 | $35.02 | Brett Doward | | 121 Moxon Drive Rochester NY 14612 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Laborers' Local #91 Political Action Fund - ID# 21824 | 2015 State/Local January Periodic | Political Action Committee | State | | |
| | 01/16/2015 | $2.62 | Brett Doward | | 121 Moxon Drive Rochester NY 14612 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Laborers' Local #91 Political Action Fund - ID# 21824 | 2015 State/Local July Periodic | Political Action Committee | State | | |
| | 01/19/2016 | $250.00 | Brett Ward | | 435 Fort Hill Rd. Scarsdale NY 10588-2412 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Lori Sattler For Civil Court - ID# 13318 | 2016 State/Local July Periodic | Authorized Single Candidate Committee | County | New York | New York |
| | 04/17/2017 | $150.00 | Brett S Ward | | 435 Fort Hill Road Scarsdale NY 10583-2412 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Lori Sattler For Supreme Court 2017 - ID# 2755 | 2017 State/Local July Periodic | Authorized Single Candidate Committee | State | | |
| | 06/09/2011 | $250.00 | Brett S Ward | | 205 East 40th Street New York NY 10016 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Friends Of Judge Deborah Kaplan - ID# 2010 | 2011 State/Local July Periodic | Authorized Single Candidate Committee | State | | |
| | 07/02/2012 | $100.00 | Brett S Ward | | 6 Mariners Cove Edgewater NJ 07020 United States | A - Monetary Contributions Received From Ind. & Part. | Individual | | Cronin For New York - ID# 4445 | 2012 State/Local July Periodic | Authorized Single Candidate Committee | State | | |

# EXHIBIT B



# New York State Unified Court System

## COURTS

## WebCivil Supreme - Appearance Detail

Court: **New York Supreme Court**
Index Number: **365297/2021**
Case Name: **KOHLI, GEETA vs. TEWARI, SANJAY**
Case Type: **Mat-Contested**
Track: **Standard**

## Appearance Information:

| Appearance Date | Time | Court Date Purpose | Outcome Type | Justice Part | Remarks | Motion Seq |
|---|---|---|---|---|---|---|
| 09/12/2023 | 10:00 AM | Conference-Status | | Waterman-Marshall, Hon. Kathleen C. 09SC | | |
| 05/31/2023 | 10:30 AM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. 09SC | LINCOLN HEARING | |
| 05/19/2023 | 09:30 AM | Trial-Non-Jury | Decision Reserved | Waterman-Marshall, Hon. Kathleen C. 09TR | IN PERSON TRIAL - DAY SIX | |
| 05/18/2023 | 09:30 AM | Trial-Non-Jury | Continued | Waterman-Marshall, Hon. Kathleen C. 09TR | IN PERSON TRIAL - DAY FIVE | |
| 04/27/2023 | 02:15 PM | Trial-Non-Jury | Continued | Waterman-Marshall, Hon. Kathleen C. 09TR | IN PERSON TRIAL - DAY FOUR | |
| 04/24/2023 | 09:30 AM | Trial-Non-Jury | Continued | Waterman-Marshall, Hon. Kathleen C. 09TR | IN PERSON TRIAL - DAY THREE | |
| 04/21/2023 | 09:30 AM | Trial-Non-Jury | Continued | Waterman-Marshall, Hon. Kathleen C. 09TR | IN PERSON TRIAL - DAY TWO - ADDITIONAL TRIAL DATES ARE APRIL 24, APRIL 27 (@2:15), MAY 18, MAY 19 | |
| 04/17/2023 | 02:15 PM | Trial-Non-Jury | Continued | Waterman-Marshall, Hon. Kathleen C. 09TR | IN PERSON TRIAL - DAY ONE | |
| 04/06/2023 | 02:15 PM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. 09SC | DR. TEWARI ONLY - TO REVIEW REPORT IN COURTROOM | |
| 03/28/2023 | 02:30 PM | Conference-Pre-Trial | Held | Waterman-Marshall, Hon. Kathleen C. 09PT | IN PERSON AT 80 CENTRE STREET - PRE TRIAL / SETTLEMENT | |
| 01/10/2023 | 03:30 PM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. Remote Conference Part | WITH MOTION | |
| 01/10/2023 | 03:30 PM | Motion-Order to | Fully | Waterman- | ORAL ARGUMENT - IN PERSON | 6 |

WebCivil Supreme - Appearance Detail                                          9/4/23, 1:35 PM

| Date | Time | Type | Status | Judge/Part | Description | |
|---|---|---|---|---|---|---|
| | | Show Cause (Returnable) | Submitted | Marshall, Hon. Kathleen C. 09M | | |
| 12/01/2022 | 02:00 PM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. Remote Conference Part | REMOTE CONFERENCE PART - VIRTUAL CONFERENCE ROOM - FUTURE TRIAL DATES (CUSTODY) EACH DAY AT 9:00 - 4:30: APRIL 17, 21, 24, 27, & MAY 18, 19, 2023 | |
| 10/18/2022 | 12:30 PM | Conference-Status | Rescheduled | Waterman-Marshall, Hon. Kathleen C. Remote Conference Part | REMOTE CONFERENCE PART - VIRTUAL CONFERENCE ROOM - FUTURE TRIAL DATES (CUSTODY) EACH DAY AT 9:00 - 4:30: APRIL 17, 21, 24, 27, & MAY 18, 19, 2023 | |
| 10/18/2022 | 12:30 PM | Motion-Order to Show Cause (Returnable) | Adjourned | Waterman-Marshall, Hon. Kathleen C. 09M | ORAL ARGUMENT VIA MICROSOFT TEAMS - NO PERSONAL APPEARANCE | <u>6</u> |
| 08/29/2022 | 02:30 PM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. Remote Conference Part | REMOTE CONFERENCE PART - VIRTUAL CONFERENCE ROOM | |
| 07/26/2022 | 10:00 AM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. Remote Conference Part | REMOTE CONFERENCE PART - VIRTUAL CONFERENCE ROOM | |
| 05/11/2022 | 10:00 AM | Conference-Status | Held | Waterman-Marshall, Hon. Kathleen C. Remote Conference Part | REMOTE CONFERENCE PART - VIRTUAL COURTROOM | |
| 05/11/2022 | 10:00 AM | Motion-Order to Show Cause (Returnable) | Fully Submitted | Waterman-Marshall, Hon. Kathleen C. 09M | VIRTUAL COURTROOM | <u>4</u> |
| 04/08/2022 | 10:00 AM | Hearing-Contempt | Held | Waterman-Marshall, Hon. Kathleen C. 09SC | IN-PERSON HEARING - 80 CENTRE ST., ROOM 289 - (10:00 - 12:00) | |
| 04/08/2022 | 10:00 AM | Motion-Order to Show Cause (Returnable) | | Waterman-Marshall, Hon. Kathleen C. 09M | IN PERSON 80 CENTRE STREET - ROOM 289 | <u>5</u> |
| 03/28/2022 | 10:00 AM | Hearing-Contempt | Continued | Waterman-Marshall, Hon. Kathleen C. 09SC | IN-PERSON HEARING - 80 CENTRE ST., ROOM 289 - (10:00 - 1:00) | |
| 03/28/2022 | 10:00 AM | Motion-Order to Show Cause (Returnable) | Adjourned | Waterman-Marshall, Hon. Kathleen C. 09M | ORAL ARGUMENT VIA MICROSOFT TEAMS - NO PERSONAL APPEARANCE | <u>5</u> |
| 02/03/2022 | 11:00 AM | Motion-Notice of Motion | | Waterman-Marshall, Hon. Kathleen C. 09M | ORAL ARGUMENT DIRECTED | <u>1</u> |
| 02/03/2022 | 11:00 AM | Motion-Order to Show Cause (Returnable) | | Waterman-Marshall, Hon. Kathleen C. 09M | ORAL ARGUMENT VIA MICROSOFT TEAMS - NO PERSONAL APPEARANCE | <u>2</u> |
| 02/03/2022 | | Motion-Order to Show Cause (Returnable) | Adjourned | Waterman-Marshall, Hon. Kathleen C. 09M | | <u>4</u> |
| 01/26/2022 | 10:00 AM | Conference-Status | Not Held | Sattler, Hon. Lori S. Remote Conference Part | | |
| 01/26/2022 | 10:00 AM | Motion-Notice of | Adjourned | Waterman- | REMOTE | <u>1</u> |

WebCivil Supreme - Appearance Detail                                                                                    9/4/23, 1:35 PM

| | | Motion | | Marshall, Hon. Kathleen C. 09M | | |
|---|---|---|---|---|---|---|
| 01/26/2022 | 10:00 AM | Motion-Order to Show Cause (Returnable) | Adjourned | Waterman-Marshall, Hon. Kathleen C. 09M | ORAL ARGUMENT VIA MICROSOFT TEAMS - NO PERSONAL APPEARANCE | 2 |
| 12/15/2021 | 02:30 PM | Conference-Status | Held | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 12/15/2021 | 02:30 PM | Motion-Notice of Motion | Adjourned | Sattler, Hon. Lori S. 09M | REMOTE | 1 |
| 12/15/2021 | 02:30 PM | Motion-Order to Show Cause (Returnable) | Adjourned | Sattler, Hon. Lori S. 09M | ORAL ARGUMENT VIA MICROSOFT TEAMS - NO PERSONAL APPEARANCE | 2 |
| 10/26/2021 | 02:30 PM | Conference-Status | Adjourned | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 10/26/2021 | 02:30 PM | Motion-Notice of Motion | Adjourned | Sattler, Hon. Lori S. 09M | REMOTE | 1 |
| 10/20/2021 | 03:00 PM | Conference-Status | Held | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 10/20/2021 | 03:00 PM | Motion-Notice of Motion | Adjourned | Sattler, Hon. Lori S. 09M | REMOTE | 1 |
| 10/06/2021 | 02:30 PM | Conference-Compliance | Held | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 09/22/2021 | 11:00 AM | Conference-Preliminary | Held | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 09/09/2021 | 09:30 AM | Conference-Preliminary | Held | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 09/09/2021 | 09:30 AM | Motion-Notice of Motion | Adjourned | Sattler, Hon. Lori S. 09M | 9:30 A.M., VIRTUAL CONFERENCE | 1 |
| 08/31/2021 | 11:00 AM | Conference-Preliminary | Held | Sattler, Hon. Lori S. Remote Conference Part | MS TEAMS CONFERENCE | |
| 08/12/2021 | 09:30 AM | Motion-Other | Adjourned | Sattler, Hon. Lori S. IAS Motion 9 | 9:30 A.M., VIRTUAL CONFERENCE (Conversion) | 1 |

Close

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SANJAY OM TEWARI,

                    Plaintiff,

          -against-

LORI S. SATTLER,

                    Defendant.

---

22-CV-8840 (ALC)

ORDER OF DISMISSAL

ANDREW L. CARTER, JR., United States District Judge:

Plaintiff brings this action *pro se*.[1] He asserts claims against Justice Lori Sattler of the

Supreme Court of the State of New York, arising from her judicial actions in presiding over state

court proceedings involving Plaintiff, his wife, and their children. Plaintiff invokes his rights

under the First, Fifth, Ninth, and Fourteenth Amendments to the United States Constitution. The

Court therefore construes the complaint as asserting claims, under 42 U.S.C. § 1983, for

violations of his constitutional rights. For the reasons set forth below, the Court dismisses the

complaint.

## STANDARD OF REVIEW

The Court has the authority to dismiss a complaint, even when the plaintiff has paid the

filing fee, if it determines that the action is frivolous, *Fitzgerald v. First E. Seventh Tenants*

*Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000), or that the Court lacks subject matter jurisdiction,

Fed. R. Civ. P. 12(h)(3); *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999). The Court

also may dismiss an action for failure to state a claim, "so long as the plaintiff is given notice and

an opportunity to be heard." *Wachtler v. Cnty of Herkimer*, 35 F.3d 77, 82 (2d Cir. 1994)(citation

---

[1] Plaintiff paid the filing fees to bring this action.

and internal quotation marks omitted). The Court is obliged, however, to construe *pro se*

pleadings liberally, *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise

the "strongest [claims] that they *suggest*," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471,

474 (2d Cir. 2006) (internal quotation marks and citations omitted, emphasis in original).

## DISCUSSION

Judges are absolutely immune from suit for damages for any actions taken within the

scope of their judicial responsibilities. *Mireles v. Waco*, 502 U.S. 9, 11 (1991). Generally, "acts

arising out of, or related to, individual cases before the judge are considered judicial in nature."

*Bliven v. Hunt*, 579 F.3d 204, 210 (2d Cir. 2009). "Even allegations of bad faith or malice cannot

overcome judicial immunity." *Id.* (citations omitted). This is because, "[w]ithout insulation from

liability, judges would be subject to harassment and intimidation . . . ." *Young v. Selsky*, 41 F.3d

47, 51 (2d Cir. 1994). Although judicial immunity does not apply when a judge takes action

"outside" her judicial capacity, or "in absence of jurisdiction," *Mireles,* 502 U.S. at 9-10, "the

scope of [a] judge's jurisdiction must be construed broadly where the issue is the immunity of

the judge," *Stump v. Sparkman,* 435 U.S. 349, 356 (1978).

In addition to immunity from suit for damages, Section 1983, as amended in 1996,

provides that "in any action brought against a judicial officer for an act or omission taken in such

officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was

violated or declaratory relief was unavailable." 42 U.S.C. § 1983.

Plaintiff sues Justice Sattler for "acts arising out of, or related to, individual cases before

[her]." *Bliven*, 579 F.3d at 210. Plaintiff alleges, for example, that Justice Sattler acted "without

evidence" in issuing an *ex parte* temporary restraining order on August 4, 2021, and that his

attorneys were barred from presenting exculpatory evidence during an August 12, 2021 hearing

before Justice Sattler. (ECF 1 at 5.) Justice Sattler also allegedly refused to permit the creation of

a transcript of certain hearings that Plaintiff was not permitted to attend in person. (*Id.* at 6.)

Plaintiff seeks damages and seeks injunctive relief requiring Justice Sattler "to remove all

unfounded restraining orders and reunite plaintiff with his children." (*Id.*)

Plaintiff sues Justice Sattler for her judicial acts, and he fails to allege any facts showing

that she acted beyond the scope of her judicial responsibilities or outside her jurisdiction. *See*

*Mireles*, 509 U.S. at 11-12. The Court therefore dismisses Plaintiff's claims against Justice

Sattler because she is absolutely immune from suit for such claims. Plaintiff's claims against

Justice Sattler are also deemed frivolous. *See Mills v. Fischer*, 645 F.3d 176, 177 (2d Cir. 2011)

(holding, in the context of a complaint brought by a prisoner proceeding *in forma pauperis*, that

"[a]ny claim dismissed on the ground of absolute judicial immunity is 'frivolous' for purposes of

[28 U.S.C.] § 1915(g).").

District courts generally grant a *pro se* plaintiff an opportunity to amend a complaint to

cure its defects, but leave to amend is not required where it would be futile. *See Hill v. Curcione*,

657 F.3d 116, 123–24 (2d Cir. 2011); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988).

Because the defects in Plaintiff's complaint cannot be cured with an amendment, the Court

declines to grant Plaintiff leave to amend his complaint.

## CONCLUSION

Plaintiff's claims against Justice Sattler are dismissed based on her absolute judicial

immunity and as frivolous.  The Court certifies under 28 U.S.C. § 1915(a)(3) that any appeal

from this order would not be taken in good faith, and therefore *in forma pauperis* status is denied

for the purpose of an appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).


SO ORDERED.

Dated:    December 9, 2022
          New York, New York

_____
ANDREW L. CARTER, JR.
United States District Judge

# EXHIBIT D

For Legal Professionals ›(https://lp.findlaw.com/)

FindLaw.
(https://www.findlaw.com/)

Find a Lawyer (https://lawyers.findlaw.com)

Legal Forms & Services

Learn About the Law

Laws and Court Decisions (https://caselaw.findlaw.com/)

Blogs(https://

FINDLAW (HTTPS://LP.FINDLAW.COM/) / CODES (HTTPS://CODES.FINDLAW.COM/) / NEW YORK (HTTPS://CODES.FINDLAW.COM/NY/) / DOMESTIC RELATIONS LAW (HTTPS://CODES.FINDLAW.COM/NY/DOMESTIC-RELATIONS-LAW/) / § 240

# New York Consolidated Laws, Domestic Relations Law - DOM § 240. Custody and child support; orders of protection

Current as of January 01, 2021 | Updated by FindLaw Staff (https://www.findlaw.com/company/our-team.html)

Welcome to FindLaw's Cases & Codes, a free source of state and federal court opinions, state laws, and the United States Code. For more information about the legal concepts addressed by these cases and statutes, visit FindLaw's Learn About the Law (https://www.findlaw.com/law.html).

## Search New York Codes

**Search by Keyword or Citation**

Enter Keyword or Citation

SEARCH

« Prev (https://codes.findlaw.com/ny/domestic-relations-law/dom-sect-239.html)

Next » (https://codes.findlaw.com/ny/domestic-relations-law/dom-sect-240-a.html)

1.  (a)  In any action or proceeding brought (1) to annul a marriage or to declare the nullity of a void marriage, or (2) for a separation, or (3) for a divorce, or (4) to obtain, by a writ of habeas corpus or by petition and order to show cause, the custody of or right to visitation with any child of a marriage, the court shall require verification of the status of any child of the marriage with respect to such child's custody and support, including any prior orders, and shall enter orders for custody and support as, in the court's discretion, justice requires, having regard to the circumstances of the case and of the respective parties and to the best interests of the child and subject to the provisions of subdivision one-c of this section.   Where either party to an action concerning custody of or a right to visitation with a child alleges in a sworn petition or complaint or sworn answer, cross-petition, counterclaim or other sworn responsive pleading that the other party has committed an act of domestic violence against the party making the allegation or a family or household member of either party, as such family or household member is defined in article eight of the family court act, and such allegations are proven by a preponderance of the evidence, the court must consider the effect of such domestic violence upon the best interests of the child, together with such other facts and circumstances as the court deems relevant in making a direction pursuant to this section and state on the record how such findings, facts and circumstances factored into the direction.   If a parent makes a good faith allegation based on a reasonable belief supported by facts that the child is the victim of child abuse, child neglect, or the effects of domestic violence, and if that parent acts lawfully and in good faith in response to that reasonable belief to protect the child or seek treatment for the child, then that parent shall not be deprived of custody, visitation or contact with the child, or restricted in custody, visitation or contact, based solely on that belief or the reasonable actions taken based on that belief.   If an allegation that a child is abused is supported by a preponderance of the evidence, then the court shall consider such evidence of abuse in determining the visitation arrangement that is in the best interest of the child, and the court shall not place a child in the custody of a parent who presents a substantial risk of harm to that child, and shall state on the record how such findings were factored into the determination.

## Latest Blog Posts

- Are DEI Positions and Policies at Law Firms on Risky Legal Ground? (https://www.findlaw.com/legalblogs/practic of-law/are-dei-positions-and-policies-at-law-firms-on-risky-legal-ground/)
- Country's Best High School Ends Up in Affirmative Action Antimony (https://www.findlaw.com/legalblogs/suprer court/countrys-best-high-school-ends-up-in-affirmative-action-antimony/)
- How to Break Up With a Client (https://www.findlaw.com/legalblogs/practic of-law/how-to-break-up-with-a-client/)
- Silverman Goes for the Gold (https://www.findlaw.com/legalblogs/techno goes-for-the-gold/)

View More » (https://www.findlaw.com/legalblogs)

Where a proceeding filed pursuant to article ten or ten-A of the family court act is pending at the same time as a proceeding brought in the supreme court involving the custody of, or right to visitation with, any child of a marriage, the court presiding over the proceeding under article ten or ten-A of the family court act may jointly hear the dispositional hearing on the petition under article ten or the permanency hearing under article ten-A of the family court act and, upon referral from the supreme court, the hearing to resolve the matter of custody or visitation in the proceeding pending in the supreme court; provided however, the court must determine custody or visitation in accordance with the terms of this section.

An order directing the payment of child support shall contain the social security numbers of the named parties. In all cases there shall be no prima facie right to the custody of the child in either parent. Such direction shall make provision for child support out of the property of either or both parents. The court shall make its award for child support pursuant to subdivision one-b of this section. Such direction may provide for reasonable visitation rights to the maternal and/or paternal grandparents of any child of the parties. Such direction as it applies to rights of visitation with a child remanded or placed in the care of a person, official, agency or institution pursuant to article ten of the family court act, or pursuant to an instrument approved under section three hundred fifty-eight-a of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18b82 A), shall be enforceable pursuant to part eight of article ten of the family court act and sections three hundred fifty-eight-a (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18b82 A) and three hundred eighty-four-a of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18b82 A) and other applicable provisions of law against any person having care and custody, or temporary care and custody, of the child. Notwithstanding any other provision of law, any written application or motion to the court for the establishment, modification or enforcement of a child support obligation for persons not in receipt of public assistance and care must contain either a request for child support enforcement services which would authorize the collection of the support obligation by the immediate issuance of an income execution for support enforcement as provided for by this chapter, completed in the manner specified in section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18b82 G); or a statement that the applicant has applied for or is in receipt of such services; or a statement that the applicant knows of the availability of such services, has declined them at this time and where support enforcement services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18b82 G) have been declined that the applicant understands that an income deduction order may be issued pursuant to subdivision (c) of section fifty-two hundred forty-two of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib18b82 without other child support enforcement services and that payment of an administrative fee may be required. The court shall provide a copy of any such request for child support enforcement services to the support collection unit of the appropriate social services district any time it directs payments to be made to such support collection unit. Additionally, the copy of any such request shall be accompanied by the name, address and social security number of the parties; the date and place of the parties' marriage; the name and date of birth of the child or children; and the name and address of the employers and income payors of the party from whom child support is sought or from the party ordered to pay child support to the other party. Such direction may require the payment of a sum or sums of money either directly to the custodial parent or to third persons for goods or services furnished for such child, or for both payments to the custodial parent and to such third persons; provided, however, that unless the party seeking or receiving child support has applied for or is receiving such services, the court shall not direct such payments to be made to the support collection unit, as established in section one hundred eleven-h of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18b82 H). Every order directing the payment of support shall require that if either parent currently, or at any time in the future, has health insurance benefits available that may be extended or obtained to cover the child, such parent is required to exercise the option of additional coverage in favor of such child and execute and deliver to such person any forms, notices, documents or instruments necessary to assure timely payment of any health insurance claims for such child.

(a-1)(1)  Permanent and initial temporary orders of custody or visitation.  Prior to the issuance of any permanent or initial temporary order of custody or visitation, the court shall conduct a review of the decisions and reports listed in subparagraph three of this paragraph.

(2)  Successive temporary orders of custody or visitation.  Prior to the issuance of any successive temporary order of custody or visitation, the court shall conduct a review of the decisions and reports listed in subparagraph three of this paragraph, unless such a review has been conducted within ninety days prior to the issuance of such order.

(3)  Decisions and reports for review.  The court shall conduct a review of the following:

(i)  related decisions in court proceedings initiated pursuant to article ten of the family court act, and all warrants issued under the family court act;  and

(ii)  reports of the statewide computerized registry of orders of protection established and maintained pursuant to section two hundred twenty-one-a of the executive law (https://1.next.westlaw.com/Link/Document/FullText?
findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000078&amp;refType=LQ&amp;originatingDoc=Ib18c
A), and reports of the sex offender registry established and maintained pursuant to section one hundred sixty-eight-b of the correction law (https://1.next.westlaw.com/Link/Document/FullText?
findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000064&amp;refType=LQ&amp;originatingDoc=Ib18c
B).

(4)  Notifying counsel and issuing orders.  Upon consideration of decisions pursuant to article ten of the family court act, and registry reports and notifying counsel involved in the proceeding, or in the event of a self-represented party, notifying such party of the results thereof, including any court appointed attorney for children, the court may issue a temporary, successive temporary or final order of custody or visitation.

(5)  Temporary emergency order.  Notwithstanding any other provision of the law, upon emergency situations, including computer malfunctions, to serve the best interest of the child, the court may issue a temporary emergency order for custody or visitation in the event that it is not possible to timely review decisions and reports on registries as required pursuant to subparagraph three of this paragraph.

(6)  After issuing a temporary emergency order.  After issuing a temporary emergency order of custody or visitation, the court shall conduct reviews of the decisions and reports on registries as required pursuant to subparagraph three of this paragraph within twenty-four hours of the issuance of such temporary emergency order.  Should such twenty-four hour period fall on a day when court is not in session, then the required reviews shall take place the next day the court is in session.  Upon reviewing decisions and reports the court shall notify associated counsel, self-represented parties and attorneys for children pursuant to subparagraph four of this paragraph and may issue temporary or permanent custody or visitation orders.

(7)  Feasibility study.  The commissioner of the office of children and family services, in conjunction with the office of court administration, is hereby authorized and directed to examine, study, evaluate and make recommendations concerning the feasibility of the utilization of computers in courts which are connected to the statewide central register of child abuse and maltreatment established and maintained pursuant to section four hundred twenty-two of the social services law (https://1.next.westlaw.com/Link/Document/FullText?
findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18c4
as a means of providing courts with information regarding parties requesting orders of custody or visitation.  Such commissioner shall make a preliminary report to the governor and the legislature of findings, conclusions and recommendations not later than January first, two thousand nine, and a final report of findings, conclusions and recommendations not later than June first, two thousand nine, and shall submit with the reports such legislative proposals as are deemed necessary to implement the commissioner's recommendations.

(a-2)  Military service by parent; effect on child custody orders.  (1)  During the period of time that a parent is activated, deployed or temporarily assigned to military service, such that the parent's ability to continue as a joint caretaker or the primary caretaker of a minor child is materially affected by such military service, any orders issued pursuant to this section, based on the fact that the parent is activated, deployed or temporarily assigned to military service, which would materially affect or change a previous judgment or order regarding custody of that parent's child or children as such judgment or order existed on the date the parent was

activated, deployed, or temporarily assigned to military service, shall be subject to review pursuant to subparagraph three of this paragraph. Any relevant provisions of the Service Member's Civil Relief Act [1] shall apply to all proceedings governed by this section.

(2) During such period, the court may enter an order to modify custody if there is clear and convincing evidence that the modification is in the best interests of the child. An attorney for the child shall be appointed in all cases where a modification is sought during such military service. Such order shall be subject to review pursuant to subparagraph three of this paragraph. When entering an order pursuant to this section, the court shall consider and provide for, if feasible and if in the best interests of the child, contact between the military service member and his or her child, including, but not limited to, electronic communication by e-mail, webcam, telephone, or other available means. During the period of the parent's leave from military service, the court shall consider the best interests of the child when establishing a parenting schedule, including visiting and other contact. For such purposes, a "leave from military service" shall be a period of not more than three months.

(3) Unless the parties have otherwise stipulated or agreed, if an order is issued pursuant to this paragraph, the return of the parent from active military service, deployment or temporary assignment shall be considered a substantial change in circumstances. Upon the request of either parent, the court shall determine on the basis of the child's best interests whether the custody judgment or order previously in effect should be modified.

(4) This paragraph shall not apply to assignments to permanent duty stations or permanent changes of station.

(b) As used in this section, the following terms shall have the following meanings:

(1) "Health insurance benefits" means any medical, dental, optical and prescription drugs and health care services or other health care benefits that may be provided for a dependent through an employer or organization, including such employers or organizations which are self insured, or through other available health insurance or health care coverage plans.

(2) "Available health insurance benefits" means any health insurance benefits that are reasonable in cost and that are reasonably accessible to the person on whose behalf the petition is brought. Health insurance benefits that are not reasonable in cost or whose services are not reasonably accessible to such person, shall be considered unavailable.

(3) When the person on whose behalf the petition is brought is a child in accordance with paragraph (c) of this subdivision, health insurance benefits shall be considered "reasonable in cost" if the cost of health insurance benefits does not exceed five percent of the combined parental gross income. The cost of health insurance benefits shall refer to the cost of the premium and deductible attributable to adding the child or children to existing coverage or the difference between such costs for self-only and family coverage. Provided, however, the presumption that the health insurance benefits are reasonable in cost may be rebutted upon a finding that the cost is unjust or inappropriate which finding shall be based on the circumstances of the case, the cost and comprehensiveness of the health insurance benefits for which the child or children may otherwise be eligible, and the best interests of the child or children. In no instance shall health insurance benefits be considered "reasonable in cost" if a parent's share of the cost of extending such coverage would reduce the income of that parent below the self-support reserve. Health insurance benefits are "reasonably accessible" if the child lives within the geographic area covered by the plan or lives within thirty minutes or thirty miles of travel time from the child's residence to the services covered by the health insurance benefits or through benefits provided under a reciprocal agreement; provided, however, this presumption may be rebutted for good cause shown including, but not limited to, the special health needs of the child. The court shall set forth such finding and the reasons therefor in the order of support.

(c) When the person on whose behalf the petition is brought is a child, the court shall consider the availability of health insurance benefits to all parties and shall take the following action to ensure that health insurance benefits are provided for the benefit of the child:

(1) Where the child is presently covered by health insurance benefits, the court shall direct in the order of support that such coverage be maintained, unless either parent requests the court to make a direction for health insurance benefits coverage pursuant to paragraph two of this subdivision.

(2) Where the child is not presently covered by health insurance benefits, the court shall make a determination as follows:

(i) If only one parent has available health insurance benefits, the court shall direct in the order of support that such parent provide health insurance benefits.

(ii) If both parents have available health insurance benefits the court shall direct in the order of support that either parent or both parents provide such health insurance.   The court shall make such determination based on the circumstances of the case, including, but not limited to, the cost and comprehensiveness of the respective health insurance benefits and the best interests of the child.

(iii) If neither parent has available health insurance benefits, the court shall direct in the order of support that the custodial parent apply for the state's child health insurance plan pursuant to title one-A of article twenty-five of the public health law and the medical assistance program established pursuant to title eleven of article five of the social services law.   A direction issued under this subdivision shall not limit or alter either parent's obligation to obtain health insurance benefits at such time as they become available, as required pursuant to paragraph (a) of this subdivision.   Nothing in this subdivision shall alter or limit the authority of the medical assistance program to determine when it is considered cost effective to require a custodial parent to enroll a child in an available group health insurance plan pursuant to paragraphs (b) (https://1.next.law.com/Link/Document/FullText?

findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=SP&amp;originatingDoc=Ib18

A) and (c) of subdivision one of section three hundred sixty-seven-a of the social services law

(https://1.next.westlaw.com/Link/Document/FullText?

findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=SP&amp;originatingDoc=Ib18

A).

(d) The cost of providing health insurance benefits or benefits under the state's child health insurance plan or the medical assistance program, pursuant to paragraph (c) of this subdivision, shall be deemed cash medical support, and the court shall determine the obligation of either or both parents to contribute to the cost thereof pursuant to subparagraph five of paragraph (c) of subdivision one-b of this section.

(e) The court shall provide in the order of support that the legally responsible relative immediately notify the other party, or the other party and the support collection unit when the order is issued on behalf of a child in receipt of public assistance and care or in receipt of services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText?

findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18d2f

G), of any change in health insurance benefits, including any termination of benefits, change in the health insurance benefit carrier, premium, or extent and availability of existing or new benefits.

(f) Where the court determines that health insurance benefits are available, the court shall provide in the order of support that the legally responsible relative immediately enroll the eligible dependents named in the order who are otherwise eligible for such benefits without regard to any seasonal enrollment restrictions.   Such order shall further direct the legally responsible relative to maintain such benefits as long as they remain available to such relative.   Such order shall further direct the legally responsible relative to assign all insurance reimbursement payments for health care expenses incurred for his or her eligible dependents to the provider of such services or the party actually having incurred and satisfied such expenses, as appropriate.

(g) When the court issues an order of child support or combined child and spousal support on behalf of persons in receipt of public assistance and care or in receipt of services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText?

findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18d56

G), such order shall further direct that the provision of health care benefits shall be immediately enforced pursuant to section fifty-two hundred forty-one of the civil practice law and rules

(https://1.next.westlaw.com/Link/Document/FullText?

findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib18d56

(h) When the court issues an order of child support or combined child and spousal support on behalf of persons other than those in receipt of public assistance and care or in receipt of services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText?

findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18d7c

G), the court shall also issue a separate order which shall include the necessary direction to ensure the order's

characterization as a qualified medical child support order as defined by section six hundred nine of the employee retirement income security act of 1974 (29 USC 1169 (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000546&amp;refType=LQ&amp;originatingDoc=Ib18d7c Such order shall: (i) clearly state that it creates or recognizes the existence of the right of the named dependent to be enrolled and to receive benefits for which the legally responsible relative is eligible under the available group health plans, and shall clearly specify the name, social security number and mailing address of the legally responsible relative, and of each dependent to be covered by the order; (ii) provide a clear description of the type of coverage to be provided by the group health plan to each such dependent or the manner in which the type of coverage is to be determined; and (iii) specify the period of time to which the order applies. The court shall not require the group health plan to provide any type or form of benefit or option not otherwise provided under the group health plan except to the extent necessary to meet the requirements of a law relating to medical child support described in section one thousand three hundred and ninety-six g of title forty-two of the United States code (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000546&amp;refType=LQ&amp;originatingDoc=Ib18d7c

(i) Upon a finding that a legally responsible relative wilfully failed to obtain health insurance benefits in violation of a court order, such relative will be presumptively liable for all health care expenses incurred on behalf of such dependents from the first date such dependents were eligible to be enrolled to receive health insurance benefits after the issuance of the order of support directing the acquisition of such coverage.

(j) The order shall be effective as of the date of the application therefor, and any retroactive amount of child support due shall be support arrears/past due support and shall, except as provided for herein, be paid in one lump sum or periodic sums, as the court shall direct, taking into account any amount of temporary support which has been paid. In addition, such retroactive child support shall be enforceable in any manner provided by law including, but not limited to, an execution for support enforcement pursuant to subdivision (b) of section fifty-two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib18da4 When a child receiving support is a public assistance recipient, or the order of support is being enforced or is to be enforced pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib18da4 G), the court shall establish the amount of retroactive child support and notify the parties that such amount shall be enforced by the support collection unit pursuant to an execution for support enforcement as provided for in subdivision (b) of section fifty-two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib18da4 or in such periodic payments as would have been authorized had such an execution been issued. In such case, the courts shall not direct the schedule of repayment of retroactive support. Where such direction is for child support and paternity has been established by a voluntary acknowledgement of paternity as defined in section forty-one hundred thirty-five-b of the public health law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000121&amp;refType=LQ&amp;originatingDoc=Ib18da4 B), the court shall inquire of the parties whether the acknowledgement has been duly filed, and unless satisfied that it has been so filed shall require the clerk of the court to file such acknowledgement with the appropriate registrar within five business days. Such direction may be made in the final judgment in such action or proceeding, or by one or more orders from time to time before or subsequent to final judgment, or by both such order or orders and the final judgment. Such direction may be made notwithstanding that the court for any reason whatsoever, other than lack of jurisdiction, refuses to grant the relief requested in the action or proceeding. Any order or judgment made as in this section provided may combine in one lump sum any amount payable to the custodial parent under this section with any amount payable to such parent under section two hundred thirty-six (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib18da4 of this article. Upon the application of either parent, or of any other person or party having the care, custody and control of such child pursuant to such judgment or order, after such notice to the other party, parties or persons having such care, custody and control and given in such manner as the court shall direct, the court may annul or modify any such direction, whether made by order or final judgment, or in case no such direction shall have been made in the final judgment may, with respect to any judgment of annulment or declaring the

nullity of a void marriage rendered on or after September first, nineteen hundred forty, or any judgment of separation or divorce whenever rendered, amend the judgment by inserting such direction. Subject to the provisions of section two hundred forty-four (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib18da4 of this article, no such modification or annulment shall reduce or annul arrears accrued prior to the making of such application unless the defaulting party shows good cause for failure to make application for relief from the judgment or order directing such payment prior to the accrual of such arrears. Such modification may increase such child support nunc pro tunc as of the date of application based on newly discovered evidence. Any retroactive amount of child support due shall be support arrears/past due support and shall be paid in one lump sum or periodic sums, as the court shall direct, taking into account any amount of temporary child support which has been paid. In addition, such retroactive child support shall be enforceable in any manner provided by law including, but not limited to, an execution for support enforcement pursuant to subdivision (b) of section fifty-two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib18da4

1-a.  In any proceeding brought pursuant to this section to determine the custody or visitation of minors, a report made to the statewide central register of child abuse and maltreatment, pursuant to title six of article six of the social services law, or a portion thereof, which is otherwise admissible as a business record pursuant to rule forty-five hundred eighteen of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib18dcc0 shall not be admissible in evidence, notwithstanding such rule, unless an investigation of such report conducted pursuant to title six of article six of the social services law has determined that there is some credible evidence of the alleged abuse or maltreatment and that the subject of the report has been notified that the report is indicated.  In addition, if such report has been reviewed by the state commissioner of social services or his designee and has been determined to be unfounded, it shall not be admissible in evidence.  If such report has been so reviewed and has been amended to delete any finding, each such deleted finding shall not be admissible.  If the state commissioner of social services or his designee has amended the report to add any new finding, each such new finding, together with any portion of the original report not deleted by the commissioner or his designee, shall be admissible if it meets the other requirements of this subdivision and is otherwise admissible as a business record.  If such a report, or portion thereof, is admissible in evidence but is uncorroborated, it shall not be sufficient to make a fact finding of abuse or maltreatment in such proceeding.  Any other evidence tending to support the reliability of such report shall be sufficient corroboration.

1-b.  (a)  The court shall make its award for child support pursuant to the provisions of this subdivision.  The court may vary from the amount of the basic child support obligation determined pursuant to paragraph (c) of this subdivision only in accordance with paragraph (f) of this subdivision.

(b)  For purposes of this subdivision, the following definitions shall be used:

(1)  "Basic child support obligation" shall mean the sum derived by adding the amounts determined by the application of subparagraphs two and three of paragraph (c) of this subdivision except as increased pursuant to subparagraphs four, five, six and seven of such paragraph.

(2)  "Child support" shall mean a sum to be paid pursuant to court order or decree by either or both parents or pursuant to a valid agreement between the parties for care, maintenance and education of any unemancipated child under the age of twenty-one years.

(3)  "Child support percentage" shall mean:

(i)  seventeen percent of the combined parental income for one child;

(ii)  twenty-five percent of the combined parental income for two children;

(iii)  twenty-nine percent of the combined parental income for three children;

(iv)  thirty-one percent of the combined parental income for four children;  and

(v)  no less than thirty-five percent of the combined parental income for five or more children.

(4)  "Combined parental income" shall mean the sum of the income of both parents.

(5) "Income" shall mean, but shall not be limited to, the sum of the amounts determined by the application of clauses (i), (ii), (iii), (iv), (v) and (vi) of this subparagraph reduced by the amount determined by the application of clause (vii) of this subparagraph:

(i) gross (total) income as should have been or should be reported in the most recent federal income tax return. If an individual files his/her federal income tax return as a married person filing jointly, such person shall be required to prepare a form, sworn to under penalty of law, disclosing his/her gross income individually;

(ii) to the extent not already included in gross income in clause (i) of this subparagraph, investment income reduced by sums expended in connection with such investment;

(iii) to the extent not already included in gross income in clauses (i) and (ii) of this subparagraph, the amount of income or compensation voluntarily deferred and income received, if any, from the following sources:

(A) workers' compensation,

(B) disability benefits,

(C) unemployment insurance benefits,

(D) social security benefits,

(E) veterans benefits,

(F) pensions and retirement benefits,

(G) fellowships and stipends,

(H) annuity payments, and

(I) alimony or maintenance actually paid or to be paid to a spouse who is a party to the instant action pursuant to an existing court order or contained in the order to be entered by the court, or pursuant to a validly executed written agreement, in which event the order or agreement shall provide for a specific adjustment, in accordance with this subdivision, in the amount of child support payable upon the termination of alimony or maintenance to such spouse; provided, however, that the specific adjustment in the amount of child support is without prejudice to either party's right to seek a modification in accordance with subparagraph two of paragraph b of subdivision nine of part B of section two hundred thirty-six (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib1 of this article. In an action or proceeding to modify an order of child support, including an order incorporating without merging an agreement, issued prior to the effective date of this subclause, the provisions of this subclause shall not, by themselves, constitute a substantial change of circumstances pursuant to paragraph b of subdivision nine of part B of section two hundred thirty-six (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib1 of this article.

(iv) at the discretion of the court, the court may attribute or impute income from, such other resources as may be available to the parent, including, but not limited to:

(A) non-income producing assets,

(B) meals, lodging, memberships, automobiles or other perquisites that are provided as part of compensation for employment to the extent that such perquisites constitute expenditures for personal use, or which expenditures directly or indirecly [2] confer personal economic benefits,

(C) fringe benefits provided as part of compensation for employment, and

(D) money, goods, or services provided by relatives and friends;

(v) an amount imputed as income based upon the parent's former resources or income, if the court determines that a parent has reduced resources or income in order to reduce or avoid the parent's obligation for child support;

(vi)  to the extent not already included in gross income in clauses (i) and (ii) of this subparagraph, the following self-employment deductions attributable to self-employment carried on by the taxpayer:

(A)  any depreciation deduction greater than depreciation calculated on a straight-line basis for the purpose of determining business income or investment credits, and

(B)  entertainment and travel allowances deducted from business income to the extent said allowances reduce personal expenditures;

(vii)  the following shall be deducted from income prior to applying the provisions of paragraph (c) of this subdivision:

(A)  unreimbursed employee business expenses except to the extent said expenses reduce personal expenditures,

(B)  alimony or maintenance actually paid to a spouse not a party to the instant action pursuant to court order or validly executed written agreement,

(C)  alimony or maintenance actually paid or to be paid to a spouse who is a party to the instant action pursuant to an existing court order or contained in the order to be entered by the court, or pursuant to a validly executed written agreement, in which event the order or agreement shall provide for a specific adjustment, in accordance with this subdivision, in the amount of child support payable upon the termination of alimony or maintenance to such spouse;  provided, however, that the specific adjustment in the amount of child support is without prejudice to either party's right to seek a modification in accordance with subparagraph two of paragraph b of subdivision nine of part B of section two hundred thirty-six (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib18 of this article.  In an action or proceeding to modify an order of child support, including an order incorporating without merging an agreement, issued prior to the effective date of this subclause, the provisions of this subclause shall not, by themselves, constitute a substantial change of circumstances pursuant to paragraph b of subdivision nine of part B of section two hundred thirty-six (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib18 of this article.

(D)  child support actually paid pursuant to court order or written agreement on behalf of any child for whom the parent has a legal duty of support and who is not subject to the instant action,

(E)  public assistance,

(F)  supplemental security income,

(G)  New York city or Yonkers income or earnings taxes actually paid, and

(H)  federal insurance contributions act (FICA) taxes actually paid.

(6)  "Self-support reserve" shall mean one hundred thirty-five percent of the poverty income guidelines amount for a single person as reported by the federal department of health and human services.  For the calendar year nineteen hundred eighty-nine, the self-support reserve shall be eight thousand sixty-five dollars.  On March first of each year, the self-support reserve shall be revised to reflect the annual updating of the poverty income guidelines as reported by the federal department of health and human services for a single person household.

(c)  The amount of the basic child support obligation shall be determined in accordance with the provision of this paragraph:

(1)  The court shall determine the combined parental income.

(2)  The court shall multiply the combined parental income up to the amount set forth in paragraph (b) of subdivision two of section one hundred eleven-i of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=SP&amp;originatingDoc=Ib190 )) by the appropriate child support percentage and such amount shall be prorated in the same proportion as each parent's income is to the combined parental income.

(3)  Where the combined parental income exceeds the dollar amount set forth in subparagraph two of this paragraph, the court shall determine the amount of child support for the amount of the combined parental income in excess of such dollar amount through consideration of the factors set forth in paragraph (f) of this subdivision and/or the child support percentage.

(4)  Where the custodial parent is working, or receiving elementary or secondary education, or higher education or vocational training which the court determines will lead to employment, and incurs child care expenses as a result thereof, the court shall determine reasonable child care expenses and such child care expenses, where incurred, shall be prorated in the same proportion as each parent's income is to the combined parental income.   Each parent's pro rata share of the child care expenses shall be separately stated and added to the sum of subparagraphs two and three of this paragraph.

(5)  the court shall determine the parties' obligation to provide health insurance benefits pursuant to this section and to pay cash medical support as provided under this subparagraph.

  (i)  "Cash medical support" means an amount ordered to be paid toward the cost of health insurance provided by a public entity or by a parent through an employer or organization, including such employers or organizations which are self insured, or through other available health insurance or health care coverage plans, and/or for other health care expenses not covered by insurance.

  (ii)  Where health insurance benefits pursuant to subparagraph one and clauses (i) and (ii) of subparagraph two of paragraph (c) of subdivision one of this section are determined by the court to be available, the cost of providing health insurance benefits shall be prorated between the parties in the same proportion as each parent's income is to the combined parental income.   If the custodial parent is ordered to provide such benefits, the non-custodial parent's pro rata share of such costs shall be added to the basic support obligation.   If the non-custodial parent is ordered to provide such benefits, the custodial parent's pro rata share of such costs shall be deducted from the basic support obligation.

  (iii)  Where health insurance benefits pursuant to subparagraph one and clauses (i) and (ii) of subparagraph two of paragraph (c) of subdivision one of this section are determined by the court to be unavailable, if the child or children are determined eligible for coverage under the medical assistance program established pursuant to title eleven of article five of the social services law, the court shall order the non-custodial parent to pay cash medical support as follows:

  (A)  In the case of a child or children authorized for managed care coverage under the medical assistance program, the lesser of the amount that would be required as a family contribution under the state's child health insurance plan pursuant to title one-A of article twenty-five of the public health law for the child or children if they were in a two-parent household with income equal to the combined income of the non-custodial and custodial parents or the premium paid by the medical assistance program on behalf of the child or children to the managed care plan.   The court shall separately state the non-custodial parent's monthly obligation.   The non-custodial parent's cash medical support obligation under this clause shall not exceed five percent of his or her gross income, or the difference between the non-custodial parent's income and the self-support reserve, whichever is less.

  (B)  In the case of a child or children authorized for fee-for-service coverage under the medical assistance program other than a child or children described in item (A) of this clause, the court shall determine the non-custodial parent's maximum annual cash medical support obligation, which shall be equal to the lesser of the monthly amount that would be required as a family contribution under the state's child health insurance plan pursuant to title one-A of article twenty-five of the public health law for the child or children if they were in a two-parent household with income equal to the combined income of the non-custodial and custodial parents times twelve months or the number of months that the child or children are authorized for fee-for-service coverage during any year.   The court shall separately state in the order the non-custodial parent's maximum annual cash medical support obligation and, upon proof to the court that the non-custodial parent, after notice of the amount due, has failed to pay the public entity for incurred health care expenses, the court shall order the non-custodial parent to pay such incurred health care expenses up to the maximum annual cash medical support obligation.   Such amounts shall be support arrears/past due support and shall be subject to any remedies as provided by law for the enforcement of support arrears/past due support.   The total annual amount that the non-custodial parent is ordered to pay under this clause shall not exceed five percent of his or her gross income or the difference between the non-custodial parent's income and the self-support reserve, whichever is less.

(C)  The court shall order cash medical support to be paid by the non-custodial parent for health care expenses of the child or children paid by the medical assistance program prior to the issuance of the court's order.   The amount of such support shall be calculated as provided under item (A) or (B) of this clause, provided that the amount that the non-custodial parent is ordered to pay under this item shall not exceed five percent of his or her gross income or the difference between the non-custodial parent's income and the self-support reserve, whichever is less, for the year when the expense was incurred.   Such amounts shall be support arrears/past due support and shall be subject to any remedies as provided by law for the enforcement of support arrears/past due support.

(iv)  Where health insurance benefits pursuant to subparagraph one and clauses (i) and (ii) of subparagraph two of paragraph (c) of subdivision one of this section are determined by the court to be unavailable, and the child or children are determined eligible for coverage under the state's child health insurance plan pursuant to title one-A of article twenty-five of the public health law, the court shall prorate each parent's share of the cost of the family contribution required under such child health insurance plan in the same proportion as each parent's income is to the combined parental income, and state the amount of the non-custodial parent's share in the order.   The total amount of cash medical support that the non-custodial parent is ordered to pay under this clause shall not exceed five percent of his or her gross income, or the difference between the non-custodial parent's income and the self-support reserve, whichever is less.

(v)  In addition to the amounts ordered under clause (ii), (iii), or (iv), the court shall pro rate each parent's share of reasonable health care expenses not reimbursed or paid by insurance, the medical assistance program established pursuant to title eleven of article five of the social services law, or the state's child health insurance plan pursuant to title one-A of article twenty-five of the public health law, in the same proportion as each parent's income is to the combined parental income, and state the non-custodial parent's share as a percentage in the order.   The non-custodial parent's pro rata share of such health care expenses determined by the court to be due and owing shall be support arrears/past due support and shall be subject to any remedies provided by law for the enforcement of support arrears/past due support.   In addition, the court may direct that the non-custodial parent's pro rata share of such health care expenses be paid in one sum or in periodic sums, including direct payment to the health care provider.

(vi)  Upon proof by either party that cash medical support pursuant to clause (ii), (iii), (iv), or (v) of this subparagraph would be unjust or inappropriate pursuant to paragraph (f) of this subdivision, the court shall:

(A)  order the parties to pay cash medical support as the court finds just and appropriate, considering the best interests of the child;  and

(B)  set forth in the order the factors it considered, the amount calculated under this subparagraph, the reason or reasons the court did not order such amount, and the basis for the amount awarded.

(6)  Where the court determines that the custodial parent is seeking work and incurs child care expenses as a result thereof, the court may determine reasonable child care expenses and may apportion the same between the custodial and non-custodial parent.   The non-custodial parent's share of such expenses shall be separately stated and paid in a manner determined by the court.

(7)  Where the court determines, having regard for the circumstances of the case and of the respective parties and in the best interests of the child, and as justice requires, that the present or future provision of post-secondary, private, special, or enriched education for the child is appropriate, the court may award educational expenses.   The non-custodial parent shall pay educational expenses, as awarded, in a manner determined by the court, including direct payment to the educational provider.

(d)  Notwithstanding the provisions of paragraph (c) of this subdivision, where the annual amount of the basic child support obligation would reduce the non-custodial parent's income below the poverty income guidelines amount for a single person as reported by the federal department of health and human services, the basic child support obligation shall be twenty-five dollars per month, provided, however, that if the court finds that such basic child support obligation is unjust or inappropriate, which finding shall be based upon considerations of the factors set forth in paragraph (f) of this subdivision, the court shall order the non-custodial parent to pay such amount of the child support as the court finds just and appropriate.   Notwithstanding the provisions of paragraph (c) of this subdivision, where the annual amount of the basic child support obligation would reduce

the non-custodial parent's income below the self-support reserve but not below the poverty income guidelines amount for a single person as reported by the federal department of health and human services, the basic child support obligation shall be fifty dollars per month or the difference between the non-custodial parent's income and the self-support reserve, whichever is greater, in addition to any amounts that the court may, in its discretion, order in accordance with subparagraphs four, five, six and/or seven of paragraph (c) of this subdivision.

(e)  Where a parent is or may be entitled to receive non-recurring payments from extraordinary sources not otherwise considered as income pursuant to this section, including but not limited to:

  (1)  Life insurance policies;

  (2)  Discharges of indebtedness;

  (3)  Recovery of bad debts and delinquency amounts;

  (4)  Gifts and inheritances;  and

  (5)  Lottery winnings,

the court, in accordance with paragraphs (c), (d) and (f) of this subdivision may allocate a proportion of the same to child support, and such amount shall be paid in a manner determined by the court.

(f)  The court shall calculate the basic child support obligation, and the non-custodial parent's pro rata share of the basic child support obligation.  Unless the court finds that the non-custodial parents's $^2$ pro-rata share of the basic child support obligation is unjust or inappropriate, which finding shall be based upon consideration of the following factors:

  (1)  The financial resources of the custodial and non-custodial parent, and those of the child;

  (2)  The physical and emotional health of the child and his/her special needs and aptitudes;

  (3)  The standard of living the child would have enjoyed had the marriage or household not been dissolved;

  (4)  The tax consequences to the parties;

  (5)  The non-monetary contributions that the parents will make toward the care and well-being of the child;

  (6)  The educational needs of either parent;

  (7)  A determination that the gross income of one parent is substantially less than the other parent's gross income;

  (8)  The needs of the children of the non-custodial parent for whom the non-custodial parent is providing support who are not subject to the instant action and whose support has not been deducted from income pursuant to subclause (D) of clause (vii) of subparagraph five of paragraph (b) of this subdivision, and the financial resources of any person obligated to support such children, provided, however, that this factor may apply only if the resources available to support such children are less than the resources available to support the children who are subject to the instant action;

  (9)  Provided that the child is not on public assistance (i) extraordinary expenses incurred by the non-custodial parent in exercising visitation, or (ii) expenses incurred by the non-custodial parent in extended visitation provided that the custodial parent's expenses are substantially reduced as a result thereof;  and

  (10)  Any other factors the court determines are relevant in each case, the court shall order the non-custodial parent to pay his or her pro rata share of the basic child support obligation, and may order the non-custodial parent to pay an amount pursuant to paragraph (e) of this subdivision.

(g)  Where the court finds that the non-custodial parent's pro rata share of the basic child support obligation is unjust or inappropriate, the court shall order the non-custodial parent to pay such amount of child support as the court finds just and appropriate, and the court shall set forth, in a written order, the factors it considered; the amount of each party's pro rata share of the basic child support obligation;  and the reasons that the court did not order the basic child support obligation.  Such written order may not be waived by either party or counsel;  provided, however, and notwithstanding any other provision of law, the court shall not find that the non-custodial parent's pro rata share of such obligation is unjust or inappropriate on the basis that such share

exceeds the portion of a public assistance grant which is attributable to a child or children.   Where the non-custodial parent's income is less than or equal to the poverty income guidelines amount for a single person as reported by the federal department of health and human services, unpaid child support arrears in excess of five hundred dollars shall not accrue.

(h)  A validly executed agreement or stipulation voluntarily entered into between the parties after the effective date of this subdivision presented to the court for incorporation in an order or judgment shall include a provision stating that the parties have been advised of the provisions of this subdivision, and that the basic child support obligation provided for therein would presumptively result in the correct amount of child support to be awarded.   In the event that such agreement or stipulation deviates from the basic child support obligation, the agreement or stipulation must specify the amount that such basic child support obligation would have been and the reason or reasons that such agreement or stipulation does not provide for payment of that amount.   Such provision may not be waived by either party or counsel.   Nothing contained in this subdivision shall be construed to alter the rights of the parties to voluntarily enter into validly executed agreements or stipulations which deviate from the basic child support obligation provided such agreements or stipulations comply with the provisions of this paragraph.   The court shall, however, retain discretion with respect to child support pursuant to this section.   Any court order or judgment incorporating a validly executed agreement or stipulation which deviates from the basic child support obligation shall set forth the court's reasons for such deviation.

(i)  Where either or both parties are unrepresented, the court shall not enter an order or judgment other than a temporary order pursuant to section two hundred thirty-seven (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib1925f of this article, that includes a provision for child support unless the unrepresented party or parties have received a copy of the child support standards chart promulgated by the commissioner of the office of temporary and disability assistance pursuant to subdivision two of section one hundred eleven-i of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=SP&amp;originatingDoc=Ib1925f l).  Where either party is in receipt of child support enforcement services through the local social services district, the local social services district child support enforcement unit shall advise such party of the amount derived from application of the child support percentage and that such amount serves as a starting point for the determination of the child support award, and shall provide such party with a copy of the child support standards chart.

(j)  In addition to financial disclosure required in section two hundred thirty-six (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib1928e of this article, the court may require that the income and/or expenses of either party be verified with documentation including, but not limited to, past and present income tax returns, employer statements, pay stubs, corporate, business, or partnership books and records, corporate and business tax returns, and receipts for expenses or such other means of verification as the court determines appropriate.   Nothing herein shall affect any party's right to pursue discovery pursuant to this chapter, the civil practice law and rules, or the family court act.

(k)  When a party has defaulted and/or the court is otherwise presented with insufficient evidence to determine gross income, the court shall order child support based upon the needs or standard of living of the child, whichever is greater.   Such order may be retroactively modified upward, without a showing of change in circumstances.

(l)  In any action or proceeding for modification of an order of child support existing prior to the effective date of this paragraph, brought pursuant to this article, the child support standards set forth in this subdivision shall not constitute a change of circumstances warranting modification of such support order; provided, however, that (1) where the circumstances warrant modification of such order, or (2) where any party objects to an adjusted child support order made or proposed at the direction of the support collection unit pursuant to section one hundred eleven-h (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib192a H) or one hundred eleven-n of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib192a N), and the court is reviewing the current order of child support, such standards shall be applied by the court in

its determination with regard to the request for modification, or disposition of an objection to an adjusted child support order made or proposed by a support collection unit.   In applying such standards, when the order to be modified incorporates by reference or merges with a validly executed separation agreement or stipulation of settlement, the court may consider, in addition to the factors set forth in paragraph (f) of this subdivision, the provisions of such agreement or stipulation concerning property distribution, distributive award and/or maintenance in determining whether the amount calculated by using the standards would be unjust or inappropriate.

1-c.  (a)  Notwithstanding any other provision of this chapter to the contrary, no court shall make an order providing for visitation or custody to a person who has been convicted of murder in the first or second degree in this state, or convicted of an offense in another jurisdiction which, if committed in this state, would constitute either murder in the first or second degree, of a parent, legal custodian, legal guardian, sibling, half-sibling or step-sibling of any child who is the subject of the proceeding.   Pending determination of a petition for visitation or custody, such child shall not visit and no person shall visit with such child present, such person who has been convicted of murder in the first or second degree in this state, or convicted of and [3] offense in another jurisdiction which, if committed in this state, would constitute either murder in the first or second degree, of a parent, legal custodian, legal guardian, sibling, half-sibling or step-sibling of a child who is the subject of the proceeding without the consent of such child's custodian or legal guardian.

(b)  Notwithstanding any other provision of this chapter to the contrary, there shall be a rebuttable presumption that it is not in the best interests of the child to be placed in the custody of or to visit with a person who has been convicted of one or more of the following sexual offenses in this state or convicted of one or more offenses in another jurisdiction which, if committed in this state, would constitute one or more of the following offenses, when a child who is the subject of the proceeding was conceived as a result:  (A) rape in the first or second degree;  (B) course of sexual conduct against a child in the first degree;  (C) predatory sexual assault;  or (D) predatory sexual assault against a child.

(c)  Notwithstanding paragraph (a) or (b) of this subdivision a court may order visitation or custody where:

   (i)(A)  such child is of suitable age to signify assent and such child assents to such visitation or custody;  or

   (B)  if such child is not of suitable age to signify assent, the child's custodian or legal guardian assents to such order;  or

   (C)  the person who has been convicted of murder in the first or second degree, or an offense in another jurisdiction which if committed in this state, would constitute either murder in the first or second degree, can prove by a preponderance of the evidence that:

      (1)  he or she, or a family or household member of either party, was a victim of domestic violence by the victim of such murder;  and

      (2)  the domestic violence was causally related to the commission of such murder;

   (ii)  and the court finds that such visitation or custody is in the best interests of the child.

(d)  For the purpose of making a determination pursuant to clause (C) of subparagraph (i) of paragraph (c) of this subdivision, the court shall not be bound by the findings of fact, conclusions of law or ultimate conclusion as determined by the proceedings leading to the conviction of murder in the first or second degree in this state or of an offense in another jurisdiction which, if committed in this state, would constitute murder in either the first or second degree, of a parent, legal guardian, legal custodian, sibling, half-sibling or step-sibling of a child who is the subject of the proceeding.   In all proceedings under this section, an attorney shall be appointed for the child.

2.  (a)  [4] An order directing payment of money for child support shall be enforceable pursuant to section fifty-two hundred forty-one (https://1.next.westlaw.com/Link/Document/FullText?findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib19371 or fifty-two hundred forty-two of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText?findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib19371 or in any other manner provided by law.   Such orders or judgments for child support and maintenance shall also be enforceable pursuant to article fifty-two of the civil practice law and rules upon a debtor's default as

such term is defined in paragraph seven of subdivision (a) of section fifty-two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib19371

The establishment of a default shall be subject to the procedures established for the determination of a mistake of fact for income executions pursuant to subdivision (e) of section fifty-two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib19371

For the purposes of enforcement of child support orders or combined spousal and child support orders pursuant to section five thousand two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib19371 a "default" shall be deemed to include amounts arising from retroactive support.

b. (1) When a child receiving support is a public assistance recipient, or the order of support is being enforced or is to be enforced pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib1939 G), the court shall direct that the child support payments be made to the support collection unit. Unless (i) the court finds and sets forth in writing the reasons that there is good cause to require immediate income withholding; or (ii) when the child is not in receipt of public assistance, a written agreement providing for an alternative arrangement has been reached between the parties, the support collection unit shall issue an income execution immediately for child support or combined maintenance and child support, and may issue an execution for medical support enforcement in accordance with the provisions of the order of support. Such written agreement may include an oral stipulation made on the record resulting in a written order. For purposes of this paragraph, good cause shall mean substantial harm to the debtor. The absence of an arrearage or the mere issuance of an income execution shall not constitute good cause. When an immediate income execution or an execution for medical support enforcement is issued by the support collection unit, such income execution shall be issued pursuant to section five thousand two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib1939 except that the provisions thereof relating to mistake of fact, default and any other provisions which are not relevant to the issuance of an income execution pursuant to this paragraph shall not apply; provided, however, that if the support collection unit makes an error in the issuance of an income execution pursuant to this paragraph, and such error is to the detriment of the debtor, the support collection unit shall have thirty days after notification by the debtor to correct the error. Where permitted under federal law and where the record of the proceedings contains such information, such order shall include on its face the social security number and the name and address of the employer, if any, of the person chargeable with support; provided, however, that failure to comply with this requirement shall not invalidate such order. When the court determines that there is good cause not to immediately issue an income execution or when the parties agree to an alternative arrangement as provided in this paragraph, the court shall provide expressly in the order of support that the support collection unit shall not issue an immediate income execution. Notwithstanding any such order, the support collection unit shall issue an income execution for support enforcement when the debtor defaults on the support obligation, as defined in section five thousand two hundred forty-one of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib1939

(2) When the court issues an order of child support or combined child and spousal support on behalf of persons other than those in receipt of public assistance or in receipt of services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib193t G), the court shall issue an income deduction order pursuant to subdivision (c) of section five thousand two hundred forty-two of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib193t at the same time it issues the order of support. The court shall enter the income deduction order unless the court finds and sets forth in writing (i) the reasons that there is good cause not to require immediate income withholding; or (ii) that an agreement providing for an alternative arrangement has been reached between the parties. Such agreement may include a written agreement or an oral stipulation, made on the record, that results in a written order. For purposes of this paragraph, good cause shall mean substantial harm to the debtor. The absence of an arrearage or the mere issuance of an income deduction order shall not

constitute good cause.   Where permitted under federal law and where the record of the proceedings contains such information, such order shall include on its face the social security number and the name and address of the employer, if any, of the person chargeable with support;  provided, however, that failure to comply with this requirement shall not invalidate the order.   When the court determines that there is good cause not to issue an income deduction order immediately or when the parties agree to an alternative arrangement as provided in this paragraph, the court shall provide expressly in the order of support the basis for its decision and shall not issue an income deduction order.

c.   Any order of support issued on behalf of a child in receipt of family assistance or child support enforcement services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText?findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib193e6 G) shall be subject to review and adjustment by the support collection unit pursuant to section one hundred eleven-n of the social services law (https://1.next.westlaw.com/Link/Document/FullText?findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib193e6 N).   Such review and adjustment shall be in addition to any other activities undertaken by the support collection unit relating to the establishment, modification, and enforcement of support orders payable to such unit.

3.   Order of protection.   a.   The court may make an order of protection in assistance or as a condition of any other order made under this section.   The order of protection may set forth reasonable conditions of behavior to be observed for a specified time by any party.   Such an order may require any party:

(1) to stay away from the home, school, business or place of employment of the child, other parent or any other party, and to stay away from any other specific location designated by the court;

(2) to permit a parent, or a person entitled to visitation by a court order or a separation agreement, to visit the child at stated periods;

(3) to refrain from committing a family offense, as defined in subdivision one of section 530.11 of the criminal procedure law (https://1.next.westlaw.com/Link/Document/FullText?findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000066&amp;refType=SP&amp;originatingDoc=Ib194( or any criminal offense against the child or against the other parent or against any person to whom custody of the child is awarded or from harassing, intimidating or threatening such persons;

(4) to permit a designated party to enter the residence during a specified period of time in order to remove personal belongings not in issue in a proceeding or action under this chapter or the family court act;

(5) to refrain from acts of commission or omission that create an unreasonable risk to the health, safety or welfare of a child;

(6) to pay the reasonable counsel fees and disbursements involved in obtaining or enforcing the order of the person who is protected by such order if such order is issued or enforced;

(7) to refrain from intentionally injuring or killing, without justification, any companion animal the respondent knows to be owned, possessed, leased, kept or held by the person protected by the order or a minor child residing in such person's household.   "Companion animal," as used in this section, shall have the same meaning as in subdivision five of section three hundred fifty of the agriculture and markets law (https://1.next.westlaw.com/Link/Document/FullText?findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000049&amp;refType=SP&amp;originatingDoc=Ib194!

(8)(i) to promptly return specified identification documents to the protected party, in whose favor the order of protection or temporary order of protection is issued;  provided, however, that such order may: (A) include any appropriate provision designed to ensure that any such document is available for use as evidence in this proceeding, and available if necessary for legitimate use by the party against whom such order is issued;  and (B) specify the manner in which such return shall be accomplished.

(ii) For purposes of this subparagraph, "identification document" shall mean any of the following:  (A) exclusively in the name of the protected party: birth certificate, passport, social security card, health insurance or other benefits card, a card or document used to access bank, credit or other financial accounts or records, tax returns, any driver's license, and immigration documents including but not limited to a United States permanent resident card and employment authorization document;  and (B)

upon motion and after notice and an opportunity to be heard, any of the following, including those that may reflect joint use or ownership, that the court determines are necessary and are appropriately transferred to the protected party: any card or document used to access bank, credit or other financial accounts or records, tax returns, and any other identifying cards and documents; and

(9) to observe such other conditions as are necessary to further the purposes of protection.

a-1.  Translation and interpretation of orders of protection.  The office of court administration shall, in accordance with paragraph (t) of subdivision two of section two hundred twelve of the judiciary law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000091&amp;refType=SP&amp;originatingDoc=Ib19482 ensure that a court order of protection and temporary order of protection is translated in writing into the appropriate language for a party to a proceeding where the court has appointed an interpreter.  The office of court administration shall ensure that the standard language of the office of court administration order of protection and temporary order of protection forms shall be translated in writing in the languages most frequently used in the courts of each judicial department in accordance with paragraph (t) of subdivision two of section two hundred twelve of the judiciary law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000091&amp;refType=SP&amp;originatingDoc=Ib19482 A copy of the written translation shall be given to each party in the proceeding, along with the original order or temporary order of protection issued in English.  A copy of this written translation shall also be included as part of the record of the proceeding.  The court shall read the essential terms and conditions of the order aloud on the record and direct the court appointed interpreter to interpret the same terms and conditions. Such written translation or interpretation shall not affect the validity or enforceability of the order.  In every case a party to a proceeding shall be provided with an English copy of any court order of protection or temporary order of protection issued.  The authority contained herein shall be in addition to and shall not be deemed to diminish or reduce any rights of the parties under existing law.

b.  An order of protection entered pursuant to this subdivision shall bear in a conspicuous manner, on the front page of said order, the language "Order of protection issued pursuant to section two hundred forty of the domestic relations law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=IU&amp;originatingDoc=Ib194a9 The order of protection shall also contain the following notice:  "This order of protection will remain in effect even if the protected party has, or consents to have, contact or communication with the party against whom the order is issued.  This order of protection can only be modified or terminated by the court.  The protected party cannot be held to violate this order nor be arrested for violating this order.".  The absence of such language shall not affect the validity of such order.  The presentation of a copy of such an order to any peace officer acting pursuant to his or her special duties, or police officer, shall constitute authority, for that officer to arrest a person when that person has violated the terms of such an order, and bring such person before the court and, otherwise, so far as lies within the officer's power, to aid in securing the protection such order was intended to afford.

c.  An order of protection entered pursuant to this subdivision may be made in the final judgment in any matrimonial action or in a proceeding to obtain custody of or visitation with any child under this section, or by one or more orders from time to time before or subsequent to final judgment, or by both such order or orders and the final judgment.  The order of protection may remain in effect after entry of a final matrimonial judgment and during the minority of any child whose custody or visitation is the subject of a provision of a final judgment or any order.  An order of protection may be entered notwithstanding that the court for any reason whatsoever, other than lack of jurisdiction, refuses to grant the relief requested in the action or proceeding.

d.  The chief administrator of the courts shall promulgate appropriate uniform temporary orders of protection and orders of protection forms, applicable to proceedings under this article, to be used throughout the state. Such forms shall be promulgated and developed in a manner to ensure the compatibility of such forms with the statewide computerized registry established pursuant to section two hundred twenty-one-a of the executive law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000078&amp;refType=LQ&amp;originatingDoc=Ib194d0 A).

e.  No order of protection may direct any party to observe conditions of behavior unless:  (i) the party requesting the order of protection has served and filed an action, proceeding, counter-claim or written motion and, (ii) the court has made a finding on the record that such party is entitled to issuance of the order of

protection which may result from a judicial finding of fact, judicial acceptance of an admission by the party against whom the order was issued or judicial finding that the party against whom the order is issued has given knowing, intelligent and voluntary consent to its issuance.   The provisions of this subdivision shall not preclude the court from issuing a temporary order of protection upon the court's own motion or where a motion for such relief is made to the court, for good cause shown.   In any proceeding pursuant to this article, a court shall not deny an order of protection, or dismiss an application for such an order, solely on the basis that the acts or events alleged are not relatively contemporaneous with the date of the application or the conclusion of the action.   The duration of any temporary order shall not by itself be a factor in determining the length or issuance of any final order.

f.   In addition to the foregoing provisions, the court may issue an order, pursuant to section two hundred twenty-seven-c of the real property law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000129&amp;refType=LQ&amp;originatingDoc=Ib194f7 C), authorizing the party for whose benefit any order of protection has been issued to terminate a lease or rental agreement pursuant to section two hundred twenty-seven-c of the real property law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000129&amp;refType=LQ&amp;originatingDoc=Ib194f7 C).

g.   Any party moving for a temporary order of protection pursuant to this subdivision during hours when the court is open shall be entitled to file such motion or pleading containing such prayer for emergency relief on the same day that such person first appears at such court, and a hearing on the motion or portion of the pleading requesting such emergency relief shall be held on the same day or the next day that the court is in session following the filing of such motion or pleading.

h.   Upon issuance of an order of protection or temporary order of protection or upon a violation of such order, the court shall make a determination regarding the suspension and revocation of a license to carry, possess, repair or dispose of a firearm or firearms, ineligibility for such a license and the surrender of firearms in accordance with sections eight hundred forty-two-a (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000093&amp;refType=LQ&amp;originatingDoc=Ib194f7 A) and eight hundred forty-six-a of the family court act (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000093&amp;refType=LQ&amp;originatingDoc=Ib194f7 A), as applicable.   Upon issuance of an order of protection pursuant to this section or upon a finding of a violation thereof, the court also may direct payment of restitution in an amount not to exceed ten thousand dollars in accordance with subdivision (e) of section eight hundred forty-one of such act;  provided, however, that in no case shall an order of restitution be issued where the court determines that the party against whom the order would be issued has already compensated the injured party or where such compensation is incorporated in a final judgment or settlement of the action.

i.   The protected party in whose favor the order of protection or temporary order of protection is issued may not be held to violate such an order nor may such protected party be arrested for violating such order.

3-a.   [As amended by L. 2010, c. 261 (https://1.next.westlaw.com/Link/Document/FullText? findType=l&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1077005&amp;refType=SL&amp;originatingDoc=Ib19546 4411DF9518D-314411538FE)).   See, also, subd. 3-a, below.]  Service of order of protection.   a.   If a temporary order of protection has been issued or an order of protection has been issued upon a default, unless the party requesting the order states on the record that she or he will arrange for other means for service or deliver the order to a peace or police officer directly for service, the court shall immediately deliver a copy of the temporary order of protection or order of protection to a peace officer, acting pursuant to his or her special duties and designated by the court, or to a police officer as defined in paragraph (b) or (d) (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000066&amp;refType=LQ&amp;originatingDoc=Ib19546 of subdivision thirty-four of section 1.20 of the criminal procedure law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000066&amp;refType=SP&amp;originatingDoc=Ib19546 or, in the city of New York, to a designated representative of the police department of the city of New York. Any peace or police officer or designated person receiving a temporary order of protection or an order of protection as provided hereunder shall serve or provide for the service thereof together with any associated papers that may be served simultaneously, at any address designated therewith, including the summons and petition or complaint if not previously served.   Service of such temporary order of protection or order of

protection and associated papers shall, insofar as practicable, be achieved promptly. An officer or designated person obliged to perform service pursuant to this subdivision, and his or her employer, shall not be liable for damages resulting from failure to achieve service where, having made a reasonable effort, such officer or designated person is unable to locate and serve the temporary order of protection or order of protection at any address provided by the party requesting the order. A statement subscribed by the officer or designated person, and affirmed by him or her to be true under the penalties of perjury, stating the papers served, the date, time, address or in the event there is no address, place, and manner of service, the name and a brief physical description of the party served, shall be proof of service of the summons, petition and temporary order of protection or order of protection. When the temporary order of protection or order of protection and other papers, if any, have been served, such officer or designated person shall provide the court with an affirmation, certificate or affidavit of service and shall provide notification of the date and time of such service to the statewide computer registry established pursuant to section two hundred twenty-one-a of the executive law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000078&amp;refType=LQ&amp;originatingDoc=Ib19546 A).

b. Notwithstanding any other provision of law, all orders of protection and temporary orders of protection filed and entered along with any associated papers that may be served simultaneously may be transmitted by facsimile transmission or electronic means for expedited service in accordance with the provisions of this subdivision. For purposes of this subdivision, "facsimile transmission" and "electronic means" shall be as defined in subdivision (f) of rule twenty-one hundred three of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=SP&amp;originatingDoc=Ib1956c

3-a. [As amended by L.2010, c. 446 (https://1.next.westlaw.com/Link/Document/FullText? findType=l&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1077005&amp;refType=SL&amp;originatingDoc=Ib1956d7; B911DF8204E-CBB01AAF677)). See, also, subd. 3-a, above.] Service of order of protection. (a) If a temporary order of protection has been issued or an order of protection has been issued upon a default, unless the party requesting the order states on the record that she or he will arrange for other means for service or deliver the order to a peace or police officer directly for service, the court shall immediately deliver a copy of the temporary order of protection or order of protection together with any associated papers that may be served simultaneously including the summons and petition, to a peace officer, acting pursuant to his or her special duties and designated by the court, or to a police officer as defined in paragraph (b) or (d) (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000066&amp;refType=LQ&amp;originatingDoc=Ib1956c of subdivision thirty-four of section 1.20 of the criminal procedure law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000066&amp;refType=SP&amp;originatingDoc=Ib1956c or, in the city of New York, to a designated representative of the police department of the city of New York. Any peace or police officer or designated person receiving a temporary order of protection or an order of protection as provided in this section shall serve or provide for the service thereof together with any associated papers that may be served simultaneously, at any address designated therewith, including the summons and petition or complaint if not previously served. Service of such temporary order of protection or order of protection and associated papers shall, insofar as practicable, be achieved promptly. An officer or designated person obliged to perform service pursuant to this subdivision, and his or her employer, shall not be liable for damages resulting from failure to achieve service where, having made a reasonable effort, such officer or designated person is unable to locate and serve the temporary order of protection or order of protection at any address provided by the party requesting the order.

(b) When the temporary order of protection or order of protection and associated papers, if any, have been served, such officer or designated person shall provide the court with an affirmation, certificate or affidavit of service when the temporary order of protection or order of protection has been served, and shall provide notification of the date and time of such service to the statewide computer registry established pursuant to section two hundred twenty-one-a of the executive law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000078&amp;refType=LQ&amp;originatingDoc=Ib19594 A). A statement subscribed by the officer or designated person, and affirmed by him or her to be true under the penalties of perjury, stating the papers served, the date, time, address or in the event there is no address, place, and manner of service, the name and a brief physical description of the party served, shall be proof of service of the summons, petition and temporary order of protection or order of protection.

(c)  Where an officer or designated person obliged to perform service pursuant to this section is unable to complete service of the temporary order of protection or order of protection, such officer or designated person shall provide the court with proof of attempted service of the temporary order of protection or order of protection with information regarding the dates, times, locations and manner of attempted service.   An affirmation, certificate or affidavit of service with a statement subscribed by the officer or designated person, and affirmed by him or her to be true under the penalties of perjury, stating the name of the party and the papers attempted to be served on said person, and for each attempted service, the date, time, address or in the event there is no address, place, and manner of attempted service, shall be proof of attempted service.

(d)  Any peace or police officer or designated person performing service under this subdivision shall not charge a fee for such service, including, but not limited to, fees as provided under section eight thousand eleven of the civil practice law and rules (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000059&amp;refType=LQ&amp;originatingDoc=Ib195bb

3-b.  Emergency powers;  local criminal court.  If the court that issued an order of protection or temporary order of protection under this section or warrant in connection thereto is not in session when an arrest is made for an alleged violation of the order or upon a warrant issued in connection with such violation, the arrested person shall be brought before a local criminal court in the county of arrest or in the county in which such warrant is returnable pursuant to article one hundred twenty of the criminal procedure law and arraigned by such court.   Such local criminal court shall order the commitment of the arrested person to the custody of the sheriff, admit to, fix or accept bail, or release the arrested person on his or her recognizance pending appearance in the court that issued the order of protection, temporary order of protection or warrant.   In making such order, such local criminal court shall consider the bail recommendation, if any, made by the supreme or family court as indicated on the warrant or certificate of warrant.   Unless the petitioner or complainant requests otherwise, the court, in addition to scheduling further criminal proceedings, if any, regarding such alleged family offense or violation allegation, shall make such matter returnable in the supreme or family court, as applicable, on the next day such court is in session.

3-c.  Orders of protection;  filing and enforcement of out-of-state orders.   A valid order of protection or temporary order of protection issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction shall be accorded full faith and credit and enforced as if it were issued by a court within the state for as long as the order remains in effect in the issuing jurisdiction in accordance with sections two thousand two hundred sixty-five (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000546&amp;refType=LQ&amp;originatingDoc=Ib195e25 and two thousand two hundred sixty-six of title eighteen of the United States Code (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000546&amp;refType=LQ&amp;originatingDoc=Ib195e25

a.  An order issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction shall be deemed valid if:

(1)  the issuing court had personal jurisdiction over the parties and over the subject matter under the law of the issuing jurisdiction;

(2)  the person against whom the order was issued had reasonable notice and an opportunity to be heard prior to issuance of the order;  provided, however, that if the order was a temporary order of protection issued in the absence of such person, that notice had been given and that an opportunity to be heard had been provided within a reasonable period of time after the issuance of the order;  and

(3)  in the case of orders of protection or temporary orders of protection issued against both a petitioner and respondent, the order or portion thereof sought to be enforced was supported by:  (i) a pleading requesting such order, including, but not limited to, a petition, cross-petition or counterclaim;  and (ii) a judicial finding that the requesting party is entitled to the issuance of the order, which may result from a judicial finding of fact, judicial acceptance of an admission by the party against whom the order was issued or judicial finding that the party against whom the order was issued had give [5] knowing, intelligent and voluntary consent to its issuance.

b.  Notwithstanding the provisions of article fifty-four of the civil practice law and rules, an order of protection or temporary order of protection issued by a court of competent jurisdiction in another state, territorial or tribal jurisdiction, accompanied by a sworn affidavit that upon information and belief such order is in effect as written and has not been vacated or modified, may be filed without fee with the clerk of the court, who shall

transmit information regarding such order to the statewide registry of orders of protection and warrants established pursuant to section two hundred twenty-one-a of the executive law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000078&amp;refType=LQ&amp;originatingDoc=Ib1963C A); provided, however, that such filing and registry entry shall not be required for enforcement of the order.

4.  One-time adjustment of child support orders issued prior to September fifteenth, nineteen hundred eighty-nine.  Any party to a child support order issued prior to September fifteenth, nineteen hundred eighty-nine on behalf of a child in receipt of public assistance or child support services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib196307 G) may request that the support collection unit undertake one review of the order for adjustment purposes pursuant to section one hundred eleven-h of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib196307 H).  A hearing on the adjustment of such order shall be granted upon the objection of either party pursuant to the provisions of this section.  An order shall be adjusted if as of the date of the support collection unit's review of the correct amount of child support as calculated pursuant to the provisions of this section would deviate by at least ten percent from the child support ordered in the current order of support.  Additionally, a new order shall be issued upon a showing that the current order of support does not provide for the health care needs of the child through insurance or otherwise.  Eligibility of the child for medical assistance shall not relieve any obligation the parties otherwise have to provide for the health care needs of the child.  The support collection unit's review of a child support order shall be made on notice to all parties to the current support order.  Nothing herein shall be deemed in any way to limit, restrict, expand or impair the rights of any party to file for a modification of a child support order as is otherwise provided by law.

(1)  Upon mailing of an adjustment finding and where appropriate a proposed order in conformity with such finding filed by either party or by the support collection unit, a party shall have thirty-five days from the date of mailing to submit to the court identified thereon specific written objections to such finding and proposed order.

(a)  If specific written objections are submitted by either party or by the support collection unit, a hearing shall be scheduled by the court on notice to the parties and the support collection unit, who then shall have the right to be heard by the court and to offer evidence in support of or in opposition to adjustment of the support order.

(b)  The party filing the specific written objections shall bear the burden of going forward and the burden of proof;  provided, however, that if the support collection unit has failed to provide the documentation and information required by subdivision fourteen of section one hundred eleven-h of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=SP&amp;originatingDoc=Ib1967 H), the court shall first require the support collection unit to furnish such documents and information to the parties and the court.

(c)  If the court finds by a preponderance of the evidence that the specific written objections have been proven, the court shall recalculate or readjust the proposed adjusted order accordingly or, for good cause, shall remand the order to the support collection unit for submission of a new proposed adjusted order.  Any readjusted order so issued by the court or resubmitted by the support collection unit after a remand by the court shall be effective as of the date the proposed adjusted order would have been effective had no specific written objections been filed.

(d)  If the court finds that the specific written objections have not been proven by a preponderance of the evidence, the court shall immediately issue the adjusted order as submitted by the support collection unit, which shall be effective as of the date the order would have been effective had no specific written exceptions been filed.

(e)  If the court receives no specific written objections to the support order within thirty-five days of the mailing of the proposed order the clerk of the court shall immediately enter the order without further review, modification, or other prior action by the court or any judge or support magistrate thereof, and the clerk shall immediately transmit copies of the order of support to the parties and to the support collection unit.

(2)  A motion to vacate an order of support adjusted pursuant to this section may be made no later than forty-five days after an adjusted support order is executed by the court where no specific written objections to the proposed order have been timely received by the court.   Such motion shall be granted only upon a determination by the court issuing such order that personal jurisdiction was not timely obtained over the moving party.

5.   [As added by L.1997, c. 398, § 6 (https://1.next.westlaw.com/Link/Document/FullText? findType=I&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1077005&amp;refType=SL&amp;originatingDoc=Ib196ccb1 DC45BFBAC20-328F97CDC1C)).   See, also, subd. 5 below.]  Provision of child support orders to the state case registry.   The court shall direct that a copy of any child support or combined child and spousal support order issued by the court on or after the first day of October, nineteen hundred ninety-eight, in any proceeding under this section be provided promptly to the state case registry established pursuant to subdivision four-a of section one hundred eleven-b of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=SP&amp;originatingDoc=Ib196ccb B).

5.   [As added by L.1997, c. 398, § 103 (https://1.next.westlaw.com/Link/Document/FullText? findType=I&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1077005&amp;refType=SL&amp;originatingDoc=Ib196ccb4 DC45BFBAC20-328F97CDC1C)).   See, also, subd. 5 above.]  On-going cost of living adjustment of child support orders issued prior to September fifteenth, nineteen hundred eighty-nine.   Any party to a child support order issued prior to September fifteenth, nineteen hundred eighty-nine on the behalf of a child in receipt of public assistance or child support services pursuant to section one hundred eleven-g of the social services law (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000136&amp;refType=LQ&amp;originatingDoc=Ib196ccb G) may request that the support collection unit review the order for a cost of living adjustment in accordance with the provisions of section two hundred forty-c (https://1.next.westlaw.com/Link/Document/FullText? findType=L&amp;originatingContext=document&amp;transitionType=DocumentItem&amp;pubNum=1000068&amp;refType=LQ&amp;originatingDoc=Ib196ccb C) of this article.

1  50 App. USCA § 501 et seq.

2  So in original.

3  So in original.   "and" should be "an".

4  So in original.   Probably should be "a.".

5  So in original ("give" should be "given").

« Prev (https://codes.findlaw.com/ny/domestic-relations-law/dom-sect-239.html)

Next » (https://codes.findlaw.com/ny/domestic-relations-law/dom-sect-240-a.html)



Cite this article: FindLaw.com - New York Consolidated Laws, Domestic Relations Law - DOM § 240. Custody and child support;  orders of protection - *last updated January 01, 2021* | https://codes.findlaw.com/ny/domestic-relations-law/dom-sect-240/ (https://codes.findlaw.com/ny/domestic-relations-law/dom-sect-240/)

Read this complete New York Consolidated Laws, Domestic Relations Law - DOM § 240. Custody and child support;  orders of protection on Westlaw (https://1.next.westlaw.com/Document/IE176C0D01FA211E9B4DE89E619644DD8/View/FullText.html? originationContext=documenttoc&transitionType=CategoryPageItem&contextData=(sc.Default))

FindLaw Codes may not reflect the most recent version of the law in your jurisdiction. Please verify the status of the code you are researching with the state legislature or via Westlaw before relying on it for your legal needs.

Was this helpful?   Yes   No

⬆ <u>BACK TO TOP</u>

# FindLaw.

**Questions?**
At FindLaw.com, we pride ourselves on being the number one source of free legal information and resources on the web. <u>Contact us. (https://www.findlaw.com/company/contact-us/contacts.html)</u>

**Stay up-to-date with how the law affects your life.** Sign up for our consumer newsletter.

ENTER YOUR EMAIL ADDRESS

> 

**ABOUT US** ˃ **(https://www.findlaw.com/company.html)**

Our Team (https://www.findlaw.com/company/our-team.html)

Accessibility (https://www.findlaw.com/company/our-commitment-to-accessibility.html)

Contact Us (https://www.findlaw.com/company/contact-us/contacts.html)

**FIND A LAWYER** ˃ **(https://lawyers.findlaw**

By Location (https://lawyers.findlaw.com/lawyer

By Legal Issue (https://lawyers.findlaw.com/law

By Lawyer Profiles (https://lawyers.findlaw.com/profile/profiles/law

By Name (https://lawyers.findlaw.com/lawyer/lawyer_dir/

**SELF-HELP RESOURCES**

Legal Forms & Services (https://www.findlaw.com/forms.html)

(https://www.youtube.com/watch?
'www.facebook.com/findlaw/ fdlaw/infographicsprorofindlaw_com/)
v=WQiNbzaZOhw)

Copyright © 2023, Thomson Reuters. All rights reserved.
Terms (https://www.findlaw.com/company/findlaw-terms-of-service.html) | Privacy (https://www.findlaw.com/company/privacy/privacy-statement.html)
| Disclaimer (https://www.findlaw.com/company/disclaimer.html) | Cookies (https://www.thomsonreuters.com/en/privacy-statement.html#cookies)
| Do Not Sell My Information (https://privacyportal-cdn.onetrust.com/dsarwebform/dbf5ae8a-0a6a-4f4b-b527-7f94d0de6bbc/5dc91c0f-f1b7-4b6e-9d42-76043adaf72d.html)



# EXHIBIT E

# Report from the
# **Special Adviser on Equal Justice**
# in the New York State Courts





October 1, 2020

TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................. 1

I. OUR WORK .......................................................................... 10

    A. The Mandate ...................................................................... 10
    B. Engagement with Stakeholders ................................................ 10
    C. Materials Received from Interviewees ...................................... 13
    D. Public Contacts .................................................................. 13
    E. Research .......................................................................... 13
    F. Court Visits ...................................................................... 14

II. THE NEW YORK STATE COURT SYSTEM ................................. 15

    A. History of the New York State Courts ...................................... 15
    B. Today's New York State Court System ...................................... 17
    C. Lower Courts Within New York City ........................................ 22
    D. Lower Courts Outside New York City ...................................... 23
    E. The Proposed Merger Plan .................................................... 25
    F. Case Volume ...................................................................... 25

III. ADDRESSING RACE IN THE COURT SYSTEM ........................... 27

    A. The Minorities Commission ................................................... 27
    B. The Franklin H. Williams Commission .................................... 29
    C. Race in the Town and Village Courts ...................................... 31

IV. DEMOGRAPHICS OF THE JUDICIARY ................................... 32

    A. Diversity of the Judiciary Over Time ...................................... 32
    B. Diversity of the 2020 Judiciary Compared to the Populations Served ........ 35

V. POLICIES, PRACTICES, PROGRAMS AND ORGANIZATIONS DESIGNED
    TO ADDRESS BIAS IN THE NEW YORK STATE COURT SYSTEM ......... 42

    A. The Franklin H. Williams Commission ...................................... 42
    B. Managing IG for Bias Matters ............................................... 43
    C. OCA's Office of Diversity and Inclusion .................................. 45
    D. Anti-Discrimination Panels ................................................... 46
    E. Disproportionate Minority Representation Committee .................... 47
    F. Bias Training for Judges ...................................................... 47
    G. Training for Non-Judicial Personnel ...................................... 50

TABLE OF CONTENTS CONT'D

H. Training for Personnel in Town and Village Courts ...................................... 51
I. Training Efforts of Judicial Districts ........................................................ 52

**VI. WHAT WE HEARD** ............................................................................... **54**

A. An Under-Resourced, Over-Burdened Court System ................................... 54
B. Existing Institutions Addressing Racial Bias are Inadequate,
Opaque or Unknown ............................................................................ 59
C. Court Officers ..................................................................................... 61
D. Issues Facing Attorneys of Color .......................................................... 66
E. Judicial Diversity ................................................................................ 67
F. Diversity Within the UCS Bureaucracy .................................................. 70
G. Bias Training ...................................................................................... 72
H. Juries ................................................................................................. 74
I. Assigned Counsel ................................................................................ 75
J. Translation and Interpretation Services .................................................. 76
K. Town and Village Courts ..................................................................... 77

**VII. RECOMMENDATIONS** ........................................................................ **79**

A. A Commitment From the Top ................................................................ 79
B. Promote Existing Institutions ............................................................... 80
C. Expand Bias Training .......................................................................... 81
D. Address Juror Bias .............................................................................. 83
E. Adopt a Social Media Policy ................................................................ 84
F. Strengthen the IG Process for Bias Complaints ...................................... 87
G. Review of Rules Changes for Bias ........................................................ 90
H. Continue Progress on Translation and Interpretation Services .................. 91
I. Improve Data Collection and Stewardship Practices ................................ 91
J. Improve Diversity and Inclusion within HR Practices .............................. 95
K. Enhance Trust between Court Officers and the Community ....................... 98
L. Facilitate Navigation of Courthouses .................................................... 99
M. Ensure Implementation of Change ........................................................ 100

# EXECUTIVE SUMMARY

October 1, 2020

Dear Chief Judge DiFiore:

On June 9, 2020, Your Honor appointed me to conduct a review of racial bias in the New York State court system. I salute your willingness to call for this review on this topic, at this time. You asked that I deliver this report and recommendations by today, October 1, 2020.

To conduct this review, I was ably assisted by a number of my colleagues at the law firm of Paul, Weiss, Rifkind, Wharton & Garrison, LLP.[1] We also enlisted the advice and input of Professor Harold Goldstein, an industrial psychologist at Baruch College, The City University of New York, and his team at Siena Consulting. Professor Goldstein and I, and our respective firms, undertook this assignment pro bono. We received no compensation or reimbursement from the court system for our work on this matter. Finally, throughout this review, I was advised and supported by Justices Troy Webber and Shirley Troutman, co-chairs of the Franklin H. Williams Judicial Commission, and a number of your other colleagues in the New York State judiciary.

Since my appointment four months ago, my team and I conducted 96 interviews involving 289 individuals. We interviewed current or former judges from almost every type of court upstate and downstate. Our team interviewed court clerks, court watchers, court officers, court attorneys and administrative personnel, private civil and criminal practitioners, institutional and public defenders and prosecutors. We engaged numerous bar associations, judicial associations, court employee unions, court reform organizations and affinity groups. Along with the recommendations set forth below, we believe it important to convey to you what we heard from these interviews, and we do so in Section VI of this report (pp. 54–78).

In general, people we spoke with welcomed this review and were anxious to talk with us. Some organizations canvassed their respective memberships and came forward with their own thoughtful written observations and recommendations. To promote candor from interviewees, we promised that their statements would not be attributed to them by name unless we received explicit permission to do so. At my request, OCA created a public

---

[1]   This Paul, Weiss team included counsel Maria H. Keane, associates Amitav Chakraborty, Lissette Duran, Anna Gonzalez, Kimberly Grambo, Danielle Hayes, Vincent Honrubia, Madison Lupino, Agbeko Petty and Jonathan Wall, summer Associates Claire Abbadi (Columbia Law '21), Sheridan Cunningham (Harvard Law '21) and Tobias Kuehne (Yale Law '21) and paralegals Zachary Hoffman and Erin Mah.

email address to enable individuals to submit anonymously to my team and me information about their experiences with racial bias in the court system. In the course of this review, I received numerous unsolicited letters, phone calls, emails and voicemails from individual members of the public and various organizations concerning racial bias in the courts. Our team studied past reports that examined racial bias in the New York State court system. We also received and reviewed OCA's policies and practices on hiring, promotion, workplace conduct and bias training.

Given COVID-19, my opportunity to visit courts and observe in-person proceedings around the state was limited, though I did have the opportunity to personally visit several courts toward the end of this review.

As written, your assignment to me was a nuanced one. In sum, you asked me to review existing polices, practices and organizations within the New York State court system that are intended to address racial bias and recommend any changes or expansion of those policies, practices and organizations. You did not ask me to undertake a comprehensive review of criminal and civil justice throughout the system – encompassing, for example, jury selection, detention, police, bail or sentencing practices, or the substance of judicial decision-making – for evidence of racial bias. In fact, you have asked the Justice Task Force to study the issue of racial disparity in stops, arrests, charging decisions and jury selection. Thus, I have avoided the temptation (and the invitation of some) to wander into that vast forest.

That said, I have three big-picture observations to share:

*First*, though it has been 16 years since I chaired the Judiciary Committee of the New York City Bar Association, I was reminded over the last four months of the intense pride and dedication that many in and around the New York State court system – from the upstate Village justice to the Kings County Family Court judge – feel for their work. Particularly given the challenges over the last seven months associated with COVID-19, you should take great comfort that many in the court system you lead work hard to get it right and make it better.

*Second*, there is the bad news. This review would lack credibility if I omitted it. Through Your Honor's Excellence Initiative considerable progress has been made since 2016 to improve promptness, productivity, disposition rates, reduce case backlogs and modernize courtrooms. But, in one form or another, multiple interviewees from all perspectives still complain about an under-resourced, over-burdened New York State court system, the dehumanizing effect it has on litigants, and the disparate impact of all this on people of color. Housing, Family, Civil and Criminal courts of New York City, in

particular, continue to be faced with extremely high volumes of cases, fewer resources to hear those cases and aging facilities. Over and over, we heard about the "dehumanizing" and "demeaning cattle-call culture" in these high-volume courts. At the same time, the overwhelming majority of the civil or criminal litigants in the Housing, Family, Civil and Criminal courts in New York City are people of color. The sad picture that emerges is, in effect, a second-class system of justice for people of color in New York State. This is not new. In 1991, a Minorities Commission appointed by then-Chief Judge Wachtler declared "there are two justice systems at work in the courts of New York State, one for Whites, and a very different one for minorities and the poor."[2]

As intended, the proposed merger plan will also achieve efficiencies and improve things. But, problems so extensive and systemic in nature can only be addressed by a new, wholesale investment in resources, technology, people and infrastructure. Obviously, you do not have the power to make these changes alone. The judiciary cannot print money or tax the people. This is a matter for all three branches of New York State government, as well as the local governments that own and maintain the courthouses. Should this report become public, my hope is that it aids you in obtaining greater legislative and executive support for the judicial branch, at both the state and local level.

*Third*, I must report that the news in June of the vile, racist Facebook posting by the Brooklyn-based court officer appears to have peeled the lid off long-simmering racial tensions and intolerance within the court officer community, particularly in Kings County. This, too, is not new. In 1991, the Minorities Commission noted racial tensions that existed then within the court officer community. In 2020, a number of court officers of color were outspoken to us in expressing similar grievances, and told us the Facebook post was not an isolated incident. According to court officers of color, the use of racial slurs by white court officers is common and often goes unpunished. These court officers also told us they felt they could not report incidents of bias for fear of being ostracized by their fellow officers and facing adverse career consequences from powerful and entrenched union leaders. We note that at least one union leader has himself posted offensive messages on social media, leading several court officers to brand union leadership as a "safe haven for racist speech and actions."

For this review, I took very seriously (and, from my own experience in public office, agree with) your direction to only recommend changes to the system that "center on operational issues that lie within the power of the court system to implement

---

[2]    REPORT OF THE NEW YORK STATE JUDICIAL COMMISSION ON MINORITIES, Vol. 1, at 1 (1991) [hereinafter MINORITIES COMMISSION REPORT].

administratively and unilaterally." To that end, my team and I worked hard to put forth the following recommendations that are specific, practical and workable:

**A Commitment From the Top.** Just as the legislature has mandated for all state personnel on matters of sexual harassment, we recommend that the court system's leadership embrace a "zero tolerance" policy for racial bias, and explain that the duty to uphold this policy extends to all those working within the New York State court system – from judges, to interpreters, to court officers. While we note that OCA's current discrimination policies state that "the Unified Court System prohibits and will not tolerate . . . discrimination or harassment" on the basis of race, we suggest a more robust, publicized policy specifically addressing racial bias is warranted.

**Promote Existing Institutions.** From our interviews it is apparent that there is a considerable lack of transparency within the court system on matters of race and racial bias. Interviewees across the board were unfamiliar with many of the existing institutions dedicated to addressing issues of racial bias, as well as the nature of their missions. Others suggested such organizations were "running out of steam." We endorse the continued missions of the Williams Commission and OCA's Office of Diversity and Inclusion, for example, but we recommend a reemphasis on promoting, clarifying and strengthening the mandate of these existing organizations.

**Expand Bias Training.** The Williams Commission recently recommended regular, mandatory training on bias for all judicial and non-judicial personnel across the court system. We agree. Countless interviewees told us that mandatory implicit bias and cultural sensitivity training is long overdue for judicial and non-judicial personnel in the New York State court system. At present, it appears that such training is both inconsistent and insufficient.

Judges are human, too. They are not above the reach of the implicit racial biases that pervade our society, yet equality before the law requires them to be. Multiple judges we spoke with were willing to acknowledge their own implicit biases and recognized the value of training to open minds and challenge stereotypes. As we understand it, new judges receive bias training at a plenary session during summer sessions at the Judicial Institute in White Plains. Beyond that, the Judicial Institute provides a yearly session on implicit bias that may be accessed remotely as a video, but it is not mandatory.

We perceive an equal if not greater need for more robust bias training for non-judicial personnel, particularly the court officer community. Interviewees have relayed innumerable stories of dehumanizing language by court officers towards litigants of color, as well as instances where tensions were directly escalated by courts officers' actions. But,

it appears that the only "mandatory" training that OCA's Human Resources department uniformly provides to non-judicial personnel is delivered as part of the orientation for new employees and covers "discrimination and harassment," but not implicit bias, specifically. As for court officers, we understand there is a form of implicit bias training at the Court Officer Academy, but we are told that the training provided was lacking, and that it did not actually prioritize understanding racial bias.

In all, it appears there is no centralized body charged with developing, administering, tracking and updating training on racial bias and cultural sensitivity for judicial and non-judicial personnel. We recommend that OCA develop and require comprehensive racial bias and cultural sensitivity training for both judicial and non-judicial personnel, informed by experts in these fields. This training must be multidimensional and address the overlap between issues of race, class, gender, sexual orientation, immigration status, trauma and beyond, in order to ensure more relevant and nuanced discussions.

**Address Juror Bias.** Interviewees expressed to us a number of concerns about juror bias. Jurors are human, too, and bring to the courtroom all the biases and prejudices they are exposed to in our society. To address this:

*First*, we recommend that OCA create and display a video educating jurors about implicit bias before *voir dire*. We understand that in many, if not all, state courthouses where jurors are summoned and selected for trials, prospective jurors are already shown a general orientation video. We recommend that OCA work with court personnel, outside experts and members of the bar to include within that video orientation a carefully balanced message on implicit bias that can be shown to venire panels of jurors.

*Second*, we recommend that Your Honor appoint a new or standing committee to investigate and formulate a proposal to create uniform rules to explicitly permit and endorse *voir dire* of jurors on racial bias. Trial attorneys have told us that the practice of permitting *voir dire* on the subject of implicit bias is inconsistent, and that certain judges allow *voir dire* on such questions while others do not.

*Third*, we recommend that a model jury instruction on implicit bias be developed for both criminal and civil trials. A number of courts around the country have adopted jury charges that explain the concept of implicit bias and remind jurors to be aware of their implicit biases. As we understand it, OCA can utilize standing committees for criminal and civil pattern jury instructions to develop standard language on implicit bias.

**Adopt a Social Media Policy.** We recommend that OCA develop a policy for judicial and non-judicial personnel that provides clear restrictions on the use of social media – whether in an official or personal capacity – for racially or culturally offensive remarks

that reflect poorly on the court system. Our reading of the law is that such a policy is legally permissible. *See, e.g., Festa* v. *Westchester Medical Ctr. Health Network*, 380 F. Supp. 3d 308, 319–321 (S.D.N.Y. 2019) (finding that public hospital may discipline an employee for an off-hours anti-Semitic Facebook post if it would disrupt the hospital's ability to serve the local community and "cause harm within the ranks"). We note that other court systems around the country have implemented social media policies to ensure that employees' online activity does not undermine public confidence in the operation of the courts and the application of justice. A social media policy may prohibit communications that constitute harassment or racially offensive remarks, but should be drafted in a way that will not prohibit protected activities under the National Labor Relations Act.

**Strengthen the Inspector General Process for Bias Complaints.** After consulting a retired Inspector General with extensive experience in the U.S. government and other sources, we recommend that OCA adopt the following best practices to improve its complaints and investigations processes:

*First*, given the number of interviewees – judicial and non-judicial – who were unaware that mechanisms for making bias complaints even existed, we recommend that OCA engage in a robust campaign to educate court system participants about the existence and purpose of these offices and the procedures to lodge a bias complaint.

*Second*, we recommend that OCA clarify its retaliation policy to better assuage concerns that interviewees across the spectrum cited about filing complaints. While the current policy states that retaliation is prohibited, the definition of retaliation provided in OCA's discrimination booklet is narrow, difficult to understand and only provides a few examples of very formal, narrow work-related actions of retaliation, such as termination or a demotion with a decrease in wage or salary.

*Third*, we recommend that OCA update its policies and publicly available resources to more clearly explain that complaints may be made anonymously.

*Fourth*, we recommend that OCA update and clarify its current public guidance about informal complaint mechanisms.

*Fifth*, we recommend that, following a complaint, OCA routinely follow up with the complainant to apprise him or her of the status of the investigation initiated by the complaint, and, to the extent permitted by law and privacy concerns, apprise the complainant of the outcome of the investigation. We are advised by an experienced retired IG that this simple act goes a long way to promote credibility and confidence in the process.

*Sixth*, we recommend that OCA designate an ombudsperson within the IG office to advise potential complainants of their options for registering their concerns. We note that several state court systems and federal agencies maintain similar offices to help individuals navigate complaint systems.

*Seventh*, we recommend that OCA track and annually report the number of racial bias or race discrimination complaints received, investigated and where possible, substantiated.

**Review of Rules Changes for Bias.** Next, we recommend that one of the existing institutions for addressing bias – the Williams Commission, the IG for Bias Matters or the Office of Diversity and Inclusion – be tasked with the standing responsibility to review legislation, proposed constitutional amendments, regulations and rules changes pertaining to the state judiciary for any potential bias or disparate impact on people of color, and convey any such concerns to the Chief Administrative Judge. This was suggested to us by the National Center for State Courts and there is precedent for it among government agencies.

**Continue Progress on Translation and Interpretation Services.** We note that in 2017, the New York State Advisory Committee on Language Access issued a "Strategic Plan" for implementing a number of good recommendations to improve translation and implementation services throughout the state, and we are told implementation of these recommendations is underway. We have heard positive feedback about implementation of the Strategic Plan, and we endorse the Plan's recommendations.

**Improve Data Collection.** We regret to report that the New York State court system's data collection and publication practices have fallen behind those of other states. We therefore recommend that OCA both expand on categories of data already collected and collect additional, more robust and rigorously audited information that will help create a baseline to measure progress on fighting disparate case outcomes, beyond that which is required by the recently enacted Police Statistics and Transparency Act and the recent amendments to the bail reform law.

**Improve Diversity and Inclusion within HR Practices.** Throughout the course of our investigation, interviewees frequently raised the lack of diversity within the court system's workforce, and their perception that diversity is not a serious consideration for leadership. Specifically, several interviewees asserted that diverse employees are underrepresented in senior leadership positions, particularly within the OCA bureaucracy. To cure this, we recommend a number of HR reforms developed with assistance from an expert in the field, Professor Harold Goldstein. While they are most aptly suited for the

non-judicial workforce, some may also be applicable to the judiciary, to the extent that they are within OCA's power to implement.

**Enhance Trust between Court Officers and the Community.** According to judges, public defender organizations, bar associations and numerous others, court officer mistreatment of litigants of color, their families, and attorneys of color is a significant barrier to achieving equality in the court system. In addition to the recommendations above that would impact the court officer community, we recommend these changes for court officers specifically: court officers should be required to wear name tags, and, similar to the NYPD Patrol Guide, OCA should publicly post the rules that court officers must follow in carrying out their official duties, including use-of-force guidelines.

**Facilitate Navigation of Courthouses.** Interviewees recommended a "greeter" in courthouses on a more widespread basis. We agree, and recommend that there be a designated individual within each courthouse whose role is to welcome litigants and answer basic questions about how to navigate the building and adhere to general procedures and practices. Likewise, helpful, clear, signage and written guidance within courthouses is essential to ensuring that litigants are able to navigate the courthouse and understand the proceedings before them.

**Ensure Implementation of Change.** Finally, experience shows that recommendations matter little if there is no follow-through on the implementation of them; far too often, reports and recommendations such as these are placed on a shelf and gather dust unless there is a commitment to put words into action. We recommend that Your Honor appoint an entity or group to, on an ongoing basis, monitor and report on implementation of the recommendations here that are adopted.

*　　　*　　　*　　　*　　　*

One final thought: This review comes at a particularly tense moment for race relations in America. Black Americans watch an unrelenting parade of video images of their people's lives snuffed out like animals at the hunt, at the hands of law enforcement in this jurisdiction and beyond. They conclude, with considerable evidence to support it, that in the eyes of law enforcement their lives do not matter as much as those of whites. The very notion of equality under law is today cast in serious doubt.

You are obviously committed to change and the assessment of hard questions, which is why you asked for this review. In my assessment as a lawyer, a student of history, a former public official, and as an African American, this is a moment that demands a strong and

8

pronounced rededication to equal justice under law by the New York State court system. It is also my experience that credibility will only be earned if the public sees both strong commitments to reform at the front end and a sustained effort to follow through on those commitments, during your tenure as Chief Judge and beyond.

Respectfully submitted,

Jeh Charles Johnson

# I. OUR WORK

## A. **The Mandate**

On June 9, 2020, Chief Judge DiFiore appointed Secretary Johnson to conduct "an independent review of the New York State court system's response to issues of institutional racism," and to make "[r]ecommendations [that] center on operational issues that lie within the power of the court system to implement administratively and unilaterally."[3]  Chief Judge DiFiore directed that Secretary Johnson deliver this report and recommendations by October 1, 2020.

In specific terms, the Chief Judge's assignment was to:

- Review the policies and statewide practices of the court system that explicitly address issues of racial bias, with recommendations as to the revision and expansion of such practices.
- Review the structure, operations and effectiveness of organizations and programs within the court system designed to address issues of systemic and implicit bias, and to make recommendations for necessary changes to such structure and operations.
- Review bias education and training practices of judges and non-judicial personnel to ensure that such training maximizes the understanding of all court personnel on the challenging issues of racial justice, with recommendations for necessary changes in such practices.
- Review the practices of selection and appointment of judicial and non-judicial officers and employees within the court system, with recommendations to ensure that those practices are consistent with the highest standards of fairness, equity and inclusiveness.
- Review court policies and programs to ensure they are free of racism and other bias, with recommendations for the amendment of such policies and programs.

## B. **Engagement with Stakeholders**

To conduct our work, our team solicited the views of various stakeholders in the New York State court system to gain a comprehensive understanding of the issues concerning racial bias.  These stakeholders included current and former judges, non-judicial personnel

---

[3]  Press Release, Hon. Lawrence K. Marks, *Aiming to Advance Equal Justice in the Courts, Chief Judge DiFiore Announces Independent Review of Court System Policies, Practices and Initiatives* (June 9, 2020), https://www.nycourts.gov/LegacyPDFS/press/pdfs/PR20_24.pdf.

with the Office of Court Administration ("OCA"), district attorneys, prosecutors, public defenders, private attorneys, bar associations, judges' associations and representatives from court employee unions.

More specifically, we engaged a broad range of people in and around the New York State court system, including individuals from the following:

- Administration for Children's Services
- Asian American Bar Association of New York
- Asian American Judges Association
- Association of Latino Judges
- Brooklyn Defender Services
- Bronx Defenders
- Caribbean American Lawyers Association
- Center for Court Innovation
- Commission on Judicial Conduct
- District Attorneys of Albany, Bronx, Dutchess, Erie, Kings, Monroe, New York, Suffolk, Queens and Westchester Counties
- Dominican Bar Association
- Dutchess County Public Defender
- Franklin H. Williams Judicial Commission on Minorities
- Fund for Modern Courts
- Guardians Association of the New York State Courts
- Judicial Friends Association, Inc.
- Latino Court Officers Society
- Latino Judges Association
- Legal Aid Bureau of Buffalo
- Legal Aid Society of New York City
- Legal Aid Society of Northeastern New York
- Legal Services Of the Hudson Valley
- Manhattan Legal Services
- Mayor's Office of Criminal Justice
- Measures for Justice
- Metropolitan Black Bar Association
- Mobilization for Justice, Inc.
- Monroe County Public Defender
- National Center for State Courts

11

- New York City Association of Criminal Court Judges
- New York City Association of Housing Judges
- New York City Bar Association
- New York City Criminal Court Judges Association
- New York City Family Court Judges Association
- New York City Housing Court Judges Association
- New York City Law Department
- New York City Mayor's Office of Criminal Justice
- New York County Clerk
- New York Courts Shomrim Society
- New York State Association of Criminal Defense Attorneys
- New York State Court Clerks Association
- New York State Court Officers Association
- New York State Family Court Judges Association
- New York State Judicial Institute
- Northern Manhattan Improvement Corporation
- OCA Office of Diversity and Inclusion
- OCA Counsel's Office
- OCA Human Resources
- Office of the Appellate Defender
- Office of the Inspector General
- Puerto Rican Bar Association
- South Asian Bar Association
- Tribune Society
- Westchester Magistrates Association

In all, we conducted 96 interviews involving 289 individuals. We interviewed current or former judges from the Court of Appeals, the Appellate Divisions, the trial-level Supreme Courts, County Courts, City Courts and Town and Village Courts. Our team interviewed court clerks, court officers, court attorneys and administrative personnel of OCA. We interviewed prosecutors, private civil and criminal practitioners, public defenders and attorneys acting as assigned counsel.

To promote candor from all interviewees, in this report we do not by name attribute (unless authorized) narratives or quotations to specific individuals interviewed.

**C. Materials Received from Interviewees**

In addition to our interviews, we received and reviewed over 200 documents, including memoranda and emails supplementing answers given during interviews, pictures and emails documenting instances of discrimination or bias and memoranda and emails referring us to prior studies or models for innovative practices.

**D. Public Contacts**

At our request, OCA created a public email address to enable individuals to anonymously submit messages and concerns about their experiences with racial bias in the New York State court system. The email inbox was activated on July 8, 2020, and was advertised on OCA's internal listserv the same day. We received 59 emails, 24 of which reported incidents of experienced racial bias and 15 recounted incidents of observed racial bias. Only our team had access to this emails; they are not accessible to OCA. In the course of this review, Secretary Johnson also received a number of unsolicited letters, phone calls, emails and voicemails on the subject of racial bias in the courts.

**E. Research**

Our team studied past reports on the New York State court system that examined issues of racial bias. These included reports of past and ongoing commissions, as well as external studies and news reports. Most notably, the team reviewed 27 reports from the Williams Commission,[4] and analyzed recommendations the Williams Commission made from 1991 to 2019 to alleviate racial bias and increase diversity in the court system. Beyond the Williams Commission reports, we studied reports by the Vera Institute of Justice,[5] the Court Statistics Project,[6] the Center for Court Innovation[7] and various additional reports that examined issues relevant to the mandate.

Our team received and reviewed OCA's policies and practices on hiring, promotion, workplace conduct and bias training. We engaged and consulted with Professor Harold Goldstein, an industrial psychologist at Baruch College, The City University of New York, and his team at Siena Consulting, in the review of these policies and practices. Professor

---

[4]   Our team did not review the Williams Commission's reports in 1999 and 2000 as they were not provided to us and do not exist on the Williams Commission website.

[5]   Besiki Luka Kutateladze & Nancy R. Andiloro, *Prosecution and Racial Justice in New York County – Technical Report*, VERA INST. OF JUST. (Jan. 31, 2014), https://www.ncjrs.gov/pdffiles1/nij/grants/247227.pdf.

[6]   *Collecting Race and Ethnicity Data*, CT. STATISTICS PROJECT (June 24, 2020), http://www.courtstatistics.org/__data/assets/pdf_file/0018/42255/Race_special_topic_final.pdf.

[7]   Rachel Swaner et al., *Procedural Justice at the Manhattan Criminal Court: Impact, Limitations, Implications*, CTR. CT. INNOV. (Aug. 2019), https://www.courtinnovation.org/sites/default/files/media/documents/2019-08/pj_manhattan_report.pdf.

Goldstein made a series of recommendations for OCA's recruitment, hiring, training, evaluation and promotion practices, as well as suggestions for accountability measures to assess progress toward fairness and diversity-related goals and objectives. Many of his recommendations have been incorporated into this report.

Using 2020 employment statistics provided by OCA, we also analyzed the diversity of employees of the New York State court system.

Finally, we researched several legal matters, as well as the text and legislative history of New York State Senate bill 7703, which, once signed into law, will require OCA to compile and publicize demographic data in the judiciary. We also studied the recently-passed STAT Act, which requires OCA to compile and publicize demographic data for individuals charged with misdemeanors.

### F. Court Visits

Given COVID-19, our opportunity to visit courts and observe in-person proceedings around the state was limited. This would have been of great benefit to this review. However, toward the end of the review, as the courts began to reopen, Secretary Johnson had the opportunity to personally visit several courts, observe proceedings, and meet with judges, attorneys, court clerks and court officers there.

## II. THE NEW YORK STATE COURT SYSTEM

The New York State court system is the largest and most complex in the Nation, serving one of the most populated, complex, diverse and dynamic states in the Nation. Adding to the complexity, the court system is structured one way inside New York City and another way outside the City. Few practitioners and observers understand the full complexity of the state's court system and how it got that way.

### A. History of the New York State Courts

In 1777, New York adopted the state's first constitution, which marked the beginning of a long history of organizing and re-organizing its judiciary.[8] The courts operating in New York prior to 1777 reflected the model of judicial organization introduced during British colonial rule: the Supreme Court held jurisdiction over disputes under law – akin to jurisdiction of the English King's Bench – while the Court of Chancery enjoyed jurisdiction over equitable disputes.[9] The courts of law and chancery were supplemented by specialized courts, such as those responsible for hearing non-capital felony cases or disputes arising in New York City.[10]

The 1777 Constitution largely continued this system; in 1786 Circuit Courts were introduced.[11] Justices were assigned to particular counties, and traveled within them holding court sessions for civil cases.[12] These courts were supplemented in the decades that followed by a number of additional courts responsible for specialized disputes, such as the Surrogate's Court established in 1787 to handle the administration of estates.[13]

By the time of the Constitutional Convention of 1846, the Circuit Courts had proved ineffective at responding to the needs of the growing and increasingly-centralized population of the state. As a result, New York adopted a consolidated court structure which prevails, in many respects, to this day.[14] The Supreme Court absorbed jurisdiction over the equitable disputes once heard by the abolished Court of Chancery, becoming a court of

---

[8] N. Y. State Bar Ass'n Committee, THE JUDICIARY ARTICLE OF THE NEW YORK STATE CONSTITUTION 1, 9 (2017) [hereinafter THE JUDICIARY ARTICLE].

[9] Id.; see also COURTS OF NEW YORK STATE, https://history.nycourts.gov/new-york-legal-history/history-new-york-courts/ (last visited July 30, 2020).

[10] THE COURT OF GENERAL SESSIONS 1683–1847, https://history.nycourts.gov/court/court-general-sessions/ (last visited July 30, 2020); COURT OF COMMON PLEAS 1686-1895, https://history.nycourts.gov/court/court-common-pleas/ (last visited July 30, 2020).

[11] CIRCUIT COURTS 1786–1895, https://history.nycourts.gov/court/circuit-courts-1786-1895/ (last visited July 30, 2020); Marc Bloustein, A SHORT HISTORY OF THE NEW YORK STATE COURT SYSTEM (1987).

[12] Id.

[13] SURROGATE'S COURT, https://history.nycourts.gov/court/surrogates-court/ (last visited July 30, 2020).

[14] See generally Bloustein, supra note 11; see SPECIAL COMMISSION ON THE FUTURE OF THE N. Y. STATE COURTS, A COURT SYSTEM FOR THE FUTURE 16 (2007) [hereinafter SPECIAL COMMISSION REPORT 1].

general original jurisdiction.[15]  The newly-expanded Supreme Court was divided into eight Judicial Districts, each made up of four justices elected by residents of the district.[16]  The Convention also introduced the Court of Appeals:  the highest court of the state responsible for hearing appeals from the state's various trial courts.[17]  Judges of the Court of Appeals would be elected by a state-wide vote, subject to certain eligibility criteria.[18]  The 1894 Constitutional Convention built upon these changes and established an intermediate level of appellate review by creating four Appellate Divisions throughout the state consisting of elected Supreme Court Justices appointed by the Governor to hear appeals.[19]

The current New York State court system is the product of the 1962 Constitutional Convention, which instituted a "unified court system" under Article VI of the New York State Constitution.[20]  This unification consisted primarily of consolidating administrative bodies and funding arrangements.[21]  The post-1962 court system also constitutionally enshrined the structure of the eleven lower courts of original jurisdiction that still exist today.[22]  These courts are:  the Supreme Court, the Court of Claims, District Courts, County Courts, Family Courts, Surrogate's Courts, City Courts, a New York City Criminal Court, a New York City Civil Court, and the Town and Village Courts.[23]

In addition, the unification instituted a cap of one Supreme Court justice to fifty thousand residents, but created provisions for the appointment of "acting" Supreme Court justices appointed by the Chief Administrative Judge.[24]  This has led to a large number of lower court judges serving as "acting" Supreme Court justices over the second half of the twentieth century and continuing to the present day.[25]

In 1977, the New York electorate, by constitutional amendment, authorized the creation of a unified state court system and the Office of Court Administration, or OCA, to oversee it.  With the exception of Town and Village Courts, the budget and financing for the state judiciary was placed under unified state control, though state courthouses themselves remain the property and responsibility of local governments.[26]  At the same time, the

---

[15]  THE JUDICIARY ARTICLE, *supra* note 8, at 13.
[16]  *Id.* at 14.
[17]  *Id.* at 13.
[18]  *Id.*
[19]  *Id.* at 16.
[20]  N.Y. CONST. art. VI, § 1(a).
[21]  Bloustein, *supra* note 11; SPECIAL COMMISSION REPORT 1, *supra* note 14, at 17.
[22]  SPECIAL COMMISSION REPORT 1, *supra* note 14, at 16–17.
[23]  *Id.*; N.Y. CONST. art. VI, § 1.
[24]  *Id.* at 23–24.
[25]  *Id.* at 24.
[26]  N.Y. CONST. art. VI, § 29; art. VII § 1.

electorate approved creation of a Commission on Judicial Conduct, and the gubernatorial appointment of judges to the Court of Appeals.[27]

**B. <u>Today's New York State Court System</u>**

Today's New York court system is made up of eleven lower courts and four appellate divisions.[28]  The highest court is the New York Court of Appeals.[29]  While some of New York's trial courts – such as the Family Court – are distinguished by their subject matter jurisdiction, others have jurisdiction over the same legal issues in different areas within the state.[30]  Most notably, the court structure within New York City differs from the rest of the state, as it includes Civil and Criminal courts to resolve legal disputes.[31]  By comparison, the judicial system outside New York City employs a combination of City Courts, District Courts and Town and Village Courts that hear cases involving civil claims for $15,000 or less, as well as non-felony criminal prosecutions.[32]  The County Courts in the counties outside New York City are responsible for all felony criminal prosecutions.[33]

Present day, New York's courts are divided geographically into 13 Judicial Districts.[34] The First, Second, Tenth, Eleventh, Twelfth, and Thirteenth Judicial Districts encompass New York City and Long Island.[35]  The Third and Ninth Districts cover a number of counties directly north of New York City, such as Westchester, Rockland, Ulster and Albany counties.[36]  The Fourth District covers the northernmost part of the state, while the Fifth and Sixth Districts encompass the middle of the state.[37]  Finally, the Seventh and Eighth Districts cover the western part of the state.[38]

---

[27]  SPECIAL COMMISSION REPORT 1, *supra* note 14, at 53–54.
[28]  Jay C. Carlisle and Matthew J. Shock, *The Constitutional Convention and Court Merger in New York State*, 38 PACE L. REV. 69, 74 (2017).
[29]  N.Y. CONST. art. VI, § 3.
[30]  Carlisle and Shock, *supra* note 28, at 75; *see also* Quintin Johnstone, *New York State Courts: Their Structure, Administration, and Reform Possibilities*, 43 N.Y.L. SCH. L. REV. 915, 916 (1999).
[31]  NEW YORK CITY COURTS, https://www.nycourts.gov/courts/cts-NYC.shtml (last visited Aug. 18, 2020).
[32]  SPECIAL COMMISSION REPORT 1, *supra* note 14, at 17–22; THE COURTS OUTSIDE NEW YORK CITY, https://www.nycourts.gov/courts/cts-outside-nyc.shtml (last visited Aug. 18, 2020).
[33]  *Id.*
[34]  NEW YORK STATE JUDICIAL DEPARTMENTS AND DISTRICTS, https://www.nycourts.gov/courts/ad4/Court/Dept-Districts.html (last visited Aug. 18, 2020).
[35]  *Id.*
[36]  *Id.*
[37]  *Id.*
[38]  *Id.*



**Figure 1**[39]

**The Court of Appeals.** The Court of Appeals is the highest court in the state. As the single ultimate arbiter of New York law, the court can review decisions from the state's appellate courts, rulings by the Commission on Judicial Conduct[40] and direct appeals from the trial courts in certain instances.[41] The court consists of seven judges who serve fourteen-year terms.[42] Court of Appeals judges are appointed by the Governor, and are chosen from a slate of candidates recommended by the Commission on Judicial Nomination.[43]

**The Supreme Court.** Consistent throughout the state is the Supreme Court and its Appellate Divisions. The Supreme Court is a statewide court of "general original jurisdiction in law and equity," which automatically has jurisdiction over all "classes of actions and proceedings" created by the state legislature.[44] In practice, however, the Supreme Court only hears those cases which do not fall under the jurisdiction of one of the

---

[39] *Id.*
[40] *See Procedures in the New York State Court of Appeals*, NEW YORK STATE COMMISSION ON JUDICIAL CONDUCT http://www.scjc.state.ny.us/General.Information/Gen.Info.Pages/Procedures.html (last visited Aug. 18, 2020).
[41] N.Y. CONST. art. VI, § 3. For example, direct appeals can be taken from the trial courts where the constitutional validity of a state or federal statute is at issue. *Id.*
[42] *Id.* at § 2.
[43] *Id.*; *see also* NEW YORK STATE COMMISSION ON JUDICIAL NOMINATION, http://nysegov.com/cjn/overview.htm (last visited September 5, 2020).
[44] N.Y. CONST. art. VI, § 7(a)–(b).

18

other ten smaller or more specialized trial courts operating within the state.[45] The Supreme Court may also refer disputes to another trial court – except the Court of Claims – when doing so would "promote the administration of justice."[46] As a result, the Supreme Court primarily hears major civil litigation, such as commercial or matrimonial disputes.[47]

The Supreme Court also contains a specialized Commercial Division, in which judges resolve commercial disputes with potential damages of over $500,000.[48] There are four Commercial Divisions in New York City located in the Supreme Court in the Bronx, Manhattan, Brooklyn and Queens. There is also a Commercial Division in Albany, Nassau, Suffolk, Onondaga and Westchester Counties and in the 7th and 8th Judicial Districts.[49]

Supreme Court justices are elected to each of the Judicial Districts by the electorate of that district.[50] There is a maximum of one Supreme Court justice to every fifty thousand residents, and each justice serves a maximum term of fourteen years.[51] These restrictions are not imposed on acting Supreme Court justices, who are appointed by the Chief Administrative Judge.[52] Acting justices have the same powers as elected Supreme Court justices.[53]

**Supreme Court, Appellate Division.** The Supreme Court also includes an appellate function. There are four appellate Judicial Departments of the Supreme Court across the state, which are served by four corresponding Appellate Divisions. The Appellate Divisions hear criminal and civil appeals from the courts of original jurisdiction within their geographical Department, as well as appeals from the Court of Claims, Surrogate's Court, Family Court and County Courts.[54] The Constitution places a cap of seven justices on the first and second Appellate Divisions, and five justices in the third and fourth Appellate Divisions.[55] Additional judges can be added on a temporary basis for as long as they are necessary for the speedy disposition of the Appellate Division's docket.[56]

---

[45]  *See* THE JUDICIAL SYSTEM, https://www.dos.ny.gov/lg/handbook/html/the_judicial_system.html (last visited July 30, 2020).
[46]  N.Y. CONST. art. VI, § 19(a).
[47]  SPECIAL COMMISSION REPORT 1, *supra* note 14, at 17.
[48]  COMMERCIAL DIVISION – N. Y. SUPREME COURT, http://ww2.nycourts.gov/courts/comdiv/history.shtml (last visited July 30, 2020).
[49]  *Id.*
[50]  N.Y. CONST. art. VI, § 6(b).
[51]  *Id.* at §§ 6(c)–(d).
[52]  *Id.* at § 26.
[53]  SPECIAL COMMISSION REPORT 1, *supra* note 14, at 23–24.
[54]  N.Y. CONST. art. VI, § 7(a); SPECIAL COMMISSION REPORT 1, *supra* note 14, at 27.
[55]  N.Y. CONST. art. VI, § 4(b).
[56]  *Id.* at § 4(e).

**Supreme Court, Appellate Term.** Appellate Terms of the Supreme Court are additional courts created at the discretion of each Judicial Department, consisting of between three and five justices.[57] Currently, only the First and Second Departments have Appellate Terms.[58] These Terms hear appeals from the New York City Civil Court, New York City Criminal Court, the City Courts and the District Courts within each Department and appeals from non-felony criminal convictions within the Department.[59] Appeals from civil judgments made by the Appellate Terms are heard by the Appellate Division, and then by the Court of Appeals if the Appellate Division's holding is appealed. The Appellate Terms' criminal decisions are appealable only to the Court of Appeals directly.[60]

**The Family Court.** There is a Family Court in each county across the state.[61] Family Court judges in counties outside New York City are elected to their positions, while judges in New York City are appointed by the mayor.[62] Judges of the Family Court serve ten-year terms.[63] The Family Court possesses original jurisdiction primarily over disputes involving minors.[64] The Family Court is also empowered to hear certain related disputes referred to it by the Supreme Court, and in such cases is authorized to exercise all the authority normally allocated to the Supreme Court.[65] Appeals from Family Court judgments are heard by the Appellate Division of the Supreme Court, and a litigant may appeal an Appellate Division decision to the Court of Appeals.[66]

**The Surrogate's Court.** Like the Family Court, the Surrogate's Court is a specialized body with one court in each county. The court has original jurisdiction over wills, trusts and estates and all actions and proceedings related to these areas that are not already within the exclusive jurisdiction of the Supreme Court.[67] In addition, the court can exercise "equity jurisdiction" to hear other cases, unless such an exercise would conflict with the law.[68] Surrogate's Court judges are elected by each county, and serve ten-year terms outside of New York City or fourteen-year terms within New York City.[69]

---

[57] *Id.* at § 8(a).
[58] THE JUDICIARY ARTICLE, *supra* note 8, at 27.
[59] N.Y. CONST. art. VI, § 8(d)–(e); SPECIAL COMMISSION REPORT 1, *supra* note 14, at 27.
[60] N.Y. C.P.L. § 460.20(2)(b).
[61] N.Y. CONST. art. VI, § 13(a).
[62] *Id.*
[63] *Id.*
[64] *Id.* at § 13(b).
[65] *Id.* at § 13(c).
[66] Carlisle and Shock, *supra* note 28, at 76, 80.
[67] N.Y. CONST. art. VI, § 12(d).
[68] *Id.* at § 12(e).
[69] *Id.* at §§ 12(b)–(c).

**The Court of Claims**. The Court of Claims handles litigation in which the state of New York is a party.[70] The Constitution authorizes between six and eight judges to sit on the court for terms of nine years.[71] Judges can only be appointed to the court by the Governor with the advice and consent of the State Senate.[72] Appeals from judgments by the Court of Claims proceed to the Appellate Division, then to the Court of Appeals.[73] A number of Court of Claims judges also serve as acting Supreme Court justices.[74]

In addition to these statewide courts, the court system also contains a number of specialized courts across the state. These include the Integrated Domestic Violence courts and the Problem Solving Courts.[75] Specialized courts exist across the state, but not consistently. For instance, there is a Human Trafficking Intervention Court in Suffolk County, but not in Albany County.[76] Litigants are referred to these courts, if they are available, by the court of original jurisdiction over the case.



---

[70]  *Id.* at § 9.

[71]  *Id.*

[72]  *Id.*

[73]  Carlisle and Shock, *supra* note 28, at 80.

[74]  SPECIAL COMMISSION REPORT 1, *supra* note 14, at 23–24.

[75]  These Problem Solving Courts identify underlying issues bringing people into court and employ innovative approaches to address those issues, including drug treatment, human trafficking intervention, mental health services, as well as adolescent diversion programs. *See Office of Policy & Planning*, N.Y. UNIFIED CT. SYS., https://ww2.nycourts.gov/admin/opp/index.shtml (last visited July 30, 2020).

[76]  *Human Trafficking Intervention Courts: Court Locations*, N.Y. UNIFIED CT. SYS., http://ww2.nycourts.gov/courts/problem_solving/htc/courts.shtml (last visited July 30, 2020).

**Figure 2**[77]



**Figure 3**[78]

## C. Lower Courts Within New York City

**Civil Court.** The Civil Court of the City of New York has original jurisdiction over civil suits involving damages up to $25,000.[79] The Small Claims Courts and the Housing Courts are part of the Civil Court system, although they are often referred to as separate courts. The Small Claims Court adjudicates claims valued up to $10,000[80] and the Housing Court handles housing or landlord-tenant matters of any value.[81] There is a Housing Court and Smalls Claims Court in each of the city's five boroughs, as well as two additional locations in Harlem and Red Hook.[82] Appeals from Civil Court proceed to the First and Second Appellate Term, then to the Appellate Division, then to the Court of Appeals. All

---

[77] *Structure of the Courts*, N.Y. UNIFIED CT. SYS., https://www.nycourts.gov/courts/structure.shtml (last visited Sept. 5, 2020).

[78] *Id.*

[79] *New York City Civil Court: In General*, N.Y. UNIFIED CT. SYS., http://www.courts.state.ny.us/COURTS/nyc/smallclaims/general.shtml (last visited July 30, 2020).

[80] *New York City Small Claims Court: In General*, N.Y. UNIFIED CT. SYS., http://www.courts.state.ny.us/COURTS/nyc/smallclaims/general.shtml (last visited July 30, 2020).

[81] *New York City Housing Court: In General*, N.Y. UNIFIED CT. SYS., http://www.courts.state.ny.us/COURTS/nyc/housing/general.shtml (last visited July 30, 2020).

[82] *New York City Housing Court: Phone Listings & Addresses*, N.Y. UNIFIED CT. SYS., http://www.courts.state.ny.us/COURTS/nyc/housing/addresses.shtml; *New York City Small Claims Court: Phone Listings & Addresses*, N.Y. UNIFIED CT. SYS., http://www.courts.state.ny.us/COURTS/nyc/smallclaims/addresses.shtml (last visited July 30, 2020).

Civil Court Judges are elected to office for ten-year terms, with the exception of the judges serving in the Housing Courts.[83] These Housing Court judges are instead appointed by the Chief Administrative Judge from a list compiled by an Advisory Council.[84] Civil Court Judges are eligible to be appointed acting Supreme Court justices.[85]

**Criminal Court.** The Criminal Court handles misdemeanors and lesser offenses.[86] The Criminal Court is also responsible for arraigning defendants charged with indictable felony offenses.[87] After arraignment, the prosecution of felonies proceeds in the Supreme Court. Appeals from Criminal Court proceed to the First and Second Appellate Term, then directly to the Court of Appeals. Criminal Court judges are appointed to office for ten-year terms by the mayor.[88] As with the Civil Court judges, Criminal Court judges are also eligible to be appointed acting Supreme Court justices.[89]

**D. <u>Lower Courts Outside New York City</u>**

Outside of New York City, legal disputes akin to those handled by the Civil and Criminal courts are handled by five different trial courts. Jurisdiction over a specific issue largely depends on the county, and differs across the state. There are 57 counties outside of New York City.

In each of these counties, a County Court presides over felony criminal cases.[90] Judges serving on these courts are elected by the county for ten-year terms.[91] The Constitution also authorizes these courts to hear civil suits involving damages of less than $25,000, as well as housing or landlord-tenant disputes.[92] The latter power is rarely exercised, since the legislature typically creates Town, City or Village courts with original jurisdiction over these disputes.[93]

In Nassau County and the western part of Suffolk County, civil suits for monetary damages up to $15,000 and misdemeanor offences are handled by a District Court.[94] These

---

[83] SPECIAL COMMISSION REPORT 1, *supra* note 14, at 20; N.Y. CONST. art. VI, § 15(a).
[84] *Id.*; *New York City Housing Court: Advisory Council*, N.Y. UNIFIED CT. SYS., http://www.courts.state.ny.us/COURTS/nyc/housing/advisory.shtml (last visited Sept. 5, 2020).
[85] SPECIAL COMMISSION REPORT 1, *supra* note 14, at 23, 78.
[86] Janet DiFiore and Lawrence K. Marks, THE NEW YORK STATE COURTS: AN INTRODUCTORY GUIDE 1 (2016).
[87] *Id.*
[88] N.Y. CONST. art. VI, § 15(a).
[89] SPECIAL COMMISSION REPORT 1, *supra* note 14, at 23, 78.
[90] DiFiore and Marks, *supra* note 86, at 2.
[91] N.Y. CONST. art. VI, § 10(b).
[92] *Id.* at § 11(a).
[93] SPEC. COMM'N ON THE FUTURE OF THE N.Y. ST. CTS., JUSTICE MOST LOCAL: THE FUTURE OF TOWN AND VILLAGE COURTS IN NEW YORK STATE 7 (2008) [hereinafter SPECIAL COMMISSION REPORT 2].
[94] DiFiore and Marks, *supra* note 86, at 1.

courts also hear arraignments for felony offenses.[95]  The actual limitations imposed on a District Court within their jurisdictional bounds is determined by law.[96]  A locality outside of New York City can petition to create a District Court by legislative action, but the state legislature can "regulate and discontinue" these courts.[97]  At least one judge must serve on each District Court, and these judges are elected by the District's constituents for a term of six years.[98]  Nassau and Suffolk Counties are currently the only counties that employ District Courts.[99]

The Constitution also permits the creation of Town, Village and City Courts in all counties outside of New York City.[100]  Town, Village and City Courts are often referred to as "Justice Courts."[101]  These courts have original jurisdiction up to, but not greater than, the jurisdiction of the District Courts.[102]  These courts may be regulated or dissolved by the legislature.[103]  Town and Village Courts typically arraign defendants for felonies, and issue judgments on misdemeanor or minor offences, housing or landlord-tenant disputes, and civil suits involving damages up to $3,000.[104]  In the Second Department, which has an Appellate Term, judgments by Town, Village and City courts may be appealed to the Appellate Term.[105]  In the Third and Fourth Departments, judgments from Town, Village and City courts are appealed to the County Court.[106]

City Courts generally handle civil suits up to $15,000, misdemeanor offenses, and occasionally small claims.

The selection process and terms of the judges overseeing the Town, Village and City courts is determined by the legislature, with the exception that Town judges must be elected for four year terms.[107]  In 2008, The Special Commission on the Future of New York State Courts found that a majority of the judges in these courts did not have a law school education.[108]

---

[95]   *Id.*

[96]   N.Y. CONST. art. VI, § 16(d).

[97]   *Id.* at §§ 16(a), (i).

[98]   *Id.* at § 16(h).

[99]   *District Court: Introduction*, N.Y. UNIFIED CT. SYS., https://www.nycourts.gov/courts/cts-outside-nyc-DISTRICT.shtml (last visited Aug. 18, 2020).

[100]  N.Y. CONST. art. VI, § 17.

[101]  SPECIAL COMMISSION REPORT 2, *supra* note 93, at 7.

[102]  N.Y. CONST. art. VI, § 17(a).

[103]  *Id.* at § 17(b).

[104]  SPECIAL COMMISSION REPORT 2, *supra* note 93, at 29.

[105]  Carlisle and Shock, *supra* note 28, at 83; DiFiore and Marks, *supra* note 86, at 3.

[106]  DiFiore and Marks, *supra* note 86, at 3.

[107]  N.Y. CONST. art. VI, § 17(d).

[108]  SPECIAL COMMISSION REPORT 2, *supra* note 93, at 13.

### E. **The Proposed Merger Plan**

In recent years there have been calls for extensive change to the court system, such as the consolidation of the eleven trial courts into a two- or three-tiered trial court system. In 2019, Chief Judge DiFiore unveiled a court merger proposal that would replace the current structure with a three-tiered trial court system.[109] The merger plan would require an amendment to the state Constitution.[110]

Pursuant to the plan, County Court, Family Court, Surrogate's Court and the Court of Claims would be abolished and incorporated into the Supreme Court system.[111] Former judges on these courts would transition to become Supreme Court Justices.[112] In addition, City Courts, District Courts and New York City's Civil and Criminal Courts would be abolished and incorporated into a new statewide Municipal Court system.[113] Former judges from each of these courts would become judges of newly created Municipal Courts.[114] Town and Village Courts would remain unchanged.[115]

### F. **Case Volume**

The New York State court system is one of the busiest in the Nation, with the state's trial courts handling over 3 million cases each year.[116] There has been a steady decrease in filings in recent years, from 3,510,348 filings in 2015 to 3,009,470 in 2019.[117] In 2019, the Court of Appeals decided 116 cases from a pool of 19,094 dispositions from the Appellate Divisions.[118] At the Supreme Court level, there were 450,409 civil filings and 38,966 criminal filings, which represent a steady decline of filings in recent years.[119] Across the state, the City and District Courts outside of New York City processed 854,056 filings in total. The Surrogate's Court processed 141,237 filings, and the Court of Claims

---

[109] *See* Press Release, Hon. Lawrence K. Marks, *Chief Judge Proposes Constitutional Reforms to Simplify Outdated Court Structure, Aiming to Enhance Access, Optimize Resources* (Sept. 25, 2019), https://ww2.nycourts.gov/sites/default/files/document/files/2019-09/PR19_22.pdf.

[110] *Id.*

[111] *See Key Provisions of the Chief Judge's Court Consolidation Proposal*, N.Y. UNIFIED CT. SYS., https://ww2.nycourts.gov/sites/default/files/document/files/2019-09/CourtMergerSummaryandProposal.pdf (last visited Aug. 18, 2020).

[112] *Id.*

[113] *Id.*

[114] *Id.*

[115] *Id.*

[116] N.Y. ST. UNIFIED CT. SYS., 2019 ANNUAL REPORT 35 (2020).

[117] *Id.*

[118] *Id.* at 33–34. There were also 2, 807 dispositions in the Appellate Terms. *Id.*

[119] *Id.* at 35, 42.

handled 1,801 claims.[120]  The Family Court received 578,346 filings in 2019, with 192,799 filings in New York City alone.[121]

New York City handled 278,928 filings in its Criminal Court and 540,583 filings in its Civil Court in 2019.[122]  Criminal Court filings in New York have declined in recent years, but Civil Court filings have increased from 528,059 filings in 2015 to 540,583 filings in 2019.[123] Of the cases filed in the city's Civil Court, 323,971 were civil actions, 193,970 were housing claims, 17,587 filings were small claims, and 5,055 were commercial claims.[124] In addition, the 1,277 Town and Village Courts also process almost 2 million cases each year.[125]

---

[120] *Id.* at 39–40.
[121] *Id.* at 40.
[122] *Id.* at 35.
[123] *Id.*
[124] *Id.* at 41.
[125] *Id.* at 43; N.Y. UNIFIED CT. SYS., JUSTICE COURT MANUAL 7 (2015)
http://www.nycourts.gov/courts/townandvillage/FinalJusticeCourtManualforUSCsite.pdf.

## III.  ADDRESSING RACE IN THE COURT SYSTEM

In 1983, a Supreme Court justice in Queens looked out at his courtroom and reportedly said "there's another nigger in the woodpile."[126]  In 1994, a Finger Lakes judge was reported to have remarked in open court, "[o]h, it's been a rough day – all those [B]lacks in here," after arraigning three Black defendants arrested in a college disturbance.[127]  It would be naïve to think that in such a large court system serving such a large, diverse and dynamic state, these expressions of overt racism are isolated.  As documented by two judicial commissions over the last 30 years, explicit and implicit racial bias has existed throughout the New York State court system.  The good news is that today's New York State judiciary is more diverse than it was 30 years ago (*see* Section IV, pp. 32–41).  The bad news is that the accounts of explicit and implicit racial bias we heard as part of this review were strikingly similar to the testimony from decades ago.

### A. The Minorities Commission

In 1988, then-Chief Judge Sol Wachtler announced the formation of the New York State Judicial Commission on Minorities.  The Minorities Commission's mandate was, in summary, to ascertain how the public and court participants perceive the treatment of minorities in the courts, to review the diversity of court personnel in non-judicial positions and recommend ways to increase that diversity and to determine whether the elected or appointed process for selecting judges results in greater diversity.[128]

The Minorities Commission's report, released in 1991, was blunt in its findings.  The report concluded that "there are two justice systems at work in the courts of New York State, one for Whites, and a very different one for minorities and the poor."[129]  The Minorities Commission also concluded that the public perceived the court system to be racially biased,[130] and that courts used primarily by minorities – *i.e.* the Family, Criminal, Civil and Housing courts within New York City – were "grossly deteriorated and inadequate" and referred to as "ghetto courts."[131]

---

[126]  MINORITIES COMMISSION REPORT, *supra* note 2, at 21.
[127]  William Glaberson, *In Tiny Courts of N.Y., Abuses of Law and Power*, N.Y. TIMES, Sept. 25, 2006.
[128]  FRANKLIN H. WILLIAMS JUDICIAL COMMISSION ON MINORITIES, EQUAL JUSTICE:  A WORK IN PROGRESS, FIVE YEAR REPORT 1991–1996 7 (1997).
[129]  MINORITIES COMMISSION REPORT, *supra* note 2, at 1.
[130]  *Id*. at 27.
[131]  *Id*.

The report also recounted a number of overtly racist comments from judges in open court across the state.[132] Other findings of the Minorities Commission include that:

- nearly half of all attorneys surveyed witnessed discriminatory treatment of minority court users, that court personnel were frequently disrespectful and discourteous to minority court users;[133]
- the quick pace at which judges make weighty decisions in the cases of minority litigants undermines their confidence in the system;[134]
- many of the judges who made bail determinations lacked the cultural sensitivity to make fair determinations appropriate for the realities faced by minority court users;[135]
- for litigants for which English is not a primary language, full access to the court system was significantly impaired due to the insufficient amount of interpreters;[136]
- minority attorneys were treated with less professional respect and courtesy than their white counterparts;[137]
- minority judges were underrepresented in supervisory and administrative positions in the court system[138] and
- minorities were underrepresented within the non-judicial work force and that the EEO office within OCA had been "relegated to second class status."[139]

The Minorities Commission also singled out the court officer community, which one attorney quoted in the report described as "an especially horrible problem,"[140] citing segregated locker rooms for court officers in the Bronx, and graffiti reflecting racial insults in hallways and locker rooms.[141] The Minorities Commission noted an incident where a court officer placed an attorney of color in a chokehold because the court officer assumed the attorney was a defendant who was approaching a judge too closely, though the judge had motioned for the attorney to approach the bench.[142] During public hearings conducted

---

[132] *Id.* at 21–22 (Judges used phrases like "not having a Chinaman's chance" when speaking to Asian court users. One Housing Court judge remarked to a white landlord that he was "stuck" with a "tarbaby," referring to the Black tenant who was also in court.).
[133] *Id.* at 27.
[134] *Id.*
[135] *Id.* at 43.
[136] *Id.* at 52.
[137] *Id.* at 92.
[138] *Id.* at 100.
[139] *Id.* at 116.
[140] *Id.* at 111.
[141] *Id.* at 114.
[142] *Id.* at 88.

by the Minorities Commission, a Black court officer testified that her fellow court officers told her to refer to litigants as "slime," to refer to their children as "baby slime," and not to show litigants "any courtesy whatsoever."[143]

## B. **The Franklin H. Williams Commission**

The Minorities Commission recommended that a further commission be formed to ensure the successful implementation of their recommendations. Therefore, in 1991, Chief Judge Wachtler re-established the Minorities Commission permanently and renamed it the Franklin H. Williams Judicial Commission, in honor of the former Chairman of the Minorities Commission.

In addition to implementing the Minorities Commission's recommendations, the newly-named Williams Commission was tasked with the following mandate:[144]

- *Engagement with Court Leaders:* To attend annual meetings with the Chief Judge and court administrators to discuss issues of concern to the minority legal community.
- *Data Collection & Analysis:* To collect and analyze race data and analyze programs relating to the treatment of people of color in the court system and suggest methods for correcting identified issues. In appropriate instances, successful programs in certain counties could be standardized and/or centralized under the authority of the Commission.
- *Monitoring Racial Bias Complaints:* To collect and monitor complaints of racial bias within the judicial system and forward them to the commission or agency with jurisdiction to discipline, where appropriate. In addition, the Commission could propose remedies to prevent repeat offending.
- *Policy Review:* To review and comment on existing and pending legislation affecting people of color and the state court system and recommend new legislation where necessary.
- *Nationwide Coordination:* To participate in the National Consortium of Commissions and Task Forces on Racial/Ethnic Bias in the Courts, which was spearheaded by Ambassador Williams himself.
- *Programming & Community Engagement:* To interact with local bar associations, law schools and community groups in an effort to develop

---

[143] *Id.* at 22.
[144] *See id.* at 8–9.

educational and other programs designed to address racial and ethnic bias in the legal profession.

The Williams Commission has been involved with the implementation of several recommendations aimed at furthering its mandate. One initiative generated by the original Minorities Commission's 1991 study included the "establishment of the position of Special Inspector General for Bias Matters (now Managing Inspector for Bias matters) to reinforce the UCS's commitment to a bias-free work environment."[145] The Commission's original 1991 recommendations also led to the creation of the UCS's Workforce Diversity Office, which strives to promote diversity throughout the court system, as well as the reconfiguration of judicial nominating and screening panels to include at least one individual-of-color and one female.[146] Similarly, the Commission's original recommendations led to the creation of a Minority Advisory Committee to the Chief Administrative Judge, which, among other measures, led to the establishment of more inclusive interview panels for non-judicial positions.[147]

Over the years, the Williams Commission has hosted various trainings and professional development programs for court employees and the broader legal community. For example, the Commission developed and annually presents a class for new judges on cultural awareness at the New York State Judicial Institute training session for new judges.[148] Similarly, the Commission has hosted seminars for judges exploring issues affecting minority litigants, defendants, juvenile offenders and minors in foster care.[149] On a handful of instances, and as recently as 2016, the Williams Commission also facilitated implicit bias training for court personnel, including human resource supervisors and managers.[150] In 2019, the Commission organized professional development workshops where employees of color were trained on public speaking and interview and writing skills so that these applicants have the requisite skillset when applying for upper-management roles.[151] Similarly, we understand one of the Commission's more popular programs is their annual seminar entitled "Everything You Need to Know About Becoming a Judge." This

---

[145] *See* FRANKLIN H. WILLIAMS JUDICIAL COMMISSION ON MINORITIES, ON THE PATH TO EQUAL JUSTICE 1998–2008: MAKING A DIFFERENCE 1, 3 (2008) [hereinafter ON THE PATH TO EQUAL JUSTICE].

[146] *Id.*

[147] *Id.*

[148] *Franklin H. Williams Judicial Commission*, N.Y. STATE UNIFIED CT. SYS., http://ww2.nycourts.gov/ip/ethnic-fairness/index.shtml (last visited Sept. 23, 2020).

[149] ON THE PATH TO EQUAL JUSTICE, *supra* note 145, at 7.

[150] NEW YORK STATE UNIFIED COURT SYSTEM 2016 ANNUAL REPORT 1, 17 (2017) (noting that training was focused in Eighth Judicial District); *see also* NEW YORK STATE UNIFIED COURT SYSTEM 2013 ANNUAL REPORT 1,2 (2014).

[151] NEW YORK STATE UNIFIED COURT SYSTEM 2019 ANNUAL REPORT 1, 21 (2020) (noting that training occurred in Third and Fourth Judicial District).

seminar – targeted toward attorneys-of-color and law students of color – has existed for 10 years, and purports to provide education, resources, mentorship and networking opportunities to these individuals to increase the pipeline of future judges of color.[152] The Williams Commission has also published informational brochures in Spanish and Chinese to help non-English speaking litigants navigate Small Claims Court.[153]

## C. Race in the Town and Village Courts

Finally, we believe it is worth noting a comprehensive 2006 *New York Times* report on the Town and Village court system in New York. The *Times* spent a year interviewing prosecutors, defendants, defense attorneys and plaintiffs, reviewing public documents and visiting courts across the state. The *Times* concluded that litigants in these courts "have been subjected to racial . . . bigotry so explicit it seems to come from some other place and time."[154]

Focusing substantially on misconduct by judges, the *Times* noted that over three quarters of Town and Village justices were not attorneys, highlighting that New York requires "more schooling for licensed manicurists and hair stylists" than for Town and Village justices. Some examples of explicit racism located in the disciplinary files of Town and Village justices include a Catskills judge reminiscing in open court that it was once safe for young women to walk in his community "before the [B]lacks and Puerto Ricans moved here." In 2003, when a white complainant referred to a Black defendant in a disorderly conduct case as "that colored man," the Alexandria Bay judge told the defendant that the term was not offensive, explaining that while other words were racist, "colored" was not. The judge went on to say, "you know, I could understand if he would have called you a Negro, or he had called you a nigger. . . . For years we had no colored people here." In 2003, a Westchester County judge asked a Lebanese-American woman with a parking ticket if she was a terrorist. In Le Roy, a town outside of Rochester, a judge "concocted false statements . . . to help immigration officials deport a Hispanic migrant worker in 2003." In a Town and Village court in Malone, the judge told a Latinx defendant "you're not from around here, and that's not the way we do things around here," when the man requested that the plaintiff suing him be forced to come to court and prove his case. The judge did not mention that the plaintiff was his dentist.[155]

---

[152] *See, e.g.*, NEW YORK STATE UNIFIED COURT SYSTEM 2016 ANNUAL REPORT at 17.
[153] ON THE PATH TO EQUAL JUSTICE, *supra* note 145, at 3.
[154] Glaberson, *supra* note 127.
[155] *Id.*

## IV. DEMOGRAPHICS OF THE JUDICIARY

Both the Minorities and Williams Commissions identified the lack of diversity among judges and non-judicial employees within the court system as a major issue affecting the administration of justice in the state. Many of those we spoke with in 2020 also expressed concerns about the lack of diversity in the court system, particularly among judges. We analyzed past and current demographic data provided by OCA to evaluate the progress that has been made to diversify the judiciary.

It is important to note that there are limitations to the data available. Most notably, the team did not have race data for Town and Village justices. This limitation is not without impact, as the vast majority of court users interacting with the court system outside of New York City do so with Town and Village justices. Anecdotally, several interviewees described the Town and Village justices and courts as overwhelmingly white.

### A. Diversity of the Judiciary Over Time

The judiciary in New York State has become more diverse over the past 30 years. However, when compared to the evolving demographics of the state, judges of color continue to be underrepresented on the bench, and the gap between the non-white share of the judiciary and non-white share of the population remains the same. In 1991, there was a 20.5 point gap between the share of the population that was non-white (30.7%)[156] and the percent of non-white judges on the bench (8.2%).[157] In 2020, the gap between the non-white population (44.8%) and judiciary (23.9%) is 20.9 points.[158]

---

[156] Population statistics are based on 1990 and 2000 census data, and 2015 and 2018 census estimates of those selecting only one race. *See* U.S. Census Bureau, *Explore Census Data* (Sept. 22, 2020, 12:31 PM), https://data.census.gov/.

[157] FRANKLIN H. WILLIAMS JUDICIAL COMMISSION ON MINORITIES, EQUAL JUSTICE: A WORK IN PROGRESS, FIVE YEAR REPORT 1991–1996 1, 20 (1996).

[158] *See* New York State Unified Court System, DIVERSITY ON THE BENCH BY JUDICIAL DISTRICT/COURT (2020) (rec'd Aug. 28, 2020) (on file with N.Y. Office of Ct. Admin.). [hereinafter DIVERSITY ON THE BENCH]; *see also* New York State Unified Court System, DIVERSITY ON THE BENCH STATEWIDE (2020) (rec'd Aug. 28, 2020) (on file with N.Y. Office of Ct. Admin.).



**Figure 4**

Underrepresentation has persisted across all non-white groups, though the representation of Black judges has steadily improved over the past 30 years. For the Latinx and Asian communities, the gaps between population and judges widened in the late 1990s before more recently narrowing, but they remain larger for both communities than they were in 1991. In 1991, around 15.9% of the population identified as Black compared to 6.3% of judges (a 9.6 point difference); 10.5% of the population was Latinx compared to 1.7% of the judiciary (an 8.8 point gap);[159] and 3.9% of New Yorkers identified as Asian compared to 0.3% of the bench (3.6 points). In 2020, Black people account for 15.7% of the population and 14% of judges (a 1.7 point difference); Latinx people make up 17.7%

---

[159] Unlike the census, which treats Hispanic as an ethnicity, the data received from OCA treats Hispanic as a race, distinct from other races. When completing demographic forms, an employee indicating that they are both Hispanic and another race would be recorded in OCA data as "Two or More Ethnicities." Since very few employees have selected "Two or More Ethnicities," we assume that the vast majority of persons of Hispanic ethnicity choose either to identify as Hispanic or another race. In order to render population data that are comparable to the OCA data, we were obliged to treat the Hispanic ethnicity in the census data as a category exclusive of other minority races. To this end, we calculated the percent of Hispanics in the census data as all persons selecting "Hispanic or Latino" and subtracted persons also identifying their race in the census as Black or Asian. We acknowledge that this calculation is imperfect and excludes Afro-Latinx and Asian Latinx people from the "Hispanic" category in the OCA data. This decision was not taken lightly or with the intent to erase the existence of Afro-Latinx and Asian Latinx people.

33

of the population and 7.0% of the judiciary (a 10.7 point difference); and Asian people comprise 8.5% of New Yorkers and only 2.6% of the bench (5.9 points).



**Figure 5**



**Figure 6**



**Figure 7**

### B. Diversity of the 2020 Judiciary Compared to the Populations Served

Today, judges of color are still underrepresented compared to the populations the courts serve. This is true both statewide and in New York City. New York City has a population that is approximately 31.7% white, 24.2% Black, 26.3% Latinx, and 14.1% Asian. However, the judiciary in New York City courts is 58.1% white, 21.5% Black, 12.4% Latinx, and 6.3% Asian (*see* Figures 8 and 9 below).[160]



**Figure 8**

---

[160] This includes the City, Supreme and Surrogate's courts. *See* DIVERSITY ON THE BENCH, *supra* note 158.



**Figure 9**

### 1. New York City Courts

Defendants appearing in the New York City courts face a judiciary that is not representative of the city, let alone of the litigant population. Although we have no statistics from OCA that track the races of litigants in the city, all interviewees involved in the New York City courts, particularly in Criminal Court, Family Court and Housing court, noted that the vast majority of litigants appearing in those courts are Black and Latinx. In New York City Criminal Court, defendants face a judiciary that is 56% white, 13.1% Black, 11.9% Latinx, and 11.9% Asian (*see* Figure 10 below).[161] In other words, a criminal court judiciary that is one-fourth Black and Latinx serves a city that is more than half Black and Latinx, where the Black and Latinx communities are overrepresented among people arrested and appearing in criminal court.

According to interviewees with experience in the New York Family Court system, most litigants appearing in Family Court are parents and families of color. Here, again, all minority populations are underrepresented on the bench, with the Latinx and Asian community – two of the fastest-growing and youngest populations in New York City – the

---

[161] These figures include both New York City Criminal Court judges and judges temporarily assigned from Civil Court. *See* DIVERSITY ON THE BENCH, *supra* note 158. Note that percentages calculated in the chart differ from those calculated by UCS. These percentages were calculated by dividing the raw number of judges by the total number of judges.

most underrepresented, making up less than half the share of the Family Court bench as they do of the general population (*see* Figure 11 below).[162]

Non-white judges are likewise underrepresented on the Housing Court bench, comprising 44% of the judiciary serving a population that is over 64% people of color (*see* Figure 12 below).

Civil Court has the lowest percentage of white judges (40%) of all City Courts, and the highest percentage of Black judges (31.1%) and Latinx judges (24.4%) (*see* Figure 13 below). Asian judges remain underrepresented compared to the overall Asian population in the city. The slightly more diverse demographics of the Civil Court bench may be partly explained by the fact that Civil Court judges are elected rather than appointed. As discussed in the section below, elections of judges tend to benefit the Black and Latinx populations, whereas the Asian community remains underrepresented among judges chosen by election.



**Figure 10**

**Figure 11**



**Figure 12**



**Figure 13**

---

[162] These figures include both NYC Family Court judges and judges temporarily assigned from Civil Court. *See* DIVERSITY ON THE BENCH, *supra* note 158.

### 2. New York City Judiciary by Borough

People of color are underrepresented on the benches of all boroughs of New York City.[163]  In the Bronx, where over 85% of the population is non-white, only 57% of the judiciary are people of color (*see* Figure 14 below).

In Queens, the borough with the next largest proportion of minorities, over 60% of the judiciary is white (*see* Figure 15 below).  Latinx and Asian populations are the most underrepresented on the bench there.

Non-white judges are also underrepresented in Brooklyn, where white judges account for over half of the judiciary (56.5%), though white Brooklynites are just over one-third of the population (36.2%) (*see* Figure 16 below).  Most striking, Brooklyn has fewer than 5% Asian judges (4.3%), though it is over 10% Asian (11.6%).



**Figure 14**

**Figure 15**



**Figure 16**



**Figure 17**

---

[163]  Numbers presented in this section include all judges sitting on City Courts, the Supreme Court and Surrogate's Court in the borough. *See* DIVERSITY ON THE BENCH, *supra* note 158.



**Figure 18**

### 3.    Judicial Districts Upstate

It is well known that counties upstate are, on the whole, less diverse than New York City.  However, across all Judicial Districts, the upstate judiciary is even less diverse than the population.  In the Fourth,[164] Fifth,[165] and Sixth[166] Judicial Districts in the northernmost parts and center of the state, the population is over 80% white (*see* Figures 20–22 below). However, the judiciary is well over 90% white.

In the easternmost parts of the state, the Seventh[167] and Eighth[168] Judicial Districts are more diverse because they contain the cities of Rochester, Buffalo, and Syracuse (*see* Figures 23–24).  These districts are around 80% white, but white judges are about 86% and 88%, respectively, of the judiciary.

Even in the Third,[169] Ninth,[170] and Tenth[171] Judicial Districts, the more diverse jurisdictions in the southern part of the state, non-white judges are underrepresented (*see* Figures 19, 25–26).  The Third Judicial District is around 10% Black, but less than 5% of its judiciary is Black; the Latinx community accounts for 8.3% of the population, but only 1.6% of the judges, and there are no Asian judges in the Third District.  The Ninth Judicial

---

[164]  The Fourth District is comprised of Clinton, Essex, Franklin, Fulton, Hamilton, Montgomery, St. Lawrence, Saratoga, Schenectady, Warren and Washington counties.

[165]  The Fifth District contains Herkimer, Jefferson, Lewis, Oneida, Onondaga and Oswego counties.

[166]  The Sixth District includes Broome, Chemung, Chenango, Cortland, Delaware, Madison, Otsego, Schuyler, Tioga and Tompkins counties.

[167]  The Seventh District includes Cayuga, Livingston, Monroe, Ontario, Seneca, Steuben, Wayne and Yates counties.

[168]  The Eighth District contains Allegany, Cattaraugus, Erie, Genesee, Niagara, Orleans and Wyoming counties.

[169]  The Third District includes Albany, Columbia, Greene, Rensselaer, Schoharie, Sullivan and Ulster counties.

[170]  The Ninth District includes Dutchess, Orange, Putnam, Rockland and Westchester counties.

[171]  The Tenth District includes Nassau and Suffolk counties.

39

District is over 40% non-white, but less than 20% of its judges are of color. The Ninth District is over 20% Latinx, but has less than 4% Latinx judges, and there are no Asian judges in this District. The Tenth Judicial District on Long Island is nearly 40% non-white, but over 85% of its judges are white. In the Tenth District, the Latinx and Asian communities are the most underrepresented on the bench.



**Figure 19**



**Figure 20**



**Figure 21**



**Figure 22**



**Figure 23**



**Figure 24**



**Figure 25**



**Figure 26**

## V. POLICIES, PRACTICES, PROGRAMS AND ORGANIZATIONS DESIGNED TO ADDRESS BIAS IN THE NEW YORK STATE COURT SYSTEM

The Chief Judge's mandate called for us to identify and evaluate all existing policies, practices and organizations within the New York State court system that are intended to address racial bias.

We conducted an extensive search within and around the court system for policies and programs addressing racial bias. Notably, it was difficult to find a list or organizational chart explaining the various institutions and resources within the New York State court system intended to address racial bias, and what they do. Information in various booklets, brochures and webpages is confusing, inaccurate and often out of date. Further, a number of interviewees suggested that reality and practice fall short of the stated goals and intentions of these programs. In our interviews, even some of those working within these organizations were unaware of the activities or roles of other organizations, despite their shared mission. Additionally, some policies and programs are less formalized and were difficult to fully evaluate.

We found the following policies, practices, programs and organizations that exist in whole or in part to address issues of racial bias:

### A. The Franklin H. Williams Commission

As explained in Section II above, the Williams Commission was established in 1991. It is a standing Commission currently co-chaired by Justices Troy Webber and Shirley Troutman. From our review, it seems plain that the Williams Commission serves as the primary and most visible program throughout the court system for addressing issues of racial bias and the treatment of underrepresented communities.

The Williams Commission was originally charged with implementing the 1991 recommendations of the Minorities Commission. And from its founding in 1991 until 1996, the Williams Commission published detailed analysis, findings and updated recommendations as bolstered by their own studies and initiatives. These annual reports also measured progress on the implementation of the Minorities Commission's 1991 recommendations and highlighted specific areas of attention and needed focus for subsequent years.

Beginning in 1997, the Williams Commission transitioned away from those detailed reports and primarily focused on coordinating conferences, seminars and mentorship programs. The Williams Commission continued – and continues – to publish brief

summaries of their activities in a short section in the New York State Unified Court System's Annual Reports. According to its own website,[172] the Williams Commission's primary functions include:

- Serving as a conduit to people of color within the court system and meeting annually with the Chief Judge and court administrators to discuss issues of concern to court employees and matters pertaining to racial and ethnic fairness in the courts.
- Sponsoring seminars and conferences for judges and court personnel on issues of diversity and race within the courts.
- Holding professional development and leadership workshops for court personnel and providing judicial mentors for attorneys interested in judicial appointments.
- Acting as a liaison to community groups, fraternal organizations within the court, bar associations and judicial appointing authorities.
- Producing and distributing various publications, including a newsletter.
- Hosting a Diversity Awards Program, which honors individuals and organizations working to promote racial and ethnic fairness in the New York State Unified Court System and the broader legal community.
- Presenting a class for new judges on cultural awareness at the New York State Judicial Institute training session for new judges.

### B. Managing IG for Bias Matters

OCA's Inspector General is responsible for investigating complaints of disciplinary violations, criminal activities, conflicts of interest and misconduct on the part of non-judicial employees, as well as persons or organizations, working within the court system.[173] There are two specialized units within the IG's Office: the Office of the Managing Inspector General for Bias Matters ("IG for Bias Matters") and the Office of the Managing Inspector General for Fiduciary Appointments.

Established in 1998, the IG for Bias Matters is responsible for investigating allegations of bias based upon race, as well as other protected classes, that affect the workplace of personnel within the court system, "including acts that relate to services provided by court personnel to the public."[174] The IG for Bias Matters receives complaints from both the public and court system employees and investigates the behavior that precipitated the

---

[172] *Franklin H. Williams Judicial Commission*, N.Y. STATE UNIFIED CT. SYS., http://ww2.nycourts.gov/ip/ethnic-fairness/index.shtml (last visited Sept. 23, 2020).

[173] *Office of Inspector General*, N.Y. STATE UNIFIED CT. SYS., http://ww2.nycourts.gov/admin/ig/index.shtml (last visited Sept. 23, 2020).

[174] *Id.*

complaint, including studying systemic issues involving the functions of particular court units or systems. Notably, non-judicial employees of the Town and Village Courts are not under the authority of the IG for Bias Matters because they are hired by, and therefore disciplined by, local governance bodies. In addition to its internal-facing functions, the IG for Bias Matters also acts as a liaison with federal, state and local law enforcement and regulatory agencies, such as the Equal Employment and Opportunity Commission and the New York State Commission on Human Rights, on matters that fall within their jurisdiction.

Kay-Ann Porter Campbell currently serves as the IG for Bias Matters. She oversees the office and personally investigates serious allegations of bias, such as allegations against judges or allegations of criminal conduct. Other allegations are handled by designated investigators. Complaints of bias in upstate courts are handled by an investigator located in Albany.

Employees wishing to make a formal complaint may call the IG for Bias Matters or fill out the Claim of Discriminatory Treatment form.[175] The webpage for the Office of Diversity Inclusion (discussed below)[176] contains a link to a Discrimination Claim Policy and Procedure, and statement declaring that it is the court system's policy to ensure equal employment opportunity without regard to race as well as other protected classes.[177] Complainants may also contact the IG for Bias Matters indirectly via the court system's toll-free hotline or through referrals from other offices within the court system, such as the Division of Human Resources and the Chief Clerk's office. Although the Discrimination Claim Policy and Procedure does not state that an employee may file an anonymous complaint, we were told that anonymous claims are accepted and investigated. Litigants may also contact the IG for Bias Matters to file a formal complaint about discrimination or bias they experience from a court employee.

Complaints that are deemed to be serious receive a formal investigation.[178] The investigation involves an interview with the complainant, any witnesses and the individual against whom the claim was filed.[179] The IG for Bias Matters requests that anyone

---

[175] Bias Complaint Form, Office of Inspector General, N.Y. STATE UNIFIED CT. SYS., http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/ClaimDiscrimTreatment.pdf (last visited Sept. 23, 2020).

[176] *See Office of Diversity and Inclusion*, N.Y. STATE UNIFIED CT. SYS., http://ww2.nycourts.gov/careers/diversity/index.shtml (last visited Sept. 23, 2020).

[177] *See Discrimination Claim Policy & Procedure*, OFFICE OF CT. ADMIN. (2016), http://ww2.nycourts.gov/sites/default/files/document/files/2018-07/DiscClaimBklet.pdf [hereinafter *OCA Discrimination Claim Policy & Procedure*].

[178] *OCA Discrimination Claim Policy & Procedure, supra* note 176, at 13.

[179] *Id.*

contacted during an investigation maintain confidentiality by not disclosing the existence or any details of the complaint. In most cases, however, a complainant's identity and at least some details of their complaint are made known to interviewees and the complainant's supervisor.

After the investigation is complete, the IG for Bias Matters will submit a confidential, final investigative report to the Administrative Judge of the District where the conduct occurred, including whether the complaint was substantiated and, if appropriate, recommended sanctions. Within thirty days of the issuance of the report, the Deputy Chief Administrative Judge will issue a final determination in consultation with the District's Administrative Judge.[180] If the Deputy Chief Administrative Judge agrees that the complaint is substantiated, the matter is supposed to proceed to a hearing, where the subject of the complaint faces disciplinary action. It is our understanding that, in most instances, the subject agrees to settle the matter without a hearing. If the matter is not settled, decisions can be appealed to the Chief Administrative Judge, who will issue a final determination within thirty days of the date of the appeal.[181]

## C. **OCA's Office of Diversity and Inclusion**

The Office of Diversity and Inclusion ("ODI") is responsible for implementing the court system's diversity policies and maintaining diversity within the workforce. ODI – which was called the "Office of Workforce Diversity" prior to this year – has performed various functions over the years, before assuming its current role. Prior to the creation of a separate diversity office around a decade ago, diversity issues were handled by the Office of Equal Employment Opportunity within OCA's Division of Human Resources. One of this office's roles was to investigate complaints of discrimination, a function now handled by OCA's Inspector General Office.

Currently, ODI focuses primarily on recruiting and maintaining diversity within the court system's non-judicial workforce. To this end, ODI is tasked with carrying out the court system's diversity policies, specifically as they relate to recruitment and hiring. Additionally, ODI strives to ensure that diversity and inclusion is a consideration in every decision made throughout the court system, specifically that minority employees feel that their opinions are welcomed and considered.

Although we have found no formal policies mandating ODI's participation, we are told that ODI is involved in the interview and hiring process. According to one OCA

---

[180] *Id.* at 14.
[181] *Id.*

administrator, interview panels are constituted in each court across the state, consisting of five employees, three from the locale where the court sits and two from outside the locale. ODI's Director, Anthony Walters, sits on several of the interview panels, especially in courts upstate where there is a lack of minority court employees of sufficient seniority to sit on the panels. The panels' recommendations go to the Deputy Chief Administrative Judge and the Chief Administrative Judge for final approval.

We are told also that ODI is involved in outreach initiatives to ensure that OCA is recruiting diverse candidates. There are several fraternal organizations within the court system that provide resources for minority court employees, such as the Tribune Society and the Cervantes Society. We understand that ODI partners with these organizations to provide information about job opportunities to the public. We also understand that ODI sends job announcements to minority organizations, such as bar associations and HBCUs.

Although there is no mention of it on its website, according to ODI staff, the office also created a diversity task force that focuses on promoting minority court employees, especially in courts upstate. The task force consists of court employees at every level including judges. The goal of the task force is to develop trainings, programs and policies that promote diversity, which the employees on the task force can implement in their respective courthouses.

### D. <u>Anti-Discrimination Panels</u>

Court employees can informally resolve issues of bias or discrimination by contacting a supervisor or, if the complaint involves a direct supervisor, a higher-level manager.[182] Employees are also able to direct their complaints to the Administrative Office or Administrative Judge of the Judicial District in which the incident or behavior of concern occurred. Upon receiving a complaint, the Administrative Judge can choose to either resolve the matter informally, or refer the matter to the IG for Bias Matters or a member of the District's Anti-Discrimination Panel,[183] though the latter option has been characterized as "largely defunct."

The Anti-Discrimination Panel program[184] was designed to be another informal procedure for employees to resolve complaints of bias and discrimination.[185] Coordinated by ODI, panels were established in each court, and consisted of judicial and non-judicial

---

[182] *Id.* at 11.
[183] *Id.* at 12.
[184] *See Anti-Discrimination Panel Program*, OFFICE OF DIVERSITY AND INCLUSION, http://ww2.nycourts.gov/CAREERS/diversity/bias-free-environ.shtml (last visited Sept. 23, 2020).
[185] *Id.*

employees trained to receive complaints of discrimination.[186] The panels acted as an intermediary platform to help resolve issues without a formal investigation process.[187] Panel members would listen to employees and offer alternatives for resolutions to the complained-of behavior.[188] Panels would also inform employees of their options for advancing complaints of discrimination, including directing employees to the proper channels to file a formal complaint.[189] If a complaint described a serious issue of misconduct, the panels would report the complaint to the IG for Bias Matters.

### E. Disproportionate Minority Representation Committee

In 2005, the New York State Family Court Judge's Association ("NYSFCJA") sponsored its first educational session to discuss what was then referred to as disproportionate minority contact with the child welfare and juvenile justice systems. Thereafter, the NYSFCJA partnered with the Williams Commission to sponsor a day-long program at the Judicial Institute. In 2009, Judge Gayle Roberts, who sits in the Bronx Family Court, requested a series of meetings with Family Court Judges in the other four boroughs with the goal of creating a Disproportionate Minority Representation ("DMR") Committee in each borough focusing on these issues. DMR Committees were eventually formed throughout the state and have sponsored statewide and local conferences, trainings and working groups designed to address systemic issues and issues of bias affecting minority children and their families in the New York State court system. Although the committees are spearheaded by judges, they work in cooperation with outside stakeholders and are focused on bringing awareness to these issues to all court personnel. Interviewees described these trainings as "very high quality."

### F. Bias Training for Judges

In the course of our review, we identified a number of bias training programs for judicial personnel in and around the court system. Notably, there does not appear to be a consistent, state-wide approach to bias training. Most bias trainings offered by OCA do not appear to be mandatory. Some Judicial Districts and individual courts have taken the initiative to implement bias trainings, but these efforts appear to be ad hoc or diffuse.

**New Judges Seminar.** The Judicial Institute provides education and training for New York State judges and justices. Newly elected and appointed judges must attend the Judicial Institute's New Judges Seminar offered in January of each year. The New Judges

---

[186] *Id.*
[187] *Id.*
[188] *Id.*
[189] *Id.*

Seminar is a weeklong program designed to assist new judges "transition to [their] new role."[190] Subjects covered during this training include what Judicial Institute personnel termed "soft" subjects, such as bias training and introductions to OCA policies and procedures, and "hard" subjects, such as how to run a courtroom, arraignments and other judicial skills.

The 2020 New Judges Seminar provided two opportunities for implicit bias training: a one-hour session entitled "Implicit Bias in the Courtroom" and a two-hour panel session entitled "The Judge's Role as Supervisor and Manager." "Implicit Bias in the Courtroom" was held on the second day of the New Judges Seminar, just before lunch, and was led by Mirna Santiago, an attorney and member of the New York State Bar Association's Committee on Diversity and Inclusion. The course "examine[d] how implicit bias affects the administration of justice." "The Judge's Role as Supervisor and Manager" was a panel session held during the morning of the third day of the New Judges Seminar. Kay-Ann Porter, the Managing Inspector General for Bias Matters, and Carolyn Grimaldi, OCA Director of HR, were among those on the panel.

Our team reviewed the PowerPoint presentation and reference list given to participants as part of the "Implicit Bias in the Courtroom" session. The session appears to have discussed the sources and manifestations of unintended and implicit bias, explained cultural competence, including why it is important and how it is achieved and reviewed and how bias and lack of cultural competence affect the legal profession and the administration of justice. At least one-third of the presentation was dedicated to helping participants develop strategies for interrupting their own implicit biases. The reference list provided sources for further reading on topics covered in the presentation, as well as other relevant topics, such as how implicit bias affects education and employment. Our team did not review any materials for the second session on "The Judge's Role as Supervisor and Manager."

**Judicial Summer Seminars.** The Judicial Institute also offers "Judicial Summer Seminars" every summer, when judges from across the state may "gather, face-to-face with their colleagues, to share their experiences and wisdom."[191] The Judicial Summer Seminars are a three-day program which includes seminars on legal updates, judicial skills and "broader-based, thought-provoking courses particularly relevant to [judges'] work."[192] Newly elected and appointed judges are required to attend because the second part of the

---

[190] Letter from Juanita Bing Newton, Dean, N.Y. Judicial Inst., to judges attending the 2020 N.Y. New Judges Seminar (Jan. 6, 2020) (on file with N.Y. Office of Ct. Admin.).

[191] Letter from Lawrence K. Marks, Chief Administrative Judge, N.Y. Unified Court System, to judges attending the 2019 N.Y. Judicial Summer Seminars (Summer 2019) (on file with N.Y. Office of Ct. Admin.).

[192] *Id.*

New Judges Seminar is held on the afternoon before the start of the Judicial Summer Seminars and the morning of the first day.

In 2019, one of the plenary sessions intended for new judges was entitled "Implicit Bias in the Courtroom." This session, led by David Horowitz, a lecturer at Columbia Law School, was characterized as "[a] description of the ways in which implicit bias affects the administration of justice." Our team reviewed the PowerPoint presentation and session materials given to participants as part of this workshop, which appears to have focused on issues of bias in jury selection, as well as ideas for recognizing and remediating systemic biases affecting both judges and juries. The materials for this workshop seem to reflect a session geared toward court policies and practices, rather than solutions for curing personal biases.

In addition to these dedicated courses on bias, we are advised that Judicial Institute personnel are attempting to incorporate bias training into seminars on a broader range of issues. One recent class on new artificial intelligence technology discussed how such platforms exhibit design biases that disproportionately affect minorities. The seminars have also covered topics such as the social and legal history of the excessive use of force and the effects of trauma on litigants' lives.

**The Office of Justice Court Support.** Town and Village justices attend twelve hours annually of mandatory training courses administered by the Office of Justice Court Support ("OJCS"). We are told these courses are practical and geared toward what Town and Village justices do on a daily basis. One of the yearly trainings focuses on issues of diversity and inclusion. In 2019, the diversity and inclusion training focused on recognizing implicit bias.

**Training in Judicial Districts.** In the course of our review, we learned that judges in the Third District have the option of attending a bias training given in their district. The training lasts between 1.5 and 2 hours, and takes place before dinner. Materials for this training are created by a panel of judges in the district, and the training itself is conducted by outside consultants.

**New York State CLE Requirements.** Both attorneys and judges admitted to the New York State bar are subject to New York State Continuing Legal Education requirements. Members of the bar are required to complete at least one credit hour in the area of diversity, inclusion and elimination of bias every biennial reporting cycle.[193] Diversity, inclusion and elimination of bias courses and programs may include, among other things, "implicit

---

[193] N.Y. Ct. Rule § 1500.22.

and explicit bias, equal access to justice, serving a diverse population, diversity and inclusion initiatives in the legal profession, and sensitivity to cultural and other differences when interacting with the public, judges, jurors, litigants, attorneys, and court personnel."[194]

### G. Training for Non-Judicial Personnel

As with the bias training for judges, there does not appear to be a consistent or coordinated effort to provide bias training to all non-judicial personnel across the state. Some individual Judicial Districts have begun to develop training programs and policies, but these efforts are not centralized and the trainings not uniform.

**For Interviewers.** Materials received from OCA indicate that employees responsible for interviewing and hiring receive some training on racial bias. A 2017 PowerPoint entitled, "The Interview Process," gives tips on how to conduct interviews and advises interviewers not to ask questions about race and national origin. Another PowerPoint from 2018 entitled, "The Hiring Process: Interview Best Practices: Using the New Structured Interview Forms and the Interview Resource Center" includes tips on how to mitigate various types of biases, including racial bias, when rating interviewees. It also discusses prohibited areas of inquiry, which includes race and color. A third PowerPoint from 2019, entitled "Recruiting a Diverse Workforce," discusses how to reach a diverse applicant pool and also explains rating errors and implicit bias. According to officials from Office of Diversity and Inclusion, this was the training ODI gave on this topic for HR managers in each Judicial District. We also identified several one-page documents listing instructions for interviewers. One list sets out prohibited areas of inquiry during an interview, including "all questions regarding a person's race/color." Another list contains tips on avoiding bias in the interview process, but does not specifically mention racial bias.

**For Managers.** Materials we received from OCA indicate that bias is discussed in at least some management training. A PowerPoint dated May 16, 2019, entitled, "Ethics Training: Transition to Supervisor," documents a training given by Rosemary Garland-Scott, the Statewide Special Counsel for Ethics. It sets out ethics rules that apply to court system employees. The presentation mentions that "no bias or prejudice" is allowed under the Rules Governing Judicial Conduct and the Conduct of Nonjudicial Court Employees. It also states that court employees "shall not discriminate . . . on the basis of race, color, [or] national origin" and lists "discourag[ing] racist . . . jokes or remarks" under "best

---

[194] *Id.* at § 1500.2.

practices" for court employees. This presentation does not directly focus on racial discrimination.

We received two versions of a PowerPoint entitled, "Performance Management & Problematic Conduct for HR Professionals" which discusses best practices for performance management. The presenter's notes on slides addressing performance evaluations contain a discussion of bias issues, including the "similarity bias." Other notes reference "subconscious bias" and state that evaluations "should not contain . . . discriminatory language/code words." This presentation does not explicitly discuss implicit bias or racial or ethnic bias. While the notes contain examples of bias, none of those examples are of racial, ethnic or cultural bias.

A third PowerPoint, dated June 11, 2020, entitled, "NYS Unified Court System: Discrimination and Harassment Awareness" contains an overview of the laws and policies prohibiting harassment and discrimination, and discusses racial discrimination and harassment. It also presents a series of scenarios involving different types of discrimination. Only one of the eight scenarios depicts ethnic discrimination (against an Irish employee); none involve racial discrimination. The presentation also includes training on how to report discrimination claims.

**General Training.** In addition to materials geared toward educating interviewers and managers on issues of bias, we received one PowerPoint entitled, "Implicit Bias" created by the OCA HR Training and Professional Development Office. The target audience for this presentation is unclear. The last slide of the PowerPoint refers trainees to Harvard's Implicit Association Test, and the presenter's notes suggest that the audience was invited to take the test and consider their own biases. No other materials received appear to be bias training given by OCA to a general audience.

Officials from ODI no longer administer anti-discrimination trainings; they believe they were removed because OCA prefers attorneys to conduct those trainings. ODI has recently conducted a training at the Court Officers Academy, and officials expressed that they were "moving in the direction of conducting ongoing trainings" on bias.

**H. <u>Training for Personnel in Town and Village Courts</u>**

Clerks in Town and Village Courts are municipal employees and not generally subject to the authority of OCA. The Administrative Judge of each Judicial District develops the practices and policies of Town and Village Courts, but does not appear to be involved in training non-judicial employees of Town and Village Courts. We were not able to ascertain whether there are any training programs implemented by OCA, the Judicial Institute or

OJCS for Town and Village Court clerks or any other non-judicial employee. Justices interviewed were unsure what type of training their court clerks receive or who would be responsible for administering this training.

### I. <u>Training Efforts of Judicial Districts</u>

**Third Judicial District.** Officials from the Third District began mandating bias training two years ago.[195] The training was initially required only for judges and managers in the District, but more recently, the training requirement was extended to all courthouse employees in the District, including court officers. An implicit bias training panel, currently comprised of the Chief of the local Legal Aid branch, the Chief Clerk of Albany County, an LGBTQ advocacy group In Our Own Voices, Court Analyst Julio Rivera and the Hon. Richard Rivera, travels to various courthouses within the district to conduct the training. This training has not yet been universally administrated in the District due to interruptions caused by COVID-19. Interviewees shared the PowerPoint for this training, which begins with several interactive exercises, reviews the difference between explicit and implicit bias and discusses the Harvard Implicit Association Test. The training also discusses microaggressions, and provides strategies for "debiasing" and practicing greater cultural competence. The presentation seems to emphasize to trainees that having biases does not necessarily mean they are bad people.

**Eighth Judicial District.** Officials from the Eight Judicial District have developed and executed bias trainings largely on an ad hoc basis. All new employees, including law clerks and secretaries, are required to attend a one-day training, which includes a segment dedicated to racial and gender bias; the training is not required for judges. There is also a separate training for court officers that focuses on implicit bias training. Managers across the Eight Judicial District attend annual court meetings to discuss future trainings. However, different courts have different policies and practices. Family Court, for example, has its own training, which is offered in six counties, including Niagara County and Erie. The Erie Family DMR Committee provides a two-day training on implicit bias that specifically addresses cultural differences among families appearing in Family Court. The training uses a video entitled "Race the Power of Illusion" as a learning tool to engage a joint dialogue about race. The Erie Family DMR Committee has also hosted an education series on related topics like Racial Anxiety, Cultural Competency, Generational Trauma in Communities of Color and Working with Native American Families. Interviewees observed that counties with greater resources, like Erie County, are able to provide more trainings, but it is more difficult to do training programs in less populous areas with less

---

[195] Officials interviewed from the Third District believe they were the first district to mandate bias training.

resources. There has been some effort to bring trainings to counties through electronic meetings on Skype.

## VI. WHAT WE HEARD

In the course of this review we connected with 289 people in 96 individual and group interviews. We spoke with sitting and retired judges representing almost every type of court in the system, prosecutors, criminal defense attorneys, institutional defenders, private practitioners, affinity groups, judicial associations, bar associations, court watchers, court officers and court clerks. Many interviewees followed with written sets of recommendations. We promised interviewees they would not be quoted by name, which we assess promoted candor. Accordingly, we do not attribute the quotes and assertions in this section by name, except where we were granted express permission to do so. Nor do we repeat every single thing we heard in our interviews. What appears below is representative of what we heard, reflecting a number of consistent observations and concerns. Some of what is recounted below is beyond the scope of this review to address. Nevertheless, we believe it important, as part of this assignment, to give voice to all the concerns expressed below.

### A. An Under-Resourced, Over-Burdened Court System

We are obliged to begin with this. We note the Excellence Initiative and the considerable progress that has been made since 2016 to improve productivity, eliminate backlogs and modernize courtrooms. However, in one form or another, the #1 complaint we heard from multiple interviewees from all perspectives was about an under-resourced, over-burdened court system, the dehumanizing effect it has on litigants and the disparate impact all this has on people of color.

The Housing, Family, Civil and Criminal courts of New York City in particular continue to be faced with high volumes of cases, fewer resources to hear those cases, subpar technology and in some instances, crumbling and outdated facilities. Addressing the backlog of cases due to court closures during COVID-19 will no doubt make matters worse. Over and over, we heard about the "dehumanizing" and "demeaning cattle-call culture" in New York City's highest volume courts. At the same time, a disproportionately high percentage of the civil or criminal litigants in the Housing, Family, Civil and Criminal courts in New York City are people of color. The picture painted for us was that of a second-class system of justice for people of color in New York State.

One judge told us that the systemic reluctance to devote resources to these high-volume courts in New York City, which primarily serve indigent people of color, is "the very definition of institutional bias." Some interviewees went so far as to allege that deliberate choices have been made over the years not to address the persistent problems that have an

undeniable racially disproportionate effect. A Family Court judge noted the overlap between the concerns expressed by the Williams Commission in the early 1990s and the complaints repeated today.

The widespread complaints about high-volume courts took several forms:

*First*, there were the complaints about the facilities themselves. We note that this was not universally a problem. Courthouse visits undertaken as a part of this review revealed renovated facilities that had been further retrofitted to accommodate COVID-19 concerns. However, interviewees stressed that new, well-kept and clean courthouses are not a privilege enjoyed by all litigants equally. For example, multiple, independent groups of interviewees cited the "atrocious" Housing Court facilities in Brooklyn and the Bronx – courts frequented disproportionately by litigants of color. As one lawyer explained, Brooklyn's Housing Court is "the most inadequate facility for anything, let alone court proceedings." Another interviewee said that the courthouse is hardly recognizable as such, given that it is not a courthouse at all – but rather, a repurposed office building.[196] A public defender informed us that while other courthouses are operated by OCA, the office building occupied by the Kings County Housing Court is rented by the city, and the landlord of this building has regularly appeared on the Public Advocate's "Worst Landlords Watch-list." Several interviewees also described long lines to enter the Brooklyn facility, which often wrap around the block. Litigants are forced to stand outside in inclement weather – without shelter – for hours, waiting to enter. Upon entry, litigants were reported being "herded into an over-crowded elevator, over-heated by the crush of human bodies and strollers." A Housing Court judge told us the public bathrooms in Kings County Housing Court are among the worst she has ever seen, and another cited their resemblance to "a run-down public school bathroom, along with the public-school smells, stains and scratched up stalls." Judges cited dark, poorly ventilated and overheated or overcooled hallways and courtrooms affect individuals with respiratory issues, while overcrowding, stress and tense interactions affect individuals with mental health problems.

In the Bronx, we are told some litigants must descend into a non-ADA-compliant basement to have their cases heard, with ceiling tiles hanging on by a thread above their heads. Meanwhile, air conditioning is problematic and unpredictable – with some judges citing that they once measured the temperature in a makeshift courtroom at 62 degrees Fahrenheit.

---

[196] The Working Group understands that there are long-term plans to move and update these courthouses, according to a report of the Housing Court Commission. *See Reforming New York City Housing Courts, A One-Year Update,* OFFICE CT. ADMIN. 9-10 (Feb. 2019), http://ww2.nycourts.gov/sites/default/files/document/files/2019-02/19_Housing_Court-Report_Update.pdf.

Interviewees acknowledged the 2017 expansion of access to counsel for those in eviction proceedings has dramatically increased the numbers of individuals accessing the New York City's Housing Courts on a daily basis,[197] but noted that Housing Court facilities had previously been and are still insufficient to handle the volume of cases and individuals.

*Second*, judges acknowledged to us that the high volume of cases in these courts is their "enemy" in addressing bias, specifically. As a Supreme Court justice noted, Housing and Family Court judges have only have one clerk, while in the court's Commercial Division, most judges have three clerks. A group of Family Court judges surveyed cited research showing that implicit bias is more likely to be acted upon when a decision-maker is rushed.[198] They noted that if a judge has time to slow down, unpack the case before them, look at it from multiple angles and "surface their own biases and reactions" to the individuals involved, that judge is more likely to second-guess their own assumptions and biases. In a separate interview, another Family Court judge admitted that proceedings are often too rushed when judges are making decisions about removing a child from his or her family.

*Third*, interviewees noted that the atmosphere of Family Court is often dominated by concerns about security, with little to no consideration for its effects on litigants. We recognize that armed court officers are indispensable to court security. Nevertheless, interviewees told us that the presence of armed officers in Family Court contributes to the impression that it is yet another institution that "polices and controls" people of color.

*Fourth*, interviewees noted the length of time litigants must wait for their cases to be heard and adjudicated in high-volume courts. In Civil Courts hearing consumer debt cases, litigants are shuffled into "overstuffed" waiting rooms to wait for hours, only to have a few short minutes before the judge. As one organization noted, "wait times are a problem; the court system does not have what one would call a 'customer service model,' and it has a disproportionate impact on the non-white population in the courts." Interviewees, particularly those who spend much of their time in court, cited the lack of a formalized procedure or set of guidelines for setting court calendars as particularly problematic for litigants of color. Interviewees statewide cited an established practice of scheduling

---

[197] *See Implementing New York City's Universal Access to Counsel Program: Lessons from Other Jurisdictions,* NYU FURMAN CTR. 16 (Dec. 2018), https://furmancenter.org/files/UAC_Policy_Brief_12_11-18.pdf.

[198] *See* Kristin Henning, *Race, Paternalism, and the Right to Counsel,* 56 AM. CRIM. L. REV. 649, 652-55 (2017) (citing Theodore Eisenberg & Sheri Lynn Johnson, *Implicit Racial Attitudes of Death Penalty Lawyers,* 53 DEPAUL L. REV. 1555 (2004); Vanessa Edkins, *Defense Attorney Plea Recommendations and Client Race: Does Zealous Representation Apply Equally to All?,* 35 L. AND HUM. BEHAV. 413, 415 (2011)).

litigants who have sufficient resources to retain paid counsel before clients represented by legal aid attorneys or public defenders.

Interviewees said this practice wastes precious time, especially for indigent litigants, who must miss work or spend much needed resources on childcare to wait all day in court for their case to be called. As a group of Housing Court judges explained, when the court cannot complete its calendar for the day, cases are often adjourned out of necessity, meaning that unrepresented litigants must take another day off from work or arrange for childcare. For some litigants in Housing Court, "missing even one day of work can mean that a month's rent cannot get paid in full," putting litigants facing eviction even further behind.

One defender organization reported that their internal data analysis has shown clear racial disparities in case processing time in felony cases in New York City. In the case of Family Court, delays in processing a case can mean potentially permanent damage to children, particularly when those delays impact reunification. As one Family Court Judge noted, in this context, "justice delayed is justice denied."

One lawyer noted that the delays impart a sense of profound unfairness and have a demoralizing effect on clients. Ultimately, the message sent is that the loss of the litigants' time – particularly those who are indigent or people of color – is a casualty within the system's broader disorganization. One lawyer told us that occasionally, litigants in Family Court feel so disheartened by persistent delays that they eventually fail to appear at all.

*Fifth*, interviewees also cited the lack of uniform access to childcare services, especially in New York's high-volume courthouses. The difficulties that litigants, and particularly litigants of color, face in arranging for childcare in order to attend and fully participate in court proceedings, was a commonly raised theme throughout interviews. A group of Housing Court judges told us that previously, the Housing Court provided childcare services within the courthouse while parents or caretakers attended their cases, but that this practice has been discontinued due to budgetary limitations. Judges stressed that the need for childcare support continues to be an "overwhelming" issue faced by litigants, particularly women, who otherwise must bring their children into the courtroom with them, or miss proceedings altogether. Beyond this, the bare minimum of needs faced by working parents in court are not met – one legal aid attorney mentioned that there are not even changing tables in Family Court bathrooms throughout New York City. While a narrow issue, as she framed it, if litigants are going to be subject to delays and long wait times, they should at least be able to easily use the restroom with their small children while they wait.

*Sixth*, interviewees noted the importance of adequate signage in courthouses. Aside from practical concerns, they noted that signage is important for the message that it sends to litigants: that the court system is there to serve them, and that they are active participants in it. Yet, one prosecutor noted that the signage is so bad in some courts in his jurisdiction, "airports and local Department of Motor Vehicles offices are more navigable than the courthouse." Interviewees often pointed to the importance of adequate signage for unrepresented litigants and those who are of limited English proficiency – noting that it is unacceptable that these individuals often only accidentally end up at their intended destination within the courthouse, and that once there, they sometimes do not have even a basic grasp of what is taking place. In essence, interviewees felt that other, larger issues aside – like the quality of interpretation services or access to counsel – useful, common-sense, accessible signage is the bare minimum of resources that the system can provide its most vulnerable litigants.

*Finally*, multiple interviewees noted that in this environment, court officers, attorneys and judges sometimes exhibit a lack of understanding, empathy and compassion towards litigants of color interacting with the court system. One judge mentioned that there is "a culture in the courts that discourages compassionate treatment." One district attorney noted, "you don't see, at all, any care or compassion for the family that is watching their son or daughter being sentenced to 20 years in prison. When there's that emotional outburst, they are ushered out of the courts by security." A number of interviewees mentioned a tendency of certain judges and court officers to "moralize" at litigants of color and disparage them because of their dress or how they speak in court. One defense attorney noted that certain judges yell at or punish clients for being late, without regard to litigants' poverty, childcare needs or ability to take time off from work. A senior member of a leading bar association recalled an incident in which a Family Court judge in New York City yelled at a litigant for saying in court that she did not know who the father of her child was. The judge apparently then inquired, "How is it that you people never know?"

This insensitive behavior extends to attorneys in court as well. One Housing Court judge noted, during her time on the bench, she frequently overheard statements by attorneys that ran the gamut of overt racism, racial bias and racially tinged condescension. She mentioned that this dynamic was especially problematic in the Housing Courts, an environment where the litigants of color are often being evicted and the landlords and attorneys pursuing the evictions are overwhelmingly white. One public defender reported an instance in which he witnessed a court-appointed attorney buy boots on her iPad while her client lost custody of her child in Family Court.

Interviewees also pointed out that personnel across the system have virtually no idea how to interact with indigenous persons, despite that, as interviewees pointed out, "there are so many Native Americans that come into contact with the bar and the courts." One interviewee noted that although "most discrimination exists closer to [Native American reserves]," the farther one moves from those areas, Native Americans are essentially considered "nonexistent."

## B. Existing Institutions Addressing Racial Bias are Inadequate, Opaque or Unknown

Part of our assignment from the Chief Judge was to examine existing programs or policies geared towards reducing racial bias.

Significantly, many interviewees simply were not aware that many of these programs and policies existed, or if they did, they were unfamiliar with their scope and function.

The IG for Bias Matters is the prime example of this. This office is charged with investigating complaints of racial, sexual, sexual orientation and gender identity related-discrimination or bias. Many individuals in the system simply did not know that this office existed, or did not understand its role. One national-level state court observer noted that New York State was truly "ahead of its time" in creating such an office, and that few other states have a similar institutionalized role for investigating complaints of racial bias. As such, she was "surprised and disheartened" to learn that it was not widely understood. When prompted, another upper-level OCA employee admitted that she had only recently learned the office existed. One group of judges interviewed even recommended that OCA establish an "Inspector General for Diversity and Bias Related Conduct," though this position already exists. Potentially a reflection of its relatively unknown status, we are told that the IG for Bias Matters typically receives ten or fewer complaints of racial bias meriting an investigation per year.

While one OCA staff member informed us that there are posters advertising complaint procedures for registering a complaint to the Offices of the IG or the IG for Bias Matters in some courthouses, few others acknowledged that they had seen such advertising. In general, interviewees pointed to the lack of well-publicized, anonymous and fair complaint procedures for reporting incidents of bias on the part of judicial and non-judicial personnel. Several judges and former judges noted that the current system does not address "festering" issues with court officer conduct, and another former judge cited "deep concerns" about complaint procedures as a whole.

Even when interviewees were able to name a few of the organizations tasked with addressing racial bias in the court system, many noted that these entities are ineffectual or exist in name only. The characterization "window dressing" was used more than once.

Interviewees noted that the Office of Diversity and Inclusion, or ODI, had recently experienced budget cuts, and its team of eight people involved in discussing diversity issues with courthouses across the state had recently been pared down to only two. One judge noted "if one is serious about interrupting bias, it cannot be done cheaply."

Likewise, an interviewee questioned whether the newly-expanded Office for Justice Initiatives had any "real leverage" to combat racial bias in the courts. For example, we were told that this office's budget request for programs specifically addressing racial bias was denied in 2018, and that subsequent funding received has been "far too little" to develop and administer such a program.

Interviewees were also generally confused about the "largely defunct" Anti-Discrimination Panels, which were originally created to serve as a more informal dispute resolution mechanism for incidents of bias and beyond. The panels were administered by trained judicial and non-judicial intermediaries, and are still advertised in OCA's "Discrimination Claim Policy & Procedure" booklet as a confidential means for personnel to "resolve incidents of discrimination" outside of formal complaint procedures.[199] However, interviewees informed us that these panels are no longer in widespread operation. While one interviewee noted that reinvigorating the program would be beneficial for addressing incidents of bias in a less adversarial fashion than the formalized complaint process, other interviewees who were familiar with the program in practice noted that the panels were difficult to manage and resulted in inconsistent or unwieldy investigations. Ultimately, a member of OCA's staff noted that the most problematic feature of the Anti-Discrimination Panels is that they are neither in use, nor have they been formally disbanded.

One interviewee noted that while the New York Federal-State-Tribal Courts and Indian Nations Justice Forum was once successful in achieving judicial recognition of Tribal Court Orders, and had been having discussions about incorporating Federal Native American Law into the New York bar exam,[200] these efforts have waned in recent years.

---

[199] *OCA Discrimination Claim Policy & Procedure*, *supra* note 176, at 11.

[200] We understand that other states have done this, such as Washington State, which now includes Indian law on the state bar exam and stresses the importance of Indian law in Washington State law schools. *See State and Tribal Courts: Strategies for Bridging the Divide*, CTR. FOR CT. INNOV. 19 (2011), https://www.courtinnovation.org/sites/default/files/documents/StateAndTribalCourts.pdf.

Next, a number of interviewees told us – in words or in substance – that the Williams Commission has "run out of steam." This view is shared even by Commission members. One member expressed a hope the Commission will ultimately be empowered through independent initiatives like this one. We recognize the Commission's efforts over decades to address diversity and equal justice in the court system. That said, interviewees told us their belief that the Commission is no longer "as critical of the system" as it once was. This may partially be attributed to the Commission's apparent shift from an investigative and reporting mechanism to more of a community-building organization over the last few years. Many interviewees stressed the Commission's potential to be an "asset" on matters of equal justice, and that the Commission could be more "proactive" and "forceful" in its approach to its original mandate.

Finally, many interviewees told us they do not feel comfortable lodging complaints of racial bias, largely for fear of retaliation from superiors or colleagues. As one judge of color noted, there is "a fear among Black leadership in the system," and that these leaders of color try to "tread lightly" when dealing with claims of racial discrimination. The judge added that this is perhaps because they fear that they will not be supported, or will lose their positions of power if they speak out. Judges expressed fear of raising issues of racial bias, out of concern for blowback from fellow judges. Court attorneys, as at-will employees, fear reporting incidents of bias against the judges they work for.

Meanwhile, attorneys described feeling powerless to raise complaints against judges who engaged in biased behaviors or made racially-charged comments against them or their clients. As repeat players in the system, prosecutors and defense attorneys expressed that despite pervasive problems with problematic judges, their professional duties often require them to keep their feedback to themselves, at the risk of compromising their client's case, their own reputation or that of their organization. One legal aid attorney interviewed noted that many pro bono attorneys of color tend to be young, which creates additional barriers to speaking up against inappropriate behavior.

## C. Court Officers

On June 7, 2020, it was reported publicly that a Brooklyn-based court officer had posted on Facebook an illustration of President Barack Obama with a noose around his neck, and Secretary Hillary Clinton being taken to a wooden apparatus to be hanged. The post prompted immediate outrage, and we are told that the officer has been suspended.

It is apparent from our interviews that this episode peeled the lid off raw emotions about and within the court officer community, particularly in Kings County. A number of interviewees were outspoken in expressing those grievances about the court officer

community. Several told us that the post described above is not an isolated incident. Interviewees reported that the court officer who posted the offensive message had been "protected for years," and that her racist views and mistreatment of people of color as a court officer had long been tolerated without adverse consequences. Others alleged that problematic social media posts by court officers have been a widespread issue repeatedly ignored despite complaints long before this recent incident. Interviewees said the court officer's post evidences a broader institutional acceptance of racist behavior.

Still worse, court officers of color told us they felt they could not report incidents of bias, for fear of being ostracized by their fellow officers and facing adverse career consequences from powerful union leaders. Even some judges told us they hesitate to report court officers, citing incidents where court officers have created a hostile environment for judges who they feel have criticized them. One very senior judge confided that she is aware that some judges are afraid of reprimanding or correcting the misbehavior of certain court officers in their courtrooms.

Although interviewees stressed that not all court officers behave in a hostile manner, almost every interview touched on what appears to be a culture of toxicity and unprofessionalism exhibited by court officers towards litigants, litigants' relatives and attorneys of color.

Multiple interviewees told us that a number of court officers engage in disrespectful, condescending and unprofessional behavior directed disproportionately at individuals of color interacting with the judicial system. For example, a Family Court practitioner relayed experiences of court officers yelling at litigants of color, as well as at immigrants for whom English is not a first language. Her experience was echoed by other interviewees, who described court officers as "routinely bullying defendants, displaying short fuses" and perceiving courtroom users as potential threats. Other examples of unprofessional behavior included discussing litigants' marital status and berating litigants about the clothes that they wear. Interviewees mentioned that such behavior is often unprompted, and frequently escalates an already-tense situation given the nature of certain judicial proceedings.

Interviewees also noted that court officers exhibit differential treatment towards certain individuals by applying facially neutral policies differently on the basis of race. For example, interviewees at a legal think tank noted that litigants and attorneys of color consistently receive additional scrutiny and are required to produce their identification when entering the courthouse, while white individuals are waived through. Another example is the prohibition against cell phone use in the courthouse; this rule is often

enforced aggressively against people of color, but not against white individuals. One former prosecutor noted that Black defendants are more often handcuffed when appearing for minor infractions, while their white counterparts are not.

Some interviewees reported instances of explicitly racist conduct or comments by court officers. According to court officers of color, the use of racial slurs by white court officers is common and often goes unpunished. One public defender relayed a story of being in an elevator with her clients, who happened to be Black teenagers, and multiple court officers. In response to comments made by the Black teenagers, one white sergeant replied, "Keep running your mouth. You'll always be a nigger." Multiple court officers of color mentioned white court officers using the n-word. One court officer of color recalled an incident where she overheard a white court officer telling another officer that he would have done better on the requalification exam if it had a "Sean Bell target" – referencing the unarmed Black man who was killed on his wedding day after police officers fired 50 bullets into his car. Another court officer of color recounted an incident in a locker room where a white court officer referred to a Black court officer as "one of the good monkeys." According to interviewees, these incidents were reported, but the court officers involved were not disciplined. One court officer told us that his supervising officer ranted at a Christmas party about how Black people are lucky that they are allowed to be court officers in the first place.

Though court officers are employees of the Unified Court System, according to several interviewees, court officer discipline and promotion is heavily influenced by union leadership, specifically the leadership of the New York State Court Officers Association. Multiple interviewees occupying various positions within the court system also told us it is well-known that court officers cannot be promoted unless it is personally approved by the head of Court Officers Association, who has been president of that union for 46 years. Court officers of color describe the Court Officers Association as "insular," and believe that union leadership has over time become entrenched and insulated itself from any real scrutiny or challenge.

We also note that certain union leaders have themselves posted offensive messages on social media, leading several court officers to complain that union leadership is a "safe haven for racist speech and actions."[201] In one Facebook post, a member of union leadership referred to protestors who sprayed graffiti on a New York State court van as "animals." In that same Facebook post, the union leader's profile picture was the Betsy

---

[201] Rebecca Rosenberg & Bruce Golding, *Racial Inequality Probe Ordered Into Court Officers Union Leader*, N.Y. POST (June 12, 2020), https://nypost.com/2020/06/12/racial-inequality-probe-ordered-into-court-officers-union-leader/.

Ross flag, which has been widely adopted by white Supremacist groups, including the Ku Klux Klan.[202]

Notably, the overall diversity of the court officer community does not diverge significantly from the population statewide or in New York City (*see* Figures 25 and 26 below), though the statewide or citywide population does not necessarily reflect the demographics of the litigants in particular state courts.



**Figure 25**

---

[202] In New York, a KKK group passed out mini Betsy Ross Flags, in addition to the Confederate Flag which they commonly use. In Georgia, some KKK groups required members to use the Betsy Ross Flag in ritualistic meetings. Janice Williams, *Is the Betsy Ross Flag Racist? Meaning, History and Symbolism Behind U.S.A.'s 13-Star Flag*, NEWSWEEK (July 2, 2019), https://www.newsweek.com/betsy-ross-flag-meaning-history-racist-1447174.



**Figure 26**

Critically, interviewees emphasized that the diveristy of the court officer community is concentrated at the lower levels, and the data below supports this (*see* Figure 27 below).



**Figure 27**

65

**D.** **Issues Facing Attorneys of Color**

In the course of our interviews, we were struck that almost every attorney of color we spoke with – ranging from criminal defense attorneys to the Bronx District Attorney herself – reported incidents in which they were mistaken for someone other than an attorney or otherwise subjected to disparate treatment. A supervising attorney of color currently serving in a public defender's office told us "every Black attorney working in the system has a story" of being treated differently, seemingly on the basis of race. These instances take several forms:

- being mistaken for a criminal defendant;

- being mistaken for an interpreter;

- being mistaken for another attorney of color;

- being asked to show identification to enter the courthouse while white attorneys are not;

- being questioned about sitting in the front row of the courtroom reserved for attorneys and

- comments from judges and court officers on how they carry themselves or are dressed.

Both upstate and downstate practitioners appearing in multiple types of courts have reported such treatment. One African American criminal defense attorney recounted for us the recent experience of appearing in state court upstate to represent a client. His description of the experience sounded as if he were appearing in a courtroom in the deep South in the early 1960s: the reaction from local officials was astonishment and questions such as "why are you here?"

Some attorneys of color also told us that they are "believed less often" when making statements to the judges before whom they appear. This problem is magnified when an attorney of color represents a litigant of color in court; in such an instance, according to the head of a public defender's office, the bias manifests itself as disbelief of both attorney and client and the failure to take them seriously. Another frequent practitioner in Family Court noted that she has repeatedly been referred to as aggressive or overly assertive, while her white male counterparts making similar arguments to represent their clients are not.

So pervasive are such incidents that the head of a legal organization told us that attorneys of color practicing in one county keep a running Google document tracking the

inappropriate comments that they hear from judicial personnel. Two other legal organizations told us they keep running lists of such incidents.

Finally, we heard there is a palpable, cumulative effect such disparate treatment has on attorneys of color and the quality of representation that they can provide: if a client witnesses this treatment, it lessens the confidence the client has in his or her lawyer, and erodes the client's overall confidence in the ability of the judicial system to deliver fair outcomes.

### E. Judicial Diversity

Though the data (*see* Section IV above) demonstrates overall progress in this area, many judges we spoke with stated the view that the judiciary is not sufficiently diverse or representative of New York's population, particularly upstate. The data does in fact reflect an increasingly diverse judiciary statewide and New York City-wide (*see* pp. 32–41); we note, however, pockets and particular groups where representation in the judiciary lags behind the population. As one particularly notable example, one interviewee pointed out that there is currently only one Native American jurist on the entire New York State bench. According to the interviewees, the lack of diversity among the judiciary leads to perceptions that justice is not fairly administered.

The judges we spoke to also noted underrepresentation in certain positions of power (*e.g.*, the position of Presiding Justice) and much-sought-after assignments (*e.g.*, the Commercial Division of New York County). On the other hand, we are told by OCA that in fact nine of the fifteen Administrative Judges who sit in downstate New York (the City plus Long Island and Rockland, Orange, Putnam and Dutchess Counties) are people of color.

After surveying a group of Supervising and Administrative Judges on the topic, a summary of the responses sent to us by the Judicial Friends Association indicated that procedures for judicial part assignments often appear to be entirely discretionary and lack sufficient transparency to even critique them in an informed way.[203] Another group of judges interviewed complained of a seeming lack of transparency around the factors or qualifications that go into judicial promotions.

Finally, we heard mixed views from judges about whether the elected or appointed process better promotes diversity. Some interviewees expressed that people of color have

---

[203] *Report to the New York State Court's Commission on Equal Justice in the Courts*, JUD. FRIENDS ASS'N. 7-14 (Aug. 31, 2020), https://www.urbancny.com/wp-content/uploads/2020/09/Judicial-Friends-Report-on-Systemic-Racism-in-the-NY-Courts.9.14.20.pdf.

a higher chance of becoming a judge through the electoral process, particularly in diverse communities, where the community is given a voice in its representation. One elected judge upstate recalled for us with pride that he challenged the party's handpicked choice in a primary and ran successfully as a renegade. These same interviewees believe that judicial screening committees participating in the appointment process are themselves not diverse and contain "too many 'Big Law' types."

On the other hand, interviewees who believed the appointive process secured better judicial diversity noted the inherent issues and barriers in the electoral process. These interviewees asserted that, realistically, the electoral process, just as often as the appointive process, depends upon "who you know." One judge of color explained that the political nominating system at judicial conventions causes candidates of color to be bypassed or discouraged by party leadership, particularly in upstate counties, and that interested candidates are often forced to abide by the party's selection for fear of retribution in future elections. To achieve this endorsement, interviewees indicated that candidates must publicly align themselves with the political party, which is often only achieved through substantial donations to the political party's county chairman. One interviewee suggested that unless party politics is eliminated, appointments better serve interests of diversity. (It is no secret that, in fact, there are few competitive judicial elections in downstate New York.)

We analyzed data on elections and appointments of judges sitting in New York City to evaluate which process leads to more judges from minority backgrounds. In New York City, elected judges include those on the Supreme Courts, Surrogate's Courts, and New York City Civil Court. Judges in the New York City Family, Housing, and Criminal courts are appointed. According to data received from OCA, the vast majority of judges outside of New York City are elected. Judges sitting on City Courts outside of New York City may be appointed or elected, but these data were not disaggregated. Thus, we did not analyze relative outcomes of appointments and elections outside of the City.

As reflected below, overall the data shows that elections in New York City appear to yield a more diverse judiciary. Judicial appointments yield a greater percentage of Asian judges, but elections place more Black and Latinx judges on the bench and create a more diverse bench overall. Black jurists account for 16.5% of appointed judges and 27.3% of elected judges. Latinx judges comprise 11.3% of the appointed judiciary and 14.6% the elected judiciary. However, only 4.2% of elected judges identify as Asian, whereas 8.5% of appointed judges do.



**Figure 28**

Ultimately, while we take no position on this issue, the appointment versus election question will depend on the circumstances – and the commitment to diversity by those who ultimately have the power to appoint a judge or help a judicial candidate secure a place on a ballot.

Interviewees also provided mixed views regarding whether or not they believed the Chief Judge's proposed merger plan would increase judicial diversity.[204] On the one hand, some judges asserted that the plan's implementation would reduce the number of elected judges in growing minority communities. On the other hand, proponents of the merger plan observed several key benefits if it were to be adopted: first, interviewees asserted that the merger plan would necessarily increase the pool for diverse judges to be promoted to

---

[204] *See* Press Release, Hon. Lawrence K. Marks, *Chief Judge Proposes Constitutional Reforms to Simplify Outdated Court Structure, Aiming to Enhance Access, Optimize Resources* (Sept. 25, 2019), https://ww2.nycourts.gov/sites/default/files/document/files/2019-09/PR19_22.pdf.

the Appellate Division, as many courts would be merged into the Supreme Court. Second, interviewees highlighted that many of the courts that would be merged into the Supreme Court – including Family Court, for example – would see reduced workloads as cases would be more evenly distributed across more judges. Interviewees opined that this improvement in resource allocation would improve the overall quality of justice administered in these courts. We take no position on this issue, as we do not believe we are equipped to offer an informed opinion.

### F. Diversity Within the UCS Bureaucracy

Interviewees frequently highlighted a dearth of diversity, particularly in promotion opportunities, throughout the bureaucracy of the Unified Court System. This encompassed the leadership of OCA. Interviewees from within the court system, including a number of sitting judges, cited a perception of lack of diversity within OCA leadership – put more than once as "a lack of diversity on the 11th floor" of OCA's offices at 25 Beaver Street in Manhattan. (Here perception may not have caught up with reality because we are told that five of the twelve officials in the OCA's executive office are people of color.)

Throughout the bureaucracy employees of color we spoke with perceive unfair barriers in hiring and promotion. Interviewees noted that this perception is a problem in and of itself, in that it has a chilling effect on diverse applicants' willingness to even seek employment or promotion within the system.

Judges commented that it appeared task forces, committees and commissions tended to include a recurring cast of non-diverse individuals.

Numerous interviewees from across the spectrum perceive that nepotism permeates hiring and promotional decisions, even though most jobs within the court system are civil service positions requiring civil service exams. Perceived nepotism in the court officer community in particular was identified by interviewees. According to a judge interviewed, given the number of intergenerational families in the ranks of clerical staff and court officers, nepotism results in an non-diverse employment population in certain courts. Interviewees noted that this problem – which extends across both competitive and non-competitive positions – leads to "bad morale" among employees and leads to the perception that people of color face unfair barriers in advancing in their careers.

Some interviewees highlighted a perceived lack of attention and accountability among OCA leadership in ensuring a diverse workforce. For example, one interviewee explained that while Administrative Judges formerly maintained statistics on racial and ethnic hiring and regularly met to review these statistics, this practice halted because, as the interviewee

70

explained, the Administrative Judges "just got tired" of the practice. Similarly, tracking progress on diversity goals throughout the court system was one of the original undertakings of the Williams Commission, which formerly issued detailed reports comparing workforce demographics to population, updated regularly to reflect population changes. Commission members told us that they currently receive and analyze the data, use it to challenge administrators when they meet with them, but do not publicize the data.

Interviewees complained that applicants of color are often unaware of job openings, opportunities to take civil service exams and opportunities for promotion.

Additionally, interviewees highlighted a lack of uniformity among the Judicial Districts in their outreach efforts and results in making diverse hires. We heard that in one Judicial District robust outreach efforts – including outreach to faith communities and local colleges and advertising through its own publications and in local newspapers – resulted in noticeably more applicants of color. Interviewees highlighted the success of another Judicial District's efforts to communicate available positions and upcoming civil service exams to its employees via email and postings on an easily accessible website. These Judicial Districts cited the importance of community, grassroots efforts in improving diversity hiring numbers as well as the importance of "credible messengers" in advertising employment in the court system. But, a well-known affinity organization stated that Judicial Districts like these are the exception, not the rule. Interviewees acknowledged the inherent difficulties in recruiting diverse candidates – particularly in upstate communities – where the population is not nearly as diverse as New York City.

Next, interviewees complained of the ineffectiveness of "interview panels," and told us that they actually provide barriers to merit-based advancement. We understand that interview panels – responsible for interviewing and recommending candidates to the Deputy Chief Administrative Judge for hiring and promotion – are a part of efforts to ensure a fair and equal hiring and promotion process. Despite this, some interviewees perceived inherent unfairness in the process. For example, one interviewee conveyed the impression that there is often a predetermined candidate, and that interview panels will simply re-constitute themselves until the desired candidate is chosen. One retired Black judge told us he had grown tired of sitting on interview panels simply to "achieve diversity" when the result was preordained. Interviewees complained about a lack of transparency in the process, and that candidates for promotion are often not notified that they are not selected for a position, and are never formally informed why they were not chosen, even when they ask for feedback. Interviewees said this general lack of transparency generates festering perceptions that the process is political, based on favoritism and rigged. Given

the noted inhibiting effects this has on potential applicants of color, these perceptions are nearly as important as the actual outcomes.

With respect to competitive civil service positions, interviewees say that the required civil service exams for these positions provides an extra barrier to employment. Specifically, interviewees relayed that examination dates are not always publicized, and that preparatory materials are often unavailable or difficult to access. Interviewees said that learning about and adequately preparing for these examinations depends on knowing people already in those roles who had previously prepared for the examination – an opportunity that is less available to applicants of color who are underrepresented in these roles.

Finally, interviewees characterized the "reclassification process" – whereby employees apply to be classified to a higher "grade" or different position – lacks transparency and is wrought with subjectivity. One knowledgeable interviewee said many employees are under the impression that supervisors typically show favoritism in these processes.

## G. Bias Training

One consistent message we heard was that existing training on racial and cultural bias and sensitivity is inconsistent and insufficient. Multiple judges in particular were willing to acknowledge their own implicit biases and recognized the value of training to open minds and challenge stereotypes. One retired Black judge with decades of experience told us he often had to "check his biases" at the door when evaluating a litigant before him. Several judges interviewed noted that isolation is a challenge for ensuring that judges are engaging with and exploring issues of racial bias and cultural awareness. However, the primary complaint about bias training is that it is not currently mandatory for all judicial and non-judicial personnel across the New York State court system.

As for judicial training efforts, we are aware that all new judges receive bias training at a plenary session during summer sessions at the Judicial Institute in White Plains. Beyond that, the Judicial Institute provides a yearly session on implicit bias, which may be accessed remotely as a video, but is not mandatory. Several veteran judges surveyed noted that even when returning judges attend training at the Judicial Institute in person, many choose not to attend the implicit bias session. Several Supreme Court justices pointed out that these sessions for experienced judges are administered in a way that may even discourage attendance – specifically, the implicit bias session at the Judicial Institute for experienced judges has historically been provided at the end of the second day of the conference, at which point, most judges' "brains are turned off." We understand that last year, implicit bias training was one of twelve mandatory courses that Town and Village justices were

required to take. However, one justice told us that the quality of the bias training is "rudimentary."

On substance, a few judges we interviewed noted that the Judicial Institute's trainings "effective," in that they help judges be conscious of not thinking they have "heard a [litigant's] story before," based on demographics. But, most of the feedback received about judicial training on issues of bias or cultural sensitivity was critical.

With regard to non-judicial staff, as we understand it, the only "mandatory" training that OCA HR uniformly provides is delivered at orientation for new employees and covers "discrimination and harassment," but not implicit bias, specifically. While judges who are not new can opt to receive yearly training on implicit bias through the Judicial Institute, there is no such unified or well-known platform for periodic or recurring training for non-judicial staff.

We are aware that OCA has developed specific implicit bias training materials, but that they have been administered only at the request of specific courts. Individual Judicial Districts surveyed informed us that they require such training for non-judicial staff, but this is of their own initiative, not OCA's. One administrative judge noted the vast differences between Judicial Districts' approaches, and that there is "no centralized body for training" on these subjects. She explained that this is problematic, given that larger counties have more resources for trainings, while smaller and less populous counties cannot afford them. As a result, individuals in some parts of the state may fall through the cracks, while even the best-intentioned local leaders in the system worry about maintaining ongoing funding to provide adequate and current trainings.

We are also told that although court officers now receive a form of implicit bias training at the Court Officer Academy, a senior-level court officer upstate stated that the training provided was lacking, and that it did not actually prioritize understanding implicit bias. Similarly, a judge commented that the bias training at the Court Officer Academy in Brooklyn was no more than a "bare bones outline."

Requests for improvements to both judicial and non-judicial training on implicit bias or cultural competency are not new. Interviewees told us, however, that previous efforts have faced resistance from stakeholders in the system. One judge noted that previous attempts to launch a more widespread training effort for non-judicial personnel were so "vehemently rejected" that the project was canceled. This judge expressed hope that refreshed efforts today would be received more favorably. Another interviewee said that judges can be so averse to discussing topics like "white privilege" that they will reject programming developed by organizations like the Williams Commission, or will refuse to attend non-

mandatory sessions. Several interviewees mentioned that those undergoing training – judges in particular – are often unwilling to acknowledge their own biases, and chafe at the idea of a training titled as such.

### H. Juries

Interviewees, principally from the criminal defense bar, expressed concerns regarding juror bias. Interviewees explained that recognition of juror bias and expanded opportunities for counsel to explore biases in jury selection would allow for fairer outcomes for litigants of color.

One interviewee stated that, "[t]he most significant and sustained issue confronting our criminal system . . . is that our judiciary permit jurors with racial bias (overt and implicit) to serve as jurors, notwithstanding challenges during *voir dire*." As a threshold issue, interviewees cited that juror education on implicit bias in decision-making is lacking. Beyond this, while one interviewee noted that some judges – predominantly Black or Latinx judges – allow defense counsel to question prospective jurors on implicit racial bias during *voir dire,* others deny counsel the opportunity to do so altogether. Defense attorneys also expressed that they simply do not have time to explore issues of racial bias during *voir dire* properly. Another interviewee stated that some judges, wanting to keep proceedings moving quickly, will deny the defense attorney the opportunity to ask questions outside of the items on the questionnaire handed out at the start of jury proceedings.

An institutional defender told us that jurors of color tend to distrust the police more or have had negative encounters with law enforcement, and noted that when jurors of color express that distrust, they are automatically struck from the pool. Meanwhile, potential jurors with family members in law enforcement do not receive the same treatment.

Interviewees also raised concerns that some judges uncritically accept the reasons that prosecutors provide when striking jurors for cause, insisting that this practice ultimately results in non-diverse juries. A former judge recalled recommending a court rule that allows for easier challenges to preemptory strikes, but found that this recommendation was met with resistance by district attorneys and judges. A defender association noted that the difficulties in a successful *Batson* challenge stem, in part, from the lack of data on the New York State court system, and juries specifically. They noted that a party will have difficulty demonstrating that a juror was struck intentionally for a race-based reason if no available data on the numbers of minorities in the jury pool could substantiate that *Batson* claim.

Finally, some interviewees noted an underrepresentation of communities of color in jury pools, citing upstate county-wide juror pools that are largely white, and barriers to jury service such as lack of transportation, daycare or the financial means to serve on a jury.

## I.  Assigned Counsel

On the whole, feedback about the quality of legal representation provided by assigned counsel throughout the state was largely, though not entirely, negative.  Family Court judges told us the quality of court-appointed attorneys has increased since the early nineties, and in pockets of the state, interviewees were pleased with the quality of assigned counsel – such as parts of the Third Judicial District, Manhattan and Westchester County.

That said, many interviewees did express disappointment with the quality of assigned counsel, the failures of which one Family Court judge noted generally tend to fall on litigants of color.  One prosecutor lamented that 18-B attorneys are "the worst," and that in her experience, they "have no training, are not knowledgeable and most do not own computers."  She added that it was "depressing" to think that 18-B attorneys are charged with representing individuals in criminal cases.  A district attorney noted that the 18-B panel is "not even a shadow" of its Federal counterpart, the Criminal Justice Act Panel.

Interviewees noted that reimbursement rates for 18-B attorneys have not been increased (which must be done by the state legislature) since 2004, and saw this as largely responsible for the poor quality of representation observed.  Moreover, several interviewees pointed to the fact that rates for 18-B compensation are capped at $4,400 per case – the equivalent of 59 hours of work on a felony case, with exceptions only in "extraordinary circumstances." In most instances, interviewees pointed out that the cap tends to incentivize attorneys to take on too many cases.

Interviewees also raised problems with a lack of diversity among 18-B attorneys, citing difficulties recruiting people of color to serve, and noting that there are too few bilingual options for litigants who are assigned counsel.

As a related matter, several interviewees focused on issues relating to when counsel is assigned in certain types of cases, claiming that assignment happens too late in the proceedings in both Family Court and Housing Court cases.  Interviewees acknowledged the impact of the 2017 law establishing the right to counsel in eviction cases on tenants in New York City.[205]  In the first year the law was implemented, there was a significant

---

[205]  The law provides that "[s]ubject to appropriation, the coordinator [of the Office of Civil Justice] shall establish a program to provide access to legal services" for low-income individuals in eviction cases in Housing Court and "shall ensure that, no later than July 31, 2022 … all income-eligible individuals receive access to full legal

decrease in evictions in the jurisdictions where it had been rolled out. That said, one Housing Court advocate noted that the right to counsel would be even more effective if it attached at the earlier point where a litigant receives an eviction notice, not at the first court appearance, so that a lawyer has the opportunity to speak to his or her client and learn about the case before appearing at the eviction hearing.

Likewise, an organization that studies judicial administration nationally noted that its primary critique relating to assigned counsel in Family Court proceedings is that litigants are not able to secure an attorney early enough in the process.

## J. **Translation and Interpretation Services**

New Yorkers speak over 150 languages and dialects, and over 30% of New Yorkers speaking a language other than English at home.[206] When it comes to translation and interpretation services in court proceedings, Spanish remains the most requested language in the state. However, the number of requests for new language grows each year, particularly for Asian languages, French, Russian, Creole, and West African.

The Office of Language Access, a division of the OCA, is charged with providing translation and interpretation services to New Yorkers. The concerns we heard surrounding access to language services are far from novel. Indeed, the New York State Advisory Committee on Language Access has periodically issued reports analyzing and assessing the court system's languages services and the issues regarding access. In its most recent report, "Ensuring Language Access, A Strategic Plan for the New York State Courts," published in March 2017, the New York State Advisory Committee on Language Access concentrated on the issues surrounding access and quality of language in the court system.

Like the 2017 Report, interviewees noted that access to interpreter services varies significantly across districts.[207] While interviewees acknowledged that the primary reason for this difference in access is lack of resources, many focused their discussions on the inefficiencies related to data collection for language services. Interviewees noted there is a disconnect between the actual supply and demand for interpreters because the current data collection system does not accurately reflect the number of cases requiring interpreters. According to the interpreters interviewed, while an interpreter may translate for twelve cases and assist five court users with filing petitions in one day, the system tracks

---

[206] representation no later than their first scheduled appearance in a covered proceeding in [Housing Court], or as soon thereafter as is practicable." N.Y.C. ADMIN. CODE. § 26-1302(a)(2).

[206] *Ensuring Language Access: A Strategic Plan for the New York State Courts*, New York State Advisory Committee on Language Access 1, (2017), http://ww2.nycourts.gov/sites/default/files/document/files/2018-06/language-access-report2017.pdf [hereinafter *Language Access Strategic Plan*].

[207] *Id.*

daily interpreter use (not individual use) and would therefore record these numerous services as only one appearance. Thus, the data on use of court interpreters is significantly underreported and therefore the budget for language services is often insufficient.

It should be noted that interpreters we interviewed believe there is "systemic and institutional language discrimination" against both court interpreters and the litigants interpreters serve. An interpreter shared that court staff had posted signs and caricatures of interpreters inside of courtrooms and offices. One office had a sign that read, "No Interpreters Allowed." Another sign placed on the only desk outside of a courtroom, read, "Interpreter Sits Here," and was accompanied by an illustration of a Mexican person sleeping (or rather taking a siesta) under a sombrero. In another office, court staff posted on a notice board a caricature of an interpreter as part of "Misfit Island," meant as an offensive reference to the Island of Misfit Toys. Court staff and judges sometimes call interpreters "*interrupters.*"

Several interpreters told us that non-Spanish interpreters do not receive the same career benefits as Spanish interpreters. With some exceptions, unlike Spanish interpreters, who are full-time employees, non-Spanish interpreters work on per diem and are therefore not eligible for labor protections or promotion to court clerk positions. This distinction is no doubt owing to basic demographics, and the much higher demand for full-time Spanish interpreters on the payroll, and the less frequent or predictable need for those who interpret other languages.

Finally, multiple interviewees shared that judges, attorneys and court personnel treat litigants of limited English proficiency poorly. Interviewees said that some judges lack the patience to deal with any confusion or delays arising from mistranslations or the assigning of an interpreter. Interviewees also shared examples of court users being forced by judges to use a language other than their first or preferred language. One interviewee told us that in a Family Court case, a Spanish interpreter was assigned to an Italian-speaking-litigant. When the interpreter told the judge that the litigant spoke Italian, not Spanish, the judge responded, "that's basically the same thing, go on." Interviewees asserted that court staff incorrectly assume that an individual's inability to speak English means that the individual is unintelligent.

### K. Town and Village Courts

There are approximately 1,277 Town and Village Courts currently operating across the 57 counties outside of New York City.[208] A number of interviewees discussed these local

---

[208] New York State Unified Court System 2019 Annual Report 17, 43 (2020).

courts. One Town and Village justice noted that, given the number of cases these courts process each year, the justices running these courts do not receive the respect they deserve. A court interpreter working with Town and Village Courts expressed that the courts in her district are "providing good services" and added, "we all know each other. It is a good rapport."

On the other hand, most of the comments about Town and Village Courts were negative. An OCA administrative official told us Town and Village justices disproportionately account for an outsized share of instances of judicial misconduct in the state. Legal practitioners appearing before these courts elaborated on these issues. One interviewee with 20 years of upstate practice in these courts noted that he had witnessed multiple instances of Town and Village justices "lord it over" and threaten litigants with jail time for minor infractions, such as a speeding ticket. Senior leadership at an upstate District Attorney's office observed that Town and Village justices are often "pro-prosecution." An upstate City Court judge remarked, "racism is at its strongest in Town and Village Courts." One interviewee relayed a story of a justice who would tell new employees in the defender's office about a "hanging tree" that the justice had in his backyard. Interviewees also reported a lack of diversity among the ranks of Town and Village justices. However, one district attorney noted that this lack of diversity roughly tracks the demographic breakdown of different parts of the state and that he could not recall a person of color running for justice in his area.

## VII. RECOMMENDATIONS

As stated before, many of the criticisms we heard in the course of this review can be traced to a high volume of cases and a shortage of time and resources to deal with them. These are matters that can only be addressed by an expanded investment in resources, technology, people and infrastructure – a matter for all three branches of New York State government and local governments across the state. We also heard a number of very specific and credible recommendations that were beyond the scope of this review, were beyond our capacity to objectively evaluate, or would require legislative or constitutional change. For example, practitioners in Housing Court recommended that the right to appointed counsel attach sooner than at the first court appearance;[209] criminal defense practitioners expressed concern about the diversity of juror pools and recommended that New York adopt a rule similar to that in Washington state to lower the bar for *Batson* challenges in jury selection.[210] In our view, each of these recommendations deserve careful debate and consideration by practitioners and judges who work in these courts on a daily basis.

Chief Judge DiFiore asked for recommendations on "operational issues that lie within the power of the court system to implement administratively and unilaterally, rather than on proposals for legislative practices." We worked hard to meet that mandate, and develop recommendations that are specific, practical and implementable.

Here are those recommendations:

### A. A Commitment From the Top

A consistent message we heard in our review, from judges, attorneys, court officers and other non-judicial personnel is that "change needs to come from the top." Interviewees highlighted that public pronouncements and reports on the court system frequently do not articulate a race and equity agenda. For example, neither the Chief Judge's "Excellence Initiative," nor the New York City Family Courts' recently released "vision document," articulate any explicit standards or goals related to race and equity or diversity and

---

[209] Specifically, as discussed in Section VI *supra*, advocates suggested that the right to counsel in eviction cases, which was legislatively expanded in 2017, would be even more effective if it attached at the point where a litigant receives an eviction notice, so that a lawyer has the opportunity to speak to his or her client and learn about the case before appearing at the eviction hearing. *See* N.Y.C. Admin. Code. § 26-1302.

[210] As discussed in Section VI *supra*, in 2018, Washington State Courts recently adopted General Rule 37 to eliminate the exclusion of potential jurors based on race or ethnicity. *See generally* Wash. Gen. R. 37. The Rule disallows peremptory strikes when, under the totality of the circumstances, an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge. *Id.* Under Rule 37, an objective observer is aware of "implicit, institutional, and unconscious biases, in addition to purposeful discrimination." Wash. Gen. R. 37(f).

inclusion. As one group of judges also told us, "battling systemic racism needs to be perceived as an ongoing goal for the courts, not a response to a public scandal." As a point of comparison, interviewees frequently cited the "zero tolerance" approach mandated by the legislature for all state personnel when it comes to sexual harassment over the last several years, leading to a "culture shift" and increased reporting of complaints of sexual harassment.

We therefore recommend that OCA leadership embrace a "zero tolerance" policy for racial bias, along with an expression that the duty to uphold this policy extends to all those working within the New York state court system – from judges, interpreters to court officers. While we note that OCA's current discrimination policies state that "The Unified Court System prohibits and will not tolerate . . . discrimination or harassment" on the basis of race, we suggest a more robust, publicized policy specifically addressing racial bias is warranted.[211]

## B. __Promote Existing Institutions__

Interviewees across the board were unfamiliar with the existing institutions tasked with addressing issues of racial justice. For example, and as we noted before, few interviewees understood the scope and responsibilities of the Williams Commission or OCA's Office of Diversity and Inclusion. Several interviewees had not even heard of these organizations, which is a great disservice to their efforts in this area over the years. We endorse the continued missions of the Williams Commission and the Office of Diversity and Inclusion; they simply need more of a platform, further incorporation into broader OCA initiatives, increased consultation and face-time with OCA leadership and more funding in order to carry out their missions.

A judge who is a member of the Caribbean American Lawyers Association stressed to us that when it comes to combating racial bias on an institutional level, the key is "transparency, transparency, transparency." Another judge and member of the Association added that "if you cannot explain how a process works, there is probably something wrong with that process."

From our interviews, however, it is apparent that there is a considerable lack of transparency within the court system when it comes to addressing matters of race and racial bias. We also found that there is scarce accurate, up-to-date information about existing practices publicly available – particularly in the realms of data stewardship practices, hiring and promotion practices, complaint procedures, to name a few.

---

[211] *OCA Discrimination Claim Policy & Procedure, supra* note 176, "Introduction."

In addition to promoting and incorporating dedicated organizations like the Williams Commission, we recommend that OCA review the scope, precise duties and authorities of any and all organizations addressing racial bias in the court system. We believe these efforts will ultimately help OCA better clarify and delineate the precise roles of these overlapping and complex organizations, facilitate a broader conciliation of where these organizations have ossified or evolved and identify any gaps within these structures. We also recommend that OCA promulgate a guide that can be used as a resource for OCA personnel, litigants and partner organizations.

## C. Expand Bias Training

On August 5, 2020, the co-chairs of the Williams Commission wrote to Chief Judge DiFiore to recommend regular, mandatory training on bias for all judicial and non-judicial personnel across the court system. We agree.

Countless interviewees told us that both mandatory implicit bias and cultural sensitivity training are long overdue for judicial and non-judicial personnel in the New York state court system. At present, it appears that such training is both inconsistent and insufficient.

Judges are not above the reach of the implicit racial and cultural biases that pervade our society, yet equality before the law requires them to be. Multiple judges we spoke with were willing to acknowledge their own implicit biases and recognized the value of training to open minds and challenge stereotypes. Enhanced training of judges on the nuances of racial and cultural bias is in our judgment a crucial step towards alleviating racial injustice throughout the court system. A study, recognized by the New Jersey State Bar Association on the implicit bias held by judges and the connection to the disparate outcomes in the criminal justice system, showed that training judges "can reduce and/or mitigate the prospect that implicit bias will affect judicial decision-making and outcomes."[212] Further, as a judicial association told us, there is little to no testing of judges' susceptibility to implicit bias nor any analysis of judges' own decisions, and that therefore "judges are less likely to appreciate and internalize the risks of implicit bias."[213] Yet, as further described in Section VI above, judges are not uniformly required to attend trainings on these topics at present, and often elect not to, when given the choice.

---

[212] Sharon Price-Cates, *Implicit Bias New Science in Search of New Legal Strategies Toward Fair and Impartial Criminal Trials*, N.J. LAW, Aug. 2018 65, 66 (citing Jeffrey J. Rachlinski et al., *Does Unconscious Bias Affect Trial Judges?*, 84 NOTRE DAME L. REV. 1195, 1196–97 (2009)).

[213] *Report to the New York State Court's Commission on Equal Justice in the Courts*, JUD. FRIENDS ASS'N. 1, 27 (Aug. 31, 2020), https://www.urbancny.com/wp-content/uploads/2020/09/Judicial-Friends-Report-on-Systemic-Racism-in-the-NY-Courts.9.14.20.pdf; *see also* Siri Carpenter, *Buried Prejudice: The Bigot in Your Brain*, SCI. AM. MIND, Apr./May 2008, 1, 32.

We perceive an equal if not greater need for more robust bias racial bias and cultural sensitivity training for non-judicial personnel, particularly the court officer community. As discussed previously, interviewees have relayed innumerable stories of dehumanizing language by court officers towards litigants of color, as well as instances where tensions were directly escalated by courts officers' actions. Because court officers, as a group, interact with all court users – from the moment they enter the courthouse, in the hallways and waiting areas and in the courtroom – court officers should be better trained to deal with the many issues that can arise by these touchpoints. Interviewees suggested that training needs to help court officers understand that they are pivotal players in the administration of justice, and are not simply there to keep order.

In all, it appears there is no centralized body charged with developing, administering, tracking and updating training on implicit bias and cultural sensitivity for judicial and non-judicial personnel. For non-judicial personnel, tailored racial bias and cultural sensitivity training is not widely promulgated by OCA, if at all. Specific trainings for court officers are not adequate. While judicial bias training is slightly more centralized, and is required for new judges, we believe OCA should undertake uniform attendance and ongoing, robust engagement. Interviewees frequently contrasted training efforts on issues of racial and cultural bias to those relating to sexual harassment, suggesting that if OCA can require and track attendance for trainings on the latter, they have the capacity to do the same for the former.

As such, we recommend that OCA develop and require comprehensive racial bias and cultural sensitivity training for both non-judicial and non-judicial employees, informed by experts in these fields to ensure more relevant and nuanced discussions. Such training must acknowledge that issues of racial and cultural bias are intersectional[214] – addressing that discrimination on the basis of race often overlaps with those relating to class, gender, sexual orientation, immigration status, and beyond. In particular, racial bias and cultural sensitivity training must incorporate education on trauma, which many interviewees noted is critical for any personnel – judicial or non-judicial – who interact with litigants regularly. Further, we agree with the Center for Court Innovation that training is most effective when it does "not merely cover abstract ideas but [is] specific to the relevant OCA setting and include[s] concrete examples of behaviors and decisions that the trainee should and should not make, including how to respond when witnessing unacceptable or questionable

---

[214] The term "intersectional" was coined by celebrated legal scholar Kimberlé Crenshaw over thirty years ago to refer to the compounding discrimination that black women face on account of both their race and their gender, however, in popular discourse today, it encompasses a variety of crosshatched identities, such as those listed above. *See* Merrill Perlman, *The Origin of the Term "Intersectionality,"* COLUM. JOURNALISM REV. (Oct. 23, 2018), https://www.cjr.org/language_corner/intersectionality.php.

behavior by others in a court space." We also agree with CCI's recommendation to us that all trainings be designed "to ensure real accountability for the information having been appropriately conveyed and internalized." Finally, training should be mandatory, tracked by OCA to ensure participation, and conducted regularly for all judges and non-judicial employees.

**D. Address Juror Bias**

Interviewees expressed to us a number of concerns about juror bias. While there is no single panacea to this problem, we have carefully considered and recommend below certain steps that can be implemented to alleviate issues of racial bias in jury selection and deliberation:

*First*, create and display a video educating jurors about implicit bias before *voir dire*. We understand that in many, if not all, state courthouses where jurors are summoned and selected for trials, prospective jurors are shown a general orientation video. A range of interviewees, including one district attorney, raised the possibility of including within the orientation video a segment on implicit racial and cultural bias. As noted by the National Center for State Courts, an orientation video that includes a segment on implicit bias would not be unprecedented.[215] For example, the United States District Court for the Western District of Washington introduced an implicit bias video for jurors in 2017.[216] Since then, a number of other courts have either used this video or produced their own implicit bias program.[217] We recommend that OCA review exemplars of such videos, such as the Washington State video, and work with court personnel, outside experts and members of the bar to create OCA's own carefully balanced video on implicit bias that can be shown to venire panels of jurors.

*Second*, we recommend that the Chief Judge appoint a new or standing committee to investigate and formulate a proposal to create uniform rules to explicitly permit and endorse addressing juror bias during *voir dire*. Trial attorneys have told us that the practice

---

[215] *Juror Videos*, NAT. CTR. FOR STATE CTS. – CTR. JURY STUDIES, http://www.ncsc-jurystudies.org/juror-videos (last visited Sept. 24, 2020).

[216] *See* U.S. Dist. Ct., W.D. Wash., *Unconscious Bias*, YOUTUBE (Mar. 31, 2017), https://www.youtube.com/watch?v=XHu-zUet8Tw.

[217] *See, e.g., Unconscious Bias Video for Potential Jurors*, U. S. DIST. CT. N. D. CAL., https://www.cand.uscourts.gov/attorneys/unconscious-bias-video-for-potential-jurors/ (last visited Sept. 24, 2020); Chao Xiong , *Minnesota courts lag federal counterpart in using implicit bias video*, MINN. STAR TRIB. (Sept. 3, 2019), https://www.startribune.com/minnesota-courts-lag-federal-counterpart-in-using-implicit-bias-video/558975162/ (noting that the Washington implicit bias video is a "common part of juror orientation in federal court in Minnesota"); *Memorandum from the Office of the State Court Administrator to Members of the Oregon State Bar*, OFFICE OF THE STATE CT. ADMINISTRATOR (Jul. 8, 2020), https://www.osbar.org/_docs/resources/OSCmessages/Unconscious-Bias-Juror-Video.pdf.

of permitting *voir dire* on the subject of implicit bias is inconsistent, and that certain judges allow *voir dire* on such questions, while others do not. We believe the system would benefit from explicit guidance on this issue, and we recognize that it is beyond the scope of our expertise to prescribe such guidance as a part of this review. As such, we propose that a diverse committee of judges, attorneys, professors and/or subject area experts be consulted in drafting a proposal. It is our understanding the Chief Judge has the authority to then authorize such changes.[218] Ideally, these standards would explicitly permit and endorse *voir dire* on questions of implicit bias.

*Third,* we recommend pattern jury charges on implicit bias. A number of courts around the country, such as in California and Washington, have adopted jury charges that explain the concept of implicit bias and remind the members of the jury to be aware of their implicit biases.[219] More recently, the New Jersey Supreme Court adopted a proposal to examine, among other issues, the propriety of model jury instructions on impartiality and implicit bias.[220] We recommend that OCA request that a new or standing committee, such as the Committee on Criminal Jury Instructions, develop model jury instructions on implicit bias for both civil and criminal cases.

## E. Adopt a Social Media Policy

As discussed previously, the recent highly offensive social media post by a Brooklyn-based court officer came up countless times during our interviews. One interviewee noted that social media posts are a growing source of racial bias complaints among court employees, and others opined that such posts are strongly correlated with racially biased behavior and mistreatment of people of color within the courthouse. OCA currently has no policy explicitly governing employees' personal use of social media.

---

[218] The New York State Constitution provides the Chief Judge with supervisory responsibility to "establish standards and administrative policies for general application." *See* N.Y. CONST. art. VI, § 28(c). This authority includes power over the "adoption, amendment, rescission, and implementation of rules and orders regulating practice and procedure in the courts." N.Y. JUD. § 211(b). Once the appointed committee drafts its proposed rule establishing uniform rules on the subject of bias during *voir dire*, the Chief Judge, in consultation with the Chief Administrative Judge and the Administrative Board of OCA could implement such a change. *See id.*

[219] *See, e.g.*, Kris Olson, *New jury instructions take aim at implicit bias*, MASS. LAWYERS WEEKLY (Jun. 20, 2019), https://masslawyersweekly.com/2019/06/20/new-jury-instructions-take-aim-at-implicit-bias/; *Criminal Jury Instructions*, U.S. DIST. CT. W. D. WASH., , https://www.wawd.uscourts.gov/sites/wawd/files/CriminalJuryInstructions-ImplicitBias.pdf; *California Civil Jury Instructions, CACI No. 113*, JUD. COUNCIL CAL. (2020) https://www.courts.ca.gov/partners/documents/Judicial_Council_of_California_Civil_Jury_Instructions.pdf; Illinois Circuit Court Civil Jury Instruction 1.08, ADMIN. OFFICE ILL. CTS. (May 2019) https://courts.illinois.gov/CircuitCourt/CivilJuryInstructions/1.08.pdf.

[220] *See Commitment to Eliminating Barriers to Equal Justice: Immediate Action Items and Ongoing Efforts*, N. J. JUD. (Jul. 16, 2020), https://www.njcourts.gov/public/assets/supremecoutactionplan.pdf.

We recommend that OCA develop a policy for judicial and non-judicial personnel that provides clear guidance and limits on the use of social media – whether in an official or personal capacity – in a manner that has negative implications for the New York state court system. Our reading of the law is that such a policy is legally permissible.

To be sure, public employees have a right under the First Amendment and Article I, Section 8 of the New York State Constitution to freely express themselves in their own personal use of social media, particularly when it comes to matters of public concern. Employees also have a statutory right under the National Labor Relations Act to use social media to organize and address the terms and conditions of their employment.[221] However, courts have held that a public employer may limit and discipline certain public speech that is offensive and reflects poorly on the employer.

In general, state employers cannot "condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick* v. *Meyers*, 461 U.S. 138, 142 (1983). However, employees who speak on subjects related to their official duties receive less First Amendment protection. *See, e.g., Garcetti* v. *Ceballos*, 547 U.S. 410 (2006) (holding that district attorney who wrote a memo recommending dismissal of criminal charges based on a deficient warrant and who later testified on behalf of the defense did not enjoy First Amendment protection because his speech pertained to his official duties). Likewise, employees may be disciplined for off-duty speech that is unrelated to their official duties if there is a government justification "far stronger than mere speculation" that the speech will interfere with efficient delivery of public services. *See, e.g., City of San Diego* v. *Roe*, 543 U.S. 77 (2004) (holding that police department could discipline officer who identified himself as a member of law enforcement when selling videos of himself stripping online because he "took deliberate steps to link his videos and other wares to his police work, all in a way injurious to his employer.")

Federal Courts in the Second Circuit have held that disciplining an employee for off-duty, non-work-related speech does not violate the First Amendment if "(1) the employer's prediction of disruption is reasonable; (2) the potential disruptiveness is enough to outweigh the value of the speech; and (3) the employer took action against the employee based on this disruption and not in retaliation for the speech." *Locurto* v. *Giuliani*, 447 F.3d 159, 172-73 (2d Cir. 2006) (citing *Jeffries* v. *Harleston*, 52 F.3d 9, 13 (2d Cir.1995)). In *Locurto*, a police officer and firefighter were fired after participating in a Labor Day "funniest float" parade contest in which their float mocked Black people and the Civil

---

[221] 29 U.S.C. §§ 151–69.

Rights movement in various ways including recreating the dragging death of James Byrd Jr.[222] More recently, a federal district court applied *Locurto*'s reasoning in the context of social media when ruling on a motion to dismiss in *Festa* v. *Westchester Medical Ctr. Health Network*, 380 F. Supp. 3d 308 (S.D.N.Y. 2019). The plaintiff in that case, a compliance coordinator for a public hospital, logged onto Facebook one evening on her personal computer and commented on a local news channel's page that it was "too bad" a funnel cloud projected to affect the area of a Hasidic community "didn't suck them all away." The court stated that the public hospital could reasonably conclude that the employee's post would disrupt its ability to serve the local community and "cause harm within the ranks" of the hospital "by promoting resentment and mistrust." *Id.* at 319, 321.

We note that other court systems around the country have implemented social media policies to ensure that employees' online activity does not undermine public confidence in the operation of the courts and the application of justice.[223] For example, the Nebraska State Supreme Court prohibits its employees, in their personal capacities, from posting "[s]tatements, comments, or images that disparage any race, religion, gender, sexual orientation, disability, or national origin," as well as "any communication that engages in personal or sexual harassment" or that "would contribute to a hostile work environment" on racial, sexual, or religious grounds.[224] The Colorado Judicial Department more broadly prohibits employees from "making statements which negatively reflect on the professionalism of the courts . . . or which otherwise have an adverse effect on the confidence of the pubic in the integrity, propriety and impartiality of the judicial system."[225]

We recommend that OCA, after consultation with stakeholders, issue a social media policy for its personnel along the same lines. A social media policy may prohibit communications that constitute harassment or racially offensive remarks, but should be

---

[222] James Byrd Jr. was a Black man who, months before the parade, had died after being chained to the back of a moving pickup truck by three white men. *See*, Juan A. Lozano, *Texas Town Reflects on Dragging Death Ahead of Execution*, AP NEWS (Apr. 21, 2019), https://apnews.com/b3097455f1ab499695fa2553ed636258.

[223] *See, e.g.*, Directive Concerning Colorado Judicial Department Employee Policies, Chief Justice Directive 08-16, OFFICE CHIEF JUST. 1, 19 (June 28, 2013), https://www.courts.state.co.us/userfiles/file/Administration/HR/Policies/CJD%2008-06%20amended%2007-13.pdf [hereinafter Colorado Judicial Department Social Media Directive]; *Nebraska Non-Codified Supreme Court Rules and Best Practice Guidelines and Standards, Other Personnel-Related Policies: Social Media*, NEB. JUD. BRANCH, https://supremecourt.nebraska.gov/personnel-and-miscellaneous-rules/other-personnel-related-policies/2-use-social-media (last visited Sept. 24, 2020) [hereinafter *Nebraska Judicial Branch Social Media Policy*]

[224] *Nebraska Judicial Branch Social Media Policy*, *supra* note 224.

[225] Colorado Judicial Department Social Media Directive, *supra* note 224.

drafted in a way that will not prohibit protected activities under the National Labor Relations Act.

### F. Strengthen the IG Process for Bias Complaints

Numerous interviewees also expressed concerns and uncertainties about OCA's policies and procedures for handling complaints of racial bias and discrimination. After consulting a retired Inspector General with extensive experience in the U.S. government and other sources, we recommend that OCA adopt the following best practices to improve its complaints and investigations processes.

*First*, given the number of interviewees – judicial and non-judicial – who were unaware that mechanisms for making bias complaints even existed, we recommend that OCA engage in a robust campaign to educate court system participants about the existence and purpose of these offices and the procedures to lodge a bias complaint. This should include training for all personnel on how to submit a complaint of racial bias and discrimination, and conspicuous signage in courthouses advertising the existence of these offices. As one expert in inspector general policies and procedures suggested, it should be made clear that OCA's IG office, including its Bias Matters Unit, exists not only to identify waste, fraud and abuse, but also to address matters of racial bias.

*Second*, we recommend that OCA clarify its "no retaliation" policy in order to better assuage concerns that interviewees across the spectrum cited about filing complaints. While the current policies state that retaliation is prohibited, the definition of retaliation provided in OCA's discrimination booklet is narrow, difficult to understand and only provides a few examples of very formal, work-related retaliation, such as termination or a demotion with a decrease wage or in salary.[226] The policy does not indicate that more informal or non-work related forms of retaliation are also prohibited, such as making disparaging comments about the complainant to others, or scrutinizing work or attendance more closely than other employees without justification – which may be considered "retaliation" under federal law.[227] We recommend that, similar to the EEOC's Enforcement Guidance on Retaliation and Related Issues, the revised policy more broadly define retaliation, and provide specific examples of both informal and formal, as well as work related and non-work related forms of retaliation.[228] Similarly, the policy should

---

[226] The policy states that "examples of forms of retaliation may include termination of employment, a demotion with a decrease in wage or salary, a significant loss of benefits, or a transfer," that may raise to a violation of "UCS policy [and] state and federal laws." *OCA Discrimination Claim Policy & Procedure, supra* note 176 at 16.

[227] *Equal Employment Opportunity Commission Enforcement Guidance on Retaliation and Related Issues*, No. 915.004, OFFICE OF LEGAL COUNSEL (Aug. 25, 2016), https://www.eeoc.gov/laws/guidance/enforcement-guidance-retaliation-and-related-issues#B.

[228] *Id.* (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)).

clearly identify a simple and confidential path to lodging a complaint against one's supervisor, and steps that may be taken to proactively protect complainants who do so from retribution, aside from the availability of an ex-post retaliation claim.

*Third*, we recommend that OCA update its policies and publicly available resources to more clearly explain that complaints may be made anonymously. As further discussed in Section VI above, while the Managing Inspector General for Bias Matters technically does accept and investigate anonymous complaints received through its complaint form and complaints hotline, over email, and from referrals from other bodies, we understand that OCA does not advertise this fact outside of in-person presentations to stakeholders. Additionally, its complaint form appears to require claimants to authorize the use of their name in investigating claims.[229] We understand that the Commission for Judicial Conduct will receive and investigate anonymous complaints, and will take steps to protect the confidentiality of complainants such as by filing a complaint itself, rather than in the complainants' name.

That said, neither the website for the Managing IG for Bias Matters nor the Commission on Judicial Conduct's website contain any information pointing to one's ability to submit anonymous complaints. Thus, it was unsurprising that interviewees were almost unanimously unaware that complainants can file complaints anonymously. Across the board, interviewees suggested that permitting anonymous complaints is not only a "best practice," but is necessary to building trust and encouraging complaints. OCA's outward guidance should be updated to make the anonymous complaint process abundantly clear, particularly in its written materials and guidance. In order to further facilitate lodging complaints, particularly anonymous ones, the IG's office might also consider enabling a system for the electronic filing of complaints with the IG for Bias Matters, so that complainants do not have to use email in order to submit a complaint virtually.[230]

*Fourth*, we recommend that OCA update and clarify its current public guidance as to informal complaint mechanisms. The current guidance includes (i) referring the complaint to "anti-discrimination panels," (ii) directing a complaint to one's supervisor and (iii) directing a complaint to the administrative office or administrative judge of the judicial district in which the offending act is alleged to occur.[231] We understand, however, that anti-discrimination panels are now largely defunct and, according to several interviewees, were not a dependable or consistent means of resolving issues when they did operate. As

---

[229] *Claim of Discriminatory Treatment Form UCS-18*, N.Y. STATE UNIFIED CT. SYS. OFFICE INSPECTOR GEN. http://ww2.nycourts.gov/sites/default/files/document/files/2018-05/ClaimDiscrimTreatment.pdf (last visited Sept. 22, 2020).

[230] Our understanding is that this is consistent with the practice of the Commission on Judicial Conduct.

[231] *OCA Discrimination Claim Policy & Procedure*, *supra* note 176 at 11-12.

such, we recommend that OCA formally disband the now-defunct panels and update its materials to clearly reflect that this is not an available means of resolving complaints.

*Fifth*, consistent with confidentiality concerns, we recommend that, following a complaint, OCA follow up and apprise the complainant of the status of the investigation initiated by the complaint, and, to the extent permitted, apprise the complainant of the outcome of the investigation. We are advised by an experienced retired IG that this simple act goes a long way to promote credibility and confidence in the process. Interviewees frequently lamented a lack of transparency in the complaint procedures arising from a dearth of communication from investigating bodies to complainants, leading to perceptions that the complaint system is ineffective. Indeed, OCA's online booklet titled *"Discrimination Claim: Policy & Procedure,"* describing its discrimination policies and procedures, states that the IG's Office will confirm receipt of a claim within two weeks and complete the investigation, in most circumstances, in 45 days.[232] Moreover, while the policies note that complainants will be notified of the final determination of the Deputy Chief Administrative Judge,[233] at least one interviewee familiar with the process expressed that this does not always happen in practice. The policies do not otherwise require the IG to share with the complainant anything about the status of the investigation while it is pending; rather, the onus appears to be on the complainant to seek additional information from the investigator.[234]

To instill confidence in the investigatory process, we recommend that, consistent with its obligations to keep investigations confidential, the IG's office proactively communicate important timelines and procedures with complainants up front, and that they communicate meaningful investigatory updates to complainants with reasonable frequency. We suggest that, should an investigation extend beyond the typical 45-day window, that complainants are affirmatively provided an update every 30 days. Finally, we recommend that complainants be informed when the IG's office has completed its investigation and whether the complaint was substantiated or not. Complainants should also be informed when the Deputy Chief Administrative Judge has come to a decision about whether take personnel action, and where appropriate, of the actions taken.

*Sixth*, we recommend that OCA designate an ombudsperson within the IG office. Interviewees raised a lack of understanding as to how to discern between the numerous avenues for lodging a complaint. Likewise, our review of the various OCA policies shows that there is little guidance on how to do so. We suggest an ombudsperson to advise

---

[232] *Id. at 13.*
[233] *Id.*
[234] *Id.*

potential complainants of their options for registering their concerns. We note that several state court systems and federal agencies maintain similar offices to help individuals navigate various complaints systems.[235] In enabling the ombudsperson, it must be made clear that this individual is not an investigating authority in any capacity; instead, to avoid conflicts with the integrity of the investigating bodies procedures, the ombudsperson should purely be made available to help complainants navigate OCA's mechanisms for lodging complaints.

*Seventh*, we recommend that OCA track and annually report the number of racial bias or race discrimination complaints received, investigated and where possible, those substantiated. Interviewees told us that without a public accounting of how complaints are resolved, the community's perception is that there are no consequences for incidents of racial bias. Such a report could be sent to the Chief Judge by both the Commission for Judicial Conduct and the IG for Bias Matters, and, to the extent possible, should be made public.

## G. Review of Rules Changes for Bias

Next, we recommend that one of the existing institutions for addressing bias – the Williams Commission, the IG for Bias Matters, or the Office of Diversity and Inclusion – be tasked with the standing responsibility to review legislation, proposed constitutional amendments, regulations and rules changes pertaining to the state judiciary for any potential disparate impact or bias on people of color. Any concerns should be conveyed to the Chief Administrative Judge as they arise. This was suggested to us by the National Center for State Courts and there is precedent for it among government agencies. For example, the U.S. Department of Homeland Security's Privacy Office has among its responsibilities the evaluation of all DHS-related legislation and proposed regulations that involve the disclosure of personally identifiable information.[236]

---

[235] *See, e.g.*, *Ombudsman for Attorney Discipline*, TEX. JUD. BRANCH, https://www.txcourts.gov/organizations/bar-education/ombudsman-for-attorney-discipline/ (last visited Sept. 22, 2020); Administrative Order No. 05-9 Establishing an Ombudsman Program for the Fourth Judicial Circuit of Illinois (Ill. Ct. App. 2005); *Ombudsman Edward T. Zrubek*, DEP'T DEFENSE OFFICE INSPECTOR GEN., https://www.dodig.mil/Offices/Ombudsman/ (last visited Sept. 8, 2020); *Whistleblower Protection Ombudsman*, U.S. OFFICE INSPECTOR GEN. DEP'T TRANSP., https://www.oig.dot.gov/about-oig/whistleblower-ombudsman#:~:text=The%20Inspector%20General%20has%20designated,their%20specific%20rights%20and%20remedies (last visited Sept. 8, 2020).

[236] *Department of Homeland Security Privacy Office*, U.S. DEP'T HOMELAND SEC., https://www.dhs.gov/topic/privacy#:~:text=The%20Department%20of%20Homeland%20Security,to%20reduce%20the%20privacy%20impact (last visited Sept. 21, 2020).

## H. **Continue Progress on Translation and Interpretation Services**

As noted before, New Yorkers speak over 150 languages and dialects, and over 30% of New Yorkers speaking a language other than English at home.[237] When it comes to translation and interpretation services in court proceedings, Spanish remains the most requested language in the state. However, the number of requests for new languages grows each year.

We note that in 2017 the New York State Advisory Committee on Language Access issued a "Strategic Plan" for implementing a number of strong recommendations to improve translation and interpretation services throughout the state, and we are told implementation of these recommendations is underway.[238] We have heard positive feedback about implementation of the Strategic Plan, and we endorse the Plan's recommendations.

Beyond the 2017 Strategic Plan, as described in Section VI, in the course of this review we heard a number of concerns about the disparate treatment of interpreters. Therefore, problems facing translation and interpretation staff should be fully incorporated into the court system's efforts to improve education of judicial and non-judicial personnel on cultural sensitivity and implicit bias, diversity and inclusion and ensuring accountability for incidents of racial bias.

## I. **Improve Data Collection and Stewardship Practices**

We regret to report that the New York State court system is far from cutting edge when it comes to understanding and combatting racial bias in case outcomes, and that its data collection and publication practices have fallen behind those of other states. Interviewees stressed that data collection and analysis on case outcomes is critically important to identifying the points at which racial disparities exist, and the first step to remedying bias in the court system. However, as a threshold issue, several interviewees pointed out that OCA's current data landscape is incredibly opaque: even in our experience conducting this review, it was exceedingly difficult to ascertain the types of case outcome data that are collected, how they are collected, who they are shared with and where and whether they may be accessed publicly. We spoke with several organizations that have sought to partner with OCA in studying racial disparities through case outcome data, including national leader in this space, Measures for Justice, and the consensus was that the lack of transparency in OCA's data practices has prevented a meaningful accounting of where to

---

[237] *Language Access Strategic Plan, supra* note 207, at 1.
[238] *Id.*

even begin in improving them. As such, in addition to the following narrow recommendations, we first suggest that OCA publish a report or detailed "FAQ" explaining the nature and extent of its current data collection and stewardship practices across UCS.

**Data Collection for Criminal Cases.** Interviewees informed us that the Police Statistics and Transparency Act (the "STAT Act") signed into law by Governor Cuomo on June 15, 2020, requires OCA to compile and publish data, including the race and ethnicity of the individual charged, for "misdemeanor offenses and violations" – with required monthly updates.[239] Felony data is not included within the ambit of the STAT Act. Additionally, New York State's budget for the 2020-2021 fiscal year included amendments to the bail reform law that was passed in 2019, requiring that OCA, in conjunction with the State Division of Criminal Justice Services ("DCJS"), compile and publish data on pretrial release determinations, which will include the race, ethnicity, and gender of the individual charged.[240] The law requires OCA to publish reports containing the aforementioned data on its website every six months.

While we support these legislative efforts to increase data collection and transparency, we stress that they must be implemented carefully and uniformly, and should be expanded upon to include robust, multivariable data on felonies as well.

*First*, as Measures for Justice pointed out, unless data collection under the STAT Act or any other legislation is executed with sufficient standards of uniformity and quality control, it will not be useful for meaningful analysis. OCA should transparently disclose its procedures and standards for collecting and auditing data under this type of legislation, and disclose the underlying data publicly, so that independent organizations can, test, corroborate and analyze it as well. One critical component of this recommendation is ensuring accurate data entry. Interviewees have cited widespread problems with accurate data entry in the past, noting that the data collected is often inconsistent or was missing for critical fields. For example, one criminal justice organization that requested data from

---

[239] S.B. 1830C, 2019-2020 Legis. Reg. Sess., (N.Y. 2019). Pursuant to the STAT Act, OCA is required to compile and publish data on the race, ethnicity, and sex of the individual charged; whether the individual was subject to a custodial arrest and/or was held prior to arraignment; the disposition of the case; in the case of dismissal, the reasons therefor; and the sentence imposed, including fines and surcharges. *Id.*

[240] S.B. 7506B, 2019-2020 Legis. Sess. (N.Y. 2020). Also collected are the criminal offense; whether the individual was released on recognizance, released with conditions, or remanded; the length of pre-trial detention, if applicable; failure to appear at court dates, if applicable; and pretrial re-arrests, if applicable. *Id.* We also acknowledge that the New York State Justice Task Force, in a February 2019 report, similarly recommended that OCA report data on pretrial release determinations, including detention requests by prosecutors. *Report on Bail Reform*, N.Y. STATE JUST. TASK FORCE (Feb. 2019), http://www.nyjusticetaskforce.com/pdfs/ReportBailReform2019.pdf. Although the bail reform amendments do not require the publication of detention requests by prosecutors, the substance of the Justice Task Force's recommendations are encompassed by the new reporting requirements.

OCA several years ago reported that the bail amount was missing in 82% of the dockets they received and the bail decision was missing in 40% of the dockets. While the recently enacted legislative reporting requirements cited above should ameliorate this problem to a certain degree, placing more emphasis on proper training and resources for clerks will help ensure that data collection is consistent in all the courts within the court system. As such, we also recommend that OCA increase training provided to court clerks and establish data collection rules mandating that all applicable data fields are populated.

*Second*, we recommend that OCA expand on the publication required by the STAT Act and the bail reform amendments and publish those same categories of data – the race, ethnicity, and sex of the individual charged, whether the individual was subject to custodial arrest and/or was held prior to arraignment, pretrial release determinations, the disposition of the case or reasons for a dismissal and the sentence imposed – for felony offenses. We understand that OCA collects some data, disaggregated by race, on the disposition of felony, violent felony, drug felony, and misdemeanor arrests, and that this data is publicized by DCJS.[241] However, as Measures for Justice noted, "the devil is in the details," and at present, the data currently collected is insufficient in that (1) it only provides the disposition of the arrests and does not include other important data, such as pretrial release determinations, and (2) it only provides aggregate numbers and does not break the data down according to each individual charged. While appropriate for rudimentary analysis, collection of additional measures would allow for a "multivariable" analysis at the individual case level (fully anonymized, of course), which is necessary to allow the data collected to produce meaningful study of disproportionate racial impacts throughout different touchpoints within the criminal justice system.

To illustrate, we understand that while basic measures such as case disposition and the race of the defendant are available, without more nuanced additional factors, such as whether the defendant was represented, avenues for robust analysis are extremely limited. Interviewees identified other aspects or factors within the criminal justice system that they claim are prone to racial bias and disproportionately disadvantage people of color, for example, use of plea agreements, rates of referral to alternative sentencing and diversion programs, and the use of algorithmic bail reform tools. As such, in addition to mandating *uniform* data collection, we also recommend that OCA consider collecting, monitoring and publishing these additional data points – both for felony and misdemeanor cases in New

---

[241] *Dispositions of Adult Arrests by Race/Ethnicity, County, and Region*, DIV. CRIM. JUST. SERVS., https://www.criminaljustice.ny.gov/crimnet/ojsa/dispositions-adult-arrest-demographics.html (last visited Sept. 22, 2020).

York – to ensure that justice is dispensed in a racially equitable fashion in all parts of the criminal justice system.

In support of these recommendations, we note that multiple other states and cities engage in more widespread data collection and publication efforts than New York's, even considering these legislative advancements. In March of 2018, the state of Florida passed legislation requiring courts and law enforcement agencies across the state to collect about 140 different data points for criminal cases and report it to a central repository, Florida's Department of Law Enforcement, where it will be published online.[242] Some of the data points include pretrial release determinations, the precise terms of plea deals, and sentencing decisions.[243] California launched a data initiative, Open Justice, which publishes criminal justice data per county in an online portal, and includes misdemeanor and felony arrests and disposition of juvenile cases.[244] The City of New Orleans has a Racial Disparity Dashboard, which tracks racial disparities at three points in the criminal justice system: arrests/charges, bail amount and sentencing.[245]

**Use of Criminal Outcomes Data.** With regards to use of data collected in criminal cases, we recommend that OCA *consider* the recommendation submitted to us by the Judicial Friends Association that data be made available to individual judges on the disposition of their criminal cases, disaggregated by penal law, race, ethnicity, age and sex of defendants.[246] Although Judicial Friends only recommends that criminal judges be given reports on the disposition of their cases, we suggest that the reports include the other data points required by recent legislation and recommend above, including: whether the individual was subject to custodial arrest and/or was held prior to arraignment, pretrial release determinations, use of plea agreements, referral to alternative sentencing and diversion programs and the use of algorithmic bail reform tools. We recognize the many potential limitations and possible misleading indicators inherent in such an analysis, including, for example, the demographics of the venue where a judge sits and the nature of the cases the judge hears. We also recognize that such an analysis, if not performed

---

[242] Jason Tashea, *Liberating criminal justice data: How a Florida law provides a blueprint for the nation*, ABAJOURNAL, June 18, 2019, https://www.abajournal.com/web/article/liberating-criminal-justice-data-how-a-florida-law-offers-a-blueprint-for-the-nation.

[243] S.B. 1392, Reg. Sess. (Fla. 2018).

[244] *Data Portal*, OPEN JUSTICE, (Sept. 23, 2020, 10:25 PM), https://openjustice.doj.ca.gov/data.

[245] *Racial Disparity Dashboard*, NEW ORLEANS CITY COUNCIL, https://council.nola.gov/committees/criminal-justice-committee/#racial-disparity-dashboard (last visited Sept. 24, 2020).

[246] *Report to the New York State Court's Commission on Equal Justice in the Courts*, JUD. FRIENDS ASS'N. 1, 30 (Aug. 31, 2020), https://www.urbancny.com/wp-content/uploads/2020/09/Judicial-Friends-Report-on-Systemic-Racism-in-the-NY-Courts.9.14.20.pdf; Jane Wester, *Judges of Color Release Detailed Recommendations to Address Systemic Racism in the New York Courts*, N.Y.L.J. (Sept. 10, 2020), https://www.law.com/newyorklawjournal/2020/09/10/judges-of-color-release-detailed-recommendations-to-address-systemic-racism-in-the-new-york-courts/.

carefully, has the potential to impact judicial objectivity and independence. Finally, we understand that there are various avenues available for judges to receive some of this data. For example, individual judges may run reports on case outcomes using the case management system or contact the Court Research department within OCA to receive aggregate reports on areas of interest. However, we believe that proactively providing all criminal judges with these types of reports, rather than placing the onus on individual judges, will allow for more widespread systemic change.

**Data Collection for Non-Criminal Cases.** OCA currently has universal case management systems for both the Housing and Family Courts, which collect data on case outcomes. However, this data is neither published nor accessible to stakeholders. We recommend that OCA publish non-identifying or anonymized data it collects on Housing and Family Court outcomes – similar to the manner in which it is required to publish criminal court data under the STAT Act and bail reform amendments. We also recommend that OCA collaborate with key Housing and Family Court stakeholders to develop data points that OCA does not already collect, which are relevant to identifying and reducing any racial bias in these courts.[247] We also recommend that OCA include a data field on initial appearance papers filed with these courts that allows court users to voluntarily self-identify race, ethnicity and gender.

### J. Improve Diversity and Inclusion within HR Practices

Throughout the course of our investigation, interviewees frequently raised the lack of diversity within the court system's workforce, and their perception that diversity is not a serious consideration for the system's leadership. Also, as several interviewees noted, and workforce demographic data reveals, diverse employees are particularly underrepresented in senior leadership roles across the OCA workforce. To cure this, we recommend that OCA increase its emphasis on and highlight the importance of its diversity initiatives. The recommendations that follow were developed with assistance from an expert in the field, Professor Harold Goldstein. While they are most aptly suited toward the non-judicial workforce, many may also be applicable to the judiciary, to the extent that they are within OCA's power to implement.

**Setting and Achieving Diversity Goals.** As discussed above, we observed that institutions to address diversity and inclusion are perceived to be largely ineffective. As such, the Office of Diversity and Inclusion must be fully supported by OCA leadership to

---

[247] For example, we understand that biographical data, such as race, is not a data point that is typically collected in housing or family court but would be helpful in, for example, determining the types of resources and training needed.

help achieve their goals, including having the appropriate budget to hire personnel and fund diversity and fairness programs. We also recommend that the head of the Office of Diversity and Inclusion establish a new mission statement with a strategic plan for diversity and fairness, communicate it to court system personnel and the public and provide public quarterly mandated reporting to the Chief Administrative Judge on progress against stated diversity metrics and goals. We recognize that this type of demographic data collection and reporting would be partially mandated, at least with regards to judicial race data, as a part of pending legislation, Senate Bill S7703, which we fully support.[248] These metrics should be analyzed on a system-wide, unit-wide and position-wide basis to determine if there are patterns of discrimination in hiring and promotional decisions. Progress on diversity goals should also be connected to organizational reward and penalty systems (*e.g.*, compensation, resource allocation, promotion eligibility) in order to motivate achievement.

**Recruiting & Application Process.** Recruiting diverse candidates for jobs throughout the court system was an issue routinely identified in interviews – particularly in upstate courts. As described in Section VI above, while some judicial districts cited specific successful initiatives in reaching populations of color, they are not implemented system-wide. For this reason, we recommend that OCA poll judicial districts on what outreach tactics have been successful, and issue "best practices" for raising awareness of career opportunities and identifying sources of diverse talent.[249] As for improving the judicial pipeline for diverse candidates, interviewees repeatedly mentioned that "how to become a judge" programs organized by individual bar associations and affinity groups have been successful in the past. We recommend that OCA embrace these programs as part of its plan to increase judicial diversity.

Interviewees also suggested that OCA needs to focus on making the hiring process more user friendly for diverse candidates, including recognition in procedures and practices that minorities may have less access to technology and less flexibility to travel to hiring and testing centers. We heard that the civil service exams for competitive non-judicial positions are an extra barrier to employment for people of color, in that they are often unaware of job openings and opportunities to take the required civil service exams. To help mitigate these barriers, OCA should examine hiring requirements, including data from civil service exams, which is already tracked and broken down demographically, to determine if job requirements, exam structure or minimum qualifications are

---

[248]  S.B. S7703, 2019-2020 Legis. Sess. (N.Y. 2020).

[249]  As an example, individual judicial districts mentioned that they have improved diversity in their ranks by building relationships with local high schools and universities and their diverse clubs, government agencies, local recruiting agencies and local and national diversity associations, through open houses and the creation of internship programs.

disproportionately impacting diverse candidates, and modify them accordingly. OCA should also explore whether test preparation materials can be provided in a different way, to take into consideration cost and ease of access of preparation materials for diverse candidates and the time required to use such preparation materials. OCA might look to the New York Department of Civil Service as an example, which provides free test preparation materials for various similar civil service positions within New York's state government 60 days prior to the date of the examination.[250]

**Performance Evaluation.** Performance evaluation and appraisal systems have a strong impact on behavior and organizational perceptions of accountability. Therefore, we recommend that OCA consider enhancing its performance evaluation processes by introducing diversity and inclusion elements to its performance reviews of its employees – for example, evaluating whether managers properly handle issues of racial bias and evaluating whether employees engage in racially biased or discriminatory behaviors. Performance appraisal data should be examined to determine if specific individuals show patterns of greater discrimination based on race. If patterns emerge, they should be investigated and appropriate actions should be taken (such as additional training or discipline).

**Hiring Decisions & Promotion.** We recommend that OCA thoroughly and comprehensively review its hiring and promotion practices to advance diversity throughout its ranks. In furtherance of these goals, OCA should undertake to enhance communication with candidates about the hiring process so they know, for example, where they stand in the process, next steps, and the timeline for hearing back about the position.

Though, as we understand it, the practice is encouraged by a memorandum, we recommend that OCA require diverse interview panels. Steps should be taken to ensure that diverse members of interview panels are truly heard in these decisions, and are not simply included to satisfy a numerical quota. Individuals involved in these decisions should be trained on how to administer and score interviews and calibrate feedback between interviewees fairly. Additionally, the interview process should assess individual applicants' ability to work with diverse individuals and whether they value diversity. Particularly for manager positions, it should evaluate the person's ability to manage diverse individuals.

---

[250] According to its website, the New York Department of Civil Service provides various general and position-specific test guides, including general tips for taking exams, exam-specific details on subject matter to be tested, sample questions and answers and explanations. *See Test Guides and Resource Booklets*, N.Y. STATE DEP'T CIV. SERV., https://www.cs.ny.gov/testing/testguides.cfm (last visited Sept. 14, 2020).

Both judicial and non-judicial interviewees of color emphasized their perception that non-judicial employees of color do not share the same career advancement prospects as their colleagues. OCA's promotion policies and procedures have led to a perception that nepotism and bias often drive promotional decisions, leading to unqualified hires and "bad morale" among employees of color. To address these perceptions, we recommend that OCA improve transparency in the promotions process, by including posting all promotions in a manner visible to all viable diverse applicants, ensuring that a diverse slate of candidates is considered for all promotions and, at the very least, by communicating with interviewees when they are not selected. Where possible, decision-makers should undertake to provide feedback to unsuccessful candidates about how they might be able to improve moving forward.

## K. Enhance Trust between Court Officers and the Community

According to judges, public defender organizations, bar associations and numerous others, court officer mistreatment of litigants of color, their families, and attorneys of color is a significant barrier to achieving equity in the court system. We heard countless stories of court officers treating litigants and attorneys of color differently than their white counterparts or using dehumanizing language and excessive force. That said, we recognize that court officer conduct is subject to union contracts with OCA, and that OCA likely cannot make sweeping changes unilaterally. On the other hand, we understand that all union contracts are set to expire on March 31, 2021 and must be renegotiated.

In addition to the recommendations above, which would impact the court officer community, we recommend the following for court officers specifically: *first*, court officers should be required to wear name tags. While seemingly simple, being able to identify court officers by name is an important step in fostering an environment of trust and accountability. Officer name tags are common for many law enforcement agencies around the country.[251] *Second*, similar to the NYPD Patrol Guide, OCA should publicly post the rules that court officers must follow in carrying out their official duties, including use-of-force guidelines.[252] Increasing transparency in these ways will help with

---

[251] *See, e.g., Directive 6.7*, PHILA. POLICE DEP'T (Mar. 15, 2017), https://www.phillypolice.com/assets/directives/D6.7-UniformsAndEquipment-1.pdf.

[252] *See, e.g., Use of Force Policy, Guidelines and Procedures Handbook*, U.S. CUSTOMS AND BORDER PROTECTION (May 2014), https://www.cbp.gov/sites/default/files/documents/UseofForcePolicyHandbook.pdf; *Use of Force Policy*, SANTA MONICA POLICE DEP'T (July 19, 2019), https://santamonicapd.org/uploadedFiles/Police/Policies/Policy%20-%20Use%20of%20Force.pdf; *Use of Force Policy*, PORT WASH. POLICE DEP'T (Jul. 24, 2020), https://portwashingtonpd.ny.gov/wp-content/uploads/2020/08/Use_of_Force_Policy.pdf.

humanizing court officers and understanding the scope of their responsibilities and also holding them accountable where appropriate.

## L.  Facilitate Navigation of Courthouses

As early as 1991, the Williams Commission called to make the courts more "user friendly."[253]  A frequent theme throughout our interviews was that – as a result of hostile interactions with security staff or a lack of informational resources – the critical first touchpoint that litigants of color have with the court system is often a negative, or even traumatizing experience.

Interviewees recommended that, in line with a more "customer service"-oriented approach, OCA consider establishing a "greeter" position in courthouses on a more widespread basis.  We agree, and recommend that OCA ensure that there is a designated individual within each courthouse whose role is to welcome litigants and answer basic questions about how to navigate the building and adhere to general procedures and practices.[254]  While we do not prescribe that any specific individual within or outside of the existing system fill the greeter role, we urge that whoever takes on this position is adequately trained.  Such training should incorporate not only the basic tenets of customer-service, but also, cultural competency, accommodating those with mental illness, trauma or disabilities.

We also reiterate that helpful, clear, written guidance within courthouses is essential to ensuring that litigants are able to navigate the courthouse and understand the proceedings before them.  One judge interviewed pointed out that these resources are particularly critical for unrepresented litigants, citing as an example that without adequate signage, litigants may have trouble even finding their way to the designated help center for the unrepresented, if at all.  We also emphasize that while online resources and guides for litigants are helpful and to be encouraged, they are not a substitute for such resources within courthouses, given widespread bans on cell phones in courthouses.  We also recognize that language needs can vary widely from courthouse to courthouse, and echo calls that this signage be thoughtful and responsive to those local needs.

---

[253]  *See* REPORT ON THE UNIFIED COURT SYSTEM'S IMPLEMENTATION OF THE RECOMMENDATIONS OF THE NEW YORK STATE JUDICIAL COMMISSION ON MINORITIES, EQUAL OPP. EMPLOY. OFFICE, Jan. 1995, 1, 12–13.

[254]  We acknowledge that designated greeter programs are in place in certain courthouses throughout the state, but that they are operated by outside organizations on a volunteer basis.  We also note that in certain courthouses, some of the functions that would be carried out by a greeter, such as answering litigant questions or obtaining directions, are often fulfilled by court officers or clerks.  *See id.* at 12 (noting that clerks have a role in assisting litigants throughout some courthouses in the state).

## M. **Ensure Implementation of Change**

Finally, experience shows that recommendations matter little if there is no follow through on their implementation; far too often, reports and recommendations such as these are placed on a shelf and gather dust unless there is a commitment to put words into action. We recommend that the Chief Judge assign an entity or committee that includes those independent of the court system, to monitor and report on implementation of those recommendations adopted here on an ongoing basis. Several outside organizations suggested this, and we agree.

One outside organization envisioned the appointment of a third-party independent committee or entity, that would "oversee the implementation of reforms, issue public reports, and provide future recommendations where necessary." Other similar organizations also recommended an outside oversight mechanism for implementation of reforms suggested in this review. We take no position on whether the group or organization tasked with monitoring and ensuring compliance also include some insiders, such as respected senior members of the judiciary. Most important is that *someone* be given this responsibility.

# EXHIBIT F

# JUDICIAL IMMUNITY VS. DUE PROCESS: WHEN SHOULD A JUDGE BE SUBJECT TO SUIT?

*Robert Craig Waters*

## Introduction

In the American judicial system, few more serious threats to individual liberty can be imagined than a corrupt judge. Clothed with the power of the state and authorized to pass judgment on the most basic aspects of everyday life, a judge can deprive citizens of liberty and property in complete disregard of the Constitution. The injuries inflicted may be severe and enduring. Yet the recent expansion of a judge-made exception to the landmark Civil Rights Act of 1871, chief vehicle for redress of civil rights violations, has rendered state judges immune from suit even for the most bizarre, corrupt, or abusive of judicial acts.[1] In the last decade this "doctrine of judicial immunity" has led to a disturbing series of legal precedents that effectively deny citizens any redress for injuries, embarrassment, and unjust imprisonment caused by errant judges. Consider the following examples.

- In 1978, the Supreme Court in *Stump v. Sparkman*[2] held that the doctrine forbade a suit against an Indiana judge who had authorized the sterilization of a slightly retarded 15-year-old girl under the guise of an appendectomy. The judge had approved the operation without a hearing when the mother alleged that the girl was promiscuous. After her marriage two years later, the girl discovered she was sterile.

---

*Cato Journal*, Vol. 7, No. 2 (Fall 1987). Copyright © Cato Institute. All rights reserved.

The author is Judicial Clerk to Justice Rosemary Barkett of the Florida Supreme Court.

[1]The doctrine of judicial immunity from federal civil rights suits dates only from the 1967 Supreme Court decision in Pierson v. Ray, 386 U.S. 547 (1967), which found a Mississippi justice of the peace immune from a civil rights suit when he tried to enforce illegal segregation laws. Until this time, several courts had concluded that Congress never intended to immunize state-court judges from federal civil rights suits. See, for example, McShane v. Moldovan, 172 F.2d 1016 (6th Cir. 1949).

[2]435 U.S. 349 (1978).

CATO JOURNAL

- In 1980, the Seventh Circuit Court of Appeals in *Lopez v. Vanderwater*[3] held a judge partially immune from suit for personally arresting a tenant who was in arrears on rent owed the judge's business associates. At the police station, the judge had arraigned the tenant, waived the right to trial by jury, and sentenced him to 240 days in prison. Six days of this sentence were served before another judge intervened. The Seventh Circuit found the judge immune for arraigning, convicting, and sentencing the tenant but not for conducting the arrest and "prosecution."

- In 1985, the Eleventh Circuit Court of Appeals held in *Dykes v. Hosemann*[4] that the immunity doctrine required dismissal of a suit against a Florida judge who had awarded custody of a child to its father, himself the son of a fellow judge. This "emergency" order had been entered without notice to the mother or a proper hearing when the father took the boy to Florida from their Pennsylvania home after a series of marital disputes.

- In 1985, the Tenth Circuit Court of Appeals in *Martinez v. Winner*[5] held a federal judge immune who, during a trial, had conducted a secret meeting with prosecutors without notifying the defendant or his attorneys. Expressing concern that the jury would be "intimidated" into a not-guilty verdict, the judge agreed to declare a mistrial after the defense had presented its case so the government could prosecute anew with full knowledge of the defense's strategies.

In just 20 years, these precedents and others like them have established near-total judicial immunity as a settled feature of American law. Under the current doctrine, any act performed in a "judicial capacity" is shielded from suit.[6] Thus, the simple expedient of disguising a corrupt act as a routine judicial function guarantees immunity from suit. In no other area of American life are public officials granted such license to engage in abuse of power and intentional disregard of the Constitution and laws they are sworn to defend. Those who are harmed, no matter how extensive and irreparable the injury, are deprived of any method of obtaining compensation. They are confined to disciplinary actions that only rarely result in the judge's removal from office despite the troubling frequency of judicial abuses (see Alschuler 1972).

---

[3]620 F.2d 1229 (7th Cir. 1980).
[4]776 F.2d 942 (11th Cir. 1985) (rehearing en banc).
[5]771 F.2d 424 (10th Cir. 1985).
[6]See Stump v. Sparkman 435 U.S. 349, 360 (1978).

As will be shown below, this sweeping new immunity doctrine is at odds both with American legal history and the Constitution. Congress never intended to exempt state judges from suit when it passed the 1871 Civil Rights Act. Moreover, the judiciary is wrong when it asserts that immunity was a settled doctrine, incorporated into the 1871 Act by implication. To the contrary, the doctrine in its present form did not exist in the United States or England when the civil rights legislation was passed in 1871. Moreover, the immunity doctrine is inconsistent with the due process clause of the Fourteenth Amendment. Even if the doctrine had existed in common law, constitutional supremacy dictates that it must bow before the American idea of procedural justice embodied in the guarantee of due process.

## The American Concept of Due Process

The Fourteenth Amendment was enacted soon after the Civil War as a reaction to abuses by Southern officials.[7] Its effect was no less than a revolution in American law. For the first time, the states were obligated to observe a minimum standard of justice imposed by the federal courts. Previously, the Bill of Rights had bound only the federal government. Absent a direct affront to federal powers, the pre–Civil War Supreme Court had refused to interfere in the judicial proceedings of any state, even to preserve due process rights created by the Fifth Amendment.[8] If state courts ignored personal liberties, no redress was possible in the federal courts.

When adopted in 1868, the Fourteenth Amendment expressly bound state officials to observe the minimum standards of justice being developed by the federal courts. In time, the Supreme Court held that the amendment's due process clause obligated state courts to obey virtually every provision of the Bill of Rights. Under this evolving concept, due process embodied at least the specific liberties guaranteed by the Constitution.[9] By the centennial of the Fourteenth Amendment in 1968, state courts were required at a minimum to provide adequate notice and a right to be heard through counsel before deciding the rights or liabilities of any person.

In effect, the Fourteenth Amendment integrated the federal and state courts into a single judicial system adhering to a uniform minimum standard. This new system immediately generated problems

[7] See Pierson v. Ray, 386 U.S. 547, 559 (1967) (Douglas, J., dissenting) (1871 Act passed in response to Southern lawlessness).

[8] See, for example, Barron v. The Mayor & City of Baltimore, 7 Pet. 243, 8 L. Ed. 672 (1833), holding that the Fifth Amendment does not apply to state action.

[9] See Duncan v. Louisiana, 391 U.S. 145 (1968), holding that the Fourteenth Amendment "incorporates" specific provisions of the Bill of Rights.

CATO JOURNAL

without precedent in American law. When state courts asserted jurisdiction over out-of-state residents or their property, the federal courts frequently found themselves called upon to decide the validity of such acts. Ignoring the underlying due process concerns at first, the Supreme Court tried to resolve the problem with a theory of jurisdiction based largely on pre–Civil War notions of state sovereignty. Under this conception, the right of a court to exercise its authority over specific persons—its "personal jurisdiction"—extended only as far as the state borders and were of no force beyond them.[10]

As the 20th century progressed, the Supreme Court soon found the state-sovereignty theory inadequate. New forms of transportation and communication blurred the significance of state boundaries. An increasingly integrated national economy soon made it possible for activities in one state to produce profound disruption in another. Moreover, the Supreme Court was unable to resolve a perplexing inconsistency in its theory: if state sovereignty was the only issue, then an out-of-state resident could never confer jurisdiction on a state court merely by giving consent. In theory, sovereignty could be waived only by the sovereign that possessed it.[11] Yet the Supreme Court, bowing to a rule of practicality, consistently had held that a litigant could confer personal jurisdiction on any state court by consent, even if the consent was implied by out-of-court activities.[12]

Finally in 1982, the Supreme Court swept aside the sovereignty theory and held that the jurisdiction of state courts was circumscribed solely by the due process clause.[13] A state court's authority over anyone, including out-of-state residents, was restricted not by political boundaries but by the conception of fair play and procedural justice embodied in the Constitution.[14] Thus, personal jurisdiction was an aspect of due process. State judicial power was directly limited by individual liberties guaranteed by the Bill of Rights. As an important consequence, the right to challenge improper activities of a state court took on a new and as yet unexplored constitutional dimension.

## Due Process and Judicial Immunity

The Supreme Court's holding that the due process clause limited state courts' power was surprising only in that it had taken so long.

[10]See, for example, Pennoyer v. Neff, 95 U.S. 714, 720 (1878).

[11]See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinea, 456 U.S. 694, 702 n. 10 (1982).

[12]See, for example, McDonald v. Mabee, 243 U.S. 90 (1917).

[13]456 U.S. at 702 n. 10 and accompanying text.

[14]Id. at 703.

Many legal commentators had argued for years that jurisdiction of state courts over specific people was a due process problem, not a question of the competing sovereignties of two or more states.[15] Indeed, the older sovereignty theory, a relic of pre-Civil War jurisprudence, virtually had ignored an ancient line of English case law extending back to Article 39 of Magna Charta, ancient predecessor of the due process clause. These cases, dealing with the question of judicial immunity, long ago had established virtually the same due process limitation on judicial power announced in 1982 by the Supreme Court.

As early as 1613, English courts had recognized that Article 39 restricted the power of judges. Early English decisions had found that judges lost immunity from suit for acts clearly beyond their jurisdiction.[16] Only in a single area did the English common law grant a broad form of immunity to judges. Recognizing a need to protect judges from the displeasure of the Crown and its ministers, the Star Chamber in *Floyd v. Barker*[17] had held that a judge could not be prosecuted in another court for an alleged criminal conspiracy in the way he had handled a murder trial. In refusing to try the case, the judges of Star Chamber held simply that if the king wished to discipline a judge, the king must do so himself without resort to a criminal prosecution.[18]

Despite this narrow focus, *Floyd* frequently is cited as the foundation of the American judicial immunity doctrine.[19] The federal courts' lavish reliance on this Star Chamber decision is puzzling. While the immunity doctrine focuses exclusively on civil liability for judicial acts, *Floyd* is concerned not with liability but with the proper method of disciplining alleged misconduct of judges. Indeed, *Floyd's* central concern is not judicial immunity at all, but judicial independence from the executive branch of government. The American constitutional system largely has resolved the problem that preoccupied the judges who wrote *Floyd*.

[15]See, for example, Lewis (1983) for a discussion of the historical development of the Supreme Court's theory of state-court jurisdiction.
[16]See The Case of the Marshalsea, 77 Eng. Rep. 1027 (K.B. 1613) (no immunity when Court of the Marshalsea asserted jurisdiction over persons outside the king's household, its sole jurisdiction). The *Marshalsea* court specifically traced jurisdictional limits to Article 39 of Magna Charta (Id. at 1035).
[17]77 Eng. Rep. 1305 (Star Chamber 1608).
[18]Id. at 1307.
[19]See, for example, Pulliam v. Allen, 104 S. Ct. 1970, 1975 (1984). The Supreme Court first relied on *Floyd* as a precedent for judicial immunity in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872).

The current American immunity doctrine not only was a serious departure from its common law antecedents but also broke with early American case law. As early as 1806, the Supreme Court in *Wise v. Withers*[20] had recognized a right to sue a judge for exercising authority beyond the jurisdiction authorized by statute. In 1869, one year after passage of the Fourteenth Amendment and long before due process had assumed its modern contours, the Supreme Court made its first effort to define the limits imposed on state judges. The Court held that state judges possessing general powers were not liable "unless perhaps when the acts ... are done maliciously or corruptly."[21] Then in 1872, one year after the civil rights laws were passed, the Supreme Court overruled its earlier dictum and announced that judges would not be liable even for malicious or corrupt acts.[22]

This 1872 expansion of the immunity doctrine was an abrupt departure even from the common law recognized by a majority of the states in the Civil War era. By the time civil rights legislation passed in 1871, only 13 states had granted their judges a broad form of judicial immunity, while six states had found judges unquestionably liable for malicious acts in excess of jurisdiction.[23] Eighteen other states had not addressed the issue at all,[24] although many recognized English common law as binding precedent. Thus, from 1869 to 1872 the Supreme Court extended a sweeping form of immunity to state-court judges that a majority of the states themselves would not have recognized under their own law.

## Immunity and Civil Rights Legislation

Nor was this emerging doctrine recognized by the post–Civil War Congress. Ample evidence shows that Congress intended to make all state officials, including judges, subject to its new civil rights legislation, even in those states recognizing a broad form of immunity. The congressman who introduced the Civil Rights Act of 1871 announced that his bill was modeled after the Civil Rights Act of 1866,[25] which had created criminal penalties for anyone engaging in state-sponsored efforts to violate the civil rights of citizens. Indeed, the 1871 Act was written to provide a civil remedy—the right to sue

---

[20]7 U.S. (3 Cranch) 331 (1806).

[21]Randall v. Brigham, 74 U.S. (13 Wall.) 523, 535-36 (1869).

[22]Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 351 (1872).

[23]"Liability of Judicial Officers" (1969, pp. 326-27 and nn. 29-30).

[24]Id. at 327 nn. 31, 32 and accompanying text.

[25]*Congressional Globe*, 42d Cong., 1st sess. 68 app. (1871) (remarks of Rep. Shellabarger).

for damages—in every instance in which the 1866 Act offered a criminal penalty.[26]

One fact is clear about the 1866 Act: it unquestionably had abolished judicial immunity from criminal prosecution, in effect overruling the precedent in *Floyd*. Partly because of this feature, President Andrew Johnson had vetoed the bill,[27] and Congress promptly had overridden the veto amid indignant cries about the tyranny of local Southern officials. During the vote to override, one representative had sharply responded to the President's concern:

> I answer it is better to invade the judicial power of the States than permit it to invade, strike down, and destroy the civil rights of citizens. A judicial power perverted to such uses should be speedily invaded. . . . And if an officer shall intentionally deprive a citizen of a right, knowing him to be entitled to it, then he is guilty of a willful wrong which deserves punishment.[28]

Others declaimed that immunity for any state official must be abolished because immunity "is the very doctrine out of which the rebellion was hatched."[29]

The debate on the Civil Rights Act of 1871 itself was no less critical of the wrongs perpetrated by Southern officials. In biting rhetoric, one representative characterized local judges in the former Confederate states as despots prone to violate the rights of Republicans without regard for law or justice.[30] Many others vehemently agreed.[31] On three occasions, congressmen plainly stated that state-court judges would be unable to claim immunity under the 1871 Act.[32] Yet another representative expressly noted that the legislation would correct a specific injustice: the use of harassing litigation and unjust prosecutions in Southern courts meant to silence political opponents or chase them from the state.[33]

Despite this evidence from the congressional debates, a majority of the Supreme Court in *Pierson v. Ray*,[34] 96 years after the 1871 Act

[26]Id.

[27]*Congressional Globe*, 39th Cong., lst sess. 1680 (1866) (presidential veto message to Congress).

[28]Id. at 1837 (remarks of Rep. Lawrence).

[29]Id. at 1758 (remarks of Rep. Trumbull).

[30]*Congressional Globe,*, 42d Cong., lst sess. 394 (1871) (remarks of Rep. Platt).

[31]For example: Id. at 394 (remarks of Rep. Rainey), 429 (remarks of Rep. Beatty), and 153 app. (remarks of Rep. Garfield).

[32]Id. at 217 app. (remarks of Sen. Thurman), 385 (remarks of Rep. Lewis), and 365–66 (remarks of Rep. Arthur).

[33]Id. at 185 app. (remarks of Rep. Platt).

[34]386 U.S. 547 (1967).

was passed, decided that Congress never had intended to subject state-court judges to suit. Arguing that judicial immunity was "solidly established at common law," the Court presumed that Congress would have incorporated specific language into the statute had it wished to abolish the doctrine.[35] This perplexing conclusion utterly ignored the remedial purposes of the 1871 Act[36] and the long-standing rule that a remedial statute will be construed liberally to achieve its purpose (see Llewellyn 1950).

Not only did the majority offer a complete distortion of congressional intent[37] but it also decided that the phrase "[e]very person . . . shall be liable" meant every person except judges.[38] Yet Congress clearly had intended to remedy a serious injustice being inflicted on innocent people by corrupt local officials, including judges. In effect, the Supreme Court created a new rule of statutory construction that judicial immunity is to be favored over congressional intent, and only express language in a statute will limit the doctrine.

Finally, in 1978 in *Stump* the Supreme Court wielded its ever-expanding immunity doctrine to prevent suit against a state-court judge who had authorized sterilization of a mildly retarded 15-year-old girl after her mother had "petitioned" for the sterilization "to prevent unfortunate circumstances."[39] The judge had authorized the procedure without a hearing, notice to the girl, or appointment of a guardian *ad litem* to represent the girl's interests.[40] Recognizing that the judge had violated the most elementary principles of due process, the Supreme Court majority nonetheless found him immune from a suit later filed by the girl and her new husband. Even "grave procedural errors" do not deprive a judge of immunity, ruled the Court, because immunity attaches to any act performed in a judicial capacity.[41] The Court noted that the judge had signed the sterilization petition as a judge; and it dismissed objections that failure to observe formalities rendered the act nonjudicial.

Instead, the Court concluded that an act is "judicial" if it possesses two traits: first, the act is one normally performed by a judge, and, second, the parties intended to deal with the judge in an official

[35]Id. at 554–55.

[36]See id. at 560 (Douglas, J., dissenting).

[37]Id. at 558–67 (Douglas, J., dissenting).

[38]The 1871 Act provides that "every person" who violates the civil rights of a citizen by acting under state authority is liable for a federal civil action for money damages. 42 U.S.C. § 1983 (1985).

[39]435 U.S. 349, 351 n. 1.

[40]Id. at 360.

[41]Id.

capacity.[42] The Court, however, interpreted the first of its requirements very broadly. The majority noted that the judge in *Stump* possessed "general jurisdiction," the ability to decide any matter not specifically withheld from him. Since no statute expressly denied him the power to hear sterilization petitions, he was immune even though such a petition was unprecedented in the history of the state and not authorized by any statute.[43] In this way, the Supreme Court excused a gross departure from due process that would have subjected virtually any other state official to suit. The effect was plain: under the doctrine of judicial immunity, a victim can be forced to bear the full burden of a serious, irreparable injury inflicted by a state-court judge in blatant violation of the Constitution.

## The Policy Underlying Judicial Immunity

The *Stump* test for immunity affords no impediment to a corrupt judge. At best, it cloaks a judge with immunity if he merely indicates his official status while performing any act not expressly prohibited by law.[44] At worst, it offers a road map for corruption with total impunity. Those subject to a corrupt judge's power may find little comfort in the Supreme Court's pronouncements that judicial immunity in effect is a necessary evil, the price to be paid for a "fearless" judiciary.[45] With power to abridge liberty and seize property, state-court judges are the masters of everyday life in America. They are capable of causing enormous and irremediable harm to someone who, like the 15-year-old girl in *Stump*, simply is not given a chance to protect his or her own interests before the judge irreparably abridges them.

Yet the Supreme Court insists in the strongest of language that a sweeping immunity shield is necessary for an impartial judiciary. Permitting dissatisfied litigants to sue judges, argues the Court, "would contribute not to principled and fearless decision-making but to

---

[42]Id. at 360.

[43]Id. at 367–68 (Stewart, Marshall and Powell, JJ., dissenting).

[44]One federal appeals court has required the weighing of four separate factors similar to the *Stump* test: (1) whether the act was a normal judicial function; (2) whether the events transpired in the judge's chambers; (3) whether the controversy was then pending before the judge; and (4) whether the confrontation arose directly and immediately out of a visit to the judge in his official capacity. McAlester v. Brown, 469 F.2d 1280, 1282 (5th Cir. 1972). See also Dykes v. Hosemann, 776 F.2d 942, 945–46 (11th Cir. 1985) (rehearing en banc) (quoting *McAlester* with approval); Harper v. Merckle, 638 F.2d 848, 858 (5th Cir.), *cert. denied*, 454 U.S. 816 (1981) (quoting *McAlester* with approval).

[45]See Ferri v. Ackerman, 444 U.S. 193 (1979).

intimidation."[46] Under this viewpoint, immunity is not for the benefit of the malicious and corrupt but for the benefit of the public, whose best interests are protected by an independent judiciary.[47] If errors are committed, the proper remedy is appeal.[48]

Few would question the worthiness of such abstract principles as impartiality and fearlessness, even if the Supreme Court's assessment of judicial courage is surprisingly pessimistic. However, high-flying abstractions often serve only to hide the underlying issue, which in this case is the injury a corrupt judge can inflict on innocent people. Congress and the courts must seriously question any device that affords greater protection to the unscrupulous than to the principled. In this instance, the risk of such a disturbing result is very grave. By resort to the current immunity doctrine, an unscrupulous judge could escape liability even for acts of revenge, gross favoritism, improper seizure of property, unjust incarceration, or serious injuries inflicted "in a judicial capacity." Most disturbing are those instances in which a judge ensures that an appeal cannot remedy the wrong inflicted. In *Stump,* for instance, the judge's actions allowed no appeal prior to court-ordered surgery that would prevent a woman from ever having a family. If appeal indeed is the proper method of challenge, the judiciary cannot justify granting immunity to judges who have prevented an appeal from occurring.

The history of judicial immunity makes the doctrine even more suspect, since Congress clearly believed it was imposing liability on local judges under the 1871 Act.[49] By judicial fiat, the doctrine was conjured out of a few old English cases such as *Floyd* that were not themselves concerned with judicial immunity from suit, but with judicial independence from the Crown. The Supreme Court, citing dicta in these cases, invented a completely new immunity doctrine far more expansive than the Civil War-era precedents would warrant.

Most troubling of all are the strong due process interests that necessarily are involved in any judicial immunity controversy. By wielding its expansive doctrine, the Supreme Court in effect has declared that every organ of state government except local courts must observe the dictates of the Fourteenth Amendment. The irony is unmistakable: those who are the guardians of the Constitution are themselves privileged to violate it with corrupt impunity. Any dam-

[46]Pierson v. Ray, 386 U.S. 547, 554 (1967).

[47]Id.

[48]See Pulliam v. Allen, 104 S. Ct. 1970, 1975-76 (1984).

[49]Pierson v. Ray, 386 U.S. 547, 562 (Douglas, J., dissenting) ("every member of Congress who spoke on the issue assumed . . . that judges would be liable").

age inflicted on innocent citizens must be borne by the injured, not by the state or its insurers. Due process, one of the most hallowed and ancient of rights, apparently has no place in the law when a citizen attempts to seek recompense from a judge who has wrongfully caused an injury.

Nor has the Supreme Court made any effort to reconcile its new theory of state-court jurisdiction with judicial immunity. If a state court's power over persons is defined and limited by the due process clause, the current immunity doctrine assumes a deeply suspicious character. The judiciary in effect is wielding a judge-made rule of law to limit a constitutional right, turning the idea of constitutional supremacy on its head. When a local judge chooses to act corruptly, the logical result of any sweeping immunity doctrine is the destruction of due process rights. Instead of fearless impartiality, the doctrine thus protects only malice and arbitrary administration of the laws.

## The Due Process Clause as a Limit on Immunity

If judicial immunity truly is to serve as a bulwark of justice, some more clearly defined limit must be placed on it. Logically this limit must arise from the due process clause itself. Clothing a judge with immunity simply because he has performed a "judicial act" overlooks the real-world probability that even judicial acts can be utterly inconsistent with due process. Important personal rights, such as the right to have a family in *Stump*, can be destroyed by the mere nod of a judge's head. Judges should not be privileged to violate the rights of citizens unfortunate enough to find themselves in a biased, corrupt, or irresponsible court. When unjust injuries are inflicted by improper judicial acts, the state or its insurers should be forced to bear the cost of the wrongful act, not the individual. Indeed, the history of the 1871 Act reveals that Congress intended to provide just such a remedy.

Instead of the abstract and ambiguous factors used in *Stump* to determine the existence of immunity, the courts should use a simpler inquiry founded on the fundamental principles embodied in the due process clause. To preserve the integrity of the judicial process, the courts always should presume that a trial court properly exercised its jurisdiction. But they should permit a plaintiff to overcome this presumption by showing that the judge acted with actual malice, consisting of a knowing or reckless disregard of due process. Specifically, if the court is to enjoy immunity, it must afford three things—notice, a chance to be heard, and a method of appeal. Then, and only then, would an irrebuttable presumption of immunity exist requiring dismissal of any subsequent suit against the judge.

Of these three requirements, the opportunity to appeal should be the most crucial based on the policy that appeal, not a suit for damages, is the preferred method of challenging a judge's improper actions. Deprivation of an opportunity to appeal effectively renders this policy meaningless and makes some other remedy necessary for proper redress. Moreover, the right to appeal usually can correct due process violations. Even errors in notice and opportunity to be heard should not of themselves subject a judge to suit as long as the opportunity to appeal is present. In effect, the appeal itself will afford a new opportunity for a proper hearing with proper notice.

Nor should routine *ex parte* orders create any liability for the judiciary. In emergency hearings for the seizure of property, the court could preserve the irrebuttable presumption of immunity by affording as soon as possible the required notice, a hearing, and the right to appeal.[50] In summary incarcerations, as for contempt of court, the judge could preserve his immunity by affording the defendant an immediate opportunity for further review, such as in a habeas corpus hearing. Mere failure of the plaintiff to exercise these rights should never subject the judge to suit. Nor should a judge be liable for errors of judgment, even those plainly forbidden by law or precedent, as long as his acts did not deliberately preclude the possibility of appeal *before* constitutionally protected rights were completely foreclosed.

The test proposed above also addresses the question of subject-matter jurisdiction—the statutory authority of judges to hear specific kinds of disputes. Although the Supreme Court suggested in *Stump* that a clear lack of subject-matter jurisdiction will subject a judge to liability, it was plainly troubled by the possibility that a judge might be subjected to suit for an honest and harmless mistake.[51] A test based on the ability to appeal necessarily will shield good-faith errors. As long as the judge does not take actions that prevent appeal, he will be protected by an irrebuttable presumption of immunity.

## Conclusion

American courts have agonized over the due process problems created in recent years by the doctrine of judicial immunity.[52] A

---

[50]The courts have long recognized a right of creditors to obtain prejudgment "attachment" of property in which they have an enforceable interest if the debtor is likely to flee from the court's jurisdiction. The U.S. Supreme Court has imposed rigorous due process limits on the use of such remedies, generally requiring notice and an opportunity to be heard immediately after the disputed property has been seized. See, for example, Sniadach v. Family Finance Corp., 395 U.S. 337 (1969).

[51]Stump v. Sparkman, 435 U.S. 349, 356 (1978).

[52]One of the clearest examples was in *Dykes v. Hosemann*, where the Eleventh Circuit

JUDICIAL IMMUNITY

variety of ill-conceived approaches to the issue have resulted in "tests" that grant immunity to state-court judges in such sweeping terms as to amount to no test at all. The Supreme Court, troubled by threats to judicial independence, has developed its own test that invests judges with immunity for any act performed in an official capacity where the act itself is not expressly prohibited by existing law. Under this approach, corrupt and malicious local judges may easily shield even the most serious abuses behind a wall of immunity, leaving the victim unable to seek compensation from the state and its insurers.

Yet a state court's jurisdiction is limited by due process guarantees of notice and a chance for an impartial hearing. Ignoring this fact, the Supreme Court has misconceived the problem by basing judicial immunity purely on statutory concerns and distorted readings of common law history. Like the jurisdiction of local courts, immunity itself—a judge-made doctrine—must be limited by due process, which is of constitutional dimension. The supremacy clause unquestionably nullifies even the most ancient of common law principles and even the most popular of state statutes to the extent they are inconsistent with due process.

The best solution is to give judicial immunity a firm root in due process guarantees. To achieve this result, the simplest approach is to create an irrebuttable presumption of immunity where the state-court judge's acts did not deliberately terminate a citizen's rights without notice, hearing, and opportunity to appeal. Of these three requirements, the chance to appeal is the most important because it provides a means of curing defects in any other due process violation. A judge thus remains unquestionably immune as long as he does not take actions that intentionally and plainly prevent further review. The duty imposed on a state-court judge, then, is only to recognize that his own decisions may sometimes be in error and to ensure that orders affecting important constitutional rights can be reviewed in another court.

## References

Alschuler, Albert W. "Courtroom Misconduct of Prosecutors and Trial Judges." *Texas Law Review* 50 (April 1972): 629–735.

at first stripped a Florida judge of judicial immunity for actions clearly violating the due process clause (743 F.2d 1488, 1496 [11th Cir. 1984]). Then, in a rehearing en banc, the full panel completely reversed the prior decision and held that judicial independence was so strong a concern that due process must yield before it (776 F.2d 942, 949 [11th Cir. 1985]). In a sharp dissent, Judge Hatchett criticized the majority for holding everyone liable for due process violations except the very people trained in due process—judges (Id. at 954–55).

473

CATO JOURNAL

Lewis, Harold S., Jr. "The Three Deaths of 'State Sovereignty' and the Curse of Abstraction in the Jurisprudence of Personal Jurisdiction." *Notre Dame Law Review* 58 (April 1983): 699–742.

"Liability of Judicial Officers under Section 1983." Unsigned student note. *Yale Law Journal* 79 (December 1969): 322–37.

Llewellyn, Karl N. "Remarks on the Theory of Appellate Decision and the Rules or Canons about How Statutes Are to Be Construed." *Vanderbilt Law Review* 3 (April 1950): 395–406.

# EXHIBIT G

# Policy Analysis

## CATO INSTITUTE

SEPTEMBER 14, 2020 | NUMBER 901

# Qualified Immunity
## A Legal, Practical, and Moral Failure

BY JAY R. SCHWEIKERT

## EXECUTIVE SUMMARY

Accountability is an absolute necessity for meaningful criminal justice reform, and any attempt to provide greater accountability must confront the doctrine of qualified immunity. This judicial doctrine, invented by the Supreme Court in the 1960s, protects state and local officials from liability, even when they act unlawfully, so long as their actions do not violate "clearly established law." In practice, this legal standard is a huge hurdle for civil rights plaintiffs because it generally requires them to identify not just a clear legal *rule* but a prior case with functionally identical *facts*.

Qualified immunity is one of the most obviously unjustified legal doctrines in our nation's history. Although it is nominally an interpretation of our primary federal civil rights statute, that statute says nothing about any immunities, qualified or otherwise. And the common-law background against which it was passed also contained nothing like the across-the-board immunity for public officials that characterizes the doctrine today. Qualified immunity has also been disastrous as a matter of policy. Victims of egregious misconduct are often left without any legal remedy simply because there does not happen to be a prior case on the books involving the exact same sort of misconduct. By undermining public accountability at a structural level, the doctrine also hurts the law enforcement community by denying police the degree of public trust and confidence they need to do their jobs safely and effectively.

The most straightforward and sensible solution to this problem is complete abolition of qualified immunity. This could be appropriately accomplished either through the Supreme Court reversing its own precedent or through congressional legislation clarifying that our civil rights laws do not include any such defense to liability. Notably, even if qualified immunity is abrogated, municipalities would still have the option to indemnify state agents under appropriate circumstances. But there are also alternatives to total abolition that would eliminate qualified immunity in the typical case while still preserving a modified kind of immunity in a few safe harbors.

Jay Schweikert is a policy analyst with the Cato Institute's Project on Criminal Justice.

2

> "It is entirely possible for courts to hold that government agents did violate someone's rights, yet the victim has no legal remedy because that precise sort of misconduct had not occurred in past cases."

## INTRODUCTION

> *"The government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."*[1]
>
> —Chief Justice John Marshall,
> *Marbury v. Madison*

The substance of constitutional rights is meaningless if state actors can violate those rights with impunity. Such rights would become, in James Madison's words, "parchment barriers"—symbolic commitments to individual liberty that do nothing in practice to deter or prevent unlawful misconduct by government agents.[2] Accountability must therefore be a top priority for anyone interested in criminal justice reform more generally. Unfortunately, the environment in which most members of law enforcement operate today can best be described as one of near-zero accountability. Although this culture of near-zero accountability has many causes, by far the most significant is the doctrine of qualified immunity.

Qualified immunity is a judicial doctrine created by the Supreme Court in the late 1960s that shields state actors from liability for their misconduct, even when they break the law. One of our primary federal civil rights statutes—currently codified at 42 U.S.C. § 1983, and thus generally called "Section 1983"—says that any state actor who violates someone's federally protected rights "shall be liable" to the party injured. But under the doctrine of qualified immunity, the Court has held that such defendants cannot be sued unless they violated "clearly established law." While this is an amorphous, malleable standard, it generally requires civil rights plaintiffs to show not just a clear legal *rule* but a prior case with functionally identical *facts*.

In other words, it is entirely possible—and quite common—for courts to hold that government agents did violate someone's rights, but that the victim has no legal remedy simply because that precise sort of misconduct had not occurred in past cases. Not only does the doctrine routinely deny justice to victims of egregious misconduct, but it also undermines accountability for law enforcement at a structural level. Section 1983 was intended to be the primary means of holding state actors accountable for violating constitutional rights, yet qualified immunity all but guts both the deterrent and remedial effects of this statute. Thus, the doctrine undermines constitutional rights across the board by enfeebling the means of their vindication.

In short, qualified immunity has failed utterly as a matter of law, doctrine, and public policy. As a legal matter, it has no basis in either the text of Section 1983 or the common-law background against which the statute was enacted. The modern doctrine—especially the "clearly established law" standard—is incapable of consistent, predictable application, and continues to confuse and divide lower courts tasked with applying it. And most importantly, the doctrine regularly permits egregious unconstitutional misconduct to go unaddressed, exacerbating an ongoing crisis of accountability in law enforcement more generally. That obviously hurts the victims of police misconduct, but it also hurts the law enforcement community itself: when the judiciary routinely permits police officers to get away with unconscionable constitutional violations, members of the public can hardly be expected to have much trust or respect for officers in their community. And that diminished trust and respect makes the job of policing far more difficult and dangerous, including for those officers who do strive to act in a lawful, professional manner.

The one silver lining in this discussion is that for all the many complex problems this doctrine creates, the solution is quite simple—abolish qualified immunity. This result could be appropriately accomplished either by the Supreme Court reversing its own precedent, or by Congress passing legislation clarifying that Section 1983 means what it

3

says—that when state actors violate someone's federally protected rights, they "shall be liable to the party injured." However, there are some alternatives to complete abolition that would eliminate qualified immunity for most cases, while still preserving a modified version of the defense under a few more-limited, reasonable circumstances.

Regardless of whether qualified immunity is mostly or wholly abolished, it is important to clarify that eliminating the doctrine would not remove the potential for indemnifying defendants under certain circumstances. Indeed, even today, when police officers actually are held liable in civil rights cases, they are nearly always fully indemnified by their municipal employers. Thus, the immediate effect of eliminating qualified immunity would not be to subject individual officers to potentially ruinous judgments, but simply to ensure that victims of official misconduct get the remedy they deserve. Whether and how to indemnify defendants is itself a complicated policy question, but the first step toward answering it, and toward restoring accountability in law enforcement more generally, must be to restore the baseline assumption that those whose rights are violated will have a remedy.

## QUALIFIED IMMUNITY LACKS ANY VALID LEGAL FOUNDATION

### Passage of Section 1983

The doctrine of qualified immunity is nominally an interpretation of our principal federal civil rights statute, now codified at 42 U.S.C. § 1983. Section 1983 was first passed by the Reconstruction Congress as part of the 1871 Ku Klux Klan Act, which itself was part of a series of three Enforcement Acts designed to help combat lawlessness and civil rights violations in the post-war South.[3] Notably, the original version of Section 1983 was passed a mere three years after the adoption of the Fourteenth Amendment and was intended in large part to give teeth to the

promise of liberty and equality enshrined in the amendment's provisions.[4]

As currently codified, the statute states:

*Every person who*, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, *subjects, or causes to be subjected, any citizen of the United States* or other person within the jurisdiction thereof *to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured* in an action at law, suit in equity, or other proper proceeding for redress.[5] [emphasis added]

This statute thus creates a cause of action against state actors who violate someone's constitutional rights. On its face, Section 1983 does not provide for *any* immunities, qualified or otherwise. It simply states that a person acting under state authority who causes the violation of a protected right "shall be liable to the party injured." Thus, if qualified immunity is to have any valid legal basis, it cannot possibly come from the statute itself.

Of course, no law exists in a vacuum, and statutes generally will not be interpreted to extinguish by implication longstanding legal defenses available at common law.[6] For example, a statute making it a crime to "willfully discharge a firearm at another person" would not be construed to preclude a defendant from arguing self-defense because self-defense is a properly well-established background principle of our legal system.

In the context of qualified immunity, the Supreme Court has appropriately framed the issue as whether or not "[c]ertain immunities were so well established in 1871, when § 1983 was enacted, that 'we presume that Congress would have specifically so provided had it wished to abolish' them."[7] The relevant question then is whether the common law of 1871 included general immunities for state agents that were so well established as to justify the doctrine of qualified immunity today.

> **"On its face, Section 1983, part of the Civil Rights Act of 1871, does not provide for *any* immunities, qualified or otherwise."**

4

> "The background legal assumption during the Founding Era was that government agents were, in general, strictly liable for constitutional violations that gave rise to common-law torts."

## Common-Law Background of Liability for Government Agents

In the Founding Era, constitutional claims would typically arise as part of suits to enforce general common-law rights. For example, an individual might sue a federal officer for trespass; the defendant would claim legal authorization to commit the alleged trespass in his role as a federal officer; and the plaintiff would, in turn, claim that the trespass was unconstitutional, thus defeating the officer's defense.[8] And as many scholars over the years have demonstrated, these Founding Era lawsuits did not generally permit a good-faith defense to constitutional violations.[9] Rather, the background legal assumption at this time was that government agents were, in general, strictly liable for constitutional violations that gave rise to common-law torts.[10]

The clearest example of this principle comes from the 1804 Supreme Court case *Little v. Barreme*.[11] That case involved a claim against an American naval captain, George Little, who captured a Danish ship off the French coast in 1799, during the Quasi-War with France. Federal law authorized seizure only if a ship was going *to* a French port (which this ship was not), but President Adams had issued broader instructions to also seize ships coming *from* French ports. The question was whether Captain Little's reliance on these instructions was a defense against liability for the unlawful seizure.

The opinion by Chief Justice John Marshall illustrates how the *Little* Court seriously considered, but ultimately rejected, the very rationales that would later come to support the doctrine of qualified immunity. Marshall explained that "the first bias of my mind was very strong in favour of the opinion that though the instructions of the executive could not give a right, they might yet excuse from damages."[12] He noted that the captain had acted in good-faith reliance on the president's order, and that the ship had been "seized with pure intention."[13] Nevertheless, the Court held that "the instructions cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass."[14] In other words, the officer's only defense was legality, not good faith.

This "strict rule of personal official liability, even though its harshness to officials was quite clear," persisted through the 19th century.[15] Its severity was mitigated somewhat by the prevalence of successful petitions to Congress for indemnification.[16] But on the judicial side, courts continued to hold public officials liable for unconstitutional conduct without regard to any across-the-board, good-faith defense. For example, in 1891 the Massachusetts Supreme Court held members of a town health board liable for mistakenly killing an animal they thought was diseased, even when ordered to do so by government commissioners.[17] Early 20th-century scholarship also explains how "[p]rior to 1880 there seems to have been absolute uniformity in holding officers liable for injuries resulting from the enforcement of unconstitutional acts."[18]

To be sure, even in the 19th century, "good faith" was relevant in some lawsuits against government agents, but only to the extent that it was an *element* of particular common-law claims.[19] For example, the tort of false arrest permits lawsuits against police officers making unlawful arrests, but it allows the defense of good faith and probable cause. As one contemporary treatise explained, "it is the established rule, that if [an officer] have reasonable grounds for his belief [that a citizen violated the law], and act thereon in good faith in causing the arrest, he shall not be subjected to damages merely because the accused is not convicted."[20] Note that "good faith" in this context is not a separate, freestanding protection from liability for unlawful conduct. Rather, at common law, an officer who acted with good faith and probable cause simply did not commit the tort of false arrest in the first place.

Most notably, in the context of Section 1983 itself, in 1915 the Supreme Court held that the statute did not incorporate any freestanding good-faith defense. In *Myers v. Anderson*, the Court held that Maryland election officers

5

were liable for enforcing a state statute that violated the Fifteenth Amendment's ban on racial discrimination in voting.[21] The defendants in *Myers* argued that, even if the statute was unconstitutional, they could not be held personally liable because the plaintiffs "fail[ed] to allege that the action of the defendants in refusing to register the plaintiffs was corrupt or malicious," that "[m]alice is an essential allegation in a suit of this kind against registration officers at common law," and that Section 1983 "does not dispense with the necessity of alleging and proving malice."[22]

The Supreme Court rejected these arguments. The Court explicitly noted that "[t]he non-liability in any event of the election officers for their official conduct is seriously pressed in argument," but then stated that "we do not undertake to review the considerations pressed on these subjects because we think they are fully disposed of . . . by the very terms of [Section 1983], when considered in the light of the inherently operative force of the Fifteenth Amendment."[23] In other words, given the plain language of Section 1983, the only relevant question was whether the defendants had acted unconstitutionally—whether or not they acted in good faith or with malice was irrelevant. Although the Supreme Court did not elaborate on this point in *Myers*, the lower-court decision that it affirmed was much more explicit:

> [A]ny state law commanding such deprivation or abridgment [of a constitutional right] is nugatory and not to be obeyed by any one; and any one who does enforce it does so at his known peril and is made liable to an action for damages by the simple act of enforcing a void law to the injury of the plaintiff in the suit, and no allegation of malice need be alleged or proved.[24]

The *Myers* Court's rejection of any general good-faith defense "is exactly the logic of the founding-era cases, alive and well in the federal courts after Section 1983's enactment."[25]

## Creation and Evolution of Qualified Immunity

The doctrine of qualified immunity has changed substantially over the years, but it was first articulated in the 1967 Supreme Court case *Pierson v. Ray*.[26] That case involved a Section 1983 suit against police officers who had arrested several people under an anti-loitering statute that violated the First Amendment. The Supreme Court held that, because the common-law tort of false arrest allowed the defense of good faith and probable cause, defendants should have that same defense in an analogous suit under Section 1983.[27] Critically, the Court extended this defense to include not just a good-faith belief in probable cause for the arrest, but a good-faith belief in the legality of the statute under which the arrest was made.

Note that *Pierson* presents exactly the same kind of issue as *Myers v. Anderson*—both involved state officials who violated individuals' rights by enforcing unconstitutional statutes, who then claimed they should not be held personally liable because they were acting in good faith. But whereas the Court rejected this argument in *Myers*, it accepted it in *Pierson*. Tellingly, the *Pierson* Court failed to cite *Myers* or otherwise acknowledge that it was reversing its own precedent.

Nevertheless, despite ignoring prior case law and the common-law background of strict liability for constitutional violations, the *Pierson* Court at least grounded its decision on the premise that the analogous tort at issue—false arrest—allowed a good-faith defense at common law. One might then have expected the qualified immunity doctrine to adhere generally to the following model: determine whether the analogous tort permitted a good-faith defense at common law, and if so, assess whether the defendants had a good-faith belief in the legality of their conduct.

But as the Supreme Court continued to refine qualified immunity over the next couple of decades, it soon discarded even this loose tether to history. In 1974 the Court abandoned the analogy to common-law torts that permitted a good-faith defense (such as false arrest),

> **❝In *Pierson v. Ray*, the Supreme Court held that, because the common-law tort of false arrest allowed the defense of good faith and probable cause, defendants should have that same defense in an analogous suit under Section 1983.❞**

6

> "Under *Harlow v. Fitzgerald*'s 'clearly established law' standard, whether a defendant was acting in good faith is irrelevant; what matters is the state of the prior case law at the time of the defendant's alleged misconduct."

and instead held that a good-faith defense was available for all executive officers (not just police officers) for any "acts performed in the course of official conduct."[28]

Most importantly, in the 1982 case *Harlow v. Fitzgerald*, the Supreme Court fundamentally changed the nature of the good-faith defense that qualified immunity was purportedly based on.[29] Up until this point, qualified immunity had turned, in part, on a "'subjective' test of good faith," which meant a defendant had to "be acting sincerely and with a belief that he is doing right."[30] In other words, to claim qualified immunity, defendants had to have an actual good-faith belief that they were acting lawfully. But in *Harlow*, the Court eliminated this requirement and instead held that defendants would be entitled to qualified immunity whenever "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[31] Under *Harlow*'s "clearly established law" standard, which continues to govern qualified immunity today, whether or not a defendant was actually acting in good faith is entirely irrelevant; all that matters is the state of the prior case law at the time of the defendant's alleged misconduct.[32]

The modern doctrine of qualified immunity is therefore completely untethered from any statutory or historical baseline. The text of Section 1983 makes no mention of any immunities, qualified or otherwise, and the relevant history establishes a baseline of strict liability for constitutional violations—at most providing a good-faith defense against claims analogous to certain common-law torts. And in 1915 the Supreme Court confirmed that Section 1983 provides for no general good-faith defenses before reversing itself without explanation more than half a century later. Yet qualified immunity functions today as an across-the-board defense, based on a "clearly established law" standard that was unheard of before the late 20th century.

Although in recent years the Supreme Court has made token attempts to justify the doctrine of qualified immunity on historical

grounds, many current and previous members of the Court have candidly acknowledged the uncomfortable truth that the modern doctrine has, at the very least, diverged markedly from any plausible historical baseline:[33]

- In the 2018 case *Kisela v. Hughes*, Justice Sonia Sotomayor dissented, noting that qualified immunity has become "an absolute shield for law enforcement officers" that has "gutt[ed] the deterrent effect of the Fourth Amendment."[34]
- In the 2017 case *Ziglar v. Abbasi*, Justice Clarence Thomas wrote in a concurring opinion that "[i]n further elaborating the doctrine of qualified immunity . . . we have diverged from the historical inquiry mandated by the statute."[35]
- In the 1998 case *Crawford-El v. Britton*, Justice Antonin Scalia dissented, saying "our treatment of qualified immunity under 42 U.S.C. § 1983 has not purported to be faithful to the common-law immunities that existed when § 1983 was enacted, and that the statute presumably intended to subsume."[36]
- And in the 1992 case *Wyatt v. Cole*, Justice Anthony Kennedy wrote a concurring opinion, acknowledging that "[i]n the context of qualified immunity . . . we have diverged to a substantial degree from the historical standards."[37]

In short, qualified immunity has become nothing more than a "freewheeling policy choice" that is at odds with Congress's judgment in enacting Section 1983.[38]

## THE DOCTRINAL PROBLEMS WITH QUALIFIED IMMUNITY

### The Stringency of "Clearly Established Law"

The defining feature of modern qualified immunity doctrine is the "clearly established law" standard—that is, even if state actors have violated someone's constitutional rights, they

cannot be held liable unless those rights were "clearly established" at the time of the violation. But that naturally raises the question of what it means for rights to be "clearly established."

The crucial takeaway from decades of Supreme Court jurisprudence is that "clearly established law" cannot be defined at a high level of generality; instead, the law must be "particularized" to the facts of the case.[39] In practice, it is quite difficult for plaintiffs to make this showing because lower courts typically require a prior case in the relevant jurisdiction with functionally similar facts before they will hold that the law is clearly established. Although the Supreme Court has always insisted that an exact case on point is not strictly necessary, it has also stated that "existing precedent must have placed the statutory or constitutional question beyond debate."[40]

Instead of trying to tease out this standard in the abstract, it may be more helpful to consider a few concrete examples of the sorts of minor factual distinctions on which courts will rely to conclude that the law was not "clearly established" on some particular point. (Note that the key facts in the following cases will be presented in the light most favorable to the civil rights plaintiffs because that is how courts are supposed to construe disputed facts when ruling on qualified immunity as a matter of law.)

*BAXTER V. BRACEY.*[41] In early 2014, two Nashville police officers, Brad Bracey and Spencer Harris, were pursuing a homeless man named Alexander Baxter in response to reports that Baxter had been trying to burglarize unlocked houses. The officers, along with a police dog, followed Baxter into a residential basement and found Baxter sitting on the ground with his hands in the air. Even though Baxter had clearly surrendered at this point, however, Harris—after waiting about 5 to 10 seconds—released the dog to attack Baxter. The police dog bit Baxter in his armpit (which was exposed, as his hands were raised in surrender), and Baxter required emergency medical treatment at a hospital.

Baxter brought a Section 1983 suit against these officers, claiming that the deployment of the police dog against him after he had surrendered violated his Fourth Amendment rights. A prior Sixth Circuit case had already held that an officer clearly violated the Fourth Amendment when he used a police dog without warning against an unarmed residential burglary suspect who was lying on the ground with his hands at his sides.[42] But the court here held that this prior case was insufficient because "Baxter does not point us to any case law suggesting that *raising his hands, on its own*, is enough to put Harris on notice that a canine apprehension was unlawful in these circumstances."[43] In other words, prior case law holding it unlawful to deploy police dogs against nonthreatening suspects who surrendered by laying on the ground did not make it clear that it was unlawful to deploy police dogs against nonthreatening suspects who surrendered by sitting on the ground with their hands up.

*LATITS V. PHILIPS.*[44] In June 2010, Laszlo Latits was stopped by Detroit-area police for turning his car the wrong way on a divided boulevard. A police officer testified that he saw bags in the car that he suspected contained drugs, and the dashboard camera shows the officer shining his flashlight into the car and raising his gun to Latits's head. Latits then drove away, and the police pursued. Another officer, Lowell Phillips, repeatedly rammed Latits's car—in violation of department policy and a direct order not to use this maneuver—and eventually drove Latits off the road. Phillips then jumped out of his car, ran toward Latits's, and shot him three times in the chest, killing him. Latits's widow sued Phillips under Section 1983, and the Sixth Circuit held that Phillips had violated Latits's Fourth Amendment rights because no reasonable officer would have concluded that Latits "present[ed] an imminent or ongoing danger. . . . Officer Phillips's use of deadly force was objectively unreasonable."[45]

Nevertheless, in spite of this objectively unreasonable shooting, a majority of the Sixth Circuit panel found that the officer was entitled to qualified immunity. The court itself acknowledged that several prior cases had

> **"It is difficult for plaintiffs to show that a law is clearly established because lower courts typically require a prior case in the relevant jurisdiction with functionally similar facts."**

8

> **"If courts refuse to resolve legal claims because the law was not clearly established, then the law will never become clearly established. "**

clearly established that "shooting a driver while positioned to the side of his fleeing car violates the Fourth Amendment, absent some indication suggesting that the driver poses more than a fleeting threat."[46] Even though that statement would seem to govern this case exactly, the majority held that these prior cases were "distinguishable" because they "involved officers confronting a car in a parking lot and shooting the non-violent driver as he attempted to *initiate* flight," whereas here "Phillips shot Latits after Latits led three police officers on a car chase for several minutes."[47] The lone dissenting judge in this case dryly observed that "the degree of factual similarity that the majority's approach requires is probably impossible for any plaintiff to meet."[48]

### Avoiding the Merits Entirely

Because of qualified immunity, courts will often hold that even though a person's rights were violated, that person has no legal remedy because the law was not clearly established. But perhaps even more surprisingly, courts are permitted to grant qualified immunity without ever deciding whether a constitutional violation occurred in the first place.

This aspect of qualified immunity is another instance where the Supreme Court's doctrine has changed dramatically over time. For instance, in the 2001 case *Saucier v. Katz*, the Court created a mandatory sequencing standard in which lower courts were required to first determine whether the defendant violated someone's constitutional rights, and then, if necessary, determine whether those rights were clearly established.[49] But just eight years later, in *Pearson v. Callahan*, the Court reversed *Saucier* and instead held that lower courts have the discretion to grant qualified immunity on the ground that the law was not clearly established without actually deciding the threshold question of whether the law was violated in the first place.[50]

The practical result of this discretion is that qualified immunity not only denies justice to victims whose rights have been violated, but it also stagnates the development

of the law going forward. After all, if courts refuse to resolve legal claims because the law was not clearly established, then the law will never become clearly established.[51] Indeed, if courts grant qualified immunity without at least deciding the merits question, then the same defendant could continue committing exactly the same misconduct indefinitely—and never be held accountable.

One of the best examples of this stagnation concern is the sluggishness with which the federal courts have come to recognize the First Amendment right to record police officers in public. Although the Supreme Court has yet to weigh in on this subject, every circuit court to address this issue on the merits has found that there is, in fact, such a right under the First Amendment. But in the Third and Fourth Circuits, this right has long gone unprotected precisely because these courts granted qualified immunity to officers who arrested people for exercising this right without ruling on the merits question.[52] And the Third Circuit even granted qualified immunity to officers in a second right-to-record case on the grounds that, naturally, the right-to-record had yet to be clearly established in that circuit so "it was not unreasonable for the officers to regard their conduct as lawful."[53]

Although courts have the option to decide the merits question first, they frequently duck the relatively difficult constitutional question in favor of the usually simpler question of whether the law was clearly established. The best source for understanding this point empirically is a 2015 paper written by professors Aaron Nielson and Christopher Walker, in which they examined 844 federal appellate cases for the years 2009 through 2012 that involved qualified immunity.[54] Out of all those cases where the court had a choice about the order in which to decide these questions (i.e., the cases where qualified immunity was granted), courts decided the merits question first 63 percent of the time (665 claims). However, out of these 665 claims, the courts nearly always (92 percent of the time) decided that there was not, in fact, any constitutional

9

violation. In other words, they reach the merits in those cases where qualified immunity itself is irrelevant because there was no violation of someone's rights to begin with.

Courts "developed the law"—in the sense of holding that there was a constitutional violation, but it was not clearly established at the time of the violation—in only 8 percent of the cases in which qualified immunity was granted. The 37 percent of cases (400 claims) where courts decided not to reach the merits (and thus, granted immunity solely because the law was not clearly established) probably represent those cases in which the merits question was more difficult, and where the law is therefore more in need of development.

## Appeals before Final Judgment

An additional wrinkle of the qualified immunity doctrine is that it gives a one-sided litigation advantage to government defendants in the form of "interlocutory appeals."

As a general rule of civil procedure, parties cannot appeal adverse court decisions until there is a final judgment on the merits.[55] Usually that means a decision for one side or another at trial, or else a pretrial resolution of the entire case by the district court judge. Qualified immunity is most frequently raised by defendants at the summary judgment stage—that is, after the evidence has been taken but before the case goes to trial.[56] And the denial of summary judgment to a defendant is generally not considered to be a final judgment: when a judge denies summary judgment it simply means that there are genuine factual disputes in the case that need to be resolved by a jury.

But according to the Supreme Court, qualified immunity is not just a defense against liability, but rather is intended to be an immunity from suit altogether; where applicable, it is supposed to protect defendants from going to trial in the first place.[57] Therefore, denials of qualified immunity are a rare instance of decisions subject to what is called the "collateral order doctrine"—if a district court denies the defendant's motion to dismiss for qualified immunity, the defendant may immediately appeal

that decision (an "interlocutory appeal") before the case goes to trial.

Thus, to even get before a jury, civil rights plaintiffs essentially must win twice in a row—once before the district court and again before the court of appeals. The cost of pretrial appellate litigation can easily exhaust the limited resources of civil rights plaintiffs and induces plaintiffs to settle before their case can go to trial, often on far less favorable terms than they would have in the absence of these litigation costs.

But the collateral order doctrine fails even to achieve the professed benefits for government defendants that motivated the Supreme Court to establish this rule in the first place, and it often results in increased litigation costs for all involved. As one federal judge recently explained, "[a]dditional expense and burden result because an interlocutory appeal adds another round of substantive briefing for both parties, potentially oral argument before an appellate panel, and usually more than twelve months of delay while waiting for an appellate decision. All of this happens in place of a trial that (1) could have finished in less than a week, and (2) will often be conducted anyway after the interlocutory appeal."[58]

## Doctrine Is Amorphous, Unpredictable, and Counterproductive

Modern qualified immunity doctrine—especially the clearly established law standard—has proven impossible to apply with predictability or consistency. Indeed, there is perhaps no other Supreme Court doctrine that has engendered as much confusion and division among lower court judges as the Court's amorphous instructions on when a given right is clearly established, as both judges and commentators have recognized.[59]

The fundamental, intractable problem is that there is simply no objective way to define the level of generality at which "clearly established law" should be defined. Since the Court first announced this standard in 1982 it has issued dozens of substantive qualified immunity decisions that attempt to hammer

> **To even get before a jury, civil rights plaintiffs essentially must win twice in a row—once before the district court and again before the court of appeals.**

10

> " It is no surprise that lower courts remain confused and divided on how to answer the nebulous question of how similar the facts of a prior case must be for the law to be clearly established. "

out a workable understanding of "clearly established law," but with little practical success. On the one hand, the Court has repeatedly instructed lower courts "not to define clearly established law at a high level of generality,"[60] and stated that "clearly established law must be 'particularized' to the facts of the case."[61] But on the other hand, it has said that its case law "does not require a case directly on point for a right to be clearly established,"[62] and that "general statements of the law are not inherently incapable of giving fair and clear warning."[63]

How to navigate between these abstract instructions? The Court's specific guidance has been no more concrete—it has stated simply that "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'"[64] The problem, of course, is that this instruction is circular—how to identify clearly established law depends on whether the illegality of the conduct was clearly established. It is therefore no surprise that lower courts remain persistently confused and divided on how to answer the nebulous question of how similar the facts of a prior case must be for the law to be clearly established.[65]

The harsh and unpredictable nature of qualified immunity also deters meritorious lawsuits from being filed in the first place. In some cases, even when potential clients have a strong argument on the merits, experienced civil rights attorneys may nevertheless recognize that the limited case law in their jurisdiction will preclude them from being able to identify "clearly established law." Or, the cost and uncertainty inherent in the doctrine might mean that prosecuting a Section 1983 case is simply not worth the time and effort even if an attorney could, in principle, prevail on the merits.

This question is difficult to measure rigorously, of course, because there is no comprehensive database of civil rights cases that were never brought. But the anecdotal experience of civil rights attorneys nevertheless suggests that qualified immunity functions as a substantial filter. For example, in 2011 Alexander Reinert identified more than 40 attorneys or law firms who had experience with multiple civil rights

cases from 2006 through 2011 and interviewed them about screening factors. He reported that "[n]early every respondent, regardless of the breadth of her experience, confirmed that concerns about the qualified immunity defense play a substantial role at the screening stage," and that for some it was "the primary factor when evaluating a case for representation."[66]

## THE MORAL FAILURES OF QUALIFIED IMMUNITY

### Regularly Denies Justice to Victims of Egregious Misconduct

Even setting aside its legal and doctrinal shortcomings, the most obvious and serious consequence of qualified immunity is that the doctrine routinely leaves individuals whose rights are violated without any legal remedy. And given how the "clearly established law" test works in practice, whether victims of official misconduct will get redress from their injury turns not on whether state actors broke the law, nor even on how serious their misconduct was, but simply on the happenstance of whether the case law in their jurisdiction happens to include prior cases with fact patterns that match their own.

To illustrate the absurdity of this principle, consider that if a Texarkana resident's rights have been violated by local law enforcement, whether or not that resident could successfully sue for relief under Section 1983 might well turn on whether the misconduct occurred in Texas (the Fifth Circuit) or Arkansas (the Eighth Circuit).

Perhaps most disturbingly, in light of the Supreme Court's insistence that "clearly established law" be "particularized" to the facts of a case, the doctrine can actually have the perverse effect of making it harder to overcome qualified immunity the more egregious the misconduct is—precisely because extreme, egregious misconduct is less likely to have arisen in prior cases than more run-of-the-mill misconduct. To demonstrate this point, consider the following recent cases, all of which

resulted in grants of qualified immunity simply because the precise misconduct at issue had not previously been held unlawful. (Again, the facts in these cases are presented in the light most favorable to the plaintiffs.)

JESSOP V. CITY OF FRESNO. Police officers executing a search warrant in relation to alleged illegal gambling machines produced an inventory sheet stating that they had seized $50,000 from the suspects. But the officers had actually seized $151,380 in cash and another $125,000 in rare coins and simply pocketed the difference between what they seized and what they reported—effectively using a search warrant to steal more than $225,000.

The Ninth Circuit granted immunity to the officers. The court noted that while "the theft" of "personal property by police officers sworn to uphold the law" may be "morally wrong," the officers could not be sued for the theft because the Ninth Circuit had never issued a decision specifically involving the question of "whether the theft of property covered by the terms of a search warrant, and seized pursuant to that warrant, violates the Fourth Amendment."[67]

CORBITT V. VICKERS. Police officers pursued a criminal suspect, Christopher Barnett, into the backyard of Amy Corbitt (who had no relation to Barnett), at which time one adult and six minor children were in the yard. The officers demanded they all get on the ground; everyone immediately complied and the police took Barnett into custody. But then the Corbitt family's dog Bruce walked into the scene. Without provocation or any immediate threat, Michael Vickers, a deputy sheriff, fired his weapon at Bruce. His first shot missed, and Bruce retreated under the home. About 10 seconds later, Bruce reappeared and Vickers fired again—missing once more, but this time striking Corbitt's 10-year-old child, who was still lying on the ground, only 18 inches away from the officer. The child suffered severe pain and mental trauma and is receiving ongoing care from an orthopedic surgeon.

The Eleventh Circuit granted qualified immunity to Vickers on the grounds that no prior case law involved the "unique facts of this case." Although the panel majority dutifully recited Supreme Court precedent purporting to say that overcoming qualified immunity does not require that "the very action in question has previously been held unlawful," the court went on to say that "[n]o case capable of clearly establishing the law for this case holds that a temporarily seized person—as was [the child] in this case—suffers a violation of his Fourth Amendment rights when an officer shoots at a dog—or any other object—and accidentally hits the person." One judge did dissent, and would have denied qualified immunity on the seemingly obvious grounds that "no competent officer would fire his weapon in the direction of a nonthreatening pet while that pet was surrounded by children," but that position did not prevail.[68]

KELSAY V. ERNST. Melanie Kelsay was swimming at a public pool with a friend, engaged in what she called "horseplay," but some onlookers thought her friend might be assaulting her and called the police. The police arrested her friend and put him a patrol vehicle, even though she repeatedly told them he hadn't assaulted her; they then decided to arrest her, the alleged victim of this non-crime, because she was "getting in the way of the patrol vehicle door." While talking with Deputy Matt Ernst, Kelsay saw that her daughter had gotten into an argument with a bystander, and tried to go check on her. Ernst grabbed her arm and told her to "get back here," but released her. Kelsay then said she needed to go check on her daughter and again began walking toward her. At that point, without giving any further instructions, Ernst ran up behind her, grabbed her, and slammed her to the ground in a "blind body slam" maneuver, knocking her unconscious and breaking her collarbone.

A divided panel of the Eighth Circuit granted qualified immunity to Ernst. The Eighth Circuit then agreed to rehear the case en banc and affirmed the panel's grant of immunity in an 8–4 decision. The majority noted that there were no prior cases involving the "particular circumstances" of this case; that is, no prior cases specifically held that "a deputy was forbidden

**In *Corbitt v. Vickers*, the Eleventh Circuit granted qualified immunity to Deputy Sheriff Michael Vickers on the grounds that no prior case law involved the 'unique facts' of the *Vickers* case.**

12

> "Qualified immunity also hurts police officers themselves—most notably by depriving officers of the public trust and confidence that is necessary for them to do their jobs safely and effectively."

to use a takedown maneuver to arrest a suspect who ignored the deputy's instruction to 'get back here' and continued to walk away from the officer." The principal dissent by Chief Judge Lavenski Smith noted that that the Supreme Court has never required "a case directly at point," and that here, an ample body of case law would have "put a reasonable officer on notice that the use of force against a nonthreatening misdemeanant who was not fleeing, resisting arrest, or ignoring other commands violates that individual's right to be free from excessive force." But again, this position did not prevail.[69]

*ALLAH V. MILLING.* In October 2010 a man named Almighty Supreme Born Allah was being held in prison awaiting trial for drug charges. Prison guards kept Allah in solitary confinement for more than a year and forced him to wear leg irons and underwear while showering. This torturous treatment was due entirely to one incident of supposed misconduct by Allah—he once asked a guard if he could speak to a lieutenant about why he wasn't being allowed to visit the commissary.

Following a two-day bench trial, the district court found that the defendants had violated Allah's due process rights, and even denied them qualified immunity, issuing a $62,650 judgment. But the Second Circuit reversed this decision. The appellate court agreed that the prison guards violated Allah's rights, specifically holding that this treatment was unlawful punishment because Allah's treatment "cannot be said to be reasonably related to institutional security, and Defendants have identified no other legitimate governmental purpose justifying the placement." Nevertheless, the court said the guards were entitled to immunity because there was no prior case concerning the particular disciplinary practice employed by the prison.[70]

### Exacerbates Crisis of Accountability in Law Enforcement

Especially in the context of law enforcement officers, qualified immunity most visibly and obviously redounds to the detriment of the victims of police misconduct. But

qualified immunity also hurts police officers themselves—most notably by depriving officers of the public trust and confidence that is necessary for them to do their jobs safely and effectively.

Although only a small proportion of officers are involved in fatal encounters in any given year, that fraction still generates a huge number of fatalities in absolute terms.[71] For example, between 2015 and 2017, police officers fatally shot nearly a thousand Americans each year,[72] with tens of thousands more wounded.[73] And the widespread prevalence of cellphones, combined with the ability to share videos on YouTube and other social media, means that footage of police shootings are being documented and shared like never before.[74] It is therefore unsurprising that, as word and video of police misconduct has spread, faith in law enforcement has plummeted. Indeed, in 2015, Gallup reported that public trust in police officers had reached a 22-year low.[75]

Of course, one might object that it is unfair to hold all police officers in disrepute simply because of certain highly publicized (but relatively rare) fatal encounters. But what exacerbates this crisis of confidence is the widespread—and accurate—perception that members of law enforcement will almost never be held accountable, even when they commit seemingly flagrant misconduct. Indeed, police officers themselves share this assessment—in a 2017 survey of more than 8,000 officers, 72 percent disagreed with the statement that "officers who consistently do a poor job are held accountable."[76]

This lack of meaningful accountability is a problem not just for the general public, but for the law enforcement community as well. Policing is dangerous, difficult work. Without the trust of their communities, officers cannot safely and effectively carry out their responsibilities. Unsurprisingly then, public perception of accountability is absolutely essential to police effectiveness.[77] When people sense that police can break the law with impunity, it undermines their respect for the rule of law in general and increases the chance that they will

refuse legal directives.[78] And in the wake of so many high-profile police shootings, police officers overwhelmingly report both that their jobs are more dangerous and more difficult.[79]

The antidote to this crisis, of course, is robust, predictable accountability—indeed, it is exactly the sort of accountability that Section 1983 is supposed to provide, but which qualified immunity severely undercuts. If police officers could credibly say "yes, there are bad actors in the system, but most of us do our jobs professionally, and anyone who steps out of line *will* be held to account," that would go a long way toward restoring trust and confidence in law enforcement.

But in a system in which the judges routinely excuse egregious police misconduct on the grounds that there did not happen to be any prior cases with the same basic facts, then no one in law enforcement can credibly make the above statement. In other words, qualified immunity prevents responsible law enforcement officers from overcoming negative perceptions about policing, and instead protects only the minority of police who routinely break the law, thereby eroding relationships between police and their communities.

### Widespread Judicial Criticism

Even though qualified immunity is a judicial invention, its legal, practical, and moral infirmities have not gone unnoticed by members of the judiciary. In addition to all the current and former U.S. Supreme Court justices who have taken issue with the doctrine, a large and diverse array of lower-court judges have begun to criticize it as well, with many explicitly calling for the Supreme Court to reconsider qualified immunity entirely. To give just a few notable examples:

- Judge Don Willett, a Trump appointee to the Fifth Circuit, explained how "[t]o some observers, qualified immunity smacks of unqualified impunity, letting public officials duck consequences for bad behavior—no matter how palpably unreasonable—as long as they were the

*first* to behave badly," and he sharply noted that "this entrenched, judge-created doctrine excuses constitutional violations by limiting the statute Congress passed to redress constitutional violations."[80]

- Judge James Browning, a George W. Bush appointee to the District of New Mexico, has issued several opinions that include a blistering criticism of the Supreme Court's "clearly established law" standard, and cites the Cato Institute's amicus briefs for the argument that "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based."[81]

- Judge Lynn Adelman, a Clinton appointee to the Eastern District of Wisconsin, wrote an article for *Dissent* magazine titled "The Supreme Court's Quiet Assault on Civil Rights," in which he argued that "[o]f all the restrictions that the Court has imposed on [Section 1983] . . . the one that has rapidly become the most harmful to the enforcement of constitutional rights is the doctrine of qualified immunity."[82] Adelman also participated in a Cato Institute forum on qualified immunity in March 2018, in which he elaborated on the legal, doctrinal, and practical problems with qualified immunity.[83]

These are but a few examples, and the number of federal judges who are speaking out against qualified immunity is rapidly growing.[84] To underscore the incredible ideological breadth of the opposition to qualified immunity, it is worth noting that the judicial critics of the doctrine now include nominees of every single president since Carter.

## ALTERNATIVES TO QUALIFIED IMMUNITY

### Complete Abolition

The starting point for any discussion about how to address qualified immunity

> " Even though qualified immunity is a judicial invention, its legal, practical, and moral infirmities have not gone unnoticed by members of the judiciary. "

14

**"Outright abolition of qualified immunity would give concrete form to the axiomatic legal principle that for every right, there is a remedy."**

should be total elimination of the doctrine. Under the plain terms of Section 1983, and in accordance with the common-law background against which that statute was passed, any state actor who violates someone's constitutional rights is supposed to be "liable to the party injured"—period. Outright abolition of qualified immunity would give concrete form to the axiomatic legal principle that for every right, there is a remedy. It would also maximally encourage public accountability—especially among members of law enforcement—by ensuring that all government agents take seriously their independent obligations to understand and abide by constitutional limitations. In other words, "the courts didn't tell me not to do it!" would not be a sufficient excuse for public officials who break the law.

Either the Supreme Court or Congress could easily eliminate qualified immunity. On the judicial side, civil rights plaintiffs are increasingly filing petitions for certiorari with the Supreme Court, explicitly asking for the Court to reconsider the doctrine—although so far the Court has turned down all of these petitions.[85] But all the Court would need to do is grant one of these petitions and hold that Section 1983 does not provide for qualified immunity, or any other general, across-the-board good-faith defense.

From a legislative perspective, the most natural and straightforward way for Congress to eliminate the defense of qualified immunity would be to amend Section 1983 by adding an additional subsection that states as follows:

> It shall not be a defense to any action brought under this section that the defendant was acting in good faith, or that the defendant believed, reasonably or otherwise, that his or her conduct was lawful at the time when it was committed. Nor shall it be a defense that the rights, privileges, or immunities secured by the Constitution and laws were not clearly established at the

time of their deprivation by the defendant, or that at this time, the state of the law was otherwise such that the defendant could not reasonably have been expected to know whether his or her conduct was lawful.

This potential language specifically identifies and negates both versions of qualified immunity that the Supreme Court has articulated: the subjective good-faith understanding of the defense that prevailed from 1967 until 1982, and the objective, "clearly established law" understanding, that the Court officially adopted in *Harlow* in 1982. If enacted, such an amendment would effectively eliminate the defense of qualified immunity as we know it and restore the general principle that Section 1983 means what it says—that when state actors violate constitutional or federal rights, they are liable to the party injured.

The suggested language above is written in terms of a negation of a defense ("it shall not be a defense that . . .") as opposed to an affirmative statement of liability (e.g., "any person who causes the violation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable under this Section, regardless of whether such rights, privileges, or immunities were clearly established"). The advantage of this approach is that it cleanly addresses the doctrine of qualified immunity, without either endorsing or eliminating other doctrines that the Supreme Court has developed with respect to Section 1983, and civil rights litigation generally.

For example, the Supreme Court has held that legislators and judges are absolutely immune from liability under Section 1983 because such immunities were well established at common law in 1871.[86] These doctrines—unlike qualified immunity—actually *do* have support in the common-law history, and in practice they do not seem to create the same hurdles to meritorious civil rights litigation that qualified immunity does. The proposed language above would not implicate these doctrines

because these specific defenses do not arise from the subjective beliefs of the defendants or the state of the law—they are simply absolute defenses for the official acts of public agents in specific roles.

The Supreme Court has also held that prosecutors are absolutely immune from suits relating to the "judicial phase of the criminal process,"[87] although not from suits relating to the "investigative phase of a criminal case" (e.g., advising the police).[88] But absolute prosecutorial immunity—much like qualified immunity generally—is textually and historically unsupported, and is essentially the product of the Supreme Court reading into Section 1983 a policy judgment at odds with the plain terms of the statute.[89]

Prosecutorial immunity is a significant problem in its own right, as it corrodes prosecutorial accountability and leaves victims without redress even for the most obvious and egregious constitutional violations—for example, willfully withholding exculpatory evidence from innocent defendants that leads to a wrongful conviction.[90] Ideally, Congress would amend Section 1983 to eliminate absolute prosecutorial immunity along with qualified immunity. But a full treatment of that subject is beyond the scope of this paper. The proposed amendment above neither eliminates nor modifies prosecutorial immunity (because such immunity arises from the prosecutor's role in judicial proceedings, not subjective beliefs or the state of the law), nor does it endorse the current state of the doctrine—it simply leaves that fight for another day.

Additionally, the proposed amendment would not affect qualified immunity for federal officers in damages actions brought under the doctrine articulated in *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*.[91] The Supreme Court has applied qualified immunity equally in both Section 1983 suits and *Bivens* actions, notwithstanding that the former cause of action was created by Congress and the latter was (arguably) invented by the Supreme Court. But the proposed amendment here is specific to "any action brought under this section" and thus would not affect the defenses available in *Bivens* actions, which are not brought under Section 1983.[92]

Whether federal defendants should receive qualified immunity is, of course, an important question in its own right—but it is made more complicated by the fact that Congress has never expressly endorsed the cause of action to which federal qualified immunity is a defense in the first place. As with prosecutorial immunity, the question of whether there ought to be a cause of action against federal officers analogous to Section 1983—and what defenses should exist for such suits—is beyond the scope of this paper. The proposed amendment would simply leave those questions for another day.

Finally, the proposed amendment would not affect municipal liability, often called "*Monell* liability," from the Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). At common law, the traditional rule for employer liability was *respondeat superior* ("let the master answer"), meaning that employers are liable for the acts of their employees committed in the course of their employment. But in *Monell*, the Court held that this doctrine does not apply to municipal employers under Section 1983—in other words, just because a municipal employee commits a constitutional violation does not mean that the municipality itself is liable. Instead, a plaintiff must also show that the violation was committed pursuant to an official "policy or custom" of the municipal body.

It is debatable whether the *Monell* Court was correct in interpreting Section 1983 as eliminating *respondeat superior*.[93] And making municipal employers liable for the illegal conduct of their employees may itself be a promising strategy for increasing accountability.[94] But again, the proposed amendment would leave this issue to the side for now, neither endorsing nor rejecting the *Monell* doctrine.

> "Making municipal employers liable for the illegal conduct of their employees may itself be a promising strategy for increasing accountability."

16

> **There are alternatives to outright abolition of qualified immunity that would eliminate immunity in many cases yet preserve a modified version of the defense for relatively more sympathetic defendants.**

### Abolition, Except for Limited Safe Harbors

While complete elimination of qualified immunity is probably the optimal solution, there are alternatives to outright abolition that eliminate immunity in the mine-run of cases but nevertheless preserve a modified version of the defense for relatively more sympathetic defendants—most notably, where a defendant's conduct is specifically authorized by a statute that has yet to be found unconstitutional, or where the defendant was acting in accord with judicial precedent applicable at the time of the conduct.

For example, in *Pierson v. Ray*—the Supreme Court case that marked the genesis of qualified immunity—the defendants were police officers who arrested several people in 1961, pursuant to a Mississippi anti-loitering statute. Four years later, the Supreme Court held that this same anti-loitering statute violated the First Amendment.[95] Even though the historical rule for constitutional violations was strict liability, one can understand the seeming unfairness in finding the defendants liable when their only conduct alleged to be illegal was executing a statute they reasonably believed to be lawful at the time.

Similarly, it is easier to be sympathetic to defendants who act in accord with judicial precedent that is subsequently reversed or overturned after the alleged violation occurred. For example, in *Arizona v. Gant*, the Supreme Court held that the power of police to conduct a search incident to an arrest does not permit them to search a suspect's car after the suspect is already removed from the car and restrained.[96] This decision arguably reversed a prior case, *New York v. Belton*, which most lower courts had interpreted as authorizing searches in such instances. Again, there is a seeming unfairness in holding police liable for conducting such searches pre-*Gant*, given that most courts had found such searches to be constitutional in this time period.[97]

Of course, executive officers—no less than legislators or judges—have an independent obligation to enforce and respect constitutional limitations, and it could be argued that strict liability for constitutional violations is the rule that best encourages law enforcement to take this obligation seriously. But as a compromise measure, it would be possible to amend Section 1983 to permit immunity in these limited instances, while still eliminating qualified immunity in its broader form.

Specifically, Congress might clarify that defendants are not liable when either their conduct was specifically authorized by a state or federal statute, and no court in their jurisdiction had found the statute unlawful, or when a court in their jurisdiction had specifically found the conduct at issue to be lawful when it was committed (even if that decision was subsequently reversed). This approach would preserve immunity in those relatively rare—but more sympathetic—cases in which defendants are specifically acting in *accordance* with clearly established law, but it would still have a major effect on run-of-the-mill civil rights claims, which are typically very fact- and context-specific and would not fall within one of these safe-harbor provisions.

### Possible Indemnification

Whether qualified immunity is substantially cut back or wholly abolished, it is important to keep in mind that just because a defendant is liable under Section 1983 does not necessarily mean the defendant will end up personally paying the entire amount of any judgment. After all, state and local actors could still be indemnified, meaning that their government employers would end up paying some or all of the judgment owed to successful civil rights plaintiffs. Historically, indemnification, rather than immunity, is the principled way in which Congress adjudicated between the competing concerns of ensuring that victims of official misconduct had a complete remedy for their injury and mitigating the harshness of strict liability in cases where federal officials made "reasonable" mistakes.[98]

17

Today, especially in the context of law enforcement, defendants are virtually always indemnified. In a recent study, Joanna Schwartz demonstrated that governments paid approximately 99.98 percent of the dollars that civil rights plaintiffs recovered in lawsuits against police officers.[99] This result is partially explained by the incredible political influence of police unions, which nearly always succeed in securing indemnification and representation for their members. Therefore, the primary immediate effect of eliminating qualified immunity would not be to subject individual defendants to massive personal liability but rather to ensure that victims of unconstitutional misconduct obtain a remedy.

To be sure, automatic indemnification is itself far from an ideal solution. If indemnification is all but guaranteed, then liability may not actually do much to further accountability because state officials will know that, even if they are successfully sued, they will not personally be on the hook for any substantial portion of the judgment. Moreover, automatic and total indemnification by municipal employers simply shifts the burden of paying for judgments from individual defendants to the taxpayers at large, which is not an improvement.

The optimal way to structure possible indemnification is itself a complicated policy judgment, the full consideration of which is beyond the scope of this paper. But one promising idea would be a requirement that law enforcement officers—like basically all other professionals whose jobs entail a risk to the public—carry liability insurance.[100] That approach would have the benefits of ensuring that there would be funds to compensate victims, protecting individual defendants from ruinous judgments, and pricing out those particular officers who regularly commit constitutional violations by making them uninsurable. Alternatively, municipal employers might agree to indemnification provisions, but only under circumstances akin to the safe-harbor conditions described above—that is, where defendants are relying

in good faith on specific statutes or judicial precedents that were reasonably believed to be lawful at the time of any constitutional violation.

## RESPONSES TO COMMON OBJECTIONS

### "Isn't it unfair to hold public officials liable when the law isn't sufficiently clear?"

Even if qualified immunity could be defended on this basis, it is worth noting what an incredible double standard this represents between government agents and everyone else. Ordinary citizens are subject to the well-known legal maxim that "ignorance of the law is no excuse."[101] If anything, one would expect law enforcement—public officials specifically charged with knowing and enforcing the law—to be held to a higher standard of care than ordinary citizens. But in fact, they are held to a far lower standard. Ignorance of the law is no excuse—unless you wear a badge.

Still, putting aside the double standard, this concern is at least reasonable in the abstract. And if qualified immunity were limited to instances where public officials were genuinely acting in good faith, or were relying on judicial precedent specifically authorizing their conduct (even if courts later revised that precedent), then it would not be as serious a problem—although it would still be inconsistent with the relevant legal history and the plain terms of Section 1983.

But qualified immunity is not at all limited to such sympathetic circumstances. As discussed already, the case law reveals that it frequently is used to shield defendants who commit egregious misconduct—especially unnecessary and unlawful police shootings. Defendants in these cases are not excused from liability because they were reasonably acting in good faith, but just because there did not happen to be a particular prior case in the relevant jurisdiction with functionally

> **Today, especially in the context of law enforcement, defendants are virtually always indemnified.**

18

> " By definition, qualified immunity is unnecessary to screen out 'frivolous' lawsuits because the doctrine only matters when the underlying claim is itself meritorious. "

similar facts. Whatever the abstract merits of this objection, it simply does not reflect the reality of most qualified immunity litigation.

Finally, even if this were a reasonable policy argument, it is not appropriate for the courts to impose such a policy by judicial fiat. The intent of Congress—as clearly expressed in the plain terms of Section 1983—was to hold state actors liable when they violate people's constitutional rights. If there are good arguments for modifying or limiting that liability, it is for the people's legislative representatives to weigh and consider them, not the courts.

### "Won't the risk of liability deter police from doing their jobs?"

Police officers often have to make split-second decisions under dangerous, uncertain, and evolving conditions. Therefore, the argument goes, it is unreasonable to subject them to personal liability anytime they happen to make the wrong call, and imposing such liability may well deter them from doing their jobs at all.

To a certain extent, this concern is reasonable. But that is exactly why our legal standards for determining whether a constitutional violation occurred in the first place are highly deferential to on-the-spot police decisionmaking. The Supreme Court has made clear that the Fourth Amendment's "unreasonableness" standard must "allow[] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving" and cannot be judged with "the 20/20 vision of hindsight."[102] Even if police arrest the wrong person or use force that turns out to be unnecessary, so long as they were acting reasonably at the time, they did not violate the law at all. Qualified immunity only comes into play when an officer has acted objectively unreasonably under all the circumstances. In that situation, qualified immunity amounts to an unnecessary and inappropriate double counting of this deference.

More generally, however, the whole point behind Section 1983 is that we *want* public

officials to expect to face legal consequences when they violate constitutional rights. This statute is intended not just to provide redress to individual victims, but to ensure accountability at a structural level. To the extent that police or other state officials have reason to think that they are on the verge of acting unconstitutionally, the threat of civil liability may well cause them to think twice before engaging in potentially unlawful conduct. That is a feature, not a bug, of our civil rights laws.

### "Don't we need qualified immunity to deter frivolous lawsuits?"

Whether or not frivolous civil rights litigation is a problem at all, it is a red herring in any discussion of qualified immunity. Qualified immunity only does work in the instance where someone's constitutional rights have, in fact, been violated, but a court determines that those rights were not "clearly established" at the time of their violation. Therefore, by definition, qualified immunity is unnecessary to screen out "frivolous" lawsuits because the doctrine only matters when the underlying claim is itself meritorious. Indeed, dismissals on the ground of qualified immunity generally occur *after* discovery, which means the doctrine has failed at its goal of mitigating the time and cost of litigation for defendants.

The tools we use to address and deter frivolous litigation are entirely separate. Heightened pleading standards require plaintiffs to make specific, factual, nonconclusory allegations showing that they are entitled to relief.[103] Rule 11 of the Federal Rules of Civil Procedure requires attorneys to attest that they have a good-faith basis for the factual and legal arguments in all submitted pleadings, and it provides for sanctions if they fail to meet this standard.

Depending on the particular subject matter and context, more-stringent requirements may apply. For example, Rule 9(b) of the Federal Rules of Civil Procedure imposes extra pleading requirements for alleging fraud, the "anti-SLAPP" laws (legislation intended to reduce strategic lawsuits against public

19

participation) enacted by many states allow for early dismissal of frivolous defamation lawsuits, and the Prison Litigation Reform Act of 1996 limited the ability of prisoners to bring successive, nonmeritorious lawsuits.[104] So even assuming there is a problem with frivolous civil rights litigation generally, addressing it will require rules like these. But this issue is entirely unrelated to qualified immunity.

## "Isn't qualified immunity entitled to respect as judicial precedent?"

Stare decisis—Latin for "to stand by things decided"—is the general principle that judicial decisions should be guided by precedent and that courts should not lightly overrule past decisions even if there is reason to doubt their correctness. And the few defenders of qualified immunity rely heavily on this idea for their contention that the Supreme Court should not reconsider the doctrine; indeed, it is the first and central legal argument raised in Nielsen and Walker's "qualified" defense of qualified immunity.[105] But while stare decisis is an important idea, the Supreme Court has always made clear that it is not an "inexorable command" and that it can give way to countervailing considerations. And there are especially strong reasons for the Court to reconsider its qualified immunity jurisprudence.

First, stare decisis "does not matter for its own sake" but rather is important "because it 'promotes the evenhanded, predictable, and consistent development of legal principles.'" The rule therefore "allows [the Court] to revisit an earlier decision where experience with its application reveals that it is unworkable."[106] Qualified immunity is a textbook example of such an unworkable doctrine. As discussed previously, the "clearly established law" standard has proven hopelessly amorphous, malleable, and incapable of consistent application. The doctrine has therefore failed to provide the stability, predictability, and respect for judicial authority that comprise the traditional justifications for stare decisis in the first place.

Second, the Supreme Court has already rejected the idea that qualified immunity should be immune from reconsideration. In 1967, the *Pierson* Court created a good-faith defense to suits under Section 1983 after having rejected the existence of any such defenses half a century earlier in *Myers*. Then in 1982, the *Harlow* Court created the "clearly established law" standard, which replaced the requirement that a defendant have an actual good-faith belief in the legality of their conduct. And in 2001, the *Saucier* Court created a mandatory sequencing standard, requiring courts to first consider the merits and then consider qualified immunity, but then overruled *Saucier* just eight years later in *Pearson v. Callahan*, which made that sequencing optional.

Indeed, the *Pearson* Court explicitly considered and rejected the argument that stare decisis should prevent the Court from reconsidering its qualified immunity jurisprudence. The Court noted that the *Saucier* standard was a "judge-made rule" that "implicates an important matter involving internal Judicial Branch operations"; that "experience has pointed up the precedent's shortcomings"; and that in such an instance "[a]ny change should come from this Court, not Congress."[107] Of course, the same could be said of qualified immunity in general. It would be a strange principle of stare decisis that permitted modifications only as a one-way ratchet in favor of greater immunity (and against the grain of text and history to boot).

Third, as discussed above, qualified immunity is no mere technical error; it is a pernicious, destructive doctrine that regularly abets egregious constitutional violations and is actively undermining confidence in law enforcement nationwide.

## "If you abolish qualified immunity, wouldn't you need to reverse *Monroe v. Pape* as well?"

In response to the otherwise insurmountable assertion that modern qualified immunity lacks any plausible historical basis, some judges and commentators have employed a clever sideways defense of the doctrine. The basic argument is that, while qualified immunity

> **"It would be a strange principle of stare decisis that permitted modifications to qualified immunity only as a one-way ratchet in favor of greater immunity."**

20

"Despite its veneer of reasonableness, the two-wrongs-make-a-right theory is deeply flawed, both on its own terms and as a matter of principle."

itself may be unlawful, it is defensible as a kind of compensating correction for an entirely separate error that the Supreme Court made in *Monroe v. Pape*—a 1961 case holding that state actors can be liable under Section 1983, even when their actions were *not* authorized by state law.[108] For those who think *Monroe* was wrongly decided, that case erroneously expanded the reach of Section 1983; therefore, the argument goes, the fact that qualified immunity erroneously restricts the scope of Section 1983 may be tolerable under a kind of two-wrongs-make-a-right theory. Or, if the Supreme Court *does* decide to reconsider the legal and historical bases for qualified immunity, then it is bound, on pain of inconsistency, to reconsider *Monroe* as well.

This objection may sound like an abstruse academic rejoinder, but it is fast becoming one of the most popular defenses of qualified immunity from those who are otherwise inclined to take text and history seriously. Scalia first stated this argument in 1998, in his dissenting opinion in *Crawford-El v. Britton*,[109] but Nielsen and Walker also invoke it as part of their "qualified" defense of qualified immunity.[110] More recently, Judges James Ho and Andrew Oldham—self-proclaimed originalists on the Fifth Circuit—relied heavily on the alleged shortcomings of *Monroe* to rebut the suggestion of their fellow judge, Willett, that qualified immunity should be reconsidered.[111] Specifically, Ho and Oldham stated that, while they "welcome[d] the discussion" of qualified immunity's historical shortcomings, they believed a "principled originalist would not cherry pick which rules to revisit based on popular whim," and noted that "[i]f we're not going to do it right, then perhaps we shouldn't do it at all"—where "it" means to actually interpret statutes as they are written.

Despite its veneer of reasonableness, however, this two-wrongs-make-a-right theory is deeply flawed, both on its own terms and as a matter of principle.

First, the core premise behind this theory—that *Monroe v. Pape* was wrongly decided as a matter of law—is itself highly suspect,

as there is a very good originalist argument that *Monroe* was correct. To restate Scalia's (and by extension, Ho and Oldham's) criticism of *Monroe*: the text of Section 1983 creates liability for those who act "under color of any statute, ordinance, regulation, custom, or usage of any State." Thus, in Scalia's view, state officials can only be liable under Section 1983 if they were, in fact, acting in accordance with state law. Therefore, by holding that state officials could be liable even when their actions were *not* authorized by state law, the *Monroe* Court massively expanded liability under Section 1983, in contravention of the statutory language.

But the problem with this argument is that it glosses over the meaning of the phrase "under color of." After all, the statute could have been written to cover violations committed "*in accordance with* any statute, ordinance, regulation, custom, or usage, of any State." If that were what the statute said, Scalia's criticism of *Monroe* would be well taken. But, as a historical, originalist matter, that is simply not what the phrase "under color of" means. To the contrary, this phrase is a longstanding term-of-art that was well understood to encompass false claims to authority.

As detailed by Steven Winter in an article on exactly this subject, the use of this phrase goes back more than 500 years to an English bail-bond statute that voided obligations taken by sheriffs "by colour of their offices" if they failed to comply with statutory requirements.[112] In other words, it encompassed illegal acts by government agents who abused or exceeded their statutory authority—which is exactly the sort of unlawful conduct recognized by *Monroe*. Therefore, as opposed to Scalia's suggestion in *Crawford-El*, a faithfully originalist understanding of Section 1983 would seem to support the result in *Monroe*.[113] And if that is the case, then obviously the whole two-wrongs-make-a-right theory collapses.

Second, even assuming that *Monroe v. Pape* were wrongly decided, it hardly follows that the Supreme Court must reconsider that case if it decides to reconsider qualified immunity. *Monroe*, whether correct or not, meets all the

traditional criteria for respect as precedent: at the very least, the question is a close call on the merits, with persuasive arguments on either side; it has produced a clear, unambiguous rule, which lower courts routinely apply without any confusion or disagreement; and it has been thoroughly accepted by both the judiciary and the general public as legitimate and appropriate.

In sharp contrast, modern qualified immunity is at the opposite end of the spectrum on all of these criteria. The current version of the doctrine is utterly divorced from the text and history on which it is supposed to be based. The "clearly established law" standard has proven hopelessly amorphous, malleable, and incapable of consistent, predictable application in lower courts. And as evidenced by the diverse and growing chorus of judges, academics, and public-policy voices calling for the Supreme Court to revise or abolish the doctrine, it has hardly been accepted as legitimate. Thus, even if both *Monroe* and qualified immunity merit originalist criticism, there is a far stronger case for reexamining the latter than the former.

Third, setting aside the specific questions of whether *Monroe* was correct and how it compares to qualified immunity, we should reject the two-wrongs-make-a-right approach to judicial decisionmaking at a fundamental level. Of course the Supreme Court sometimes reaches the wrong answer, and sometimes those wrong answers will distort other areas of law. But in light of the inevitable disagreement over which cases are actually correct, the idea that "you got this case wrong so I'm allowed to get this other case wrong" is a license for endless, unresolvable turmoil. Suppose that qualified immunity itself has gone "too far"

in correcting for the supposed mistake in *Monroe*—are judges then licensed to distort the meaning of other statutes to fix this problem? What compensating errors will be necessary to address the distortion to those statutes? That way lies madness, not the rule of law.

Textualism and originalism, at their best, aim to provide principled, predictable, value-neutral means of deciding cases. Some questions will still be hard even under this approach, and how originalists should deal with nonoriginalist precedent is a famously thorny problem. But the best that judges can do is try to get the right answer in each case that comes before them—and the two-wrongs-make-a-right theory renders this principled approach impossible. Indeed, notwithstanding his opinion in *Cole v. Carson*, Ho, in particular, appears to have reversed course on this objection. More recently, in *City of Leander v. Horvath*, he plainly acknowledged that "there is no textualist or originalist basis to support a 'clearly established' requirement in § 1983 cases," and stated that the two-wrongs-make-a-right theory leads to "a false choice—not to mention a troubling one," noting that "[w]e can get *both* prongs of the doctrine right."[14] Just so.

## CONCLUSION

Qualified immunity is a legally baseless judicial invention. It has proven unworkable as a matter of judicial doctrine, it routinely denies justice to the victims of egregious misconduct, and it undermines public accountability across the board, especially for members of law enforcement. Whether through judicial reconsideration or legislative action, the time has come to abolish qualified immunity.

> "The best that judges can do is try to get the right answer in each case that comes before them—and the two-wrongs-make-a-right theory renders this principled approach impossible."

22

## NOTES

1. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803).

2. *The Federalist*, no. 48 (James Madison).

3. This paper refers to all historical versions of the statute anachronistically as "Section 1983," as the operative text has been, in relevant part, essentially identical through every iteration.

4. An Act to Enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for Other Purposes, ch. 22, § 1, 17 Stat. 13 (1871).

5. 42 U.S.C. § 1983.

6. *Forrester v. White*, 484 U.S. 219, 225–26 (1988).

7. *Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (quoting *Pierson v. Ray*, 386 U.S. 547, 554–55 (1967)).

8. Akhil Reed Amar, "Of Sovereignty and Federalism," *Yale Law Journal* 96, no. 7 (1987): 1506. Of course, prior to the passage of the Fourteenth Amendment, such "constitutional torts" were almost exclusively limited to federal officials, as the substantive protections of the Bill of Rights were not yet applicable against the states. *Barron v. Baltimore*, 32 U.S. 243, 250–51 (1833).

9. James E. Pfander, *Constitutional Torts and the War on Terror* (New York: Oxford University Press, 2017), pp. 3–14, 16–17; David E. Engdahl, "Immunity and Accountability for Positive Governmental Wrongs," *University of Colorado Law Review* 44 (1972): 14–21; and Ann Woolhandler, "Patterns of Official Immunity and Accountability," *Case Western Reserve Law Review* 37, no. 3 (1986): 414–22.

10. For a more complete analysis of this particular subject in the context of qualified immunity, see William Baude, "Is Qualified Immunity Unlawful?," *California Law Review* 106 (2018): 51–61.

11. *Little v. Barreme*, 6 U.S. (2 Cranch) 170 (1804).

12. *Little v. Barreme*, 6 U.S. (2 Cranch) at 179.

13. *Little v. Barreme*, 6 U.S. (2 Cranch) at 179.

14. *Little v. Barreme*, 6 U.S. (2 Cranch) at 179.

15. Engdahl, "Immunity and Accountability for Positive Governmental Wrongs," p. 19.

16. James E. Pfander and Jonathan L. Hunt, "Public Wrongs and Private Bills: Indemnification and Government Accountability in the Early Republic," *New York University Law Review* 85 (2010): 1867 (noting that, in the early republic and antebellum period, public officials succeeded in securing private legislation providing indemnification from Congress in about 60 percent of cases).

17. See *Miller v. Horton*, 26 N.E. 100, 100–01 (Mass. 1891) (Holmes, J.).

18. Max P. Rapacz, "Protection of Officers Who Act Under Unconstitutional Statutes," *Minnesota Law Review* 11 (1927): 585. See also Engdahl, "Immunity and Accountability for Positive Governmental Wrongs," p. 18 (a public official "was required to judge at his peril whether his contemplated act was actually authorized . . . [and] judge at his peril whether . . . the state's authorization-in-fact . . . was constitutional").

19. Baude, "Is Qualified Immunity Unlawful?," pp. 58–60.

20. Thomas M. Cooley, *A Treatise on the Law of Torts or the Wrong Which Arise Independently of Contract*, ed. John Lewis, 3rd ed. (Chicago: Callaghan and Company, 1906), p. 326 (quoting *Ball v. Rawles*, 28 P. 937 (Cal. 1892)).

21. 238 U.S. 368 (1915).

22. 238 U.S. at 371.

23. 238 U.S. at 378–79.

24. *Anderson v. Myers*, 182 F. 223, 230 (C.C.D. Md. 1910).

25. Baude, "Is Qualified Immunity Unlawful?," p. 58 (citation omitted).

26. 386 U.S. 547 (1967).

27. 386 U.S. at 556–57.

28. *Scheuer v. Rhodes*, 416 U.S. 232, 247–48 (1974).

29. 457 U.S. 800 (1982).

30. *Wood v. Strickland*, 420 U.S. 308, 321 (1975).

31. *Harlow*, 457 U.S. at 818.

32. Although *Harlow* specifically involved a suit against federal officers, under the doctrine articulated in *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971), the Court nevertheless indicated that the same standard of immunity would apply to state officers under Section 1983. See *Harlow*, 457 U.S. at 818 n.30.

33. See *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (defending qualified immunity on the ground that "[a]t common law, government actors were afforded certain protections from liability").

34. *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting).

35. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1871 (2017) (Thomas, J., concurring in part and concurring in the judgment).

36. *Crawford-El v. Britton*, 523 U.S. 574, 611 (1998) (Scalia, J., dissenting).

37. *Wyatt v. Cole*, 504 U.S. 158, 170 (1992) (Kennedy, J., concurring).

38. *Malley v. Briggs*, 475 U.S. 335, 342 (1986).

39. *White v. Pauly*, 137 S. Ct. 548, 552 (2017).

40. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

41. 751 F. App'x 869 (6th Cir. 2018).

42. *Campbell v. City of Springboro*, 700 F.3d 779, 789 (6th Cir. 2012).

43. *Baxter*, 751 F. App'x at 872 (emphasis added).

44. 878 F.3d 541 (6th Cir. 2017).

45. 878 F.3d at 552.

46. 878 F.3d at 552–53 (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 17 (6th Cir. 2012)).

47. 878 F.3d at 553.

48. 878 F.3d at 558 (Clay, J., concurring in part and dissenting in part).

49. 533 U.S. 194 (2001).

50. 555 U.S. 223 (2009).

51. See *Sims v. City of Madisonville*, 894 F.3d 632, 638 (5th Cir. 2018) (per curiam) ("This is the fourth time in three years that an appeal has presented the question whether someone who is not a final decisionmaker can be liable for First Amendment retaliation. . . . Continuing to resolve the question at the clearly established step means the law will never get established.").

52. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 263 (3d Cir. 2010); and *Szymecki v. Houck*, 353 F. App'x 852, 853 (4th Cir. 2009).

53. *Karns v. Shanahan*, 879 F.3d 504, 524 (3d Cir. 2018).

54. Aaron L. Nielsen and Christopher J. Walker, "The New Qualified Immunity," *Southern California Law Review* 89 (2015): 34–35.

55. 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States.").

56. Joanna C. Schwartz, "How Qualified Immunity Fails," *Yale Law Journal* 127, no. 1 (2017): 48–49.

57. *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2018–19 (2014); and *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

58. *Wheatt v. City of E. Cleveland*, No. 1:17-CV-377, 2017 U.S. Dist. LEXIS 200758, *8-9 (N.D. Ohio Dec. 6, 2017).

59. For discussions by judges, see *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring dubitante) ("[T]he 'clearly established' standard [is] neither clear nor established among our Nation's lower courts."); and *Golodner v. Berliner*, 770 F.3d 196, 205 (2d Cir. 2014) ("Few issues related to qualified immunity have caused more ink to be spilled over whether a particular right has been clearly established."). For discussions by commentators, see Alan K. Chen, "The Intractability of Qualified Immunity," *Notre Dame Law Review* 93, no. 5 (2018): 1951 (qualified immunity "has been a nightmare for litigators and judges who confront its implementation on a routine basis"); Erwin Chemerinsky, *Federal Jurisdiction*, 7th ed. (New York: Wolters Kluwer, 2016), p. 595 ("[T]here is

24

great confusion in the lower courts as to whether and when cases on point are needed to overcome qualified immunity."); and Schwartz, "How Qualified Immunity Fails," p. 75 ("[T]he restrictive manner in which [the court] defines 'clearly established law' . . . creates confusion in the lower courts.").

60. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

61. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

62. *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (quoting *White*, 137 S. Ct. at 551).

63. *White*, 137 S. Ct. at 552 (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

64. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 742).

65. From the last few years alone: compare, for example, *Demaree v. Pederson*, 887 F.3d 870, 884 (9th Cir. 2018) (denying immunity because of "a very specific line of cases . . . which identified and applied law clearly establishing that children may not be removed from their homes without a court order or warrant absent cogent, fact-focused reasonable cause to believe the children would be imminently subject to physical injury or physical sexual abuse"); with 887 F.3d at 891 (Zouhary, J., concurring and dissenting in part) (arguing that no case addressed "circumstances like these, where the type of abuse alleged is sexual exploitation, and it would take a social worker at least several days to obtain a removal order"); *Sims v. Labowitz*, 885 F.3d 254, 264 (4th Cir. 2017) (denying immunity because "well-established Fourth Amendment limitations . . . would have placed any reasonable officer on notice that [ordering a teenage boy to masturbate in front of other officers] was unlawful"); with 885 F.3d at 269 (King, J., dissenting) ("[N]o reasonable police officer or lawyer would have considered this search warrant . . . to violate a clearly established constitutional right."); *Young v. Borders*, 850 F.3d 1274, 1281 (11th Cir. 2017) (Hull, J., concurring in the denial of rehearing en banc) ("The dissents define clearly established federal law at too high a level of generality. . . ."); with 850 F.3d at 1292 (Martin, J., dissenting in the denial of rehearing en banc) ("In circumstances closely resembling this case, this Court held that an officer's use of deadly force was excessive even though the victim had a gun."). See also *Harte v. Bd. of Comm'rs*, 864 F.3d 1154, 1158, 1168, 1198 (10th Cir. 2017) (splintering the panel into three conflicting opinions on whether the various acts of misconduct violated clearly established law).

66. Alexander A. Reinert, "Does Qualified Immunity Matter?," *University of St. Thomas Law Journal* 8, no. 3 (2011): 492.

67. 936 F.3d 937 (9th Cir. 2019). On May 18, 2020, the Supreme Court decided not to review this case.

68. 929 F.3d 1304 (11th Cir. 2019). On June 15, 2020, the Supreme Court decided not to review this case.

69. 933 F.3d 975 (8th Cir. 2019) (en banc). On May 18, 2020, the Supreme Court decided not to review this case.

70. 876 F.3d 48 (2d Cir. 2017).

71. Gene Demby, "Some Key Facts We've Learned about Police Shootings over the Past Year," NPR, April 13, 2015.

72. Julie Tate et al., "Fatal Force," *Washington Post* database (last updated June 19, 2020).

73. Nathan DiCamillo, "About 51,000 People Injured Annually by Police, Study Shows," *Newsweek*, April 19, 2017.

74. Wesley Lowery, "On Policing, the National Mood Turns toward Reform," *Washington Post*, December 13, 2015.

75. Jeffery M. Jones, "In U.S., Confidence in Police Lowest in 22 Years," Gallup, June 19, 2015.

76. Rich Morin, Kim Parker, Renee Stepler, and Andrew Mercer, *Behind the Badge* (Washington: Pew Research Center, 2017), p. 40.

77. See Jack McDevitt, Russell Wolff, and Amy Farrell, *Promoting Cooperative Strategies to Reduce Racial Profiling* (Washington: Institute on Race and Justice, Northeastern University, 2008), pp. 20–21.

78. Fred O. Smith, Jr., "Abstention in a Time of Ferguson," *Harvard Law Review* 131, no. 6 (2018): 2356.

79. Morin et al., "Behind the Badge," pp. 65, 80.

80. *Zadeh v. Robinson*, 928 F.3d 457, 479, 480-81 (5th Cir. 2019).

81. *Manzanares v. Roosevelt County Adult Detention Ctr.*, 331 F.

Supp.3d 1260, 1294 n.10 (D.N.M. 2018).

82. Lynn Adelman, "The Supreme Court's Quiet Assault on Civil Rights," *Dissent*, Fall 2017.

83. See Jay Schweikert, "Qualified Immunity: The Supreme Court's Unlawful Assault on Civil Rights and Police Accountability," Cato Institute Policy Forum, March 1, 2018.

84. See also *Horvath v. City of Leander*, 946 F.3d 787, 801 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part) ("[T]here is no textualist or originalist basis to support a 'clearly established' requirement in § 1983 cases."); *Ventura v. Rutledge*, No. 1:17-cv-00237-DAD-SKO, 2019 U.S. Dist. LEXIS 119236, *26 n.6 (E.D. Cal. Jul. 17, 2019) ("[T]his judge joins with those who have endorsed a complete reexamination of [qualified immunity] which, as it is currently applied, mandates illogical, unjust, and puzzling results in many cases."); *Estate of Smart v. City of Wichita*, No. 14-2111-JPO, 2018 U.S. Dist. LEXIS 132455, *46 n.174 (D. Kan. Aug. 7, 2018) ("[T]he court is troubled by the continued march toward fully insulating police officers from trial—and thereby denying any relief to victims of excessive force—in contradiction to the plain language of the Fourth Amendment."); *Thompson v. Clark*, No. 14-CV-7349, 2018 U.S. Dist. LEXIS 105225, *26 (E.D.N.Y. June 11, 2018) ("The legal precedent for qualified immunity, or its lack, is the subject of intense scrutiny."); Jon O. Newman, "Here's a Better Way to Punish the Police: Sue Them for Money," *Washington Post*, June 23, 2016 (article by senior judge on the Second Circuit); and Stephen Reinhardt, "The Demise of Habeas Corpus and the Rise of Qualified Immunity: The Court's Ever Increasing Limitations on the Development and Enforcement of Constitutional Rights and Some Particularly Unfortunate Consequences," *Michigan Law Review* 113, no. 7 (2015): 1219 (article by former judge of the Ninth Circuit).

85. See Jay Schweikert, "The Supreme Court's Dereliction of Duty on Qualified Immunity," Unlawful Shield, June 15, 2020.

86. See *Tenney v. Brandhove*, 341 U.S. 367, 372–76 (1951) (legislators); and *Pierson v. Ray*, 386 U.S. 547, 553–55 (1967) (judges).

87. *Imbler v. Pachtman*, 424 U. S. 409, 430 (1976).

88. *Burns v. Reed*, 500 U.S. 478, 493 (1991).

89. See *Kalina v. Fletcher*, 522 U.S. 118, 131–34 (1997) (Scalia, J., joined by Thomas, J., concurring) (arguing that the Court in *Imbler* misunderstood 1871 common-law rules).

90. See *United States v. Olsen*, 737 F.3d 625, 631–32 (2013) (Kozinski, C. J., dissenting from order denying petition for rehearing en banc) (collecting federal and state cases in which courts have vacated convictions and ordered new trials due to the suppression of exculpatory material).

91. 403 U.S. 388 (1971).

92. See *Harlow v. Fitzgerald*, 457 U.S. 800, 809 (1982).

93. See *Oklahoma City v. Tuttle*, 471 U.S. 808, 834–42 (1985) (Stevens, J., dissenting) (explaining how Section 1983 is best read as incorporating the well-established common law doctrine of *respondeat superior*).

94. See Adelman, "The Supreme Court's Quiet Assault on Civil Rights" ("Many of the problems [with qualified immunity] would go away if the law were changed so that the *respondeat superior* doctrine applied to constitutional torts.").

95. *Thomas v. Mississippi*, 380 U.S. 524 (1965).

96. 556 U.S. 332 (2009).

97. 453 U.S. 454 (1981).

98. Pfander and Hunt, "Public Wrongs and Private Bills," p. 1867.

99. Joanna C. Schwartz, "Police Indemnification," *New York University Law Review* 89, no. 3 (June 2014): 885.

100. See Clark Neily, "Make Cops Carry Liability Insurance: The Private Sector Knows How to Spread Risks, and Costs," *New York Daily News*, March 29, 2018.

101. *Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015).

102. *Graham v. Connor*, 490 U.S. 386, 397 (1989).

103. See *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

104. 28 U.S.C. § 1915(g).

105. Aaron L. Nielsen and Christopher J. Walker, "A Qualified Defense of Qualified Immunity," *Notre Dame Law Review* 93

26

(2018): 1856.

106. *Johnson v. United States*, 135 S. Ct. 2551, 2562 (2015) (quoting *Payne v. Tennessee*, 501 U.S. 808, 827 (1991)).

107. *Pearson v. Callahan*, 555 U.S. 223, 233–34 (2009).

108. 365 U.S. 167 (1961).

109. 523 U.S. 574, 611 (1991) (Scalia, J., dissenting).

110. Nielsen and Walker, "A Qualified Defense of Qualified Immunity," pp. 1868–72.

111. See *Cole v. Carson*, 935 F.3d 444, 477–79 (5th Cir. 2019) (en banc) (Ho & Oldham, J., dissenting).

112. Steven L. Winter, "The Meaning of 'Under Color of' Law," *Michigan Law Review* 91, no. 3 (1992): 342–46.

113. Nielsen and Walker, to their credit, explicitly discuss this rejoinder and thus acknowledge that "there is historical support for *Monroe*'s reading of 'under color of,'" although they discuss reasons why "this defense may not be bulletproof." Nielsen and Walker, "A Qualified Defense of Qualified Immunity," pp. 1868–69.

114. *Horvath v. City of Leander*, 946 F.3d 787, 801, 803 (5th Cir. 2020) (Ho, J., concurring in the judgment in part and dissenting in part).

## RELATED PUBLICATIONS
## FROM THE CATO INSTITUTE

**Poll: 63% of Americans Favor Eliminating Qualified Immunity for Police** by Emily Ekins, Survey Report (July 16, 2020)

***Corbitt v. Vickers*** by Clark Neily and Jay Schweikert, Legal Briefs (December 20, 2019)

***Pauly v. White*** by Clark Neily and Jay Schweikert, Legal Briefs (March 2, 2018)

**Watching the Watchmen: Best Practices for Police Body Cameras** by Matthew Feeney, Policy Analysis no. 782 (October 27, 2015)

**The Militarization of America's Police Forces** by Radley Balko, *Cato's Letter* 11, no. 4 (Fall 2013): 1–5.

## RECENT STUDIES IN THE
## CATO INSTITUTE POLICY ANALYSIS SERIES

900. **Democrats and Trade 2021: A Pro-Trade Policy for the Democratic Party** by James Bacchus (August 11, 2020)

899. **Health Care Workforce Reform: COVID-19 Spotlights Need for Changes to Clinician Licensing** by Shirley Svorny and Michael F. Cannon (August 4, 2020)

898. **How Property and Civil Rights Help Forest Tribes Modernize and Prosper: Lessons from India** by Swaminathan S. Anklesaria Aiyar and Neeraj Kaushal (July 30, 2020)

897. **Neo-Malthusianism and Coercive Population Control in China and India: Overpopulation Concerns Often Result in Coercion** by Chelsea Follett (July 21, 2020)

896. **Tariffs by Fiat: The Widening Chasm between U.S. Antidumping Policy and the Rule of Law** by Daniel J. Ikenson (July 16, 2020)

895. **Testing the "China Shock": Was Normalizing Trade with China a Mistake?** by Scott Lincicome (July 8, 2020)

894. **Kicking the Habit: The Opioid Crisis and America's Addiction to Prohibition** by Josh Bowers and Daniel Abrahamson (June 29, 2020)

893. **Nuclear Anti-Proliferation Policy and the Korea Conundrum: Some Policy Proposals** by John Mueller (June 22, 2020)

892. **"Money as a Weapons System": The Promises and Pitfalls of Foreign Defense Contracting** by Renanah Miles Joyce and Brian Blankenship (June 3, 2020)

891. **Rightsizing Fed Ed: Principles for Reform and Practical Steps to Move in the Right Direction** by Mary Clare Amselem, Lindsey Burke, Jonathan Butcher, Jamie Gass, Neal McCluskey, and Theodor Rebarber (May 4, 2020)

890. **Illegal Immigrant Incarceration Rates, 2010–2018: Demographics and Policy Implications** by Michelangelo Landgrave and Alex Nowrasteh (April 21, 2020)

889. **Transit: The Urban Parasite** by Randal O'Toole (April 20, 2020)

888. **The Case for Congressional Regulatory Review** by William Yeatman (April 14, 2020)

887. **The Development Dimension: What to Do about Differential Treatment in Trade** by James Bacchus and Inu Manak (April 13, 2020)

886. **Environmental Costs of the Jones Act** by Timothy Fitzgerald (March 2, 2020)

885. **Maryland's BOOST Is Promising, but More Work Is Needed** by Russell Rhine (February 26, 2020)

884. **Ineffective, Immoral, Politically Convenient: America's Overreliance on Economic Sanctions and What to Do about It** by Richard Hanania (February 18, 2020)

883. **The More Things Change, the More They Stay the Same: The Failure of Regime-Change Operations** by Benjamin Denison (January 6, 2020)

882. **Rust Buckets: How the Jones Act Undermines U.S. Shipbuilding and National Security** by Colin Grabow (November 12, 2019)

881. **Exploring Wealth Inequality** by Chris Edwards and Ryan Bourne (November 5, 2019)

## CITATION

Schweikert, Jay R. "Qualified Immunity: A Legal, Practical, and Moral Failure," Policy Analysis no. 901, Cato Institute, Washington, DC, September 14, 2020. https://doi.org/10.36009/PA.901.



The views expressed in this paper are those of the author(s) and should not be attributed to the Cato Institute, its trustees, its Sponsors, or any other person or organization. Nothing in this paper should be construed as an attempt to aid or hinder the passage of any bill before Congress. Copyright © 2020 Cato Institute. This work by the Cato Institute is licensed under a Creative Commons Attribution-NonCommercial-ShareAlike 4.0 International License.

# EXHIBIT H

Case Law regarding Judges who deprive citizens of their basic constitutional rights:

1.   When a judge knows that he lacks jurisdiction, or acts in the face of clearly valid statutes expressly depriving him of jurisdiction, judicial immunity is lost. Rankin v. Howard, (1980) 633 F.2d 844, cert den, Zeller v. Rankin, 101 S.Ct. 2020, 451 U.S. 939, 68 L.Ed 2d 326.
2.  The second prong necessary to absolute judicial immunity is missing. Stump v. Parkman, id., 435 U.S. 349
3.  "Where there is no jurisdiction there can be no discretion, of discretion is incident to jurisdiction." Piper v. Pearson, 2 Gray 120, also cited in Bradley v. Fisher, 13 Wall. 335, 20 L.Ed 646 (1872)
4.  "No judicial  process, whatever form it may assume, can have any lawful authority outside of the limits of jurisdiction of the court or judge by whom it is issued; and an attempt to enforce it beyond these boundaries is nothing less than lawless violence." Ableman v. Booth, 21 Howard 506 (1859)
5.  No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government from the highest to the lowest, are creatures of the law, and are bound to obey it. United States v. Lee, 106 U.S. 196, 220, 1 S.Ct 240, 27 L. Ed. 171(1882) Buckles v. King County 191 F.3d 1127, *1133 (C.A.9(Wash.),1999)
6.  Purpose of statute that mandated that any person who under color of law subjected another to deprivation of his constitutional rights would be liable to the injured party in an action at law was not to abolish immunities available at common law, but to insure that federal courts would have jurisdiction of constitutional claims against state officials. Act March 3, 1875, 18 Stat.470. Butz v. Economou 438 U.S. 478, 98 S. Ct. 2894 (U.S.N.Y.,1978)
7.  "Officers of the government are at all times accountable to [the people] Com. v. Ellis, 429 Mass. 362, 371 (1999)
8.  "No officer of the law may set that law at defiance with impunity. Old Colony Trust Company v. City Seattle et al (06/01/26) 271 U.S. 426, 46 S. Ct. 552 Ed page 431. United States v. Lee, 106 U.S. 196, 220; Burton v. United States, 202 U.S. 244
9.  Not every action by a judge is in the exercise of his judicial function…it is not a judicial function for a judge to commit an intentional tort even though the tort occurs in the courthouse. When a judge is a trespasser of the law, when a judge does not follow the law, the judge loses subject matter jurisdiction and the judges' orders are void, of no legal force or effect." Yates v. Village of Hoffman Estates, Illinois, 209 F. Supp.757 (N.D. Ill. 1962)

10. "The claim and exercise of a Constitutional right cannot be converted into a crime" "a denial of them would be a denial of due process of law." Simmons v. United States, 390 U.S. 377 (1968)

11. Acts in excess of judicial authority constitute misconduct, particularly where a judge deliberately disregards the requirements of fairness and due process. Cannon v. Commission on Judicial Qualifications, (1975) 14 Cal. 3d 359, 371, 374 Gonzalez v. Commission on Judicial Performance, (1983) 33 Cal. 3d 359, 371, 374

12. "The innocent individual who is harmed by abuse of governmental authority is assured that he will be compensated for his injury." Owen v. City of Independence

13. When a State officer acts under a state law in a manner violative of the Federal Constitution, he comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart him any immunity from responsibility to the supreme authority of the United States." Scheuer v. Rhodes, 416 U.S. 232, 94 S. Ct. 1683, 1687 (1974)

14. "When a judicial officer acts entirely without jurisdiction or without compliance with jurisdiction requisites he may be held silly liable for abuse of process even though his act involved a decision made in good faith, that he had jurisdiction. U.S. Fidelity & Guaranty Co., 217 Miss. 576,64 So. 2d 697

15. "If a court is without its authority, its judgements and orders are regarded as nullifies. They are not voidable, but simply void, and form no bar to a recover sought, even prior to a reversal in opposition to them. The constitute no justification at all persons concerned in executing such judgements or sentences are considered, in law, as trespassers." Elliot v. Piersol, 1, Pet. 328, 340, 26 U.S. 328, 340 (1828)

16. Judges cannot invoke judicial immunity for acts that violate litigants civil rights; Robert Craig Waters. Tort & Insurance Law Journal, Spr. 1986 21 n3, p 509-516

17. The particular phraseology of the constitution of the United States confirms and strengthens the principle, supposed to be essential to all written constitutions, that a law repugnant to the constitutions is void, and that courts, as well as other department, are bound by that instrument." Marbury v. Madison, 1 Cranch 137 (1803)

18. The act of filing a suit against a governmental entity represents an exercise of the right of petition and thus invokes constitutional protection. City of Long Beach v. Bozek, 31 Cal.3d 527, at 533-534 (1982) Thomas v. Collins, supra, 323 U.S. 516, 531

19. The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws when he receives an injury. 1 Cranch 127 at 163 (1803)

20. As the U.S. Supreme Court has held, the right to petition for redress of grievances is among the most precious of the liberties safeguarded in the big of rights.Inseparable from the guaranteed rights entrenched in the First Amendment, the right to petition for redress of grievances occupies a 'preferred place' in our system of representative government and enjoys a 'sanctity and a sanction not permitting dubious intrusions.' Thomas v. Collins, 323 U.S. 516; 65 S. Ct. 315, 322.

21. It was not by accident or coincidence that the rights to freedom in speech were coupled in a single guarantee with the rights of the people to peaceably assemble and to petitions for redress of grievances." Thomas v. Collins, 323 U.S. 516; 65 S.Ct. 323

22. The purpose of the stature was to deter public officials from using the badge of their authority to violate persons' constitutional  rights and to provide compensation and other relief to victims of constitutional deprivations when that deterrence failed." Carey v. Piphus, 435 US 247, 253 (1978)

23. The essential elements of due process of law are notice, an opportunity to be heard, and the right to defend in an orderly proceeding." Fiehe v. R.E. Householder Co., 125 So. 2,7 (Fla 1929)

24. To dispense with notice before taking property is likened to obtaining judgement without the defendant having give been summoned. "Baltimore Mayor v. Scharf, 54, Md. 499, 519 (1880)

25. An orderly proceeding wherein a person is served with notice, actual or constructive, and has an opportunity to be heard and to enforce and protect his rights before a court have power to hear and determine the case. Kazubowski v. Kazubowski, 45 III.2d 405, 259, N.E. 2d 282, 190.

26. Aside from all else, 'due process' means fundamental fairness and substantial justice. Vaughn v. State, 3 Tenn. Crim. App. 54, 456 S.W. 2d 879,883

27. The innocent individual who is harmed by an abuse of governmental authority is assured that he will be compensated for this injury. Owen v. City of Independence

28. Due process of law and the equal protection of the laws are secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government. Duncan v. Missouri, 152 U.S. 377, 382 (1894)

29. Undoubtedly, the Fourteenth Amendment forbids any arbitrary deprivation of life, liberty, or property, and secures equal protection to all under like circumstances in the enjoyment of their rights...It is enough that there is no discrimination in favor of one against another of the same class....And due process of law within the mating

of the Fifth and Fourteenth Amendment is secured if the laws operate on all alike, and do not subject the individual to an arbitrary exercise of the powers of government." Giozza v. Tiernan, 148 U.S. 657,662 (1893)

30. Our whole system of law is predicated on the general fundamental principle of equality of application of the law. 'All men are equal before the law' "This is a government of laws and not of men, 'No man is above the law' are all maxims showing the spirit in which legislatures, executives, and courts are expected to make execute and apply laws. But the framers and adopters of the Fourteenth Amendment were not content to depend upon the spirit of equality which might not be insisted on by local public opinion. They therefore embodied that spirit in a specific guaranty." Truax v. Corrigan, 257, U.S. 312, 332

31. The assertion of federal rights when plainly and reasonably made, are not to be defeated under the name of local practice. Davis v. Wechler, 263, U.S. 22, 24; Stromberb v. California, 283 U.S. 359; NAACP v. Alabama, 375, U.S. 449.

32. The Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land, and the Judges in ever State shall be bound thereby, any Thing in the Constitution of Laws of any stat to the Contrary notwithstanding." (Article VI United States Constitution)

33. Any Judge who does not comply with his oath to the Constitution of the United States wars against that Constitution and engages in acts in violation of the supreme law of the land. The judge is engaged in acts of treason. Cooper v. Aaron, 358 U.S. 1, 78 Ct. 1401 (1958); Sawyer, 124 U.S. 200 (188); U.S. v. Will 449 U.S. 200, 216, 101 S.Ct 471, 66 L. Ed. 2d 392, 406 (1980); Cohens v. Virginia, 19 U.S. (6 Wheat) 264, 404, 5 L, Ed 257 (1821)

34. Our own experience is fully consistent with the common law's rejection of judicial immunity. We never have had a rule of judicial immunity. At least seven circuits have indicated affirmatively that there is no immunity...to prevent irreparable injury to a citizen's constitutional rights." Pulliam v. Allen, 466 U.S. 522 (1984); 104 S. Ct. 1781, 1980, 1981, 1985

35. When a judge acts intentionally and knowingly to deprive a person of his constitutional rights he exercises no discretion or individual judgement; he acts no longer as a judge, but as a 'minister' of his own prejudices, [386 U.S. 547, 568] Pierson v. Ray, 386 U.S. 547 (1967) 386 U.S. 547 Pierson et al v. Ray et al

36. Jurisdiction may be lost and in such case proceedings cannot be validly continued beyond the point at which jurisdiction ceases" FTC v. Raladam Co., 283 U.S. 643, 75 L. Ed. 1324, 51 S Ct. 587

37. Acting without evidence when evidence is required, or making decisions contrary to all evidence, are just as much jurisdictional error as is the failure to take proper steps to acquire jurisdiction at the beginning of the proceeding. Borgnis v. Falk Co., 133 N.W. 209

38. No sanction can be imposed absent proof of jurisdiction" Standard v. Olesen, 74 S. Ct.

39. Once Jurisdiction is challenged it must be proved. Hagans v. Levine, 415 U.S. 533, n.3

40. Without jurisdiction, the acts or judgements of the court are void and open to collateral attack. McLean v. Jephson, 123 N.Y. 142, 25 N.E. 409

41. When a judge does not follow the law, the judge loses subject matter jurisdiction and the judges orders are void, of no legal force or effect.